GRAHAM**HOLLIS** APC
Graham S.P. Hollis (SBN 120577)
ghollis@grahamhollis.com
Vilmarie Cordero (SBN 268860)
vcordero@grahamhollis.com
Hali M. Anderson (SBN 261816)
handerson@grahamhollis.com
3555 Fifth Avenue, Suite 200
San Diego, California 92103
Telephone: 619.692.0800
Facsimile: 619.692.0822

Attorneys for Plaintiffs PAMELA STEWART
and ZULEKHA ABDUL

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAMELA STEWART and ZULEKHA ABDUL, individually and on behalf of all similarly situated and aggrieved employees of Defendants in the State of California,<br><br>Plaintiffs,<br><br>v.<br><br>QUEST DIAGNOSTICS CLINICAL LABORATORIES, INC. and DOES 1 THROUGH 50, inclusive,<br><br>Defendants. | Case No.: 3:19-cv-02043-TWR-KSC<br><br>**DECLARATION OF JON KROSNICK IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>Date:          February 19, 2021<br>Time:          1:30 p.m.<br>Courtroom:     3A<br>Judge:         Hon. Todd Robinson<br><br>FAC Filed:<br>Complaint Filed: September 13, 2019 |

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

*GRAHAM**HOLLIS** APC*
*3555 FIFTH AVENUE SUITE 200*
*SAN DIEGO, CALIFORNIA 92103*

1

I, Jon Krosnick, hereby declare as follows:

## I.    INTRODUCTION AND BACKGROUND OF OPINION

1.    I am the Frederic O. Glover Professor of Humanities and Social Sciences and a Professor of Communication, Political Science, and (by courtesy) Psychology at Stanford University in Stanford, California, a Research Psychologist at the U.S. Census Bureau, and a Research Advisor of the Gallup Organization.  I am over age 18 and a resident of California.  I have personal knowledge of each of the matters stated herein, and if called to testify, I can and will testify competently about them.

2.    I have been retained by GrahamHollis APC in this matter to provide my opinions relating to whether a reliable survey can be conducted of some employees of Quest Diagnostics.  I understand that this Expert Declaration will be submitted in support of Plaintiff's Motion for Class Certification.

3.    A recent full curriculum vitae is attached to this declaration as Appendix A. In the paragraphs immediately below, I summarize some important aspects of my qualifications and background.

4.    I received an A.B. degree in psychology from Harvard University and M.A. and Ph.D. degrees in social psychology from the University of Michigan.  As a part of my undergraduate and graduate studies, I received extensive training in social psychology, survey and experimental research techniques, and statistical data analysis, and political science.

5.    From 1986 to 2004, I was a member of the faculties in Psychology and Political Science at The Ohio State University.  My position there involved teaching classroom courses for undergraduates and graduate students, as well as one-on-one training of graduate students in research methods.  Since 2004, I have done similar work at Stanford University.

6.    My research has been recognized by the Erik H. Erikson Early Career Award, by election as a Fellow of the American Academy of Arts and Sciences, by election as a Fellow of the American Association for the Advancement of Science, by two fellowships at the Center for Advanced Study in the Behavioral Sciences, and by election as a Fellow

GRAHAM**HOLLIS** APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103

**DECLARATION OF JON KROSNICK ISO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

by the American Psychological Association, the American Psychological Society, and the Society for Personality and Social Psychology. I was awarded the Nevitt Sanford Award from the International Society of Political Psychology. And I was awarded the lifetime career achievement award from the American Association for Public Opinion Research, the world's leading professional organization of survey researchers.

7.    I have authored or co-authored seven published books and two forthcoming, more than 160 articles published or in press in journals or edited books, over 250 research presentations at professional conferences, and more than 250 invited addresses at universities and to government agencies, businesses, and in other settings. My journal articles have been selected by editors for reprinting in edited books more than 15 times. My journal articles have appeared in top-ranked journals in social psychology (Journal of Personality and Social Psychology, Journal of Experimental Social Psychology), political science (American Political Science Review, American Journal of Political Science), survey research methods (Public Opinion Quarterly), and sociology (American Sociological Review, American Journal of Sociology).

8.    Much of my research has focused on survey research methods, including how best to measure experiences, behaviors, and opinions through surveys, and almost all of my research has involved collection and analysis of survey data.

9.    There are several other indicators of my competence as an expert on social science research methods. First, I have served on the editorial board of the most prestigious journals in social psychology (Journal of Personality and Social Psychology) and in survey research methods (Public Opinion Quarterly). Second, I regularly serve as a reviewer for other journals, publishers, and professional organizations. Third, I have received more than 100 grants to support my research. Fourth, I have served on the Board of Overseers of the General Social Survey and was on the board of and co-Principal Investigator of the American National Election Studies, which are the nation's leading academic survey research projects studying the public's opinions and behaviors. Fifth, I have been teaching research methodology since the early 1980s and have been invited to give lectures and teach courses on research methodology to the research staffs of federal agencies in

Washington, D.C., and at many professional organizations and universities around the U.S., as well as in the United Kingdom, the Netherlands, South Africa, Canada, and elsewhere.

10.    I have been asked to offer an opinion about whether survey research methodology can be used to acquire reliable data on the experiences of employees who worked for Quest Diagnostics.  To address this issue, I have reviewed case-specific documents supplied to me by plaintiffs' counsel:

a.    Plaintiff Stewart's Motion for Class Certification and Appointment of Class Representative and Class Counsel;

b.    Declaration of Courtney Castellanos;

c.    Declaration of Heather Sprinkle;

d.    Declaration of LaQuinta Carraway;

e.    Declaration of Myrtle Franklin;

f.    Declaration of Hilda Thomas;

g.    Declaration of Kate Christopherson;

h.    Declaration of Marisol Balderas;

i.    Declaration of Jenae Prim;

j.    Deposition of Tiffani Walten

I have drawn upon my pre-existing knowledge of the literatures on survey research methods and related fields.

11.    As a result of my review of this body of evidence, I have reached the conclusion that a survey can be feasibly administered using best practices for application in this case.  In this document, I explain my reasoning justifying this conclusion.

12.    My comments below are organized in the following manner.  I begin by explaining my assignment in this case regarding the conduct of a survey.  Then I explain the logic and theory underlying survey research methods and the principles that justify generalizing from a systematically selected sample of people to the full population from which they are drawn.  Next, I review the uses of surveys in court and the valuable roles

GRAHAM**HOLLIS** APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103

**DECLARATION OF JON KROSNICK ISO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

1  they can play in general and in this case in particular.  I then review some general

2  procedures that can be implemented to conduct a survey in this case.  In all of those

3  discussions, I consider possible challenges entailed in conducting a survey in this case and

4  explain how I will manage each of them.  Finally, I outline the specific steps that can be

5  taken to implement a survey to provide useful data for the Court in this case.

6  ## II.  ASSIGNMENT IN THIS CASE

7  13.    My assignment in this case has been to consider the possibility of designing a

8  survey to administer to a specific list of employees of Quest Diagnostics to assess (1)

9  whether California Patient Service Representatives (CPSRs) were ever told that they are

10  entitled to be free of duty for 10 minutes of uninterrupted time for a rest period compliant

11  with California employment law, (2) whether CPSRs were impeded or discouraged from

12  taking rest periods, (3) whether CPSRs were ever told that, under California law, they were

13  entitled to premium payments for missed rest breaks, (4) whether CPSRs were told how to

14  request payment of a rest period premium for each missed rest break, (5) whether any Quest

15  Diagnostics employee took any steps to authorize and permit CPSRs to take rest breaks to

16  which they were entitled under California law, (6) how often CPSRs took uninterrupted

17  duty-free rest breaks of at least 10 minutes as prescribed by California law, (7) how much

18  time CPSRs spend with patients providing treatment, to allow for calculation of whether it

19  is possible to meet all job requirements while taking rest breaks prescribed by California

20  law, and (8) what formal education, training, and professional experience CPSRs have that

21  may influence their hourly compensation rate, to allow for assessment of the presence of

22  racial disparities.  I have also been asked to consider whether, in conjunction with

23  employer-provided records of all time worked by and all payments made to CPSRs, I can

24  use the survey's results to calculate damages owed to class members under California law

25  for missed rest breaks.

26  ## III.  SURVEY RESEARCH METHODS

27  14.    Survey research is a well-established and solidly respected scientific approach

28  to measuring the behavior, attitudes, and beliefs of populations of individuals (Babbie,

1990, Survey research methods; Belmont, CA: Wadsworth; Weisberg, Krosnick, &

GRAHAM**HOLLIS** APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103

Bowen, 1996, <u>An introduction to survey research, polling, and data analysis</u>. Thousand Oaks, CA: Sage). Conducting a survey research study typically involves four principal phases: (1) defining a population of people to be described by the survey, (2) identifying members of that population to be interviewed (called the "intended respondents"), (3) collecting data from as many of those intended respondents as possible, and (4) analyzing the data generated to answer the questions of interest. Surveys are usually done for one or both of two reasons: (1) to document the prevalence of some characteristic in a population, and/or (2) to document causal processes that produce behaviors, beliefs, or attitudes.

15.    Once the population to be described by a survey has been specified (e.g., all adults ages 18 and older living in the United States or all people who worked at Walgreens during a specific time period), a researcher can identify the intended respondents in one of two ways. If the population is small enough, the researcher can seek to collect data from every member of the population. Doing so is referred to as conducting a census. But when a population is large, a subgroup of those individuals can be randomly selected, and that group of intended respondents will closely mirror the entire population in every regard (Van der Vaart, A. W. (1998). <u>Asymptotic statistics</u>. New York: Cambridge University Press).

16.    Although the word "random" has taken on the meaning "non-systematic" or "arbitrary" in contemporary informal, everyday conversations, the technical, scientific meaning of this term is anything but arbitrary. "Random" has a very specific, technical, and non-arbitrary definition in science, and randomization is one of the most valuable scientific tools, because it allows researchers to reach two sorts of conclusions. In one of its forms, random selection from a population is accomplished by using a method to select a subset of the population such that each member of the population has a known, non-zero probability of being chosen.

17.    One way to understand random selection is as follows. Imagine that we begin with a list of all people in a population (e.g., all adults living in the United States – about 250,000,000 people). Beginning at the top of the list, we can flip an unbiased coin for each person. An unbiased coin is one for which the result of any given coin flip cannot be

GRAHAM**HOLLIS** APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103

predicted in any way – it has a 50% chance of landing with heads up, and a 50% change of landing with tails up.  If the coin lands with heads up for a person, that person can be kept on the list.  If the coin lands tails up for a person, we can remove that person from the list.  After this first round of coin flipping, about half of the people will remain on the list.  Then we can go to the beginning of the new list and repeat the coin flipping process for each remaining person again.  This will lead to the removal of about half of the people on that list.  This process can be repeated over and over until we have, say, 1,000 American adults remaining on the list who resemble the population very closely in terms of the percent of men, the percent of women, the percent of old people, the percent of young people, the percent who have graduated from college, the percent with red hair, and all other attributes.  Every attribute will be present in almost exactly the same amount among the 1,000 people as among the entire population from which they were drawn randomly.  This is a procedure called "simple random sampling".

18.    Randomization has also been employed in thousands of scientific experiments. Consider, for example, randomized clinical trials in which a researcher wishes to determine whether a drug helps people suffering from an affliction. In particular, consider a researcher who wishes to learn whether an analgesic reduces pain from headaches. The researcher could give the drug to a group of people who report often suffering from headaches and, a month later, could ask those people whether their headache pain has been less than it was before they were given the drug. But if the month began at the beginning of April, and many of the headaches people experienced during that time were due to allergic reactions to pollen released by newly-blooming plants and flowers at the beginning of April, then people may report less pain not as the result of taking the drug but instead because of the disappearance of the stimulating pollen mid-month.

19.    To avoid this artifact, the researcher can compare reports of headache pain from a group of people given the drug with reports of headache pain from a group of people not given the drug. But imagine that the researcher collected data from the first group of people by giving them the drug at the beginning of April and measuring headache pain at the end of April, and the researcher collected data from people not given the drug by asking

GRAHAM**HOLLIS** APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103

7

about their headache pain during the month of May. Again, the difference between these two groups could be because less pollen in May caused headaches then to be less painful.

20.    This ambiguity can be eliminated by random assignment. This randomization would again be done using a truly random device, such as an unbiased coin. If we begin with a group of people who agree to participate in an experiment on analgesics and flip the unbiased coin for each of those people, we can separate them into two groups (one whose coins land heads up, and the other whose coins land tails up) that are essentially identical to one another in every regard.

21.    If one of those groups is then given the analgesic to use when experiencing headaches in April, and the other group is not given the analgesic to use during the same time period, the difference between the two groups in their reports of headache pain will be attributable to the impact of the drug (if a statistical test indicates that that difference had a small probability of occurring by chance alone). This reasoning is only possible because participants were randomly assigned to the two groups. Randomization in this sense eliminates all artifacts.

22.    But imagine that the people who participated in the experiment on headache pain were all 18-year-old men. Do the results of the study apply to 18-year-old women as well? Or to older men and women? There is no way to know, so a researcher who studies only 18-year-old men has no legitimate scientific basis to claim that the obtained study results show that the drug helps adults generally. Fortunately, randomization can be used in the selection of intended participants to eliminate this ambiguity. The participants in a study can be randomly selected from the population of interest, and the results can then legitimately be viewed as descriptive of the population.

23.    If random sampling from the population is not implemented to select intended participants, there is no scientific basis to justify generalizing the results of a study from a group of participants to any larger population of people. According to William Barber (Barber, W. G. (2011). The universe. In Diamond S. S., & Swann, J. B., Trademark and deceptive advertising surveys: Law, science, and design. Chicago, IL: American Bar Association), random sampling "produces the most statistically reliable results" (p. 47).

Graham**Hollis** APC
3555 Fifth Avenue Suite 200
San Diego, California 92103

8

24.    If simple random sampling is done, statistical principles permit precise documentation of the expected degree of deviation of the intended sample to the population due to what is called "sampling error."   For example, imagine that a random sample of 1,000 people is drawn from the entire adult population of the U.S. as described above.  And imagine that the proportion of the population that is female is 51%, and the proportion of the random sample that is female is designed by the letter "p".  If a random sample of 1,000 people is drawn from the population 100 times, in 95 percent of those random samples, the observed proportion of females will be within the "confidence interval" around the observed proportion p, that is between (p-SE) and (p+SE), where:

$$SE = \pm\ 1.96\ \sqrt{p(1-p)/(N-1)}$$

As the size of the random sample approaches the size of the total population, SE gets a bit smaller than the formula above suggests.  But when the random sample is much smaller than their relevant populations, the formula above accurately describes the sampling error involved.

25.    Illustrated more concretely, if 38% of 1,000 people in a random sample of American adults said that their favorite color was blue, the sampling error of that proportion is:

$$SE = \pm\ 1.96\ \sqrt{.38(1-.38)/(1,000-1)}\ = \pm\ 3\%$$

This means that if 100 random samples were drawn from the population, in 95 of them, the observed proportion of people saying blue was their favorite color would fall between 35% (38% - 3%) and 41% (38% + 3%).

26.    Billions of dollars are spent every year conducting surveys around the world. The U.S. federal government is a one of the largest producers of survey data.  For decades, federal agencies have sponsored ongoing surveys to track contemporary life in America in a wide array of domains.  Below is a small subset of the survey research projects that have been funded by the U.S. government continuously, beginning in the years shown and sponsored by the agencies in parentheses:

•    Survey of Income and Program Participation (Census Bureau)

GRAHAM**HOLLIS** APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103

9

**DECLARATION OF JON KROSNICK ISO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

1984 -

- Consumer Expenditure Surveys (Census Bureau) 1968 -

- Annual Housing Surveys (Census Bureau) 1973 -

- Survey of Consumer Attitudes and Behavior (National Science Foundation) 1953 –

- Health and Nutrition Examination Surveys (National Center for Health Statistics) 1959 -

- National Health Interview Surveys (National Center for Health Statistics) 1970 -

- American National Election Studies (National Science Foundation) 1948 -

- Panel Study of Income Dynamics (National Science Foundation) 1968 –

- General Social Survey (National Science Foundation) 1972 –

- National Longitudinal Survey (Bureau of Labor Statistics) 1964

- Behavioral Risk Factor Surveillance System (Centers for Disease Control and Prevention) 1984 –

- Monitoring the Future (National Institute of Drug Abuse) 1975 –

- Continuing Survey of Food Intake by Individuals (Department of Agriculture) 1985 –

- National Aviation Operations Monitoring System (National Aeronautics and Space Administration) 2002 –

- National Survey of Drinking and Driving (National Highway Traffic Safety Administration) 1991 –

- National Survey of Family Growth (National Center for Health Statistics) 1973 –

- National Survey of Fishing, Hunting, and Wildlife-Associated Recreation (Census Bureau) 1991 –

- National Survey of Child and Adolescent Well-Being

**DECLARATION OF JON KROSNICK ISO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

GRAHAM**HOLLIS** APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103

(Department of Health and Human Services) 1997 –

- Survey of Earned Doctorates (Science Resources Statistics Program, National Science Foundation) 1958 –

- National Survey on Drug Use and Health (Department of Health and Human Services) 1971 –

- Youth Risk Behavior Surveillance System (Department of Health and Human Services) 1990 –

- National Crime Victimization Survey (Bureau of Justice Statistics) 1973 –

- Schools and Staffing Survey (National Center for Educational Statistics) 1987 –

- Educational Longitudinal Survey (National Center for Educational Statistics) 2002 –

- Current Employment Statistics Survey (Bureau of Labor Statistics) 1939 –

27.     Just a few of the many other major surveys sponsored by federal agencies over the years include:

- National Survey of Distracted and Drowsy Driving (National Highway Traffic Safety Administration)

- National Survey of Veterans (Department of Veterans Affairs)

- National Survey of Children's Health (Health Resources and Services Administration's Maternal and Child Health Bureau)

- National Survey of Recent College Graduates (Science Resources Statistics Program, National Science Foundation)

- National Survey of Speeding and Other Unsafe Driving Actions (National Highway Traffic Safety Administration, Department of Transportation)

28.     Survey data form the basis of many important government policy-making

DECLARATION OF JON KROSNICK ISO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

decisions.  For example, economists at the Federal Reserve and other agencies pay close attention to the federal unemployment and inflation rates, both of which are calculated using data from national surveys.  The many other federal agencies listed above collect survey data because those data are used in on-going decision-making.

29.     The widespread use of survey research findings by government agencies has been paralleled by a striking growth in the use of survey data in academic research done at colleges and universities, across the social sciences. Whereas survey data appeared in articles in top journals in political science, economics, social psychology, and sociology in 1949 at a rate of 3%, 6%, 22%, and 24%, respectively, these figures had increased by 1994 to 42%, 42%, 50%, and 70%, respectively (Presser, S. (1984). The use of survey data in basic research in the social sciences.  In C. F. Turner and E. Martin (Eds.), <u>Surveying subjective phenomena</u>.  New York: Russell Sage Foundation; Saris, W. E., Gallhofer, I., van der Veld, W., & Corten, I. (2003).  <u>A scientific method for questionnaire design: SQP</u>. Amsterdam: University of Amsterdam).

30.     Decades of research have shown that the reliability and validity of optimally-collected survey data are generally quite high.  For example, surveys conducted just before U.S. presidential elections predict the actual election vote results very closely (see, e.g., Visser, P. S., Krosnick, J. A., Marquette, J., & Curtin, M.  (1996). Mail surveys for election forecasting?  An evaluation of the Columbus Dispatch poll.  <u>Public Opinion Quarterly</u>, 60, 181-227, Visser, P. S., Krosnick, J. A., Marquette, J., & Curtin, M. (2000). Improving election forecasting: Allocation of undecided respondents, identification of likely voters, and response order effects.  In P. Lavrakas & M. Traugott (Eds.), <u>Election polls, the news media, and democracy</u>.  New York, NY: Chatham House).  Even when there is error in such survey measurements (and there is), the error is not huge in percentage point terms (bearing in mind that a small shift in percentages can change the winner of a close election). For example, since 1936, the percent of votes won by the winner has correlated with the Gallup Poll's pre-election prediction of that percentage .85, a nearly perfect association. [1]

---

[1] Correlations can range from 1 (meaning a perfect match between the variables) to 0 (meaning a relation between the variables no better than chance) to -1 (meaning a perfect inverse relation between the variables).

**DECLARATION OF JON KROSNICK ISO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

Graham**Hollis** APC
3555 Fifth Avenue Suite 200
San Diego, California 92103

Likewise, since 1948, the American National Election Study surveys' post-election measurements of the proportions of votes won by the winning presidential candidate have correlated with official government vote counts .92, again nearly perfect.

31.    Pre-election polls using scientific methods and random sampling continue to be highly accurate.  Consider these examples, which are all final scientific pre-election polls done with random national samples of voters contacted by random digit dialing to landlines and cell phones predicting the proportions of the nation's votes cast in the 2016 U.S. Presidential Election:

| Candidate | Actual Election Results | Bloomberg | ABC/ Washington Post | Fox News | NBC/ Wall Street Journal | CBS News |
|---|---|---|---|---|---|---|
| Clinton | **48%** | 48% | 50% | 50% | 48% | 48% |
| Trump | **46%** | 45% | 45% | 45% | 44% | 44% |

32.    Equally striking are the results of the Monthly Survey of Consumer Attitudes and Behavior, conducted continuously by the University of Michigan's Survey Research Center since 1970.  Each month, a representative national sample of American adults has been asked what they expect to happen to the unemployment and inflation rates in the future (as well as many other topics), and their aggregated answers have predicted later changes in actual unemployment and inflation remarkably well (correlations of .80 and .90, respectively, between 1970 and 1995).  This is testimony not only to the aggregated wisdom of the American public but also to the ability of scientific surveys to measure that wisdom accurately.

33.    A series of studies conducted over the last 20 years have assessed the accuracy of random sample surveys in measuring a wide variety of attributes of the American public, including how many people have a valid driver's license, have a valid passport, are married, are a U.S. citizen, ever served in the armed forces, have food allergies, have donated blood, are particular height and weights, have visited hospitals, and many more.  These studies have documented very high levels of accuracy (Chang, L., & Krosnick, J. A. (2009).

GRAHAM**HOLLIS** APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103

National surveys via RDD telephone interviewing vs. the Internet: Comparing sample representativeness and response quality. Public Opinion Quarterly, 73, 641-678; MacInnis, B., Krosnick, J. A., Ho, A. S., & Cho, M-J. (2018). The accuracy of measurements with probability survey samples: Replication and extension. Public Opinion Quarterly, 82, 707-744; Yeager, D. S., Krosnick, J. A., Chang, L., Javitz, H. S., Levendusky, M. S., Simpser, A., & Wang, R. (2011). Comparing the accuracy of RDD telephone surveys and Internet surveys conducted with probability and non-probability samples. Public Opinion Quarterly, 75, 709-747; for a review, see Cornesse, C., Blom, A., Dutwin, D., Krosnick, J. A., DeLeeuw, E., Legleye, S., Pasek, J., Pennay, D., Philips, B., Sakshaug, J., Struminskaya, B., & Wenz, A.  (in press).  A review of conceptual approaches and empirical evidence on probability and nonprobability sample survey research.  Journal of Survey Statistics and Methodology).

34.    This high level of accuracy can be achieved if optimal procedures are implemented to conduct a survey, and departures from such procedures can significantly compromise the accuracy of a survey's findings.  Necessary include either conducting a census or drawing a random sample of intended respondents from the population, taking extensive steps to collect data from as many sampled people as possible, optimizing the choice of survey mode to achieve accurate measurements, asking questions that are easily comprehensible and do not entail biased wording or format, weighting results to correct for unequal sampling probabilities, and much more.

## IV.    USES OF SURVEYS IN COURT

35.    Surveys have been admitted routinely in court as evidence suitable for use by an expert to form an opinion.  Diamond (2000) provided a history of the uses of surveys in court in her chapter, Reference Guide on Survey Research (2nd edition; in Reference Manual on Scientific Evidence. Washington, D.C.: Federal Judicial Center, 229-276).  She wrote:

"Thirty years ago, the question whether surveys constituted acceptable evidence still was unsettled. Early doubts about the admissibility of surveys centered on their use of sampling techniques and their status as hearsay evidence.  Federal

Graham**Hollis** APC
3555 Fifth Avenue Suite 200
San Diego, California 92103

14

Rule of Evidence 703 settled both matters by redirecting attention to the "validity of the techniques employed." The inquiry under Rule 703 focuses on whether facts or data are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." In the case of a survey, the question becomes, "Was the poll or survey conducted in accordance with generally accepted survey principles, and were the results used in a statistically correct way?"

"Because the survey method provides an economical and systematic way to gather information about a large number of individuals or social units, surveys are used widely in business, government, and, increasingly, administrative settings and judicial proceedings. Both federal and state courts have accepted survey evidence on a variety of issues. … Surveys of employees or prospective employees are used to support or refute claims of employment discrimination. Requests for a change of venue on grounds of jury pool bias often are backed by evidence from a survey of jury-eligible respondents in the area of the original venue. … A routine use of surveys in federal courts occurs in Lanham Act cases, where the plaintiff alleges trademark infringement or claims that false advertising has confused or deceived consumers. The pivotal legal question in such cases virtually demands survey research because it centers on consumer perception (i.e., is the consumer likely to be confused about the source of a product, or does the advertisement imply an inaccurate message?). In addition, survey methodology has been used creatively to assist federal courts in managing mass torts litigation. Faced with the prospect of conducting discovery concerning 10,000 plaintiffs, the plaintiffs and defendants in *Wilhoite v. Olin Corp.* jointly drafted a discovery survey that was administered in person by neutral third parties, thus replacing interrogatories and depositions. It resulted in substantial savings in both time and cost. (Diamond, 2000, p. 227-228)."

36.    The value of surveys in court was affirmed by Jay and Levine (2005; Litigation surveys. In S. J. Best and B. Radcliff (Eds.), Polling America: An encyclopedia of public opinion. Westport, CT: Greenwood Press):

"Litigation surveys benefit the legal process by providing information on

GRAHAM**HOLLIS** APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103

disputed issues that could not feasibly be presented in court through conventional means. In class-action lawsuits, mass torts litigation, or other court cases involving numerous plaintiffs who are potential witnesses, survey evidence presented by a single witness effectively can substitute for the testimony of hundreds, even thousands. This can shorten the litigation process, reduce litigation costs, and ease court congestion. Moreover, survey evidence derived from a representative sample of a large proposed class of potential witnesses may in fact prove more reliable than the testimony of a few individuals selected from that proposed class, since a few handpicked witnesses may not be truly representative of the whole. A clear preference for survey evidence in appropriate cases has been expressed by the federal judiciary through litigation reference materials published by the Federal Judicial Center. (Jay & Levine 2003, p. 433)"

37.    These characterizations of the value of surveys in court are directly applicable to the present case. Rather than spending the time and money necessary to collect information about consumer experiences from the entire affected proposed class or an arbitrary subgroup of them through direct testimony, a survey can be conducted to efficiently collect scientifically projectable results that will describe the entire proposed class within a specifiable margin of error.

38.    When surveys are presented in court, it is not uncommon for the plaintiff or defendant to have designed and conducted the survey, seeking to enter it as a basis for an expert opinion. In such situations, the opposing party often elicits testimony from an alternative expert, who evaluates the methodology used in the survey, seeking to find faults in it. This can leave the court uncertain about the reliability of the survey evidence.

39.    For this reason, it is very appealing to consider following the protocol implemented in *Wilhoite v. Olin Corp.* and described by Diamond (2000, p. 227-228): "the plaintiffs and defendants in *Wilhoite v. Olin Corp.* jointly drafted a discovery survey that was administered in person by neutral third parties, thus replacing interrogatories and depositions. It resulted in substantial savings in both time and cost."

40.    Survey research methodology is now a solid science, with widely agreed-upon

GRAHAM**HOLLIS** APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103

**DECLARATION OF JON KROSNICK ISO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

principles of optimal design for sampling, questionnaire construction, data collection, and data analysis. Experts in this field routinely belong to and attend annual conferences sponsored by professional associations such as the American Association for Public Opinion Research and subscribe to journals such as Public Opinion Quarterly, the Journal of Official Statistics, the International Journal of Public Opinion Research, and other such periodicals to track the latest advances in survey methodology. Accomplished experts can come together to collaborate on the design of a survey and produce an approach that conforms to current best practices standards in the field. Doing so would allow the court to forego the "battling experts" phenomenon and to efficiently produce evidence suitable for resolving this case.

## V.    THE THEORY OF MEASUREMENT IN SURVEY RESEARCH

41.    For nearly a century, survey research methodology has been routinely used to generate statistics on populations, such as the experiences of Quest CPSRs related to taking of rest breaks. It might seem that in order to yield an accurate characterization of a population (in this case, all Quest CPSRs), the measurements made of every randomly selected respondent must be exactly accurate. That is, if even a single respondent misreports anything in a survey, then it might seem as if such an error by this individual dooms the survey's aggregate statistics on the population to be inaccurate. But this is not true.

42.    A helpful framework for understanding this truth is "classical true score theory" (e.g., Lord, F. M., & Novick, M. R. (1968). *Statistical theories of mental test scores*. Reading, MA: Addison-Wesley Publishing Company). Classical true score theory is built on the assumption that any measurement of a person may be inaccurate. For example, if I seek to measure a man's height by holding a tape measure next to him on three occasions, I may reach slightly different conclusions because of the angle at which I observe the top of his head and the markings on the tape measure and the exact location of the tape measure.

43.    According to classical true score theory, this variation can be thought of in terms of the following equation (Lord & Novick, 1968, pp. 32-34):

Graham**Hollis** APC
3555 Fifth Avenue Suite 200
San Diego, California 92103

**DECLARATION OF JON KROSNICK ISO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

$$y = \tau + \varepsilon$$

where y is a person's answer to a survey question, such as whether he or she asked not to receive telemarketing calls. That answer is thought to be a function of two causes: $\tau$, which is the truth for that person, and $\varepsilon$, which is random measurement error. Just as randomness can be used constructively to build an intended sample of respondents from a population and can be used to create two equivalent groups of participants in an experiment, randomness causes deviations between true scores and measures of them.

44. This is why, for example, a huge literature in psychology has developed over decades measuring attributes of people by asking large sets of questions. When Thurstone proudly announced with the title of his landmark journal article that "attitudes can be measured", he described a procedure for building a large set of questions to be asked of a person, and answers to those questions are combined to yield a single score for the person (Thurstone, L. L. (1928). Attitudes can be measured. <u>American Journal of Sociology</u>, <u>33</u>, 529-554). The purpose of doing so is built on the foundational notion of random measurement error – that each measurement contains some such error, but combining together such measurements causes the random errors to cancel each other out (which must happen, of necessity, according to the basics of statistics), yielding a reliable measurement of the attitude of interest. Over almost 100 years since then, this same principle has guided the development of hundreds of measures of personality, each of which includes many questions tapping the same attribute of people and that are mathematically aggregated to yield a reliable measure of self-esteem (Blascovich, J. & Tomaka, J. (1993). <u>Measures of self-esteem</u>. pp. 115–160 in Robinson, J. P., Shaver, P. R., & Wrightsman, L. S. (Eds.), Measures of personality and social psychological attitudes. Third Edition. Ann Arbor: Institute for Social Research), "need for cognition" (Cacioppo, J. T., & Petty, R. E. (1982). The need for cognition. <u>Journal of Personality and Social Psychology</u>, 42, 116-131), agreeableness (Costa, P.T., & McCrae, R.R. (1992). <u>Revised NEO Personality Inventory (NEO-PI-R) and NEO Five-Factor Inventory (NEO-FFI) manual</u>. Odessa, Florida: Psychological Assessment Resources), and countless other attributes of people (Robinson, J. P., Shaver, P. R., & Wrightsman, L. S. (Eds.), <u>Measures of personality and social</u>

GRAHAM**HOLLIS** APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103

18

GRAHAM**HOLLIS** APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103

psychological attitudes. Third Edition. Ann Arbor: Institute for Social Research).

45.    Thus, it is possible that in a survey, some respondents or many respondents or even every single respondent may answer a question inaccurately, and yet the aggregation of all of those answers into a single survey statistic can be exactly correct.  That is, even if every consumer mis-characterizes his or her behavior, the combination of those reports for a sample of participating survey respondents may be exactly correct in characterizing the population as a whole.   In other words, combining together a great deal of random measurement error makes the error disappear in an aggregate statistic.  This notion that individuals' estimates can be thought of as draws from underlying probability distributions and therefore include a component of random measurement error has been supported by an array of other empirical research (e.g., Hourihan, K. L., & Benjamin, A. S. (2010). Smaller is better (when sampling from the crowd within): Low memory-span individuals benefit more from multiple opportunities for estimation. Journal of Experimental Psychology: Learning, Memory, and Cognition. 36, 1068–1074; Steegen, S., Dewitte, L., Tuerlinckx, F., & Vanpaemel, W.  (2014). Measuring the crowd within again: A pre-registered replication study. Frontiers in Psychology, 5, 786; Vul, E., & Pashler, H. (2008). Measuring the Crowd Within: Probabilistic Representations Within Individuals. Psychological Science, 19, 645–647).

46.    Indeed, this is the principle behind the intuitive notion of the wisdom of the crowd (Aristotle: *Politics* III.1281b. Translated by H. Rackham, Loeb Classical Library; Galton, F. (1907/1949). "Vox populi". Nature. 75, 450–451; Landemore, H. (2012). Collective Wisdom—Old and New. In Landemore, H.; Elster, J. (Eds.). Collective wisdom : principles and mechanisms. Cambridge: Cambridge University Press; Ober, J.  (2013). Democracy's wisdom: An Aristotelian middle way for collective judgment. American Political Science Review, 107, 104-122).  The relevant version of this notion is that simple aggregation of individual judgments made by many people independently often yields a more accurate result than the individuals' judgments taken alone (Lorenz, J., Rauhut, H., Schweitzer, F., & Helbing, D.  (2011).  How social influence can undermine the wisdom of crowd effect.  PNAS, 108, 9020-9025).

**DECLARATION OF JON KROSNICK ISO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

47.     A variety of scholars have introduced an additional term to the basic classical true score theory representation of measurement:

$$y = \tau + M + \varepsilon$$

where M is bias in measurement in a particular direction due to the method of assessment (see Saris, W. E., & Aalberts, C. (2003). Different explanations for correlated disturbance terms in MTMM studies. Structural Equation Modeling, 10, 193-214; Saris, W. E., Revilla, M., Krosnick, J. A., & Schaeffer, E. M. (2010). Comparing questions with agree/disagree response options to questions with item-specific response options. Survey Research Methods, 4, 61-79). Here, *M* represents the sum of all biases that may push a measurement in one direction of another. The goal of all measurement is to identify potential sources of bias, to minimize them during data collection, to empirically estimate their presence with obtained data, and to adjust data to eliminate the bias. This is the philosophy of all scientific measurement and is the approach I will take in conducting a study for this case.

## VI.    GENERAL DESIGN DECISIONS REGARDING A QUEST DIAGNOSTICS SURVEY

48.     Thus far, I have offered reasons to believe that a survey of consumers can be done efficiently and can accurately inform the Court. How, then, would the data be collected? A series of general methodological choices must be made, and I outline these choices below, along with considerations that influence how such choices should be made in this case.

Data Collection Mode

49.     One choice involves the mode of data collection. Many survey researchers believe that the highest response rates and most accurate measurements can be achieved if respondents are contacted face-to-face at their homes and are interviewed in person, and empirical evidence supports this belief (see, e.g., Holbrook, A. L., Green, M. C., & Krosnick, J. A. 2003. Telephone vs. face-to-face interviewing of national probability samples with long questionnaires: Comparisons of respondent satisficing and social desirability response bias. Public Opinion Quarterly, 67, 79-125). This method is extremely time-consuming and expensive and is used only in the highest visibility surveys done by

GRAHAM**HOLLIS** APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103

**DECLARATION OF JON KROSNICK ISO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

the federal government and academic researchers. Much more common and cost-effective are surveys conducted by telephone, paper-and-pencil questionnaires, or questionnaires administered via the Internet.

50.    When choosing among these three survey modes, it is important to consider the accuracy of the measurements obtained. First, consider the choice between telephone interviewing and a paper questionnaire. Dozens of published studies have compared information collected via telephone interviews with comparable information collected via paper questionnaires. Unfortunately, most of these studies involved design flaws (e.g., non-random assignment of individuals to survey modes, cross-over designs wherein the same respondent provides data in multiple modes, the use of different questionnaires in the different modes) that preclude reaching clear conclusions about differences between the modes in terms of results. And almost none of these studies reported any analyses comparing the validity of the measurements obtained via the two modes.

51.    One study that did make such a comparison and is especially relevant to the present case was conducted by Silver and Krosnick (Silver, M. D., & Krosnick, J. A. (2001). An experimental comparison of the quality of data obtained in telephone and self-administered mailed surveys with a listed sample. Paper presented at the American Association for Public Opinion Research Annual Meeting, Montreal, Canada). In this study, a representative sample of commercial airline pilots were each randomly assigned to be interviewed either by telephone or to complete paper questionnaires. Respondents were asked to report the number of times they had witnessed various types of safety-related events while working in the cockpit of a commercial airliner during a specific period of time. Respondents were randomly assigned to one of various different lengths of recall periods, ranging from one week to six months. If respondents reported event frequencies accurately, then there should be a linear relation between the number of days in the recall period and the number of safety-related events reported, mediated by the number of hours flown in the recall period by each pilot. That is, the longer a pilot's assigned recall period, the more hours he or she should have flown, and the more hours a pilot flew, the more safety-related events he or she should have witnessed. The more measurement error was

Graham**HOLLIS** APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103

21

1   contained in answers to the event frequency questions, the weaker the relation between

2   these variables would have been.  Therefore, the strength of this statistical relation can be

3   viewed as a measure of the validity of the reports provided.

4       52.    Silver and Krosnick (2001) found the relation between hours flown and

5   number of events reported to be 20% stronger among respondents interviewed by telephone

6   than among respondents who completed paper and pencil questionnaires, a statistically

7   significant difference.  Furthermore, the telephone respondents expressed significantly

8   greater confidence in the accuracy of their event reports. The higher accuracy and

9   confidence seem to be attributable to the fact that respondents completing the paper

10  questionnaire rushed through the process of answering, spending only 13 minutes on

11  average completing the questionnaire, as compared to the 19 minutes on average spent by

12  respondents interviewed by telephone, a statistically significant difference.  This set of

13  results suggests caution about employing paper questionnaires to collect data for the

14  current case.

15      53.    The third standard mode that could be employed is questionnaire

16  administration via computers and the Internet. It is possible to conduct Internet surveys of

17  scientific, representative, samples of members of a population if these individuals have

18  been selected truly randomly from the population of interest and recruited to join a long-

19  term panel and to complete questionnaires regularly (e.g., every week or two). This method

20  has proven to yield results that are generally as accurate as, or more accurate than, the

21  results yielded by comparable telephone surveys of the same population (see, e.g., Chang,

22  L., & Krosnick, J. A.  (2009). National surveys via RDD telephone interviewing vs. the

23  Internet: Comparing sample representativeness and response quality. Public Opinion

24  Quarterly, 73, 641-678; Chang, L., & Krosnick, J. A.  (2010). Comparing oral interviewing

25  with self-administered computerized questionnaires: An experiment. Public Opinion

26  Quarterly, 74, 154-167; MacInnis, B., Krosnick, J. A., Ho, A. S., & Cho, M-J.  (2018). The

27  accuracy of measurements with probability survey samples: Replication and extension.

28  Public Opinion Quarterly, 82, 707-744; Pasek, J.   (2015). When will nonprobability

surveys  mirror  probability  surveys?  Considering  types  of  inference  and  weighting

Graham**HOLLIS** APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103

22

strategies as criteria for correspondence. International Journal of Public Opinion Research, 28, 269-291; Yeager, D. S., Krosnick, J. A., Chang, L., Javitz, H. S., Levendusky, M. S., Simpser, A., & Wang, R. (2011). Comparing the accuracy of RDD telephone surveys and Internet surveys conducted with probability and non-probability samples. Public Opinion Quarterly, 75, 709-747).[2]

54. Based on the information I have about this case, I have determined that telephone interviewing is the optimal mode for a study of Quest Diagnostics CPSRs.

Interviewing

55. As is probably clear from the above discussion, the collection of survey data is a complex process requiring a significant amount of professional expertise. Therefore, if a survey is conducted in this case, it should be carried out by a professional survey firm that has a track record of excellent performance in doing its business. Such a firm can program the questionnaire, hire and supervise interviewers or implement the mailing process, and build an electronic dataset suitable for analysis that can be delivered to interested parties.

56. The procedures for telephone interviewing should follow principles of best practices that are widely accepted throughout the field of survey research. Interviewers should be trained extensively in how to conduct interviews properly and should have considerable experience doing so. For this particular study, interviewers should be trained regarding proper practices for administering this particular questionnaire. Before beginning to interview actual study respondents, interviewers should practice administering the questionnaire and should be given individualized coaching on how to do so well. And each interviewer should be certified as meeting the necessary standards of excellence before beginning to interview.

Graham**Hollis** APC
3555 Fifth Avenue Suite 200
San Diego, California 92103

---

[2] The vast majority of Internet surveys done these days are not done with random, representative samples who are systematically selected from a well-defined population, all of whom have a known, non-zero probability of selection. Instead, these surveys are done with people who were not systematically sampled and instead volunteered to complete questionnaires to make money in response to banner ads on websites, email invitations sent to non-representative groups of people (e.g., members of the United Airlines frequent flier club), and other such recruitment methods that do not involve random sampling from any population. There is no scientific justification for the claim that such samples describe populations of interest, and such samples routinely produce results that are considerably less accurate than those yielded by truly random samples.

**DECLARATION OF JON KROSNICK ISO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

57.    Interviewers should call respondents from a centralized facility suitable for monitoring of interviewer performance, and experienced supervisors should monitor their work to assure high quality. Interviewers should read questions from a computer screen and should record answers by typing them directly into the computer, so it can manage the process of selecting the appropriate question to ask next.

Anonymity

58.    In order for a survey to be conducted for the Court's consideration using best practices, an important issue to consider is the assurance to respondents that their names will never be revealed to anyone and that their names will never be connected to the answers they give in the survey. Providing this assurance is standard practice in high quality surveys.

59.    One justification for this practice is the belief that affording complete anonymity prevents respondents from suffering any harm as the result of participating in the survey or as the result of giving any particular answers to particular questions. Removing these threats of harm allows the respondent to participate in the survey freely and without worry and removes a motivation to answer questions inaccurately. For example, if a class member might aspire to work for the defendant's industry in the future, his or her decision to participate in the survey might be held against him or her and therefore stand in the way of future employment.

60.    For example, the Handbook of Survey Methodology for the Social Sciences, edited by Lior Gideon (New York, NY: Springer, 2012), says:

"Individuals who participate in a survey have the expectation that they are doing so in confidence and that the information in the reports and data files from the survey will be produced in a way that will not allow any individual's responses to be identified. There is a distinction between anonymity and confidentiality. Anonymous responses are those obtained from survey participants when there is no way to link answers to the individual respondent. In many survey situations, the investigator has data that could potentially identify the respondent such as a telephone number and information on background characteristics such as age, race,

GRAHAM HOLLIS APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103

and sex, or even the person's name in studies based on list samples. Ethical survey practice requires that such information be treated in a way that assures that individuals cannot be linked to their responses" (p. 27).

61.    The American Association for Public Opinion Research (known as AAPOR) is a leading professional organization of survey researchers, and they issued a <u>Code of Professional Ethics and Practices</u> (http://www.aapor.org/AM/Template.cfm?Section=Standards_and_Ethics&Template=/CM/ContentDisplay.cfm&ContentID =3140), which endorses this notion:

"Unless the respondent explicitly waives confidentiality for specified uses, we shall hold as privileged and confidential all information that could be used, alone or in combination with other reasonably available information, to identify a respondent with his or her responses. We also shall not disclose or use the names of respondents or any other personally identifying information for non-research purposes unless the respondents grant us permission to do so."

62.    The AAPOR code explicitly addresses the litigation context:

"We understand that the use of our research results in a legal proceeding does not relieve us of our ethical obligation to keep confidential all respondent-identifying information unless waived explicitly by the respondent) or lessen the importance of respondent confidentiality."

63.    AAPOR also issued a document describing best practices in survey research (http://www.aapor.org/Best_Practices1.htm#best11) that addressed the issue of confidentiality:

"Carefully develop and fulfill pledges of confidentiality given to respondents. Establish clear intentions and meticulous procedures to assure the privacy of respondents and the confidentiality of the information they provide. Unless the respondent explicitly requests otherwise, or waives confidentiality for specified uses, one should hold as privileged and confidential the identity of individual respondents and all information that might identify a respondent with his or her responses.

*Exemplary* survey research practice requires that one literally do "whatever is

**DECLARATION OF JON KROSNICK ISO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

possible" to protect the privacy of research participants and to keep collected information they provide confidential or anonymous. One must establish clear intentions to protect the confidentiality of information collected from respondents, strive to ensure that these intentions realistically reflect one's ability to do so, and clearly state pledges of confidentiality and their realistic limitations to respondents. That is, one must ensure that the means are adequate to protect confidentiality to the extent pledged or intended, that procedures for processing and use of data conform to the pledges made, and that appropriate care is taken in dealing with directly identifying information (i.e., using such steps as destroying this type of information or removing it from the file when it is no longer needed for inquiry).

One should also assure that appropriate techniques are applied to control for potential statistical disclosure of respondent data. Individual respondents should never be identified or identifiable in reporting survey findings: all survey results should be presented in completely anonymous summaries, such as statistical tables and charts, and statistical tabulations presented by broad enough categories so that individual respondents cannot be singled out."

64.    The Council of American Survey Research Organizations (known as CASRO) is another leading professional association focused on survey research, and they too have endorsed the notion of protecting respondent identities in their Code of Standards and Ethics (http://www.casro.org/?page=TheCASROCode)::

"Since individuals who are interviewed are the lifeblood of the Survey Research Industry, it is essential that Survey Research Organizations be responsible for protecting from disclosure to third parties--including Clients and members of the Public--the identity of individual Respondents as well as Respondent-identifiable information."

65.    CASRO's Code of Standards and Ethics (http://www.casro.org/?page=TheCASROCode) also directly addresses settings involving litigation:

"The use of survey results in a legal proceeding does not relieve the Survey

**DECLARATION OF JON KROSNICK ISO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

Research Organization of its ethical obligation to maintain in confidence all Respondent-identifiable information or lessen the importance of Respondent anonymity. Consequently, Survey Research firms confronted with a subpoena or other legal process requesting the disclosure of Respondent-identifiable information should take all reasonable steps to oppose such requests, including informing the court or other decision-maker involved of the factors justifying confidentiality and Respondent anonymity and interposing all appropriate defenses to the request for disclosure."

66.    AAPOR and CASRO have routinely filed Amicus Briefs to Courts on behalf of their members and the research industry when such issues have come up in litigation (see Appendix B for an example), and Courts have often ruled in line with these recommendations.  For example, a "Legal Update" report dated March 18, 2009, under the headline "Federal Court Upholds Respondent Confidentiality" (http://www.casro.org/news/99926/Legal-Updates-Federal-Court-Upholds-Respondent-Confidentiality---AAPOR.htm) said:

"The United States District Court for the Northern District of Oklahoma ruled last week in State of Oklahoma v. Tyson Foods that the personal identification of respondents in survey research is confidential information. Oklahoma v. Tyson Foods is an environmental impact assessment case, in which Defendant Tyson Foods, moved to compel disclosure of respondent-identifiable information related to surveys conducted by the Plaintiff State of Oklahoma, and the State, in a counter motion, sought the court's protection of survey participants' personal information as confidential information.

AAPOR (American Association for Public Opinion Research) and CASRO (Council of American Survey Research Organizations) jointly submitted an Amicus ("friend of the court") Brief on behalf of their members and the research industry, and, specifically, in support of Westat and the other research organizations whose survey reports were submitted as evidence in the case. The surveys were part of a contingent valuation study to determine the amount of damages caused by excess

GRAHAM**HOLLIS** APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103

27

phosphorous from poultry waste and other sources in Oklahoma's Illinois River System. Tyson Foods, argued that discovery of respondent identities was relevant and necessary to fully critique the States' assessment of damages.

Citing the mandatory codes of standards and professional ethics of AAPOR and CASRO, the Court affirmed that respondent identities are confidential information, which, if disclosed, could be harmful to the parties involved. Further, the Court stated that the Defendants had failed to meet the burden of proof needed to compel discovery of this confidential information. The Court stated:

> 'Defendants have failed to persuade the Court that such [confidential information] is sufficiently relevant and necessary to their case to outweigh the harm of undermining the public interest in insuring the ability of surveys to elicit accurate information from respondents.'

> The Amicus Brief filed by CASRO and AAPOR asserted that the guarantee of respondent confidentiality is fundamental to the professional practice of survey research, and is assured through adherence to mandatory and enforceable codes of standards and ethics. The Amicus stated that respondent confidentiality 'is warranted (1) to protect survey research results against inaccuracies or bias as the candor of the respondents' answers may be inhibited by public disclosure and (2) to ensure the free flow of information and to provide the foundation for unbiased survey data.'

> CASRO and/or AAPOR have successfully filed Amicus briefs in support of Research Respondent Confidentiality in about a dozen legal and court challenges over the years. This advocacy is a valuable part of the service that CASRO and AAPOR provide to their members. The impact of these efforts, however extends beyond association members. AAPOR President, Richard Kulka, and CASRO President, Diane Bowers, noted that court opinions like the one in Tyson Foods which explicitly affirmed the necessity of protecting respondent confidentiality and the value of survey research, also affirms the research industry's integrity and commitment to ethical and professional practice."

GRAHAM**HOLLIS** APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103

67.   The Court's order in that case appears in Appendix C.

68.   In her chapter on survey research published in 2000 in the <u>Reference Manual on Scientific Evidence</u> by the Federal Judicial Center, Shari Diamond addressed directly the issue of concealing the identities of respondents participating in surveys to be introduced as evidence in court:

> "The respondents questioned in a survey generally do not testify in legal proceedings and are unavailable for cross-examination. Indeed, one of the advantages of a survey is that it avoids a repetitious and unrepresentative parade of witnesses. To verify that interviews occurred with qualified respondents, standard survey practice includes validation procedures, the results of which should be included in the survey report."

> "Conflicts may arise when an opposing party asks for survey respondents' names and addresses in order to reinterview some respondents. The party introducing the survey or the survey organization that conducted the research generally resists supplying such information. Professional surveyors as a rule guarantee confidentiality in an effort to increase participation rates and to encourage candid responses. Because failure to extend confidentiality may bias both the willingness of potential respondents to participate in a survey and their responses, the professional standards for survey researchers generally prohibit disclosure of respondents' identities."

> "The use of survey results in a legal proceeding does not relieve the Survey Research Organization of its ethical obligation to maintain in confidence all Respondent-identifiable information or lessen the importance of Respondent anonymity."  (pp. 271-272).

69.   Thus, Dr. Diamond is explicit in recommending that respondents' identities should be kept completely secret, in keeping with the norms of my profession.

70.   One basis for this principle is the substantial number of scientific studies showing that making a questionnaire anonymous often changed the answers that people

29

Graham**Hollis** APC
3555 Fifth Avenue Suite 200
San Diego, California 92103

provided, leading them to provide answers that appear to be more honest when social desirability pressures would encourage dishonesty (e.g., Paulhus, D. L. (1984). Two-component models of socially desirable responding. Journal of Personality and Social Psychology, 46, 598-609; Booth-Kewley, S., Edwards, J. E., & Rosenfeld, P. (1992). Impression management, social desirability, and computer administration of attitude questionnaires: Does the computer make a difference? Journal of Applied Psychology, 77, 562-566; Gordon, R. A. (1987). Social desirability bias: A demonstration and technique for its reduction. Teaching of Psychology, 14, 40-42; Becker, W. M. (1976). Biasing effect of respondents' identification on responses to a social desirability scale: A warning to researchers. Psychological Reports, 39, 756- 758; Klein, S., J. Mahler, and R. Dunnington. (1967). Differences between identified and anonymous subjects in responding to an industrial opinion survey. Journal of Applied Psychology 51, 152-160; Butler, R. P. (1973). Effects of signed and unsigned questionnaires for both sensitive and non-sensitive items. Journal of Applied Psychology, 57, 348-349; Elinson, J., & Haines, V. T. (1950). Role of anonymity in attitude surveys. American Psychologist, 5, 315; Feather, N. T. (1973). Effects of response anonymity on assessment of own and school value systems and satisfaction with school. British Journal of Educational Psychology, 43, 140-150; Fuller, C. (1974). Effect of anonymity on return rate and response bias in a mail survey. Journal of Applied Psychology, 59, 292-296; Rosen, N. A. (1961). Anonymity and attitude measurement. Public Opinion Quarterly, 24, 675-679). Thus, the accumulated academic literature indicates that anonymity can be desirable for accurate scientific measurement of some phenomena through surveys.

71.    In keeping with these professional principles, during the interviewing for a survey that could be conducted in this case, consumers can be told that their identities will be kept confidential to the fullest extent permitted by law. If this assurance is not provided to the respondents, the survey would not be conducted in keeping with the profession's current best practices and the instructions provided to me by professional associations and leading experts on the use of surveys in court.

72.    Critics sometimes attempt to undermine the argument made above by citing

an article that I published on this topic (Lelkes, Y., Krosnick, J. A., Marx, D.M., Judd, C. M., & Park, B. (2012). Complete anonymity compromises the accuracy of self-reports. <u>Journal of Experimental Social Psychology</u>, <u>48</u>, 1291-1299).  Specifically, the critics attempt to argue to courts that this publication shows that affording anonymity to respondents reduces the accuracy of their reports in surveys.  But this claim misrepresents what that paper shows.

73.    In order to understand the paper and its implications, it is critical to distinguish between "anonymity" and "complete anonymity", a term coined in that paper.  "Complete anonymity" occurs when a research participant is never identified to anyone on the research team and submits a paper questionnaire with absolutely no identifying information on it. That is, a research participant is handed a paper questionnaire, fills it out, and does not write his or her name on it or any identifying number or any other information that could link his or her answers to his or her identity.  Lelkes et al. (2012) showed that affording complete anonymity in this way reduces respondent care when answering questions and reduces the accuracy of their reports.

74.    In the survey I propose to conduct in this case, I do not plan to provide participating respondents with <u>complete</u> anonymity.  Instead, participating respondents will be afforded "anonymity", which in the profession of survey research means that the interviewer will know the respondent's identity (because the interviewer will call by telephone and ask to speak to the person by name), and the interviewer will be listening as the respondent provides all of his or her answers to survey questions.  Thus, respondents will not be afforded complete anonymity.  Instead, they will be assured that after their responses are provided, their identities will not be provided to anyone <u>other</u> than the research team, and their responses will never be connected to their names in a way that people outside the research team can observe.

75.    No scientific literature on this matter indicates that in a situation where an interviewer knows the identity of the respondent and promises not to reveal his or her identity to others or to link his or her answers to his or her name, this compromises the accuracy of survey reports. Indeed, this is exactly what is considered best practice in survey

**DECLARATION OF JON KROSNICK ISO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

Graham**Hollis** APC
3555 Fifth Avenue Suite 200
San Diego, California 92103

research and is the type of anonymity advocated by Dr. Diamond, by AAPOR, and by CASRO. This sort of anonymity is standard practice in survey research And this is the sort of anonymity that was afforded to respondents in the surveys described earlier in this report as yielding highly accurate results. Therefore, evidence that complete anonymity undermines reporting accuracy is not evidence that conventional survey anonymity does so.

Intentional Misreporting to Maximize Financial Gain

76. In the context of the present litigation, it is important to consider the possibility that respondents might intentionally bias their survey responses. For example, if respondents believed that the survey in this case were being conducted to inform the Court in this case, and if they believed that success in this litigation would cause them to be compensated financially, then they might be inclined to answer strategically to maximize the chances of a verdict in their favor in order to maximize their chances of a financial gain.[3]

77. In order for respondents to be inclined to consider such intentional misreporting, three conditions must be met. First, the respondent must be aware of the lawsuit for which the survey is being conducted. Second, the respondent must be knowledgeable about the details of the purpose of the lawsuit, in order to know what answers to the survey questions would enhance the likelihood of a verdict in plaintiffs' favor and a sizable judgment. And third, the respondent must believe that the survey is being done for the purpose of the litigation.

78. But in fact, it is unlikely that the first two of these conditions will hold for most class members. If a survey in this case is conducted before class notices are sent out,

---

[3] Critics of survey research of this sort have sometimes incorrectly referred to this as a "moral hazard". The notion of moral hazard has been discussed in economics and has very specific meanings, all of which pertain to situations in which a person increases exposure to risk. In their article entitled "A History of the Term 'Moral Hazard,'" Rowell and Connelly (Rowell, D., & Connelly, L. B. (2012). A history of the term "moral hazard". Journal of Risk and Insurance, 79(4), 1051-1075) said, "The term "moral hazard" originated in the insurance literature. Its modern use in economists is understood – by economists – to describe loss-increasing behavior that arises under insurance." (p. 1051). Rowell and Connelly (2012) described in great detail the history and uses of the term, and none of the concepts associated with the notion of moral hazard are in any way relevant to the accuracy of survey respondents' answers to questions. Furthermore, "moral hazard" is a conceptual term used in theories that seek to account for risk-taking behavior, not a phenomenon that has been empirically validated.

DECLARATION OF JON KROSNICK ISO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

GRAHAM**HOLLIS** APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103

it is unlikely that any potential respondents will be aware of the litigation. And even if a survey is conducted after the class notices are sent out, widespread knowledge among the class about the details of the lawsuit is unlikely. This is because such notices are typically sent to just one address per class member. Although that address may be accurate for some consumers, it may be outdated for consumers who have moved to a new address. And forwarding of mail for people who have moved to a new address is often not set up with the postal service. So many members of a class may never receive a class notice telling them about the litigation.

79.  But even if a class notice is delivered to a class member's residence, that does not assure that it will be read. Some people sort through mail identifying what they consider mass "junk" mailings and discard them without reading them. Even if a person does open an envelope to skim a class notice, he or she may do so quickly and realize that no action is required, so a careful reading is not merited. And even if a person does read a notice carefully, he or she may not note the details of the claimed being made in the lawsuit. And even if a person does note the purpose of the lawsuit, he or she may forget ever having read that information just a few days later, because usually, no action is required, and the person can simply wait to hear again if he or she needs to do anything. Therefore, many and perhaps even most class members may be unaware of the existence or purpose of a lawsuit weeks or months after class notices are sent out, at the time a survey is conducted.

80.  Furthermore, when conducting a survey for this case, I will implement a series of best practices to minimize the likelihood that participating respondents will believe the survey is relevant to the litigation or will distort their answers to the survey questions in order to maximize their personal gain from the lawsuit. For example, in the letters I will mail to intended respondents before initiating survey interviewing, I will explain that I am a professor at Stanford University and have been conducting a decades-long research study (outside of my capacity at Stanford) to explore the experiences that people have had working for various types of companies in the health care space. I will explain that the letter recipient is invited to participate in a survey exploring employment-related experiences without mentioning Quest Diagnostics.

**DECLARATION OF JON KROSNICK ISO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

81.     When the interviews begin, the respondents will be asked whether they have worked for any of various different types of health care companies, among which Quest Diagnostics will be listed, and then the respondents will be asked what companies they have worked for.  Thus, the interview begins in a way that does not immediately convey the idea that the study is focused exclusively on Quest Diagnostics in particular.  Furthermore, the interviewers talking to the participating respondents will never be told that the survey is being done with a special focus on litigation related to Quest Diagnostics.

82.     All of those practices are in keeping with the principle of conducting the survey "double-blind".  This is a practice used routinely in clinical trials conducted in the course of medical research.  In that context, a double-blind experiment is one in which neither the patient nor the persons interacting with the patient on behalf of the researchers know, for example, whether the patient has been given an experimental drug or a placebo.  The reason is that if the patient or interacting researcher knows this information, it could cause an illusory result of the study.  Specifically, the expectations or hopes of the researcher or participant could unintentionally influence the measurements made in the study.  For example, if a patient believes that he/she has been given a new drug, he/she may develop a sense of optimism, which may inspire living a healthier lifestyle, which itself could be responsible for improved health.  In contrast, a patient who believes that he/she has been given a placebo may be pessimistic as a result, and this pessimism may breed sadness, unhealthy living, and a decline in overall health.  That is why the double-blind methodology became standard in medical research.

83.     The wisdom of this approach is reinforced by the literature on experimenter expectancy research in psychology and related sciences.  The work of Robert Rosenthal was especially important in inspiring such research (e.g., Rosenthal, R., & Fode, K. (1963). The effect of experimenter bias on performance of the albino rat. Behavioral Science, 8, 183-189; Rosenthal, R., &. Jacobson, L. (1963). Teachers' expectancies: Determinants of pupils' IQ gains. Psychological Reports, 19, 115-118).  Rosenthal's studies, and many inspired by his work, demonstrated that if a researcher collecting data or interacting with research participants knows the hypothesis being tested and/or the expected findings, this

GRAHAM**HOLLIS** APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103

can cause the study to confirm those expectations or hopes for purely artificial reasons. This is why it is standard practice in social science research generally and surveys in particular not to provide details to participants/respondents about exactly why a study is being conducted, exactly what results are expected, or exactly what results are desired.

84.     In keeping with this logic, in her chapter on survey research published in 2000 in the <u>Reference Manual on Scientific Evidence</u> by the Federal Judicial Center, Dr. Shari Diamond addressed this issue directly (pp. 410-411):

> "One way to protect the objectivity of survey administration is to avoid telling interviewers who is sponsoring the survey.  Interviewers who know the identity of the survey's sponsor may affect results inadvertently by communicating to respondents their expectations or what they believe are the preferred responses of the survey's sponsor. To ensure objectivity in the administration of the survey, it is standard interview practice in surveys conducted for litigation to do double-blind research whenever possible: Both the interviewer and the respondent are blind to the sponsor of the survey and its purpose. Thus, the survey instrument should provide no explicit or implicit clues about the sponsorship of the survey or the expected responses."

85.     Furthermore, in line with this perspective, in his chapter on "Telephone Surveys" in the <u>Handbook of survey research</u> (J. D. Wright & P. V. Marsden (Eds.), <u>Handbook of survey research</u> (Second Edition).  West Yorkshire, England: Emerald Group), Lavrakas said the following (p. 483):

> "From the standpoint of good science it is unnecessary and inadvisable to devise an introduction containing a detailed explanation of what the survey is about, as this is likely to increase nonresponse.  Detailed instructions also may generate bias by encouraging only those interested in the topic to continue."

86.     This logic has been affirmed in Court of Appeals decisions, such as *Pittsburg Press Club v. U.S.* (3rd Cir. 1978) 579 F.2d 751, 758:

> "The interviewers or sample designers should, of course, be trained, and ideally should be unaware of the purposes of the survey or the litigation. A fortiori,

GRAHAM**HOLLIS** APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103

1    the Respondents should be similarly unaware. See <u>Berman v. New Hampshire</u>
2    <u>Jockey Club</u>, 324 F.Supp. 1156, 1168 (D.N.H.1971).”

3    87.    Indeed, in their ruling in that case, the Court of Appeals at p. 759 disallowed
4    a survey submitted as evidence and explained one reason for that decision as follows:

5    “The respondents, who were all Club members and thus interested in the
6    litigation, were told the precise nature of the litigation and the purpose of the survey.
7    They consequently knew which responses would be helpful to PPC, and conversely,
8    which would be harmful.  Moreover, it was possible that a recipient of the
9    questionnaire would fail to respond because he knew an honest response would be
10    harmful to the Club's position.  Thus the respondents might have contained a higher
11    percentage of those who could answer in a way helpful to the Club.”

12    88.    Likewise, in *Gibson v. County of Riverside* (C.D. Cal. 2002) 181 F. Supp. 2d
13    1057, 1068, the Court rejected a survey and said: “Here, … there are lacking the essential
14    hallmarks of reliability which have made surveys admissible in other cases. … importantly,
15    the recipients of the survey were informed of the purpose of the survey and reminded that
16    they were the beneficiaries of the survey.”

17    89.    This is why people to be interviewed in a survey to be done in this case would
18    not be told about the sponsor or purpose of the survey.  If prospective respondents were to
19    be told that the study is being paid for by attorneys representing a specific party in this
20    lawsuit, then both the interviewers (if interviewers are involved) and the respondents might
21    know what results are expected and desired by the survey sponsor.  Likewise, if the survey
22    were to be described as being conducted for the purpose of submitting its results as
23    evidence in a lawsuit and therefore identifying the litigation, that knowledge could
24    introduce bias in the survey responses.  For these reasons, the survey description would not
25    mention this information.

26    90.    Furthermore, I will design the questionnaire to include questions to measure
27    the presence of two of the conditions necessary in order for a participating respondent to
28    intentionally bias his or her answers: knowledge of the existence of the lawsuit, and
      knowledge of the exact claims being made in the lawsuit that would yield monetary

Graham**Hollis** APC
3555 Fifth Avenue Suite 200
San Diego, California 92103

36

damages for class members. Near the end of the interview, participating respondents will be asked whether they are aware of any lawsuits involving Quest Diagnostics, and if they answer affirmatively, they will be asked to describe all the details they know about such lawsuits, in order to assess whether participating respondents were aware of this particular lawsuit. Thus, I can identify respondents who are aware of this lawsuit and understand claims sufficiently to allow them to bias their reports if they wish to.

91.    These measurements will then allow me to conduct a statistical analysis to assess whether participating respondents knowledgeable about the purpose of this lawsuit manifested bias in their reporting. To do so, I would conduct statistical analyses predicting answers to key questions from respondents using as a predictor a "dummy variable" (that's a technical term) identifying respondents who were aware that this lawsuit seeks to compensate consumers. If the "aware" employees give systematically different results than the "unaware" employees in the direction that would be expected if intentional bias were operating, that result would be consistent with the notion that the former group may have biased their responses for financial gain. In other words, this would be a test for potential bias in reporting.

92.    If evidence of such potential bias is present in the data, I can then implement a standard statistical adjustment to the reports, removing the bias. That is, I can compute an estimate of answers to the key survey questions removing distortion that may have been created by bias in reports from "aware" employees.

Unit Non-Response

93.    A survey's response rate is the proportion of the intended sample with whom interviewers are completed. When the response rate for a survey is 100%, that means that every person who was identified to be interviewed was in fact interviewed. If a census is being conducted, then a 100% response rate would mean that ever member of the population of interest was interviewed. When the intended sample is a random subset of the population, when a 100% response rate is obtained, then the only discrepancies between the interviewed sample and the intended sample are due to random sampling error, as described by the mathematical formulas above.

94.    But in essentially all surveys, the response rate is less than 100%, meaning that not all of the intended respondents are in fact interviewed. Some intended respondents are not interviewed because they can never be contacted, and other intended respondents are contacted but decline to participate. The discrepancy between 100% and a response rate lower than that is a manifestation of what survey researchers call "unit non-response".

95.    In the second edition of the Reference Manual on Scientific Evidence, Dr. Shari Diamond's chapter (Diamond, S. (2000). Reference guide on survey research. In Reference Manual on Scientific Evidence, Federal Judicial Center. St. Paul, MN: West Group). she said this about response rates:

"Even when a sample is drawn randomly from a complete list of elements in the target population, responses or measures may be obtained on only part of the selected sample. If this lack of response were distributed randomly, valid inferences about the population could be drawn from the characteristics of the available elements in the sample. The difficulty is that nonresponse often is not random, so that, for example, persons who are single typically have three times the "not at home" rate in U.S. Census Bureau surveys as do family members. Efforts to increase response rates include making several attempts to contact potential respondents and providing financial incentives for participating in the survey.

"One suggested formula for quantifying a tolerable level of nonresponse in a probability sample is based on the guidelines for statistical surveys issued by the former U.S. Office of Statistical Standards. According to these guidelines, response rates of 90% or more are reliable and generally can be treated as random samples of the overall population. Response rates between 75% and 90% usually yield reliable results, but the researcher should conduct some check on the representativeness of the sample. Potential bias should receive greater  scrutiny when the response rate drops below 75%. If the response rate drops below 50%, the survey should be regarded with significant caution as a basis for precise quantitative statements about the population from which the sample was drawn." (p. 239)

96.    However, during the more than 20 years since that chapter was written, Dr.

Graham**Hollis** APC
3555 Fifth Avenue Suite 200
San Diego, California 92103

**DECLARATION OF JON KROSNICK ISO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

Diamond's views about response rates and those of the survey profession have evolved.  In the third edition of her chapter, published in 2011 (Diamond, S.  (2011).  Reference guide on survey research.  In <u>Reference Manual on Scientific Evidence</u>.  Washington DC: National Academies Press), she said:

> "The key to evaluating the effect of nonresponse in a survey is to determine as much as possible the extent to which nonrespondents differ from the respon¬dents in the nature of the responses they would provide if they were present in the (participating) sample. That is, the difficult question to address is the extent to which nonresponse has biased the pattern of responses by undermining the represen¬tativeness of the sample and, if it has, the direction of that bias. It is incumbent on the expert presenting the survey results to analyze the level and sources of nonresponse, and to assess how that nonresponse is likely to have affected the results. On some occasions, it may be possible to anticipate systematic patterns of nonresponse. For example, a survey that targets a population of professionals may encounter difficulty in obtaining the same level of participation from individuals with high-volume practices that can be obtained from those with lower-volume practices. To enable the researcher to assess whether response rate varies with the volume of practice, it may be possible to identify in advance potential respondents with varying years of experience. Even if it is not possible to know in advance the level of experience of each potential member in the target population and to design a sampling plan that will produce representative samples at each level of experience, the survey itself can include questions about volume of practice that will permit the expert to assess how experience level may have affected the pattern of results.

> "Although high response rates (i.e., 80% or higher) are desirable because they generally eliminate the need to address the issue of potential bias from nonresponse, such high response rates are increasingly difficult to achieve. Survey nonresponse rates have risen substantially in recent years, along with the costs of obtaining responses, and so the issue of nonresponse has attracted sub¬stantial attention from survey researchers. Researchers have developed a variety of approaches to adjust for

Graham**HOLLIS** APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103

39

**DECLARATION OF JON KROSNICK ISO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

1
2
3
4
5
6
7
8
9
10
11
GRAHAM**HOLLIS** APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

nonresponse, including weighting obtained responses in proportion to known demographic characteristics of the target population, comparing the pattern of responses from early and late responders to mail surveys, or the pattern of responses from easy-to-reach and hard-to-reach responders in telephone surveys, and imputing estimated responses to nonrespondents based on known characteristics of those who have responded. All of these techniques can only approximate the response patterns that would have been obtained if nonrespondents had responded. Nonetheless, they are useful for testing the robustness of the findings based on estimates obtained from the simple aggregation of answers to questions given by responders.

"To assess the general impact of the lower response rates, researchers have conducted comparison studies evaluating the results obtained from surveys with varying response rates. Contrary to earlier assumptions, surprisingly comparable results have been obtained in many surveys with varying response rates, suggesting that surveys may achieve reasonable estimates even with relatively low response rates. The key is whether nonresponse is associated with systematic differences in response that cannot be adequately modeled or assessed.

"Determining whether the level of nonresponse in a survey seriously impairs inferences drawn from the results of a survey generally requires an analysis of the determinants of nonresponse. For example, even a survey with a high response rate may seriously underrepresent some portions of the population, such as the unemployed or the poor. If a general population sample is used to chart changes in the proportion of the population that knows someone with HIV, the survey would underestimate the population value if some groups more likely to know someone with HIV (e.g., intravenous drug users) are underrepresented in the sample. The survey expert should be prepared to provide evidence on the poten¬tial impact of nonresponse on the survey results." (p. 383-385).

97.    Dr. Diamond's logic is reinforced by guidelines issued in 2006 by the White House Office of Management and Budget, which oversees the conduct of all surveys by the federal government: "A high response rate increases the likelihood that the survey

DECLARATION OF JON KROSNICK ISO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

1  results reflect the views and characteristics of the target population. Conversely, a low

2  response rate can be an indicator of potential nonresponse bias."  (p. 56 in Office of

3  Management and Budget, "Questions and Answers when Designing Surveys for

4  Information Collections.", emphasis added).[4]

5          98.    Thus, the fact that a survey's response rate is less than 100% does not assure

6  that its measurements are inaccurate.  In fact, surveys conducted according to best practices

7  with response rates much less than 100% have routinely yielded highly accurate

8  measurements (see, e.g., Chang, L., & Krosnick, J. A.  (2009). National surveys via RDD

9  telephone interviewing vs. the Internet: Comparing sample representativeness and response

10  quality. Public Opinion Quarterly, 73, 641-678; Chang, L., & Krosnick, J. A.  (2010).

11  Comparing oral interviewing with self-administered computerized questionnaires: An

12  experiment. Public Opinion Quarterly, 74, 154-167; MacInnis, B., Krosnick, J. A., Ho, A.

13  S., & Cho, M-J.  (2018). The accuracy of measurements with probability survey samples:

14  Replication and extension. Public Opinion Quarterly, 82, 707-744; Pasek, J.  (2015). When

15  will nonprobability surveys mirror probability surveys? Considering types of inference and

16  weighting strategies as criteria for correspondence. International Journal of Public Opinion

17  Research, 28, 269-291; Yeager, D. S., Krosnick, J. A., Chang, L., Javitz, H. S.,

18  Levendusky, M. S., Simpser, A., & Wang, R.  (2011). Comparing the accuracy of RDD

19  telephone surveys and Internet surveys conducted with probability and non-probability

20  samples. Public Opinion Quarterly, 75, 709-747).  Thus, it is possible to conduct a survey

21  with a response rate in the single digits and end up with data from the participating sample

22  that closely mirrors the population.

23          99.    Furthermore, an accumulating number of publications show that as long as a

24  representative sample of intended respondents is scientifically drawn from the population

25  and thorough, professional efforts are made to collect data from all selected intended

26  respondents, a decreased response rate is generally not associated with a notable decline in

27  the accuracy of the survey's results (Curtin, R., Presser, S., & Singer, E.  (2000). The effects

28

---

[4] https://obamawhitehouse.archives.gov/sites/default/files/omb/inforeg/pmc_survey_guidance_2006.pdf

**DECLARATION OF JON KROSNICK ISO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

of response rate changes on the index of consumer sentiment. <u>Public Opinion Quarterly</u>, <u>64</u>, 413-428; Holbrook, A. L., Krosnick, J. A., & Pfent, A. M. (2008). The causes and consequences of response rates in surveys by the news media and government contractor survey research firms. In Lepkowski, J. M., Tucker, C., Brick, J. M., de Leeuw, E. D., Japec, L., Lavrakas, P. J., Link, M. W., & Sangster, R. L. (Eds.), <u>Advances in telephone survey methodology</u>. New York: Wiley; Keeter, S., Miller, C., Kohut, A., Groves, R. M., & Presser, S. (2000). Consequences of reducing nonresponse in a national telephone survey. <u>Public Opinion Quarterly</u>, <u>64</u>, 125-148; Merkle, D., & Edelman, M. (2002). Nonresponse in exit polls: A comprehensive analysis. In Groves, R. M., Dillman, D. A., Eltinge, J. L., & Little, R. J. A. (Eds.), <u>Survey nonresponse</u>, pp. 243–58. New York: Wiley)

100.   For these reasons, survey researchers no longer view a survey's response rate as an indicator of its accuracy. What matters to survey researchers is not the response rate so much as what is called "non-response bias" – the degree to which the participating respondents differ systematically from the population and thereby introduce systematic distortion in the results.

101.   The primary way to minimize non-response bias is to take a variety of steps to maximize a survey's response rate. For example, the first such step for a survey such as the one I propose for this case is to obtain the best available set of contact information for all potential respondents. Typically in class actions, the defendant provides a list of names and addresses. Some of these addresses will be current, and others will be out of date. It would be preferable for defendants to also provide the most recent telephone numbers that they have on file for consumers, but it is my understanding that the defendant does not possess any such records.

102.   Therefore, in order to use this contact information for conducting interviews by telephone, I must obtain the best available telephone numbers for the potential respondents. A variety of commercial companies offer services to provide telephone numbers and to trace individuals who have moved to a new address. I have evaluated the services offered by these companies and have selected a small set that, when used simultaneously, provide what appears to be the best available information to locate

potential respondents.  In addition to reaching out to potential respondents directly, I will also plan to contact people who the industry calls "known associates", which includes individuals' family members, to obtain up to date contact information.  This thorough process of investigation is meant to minimize the degree to which intended respondents are not contacted, and thus is intended to maximize a survey's response rate.

103.    After having compiled the list of contact information, and before phone calling begins, intended respondents will be mailed a letter explaining the topic of the study in general terms and explaining that they can expect a phone call from an interviewer in the near future.  The "advance letter" will be accompanied by a small amount of cash, such as $2, (called a "financial incentive") to thank respondents for the time they will spend reading the letter.  Intended respondents will be promised an additional financial incentive if they complete the interview.  And intended respondents will be given information so that they can contact the interviewing firm and will be offered an additional financial incentive for calling in rather than waiting to hear from an interviewer (see Singer, E.  The use of incentives to reduce nonresponse in household surveys.  University of Michigan, Institute for Social Research, Survey Methods Program).[5]

104.    Interviewers will make many attempts to reach each intended respondent at various different times of day and on different days of the week, including weekdays and weekends.  If an intended respondent is contacted but is too busy at the time to complete the interview or is ill or otherwise temporarily unavailable, an alternative time will be scheduled for an interviewer to call back to complete the interview.  If an intended respondent declines to be interviewed, some time will be allowed to pass, and an interviewer who is an expert at "refusal conversion" will call back to attempt to complete the interview, offering a larger financial incentive.

105.    Providing financial incentives to intended respondents is not only the respectful thing to do to acknowledge time that respondents spend answering questions but is also a best practice in survey research.  To date, financial incentives have been shown in

---

[5] http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.611.1597&rep=rep1&type=pdf

**DECLARATION OF JON KROSNICK ISO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

GRAHAM**HOLLIS** APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103

1  numerous studies to increase response rates (and thereby reduce the risk of non-response

2  bias) while introducing no bias into the answers that participating respondents give (Singer,

3  E.  The use of incentives to reduce nonresponse in household surveys.  University of

4  Michigan, Institute for Social Research, Survey Methods Program).

5      106.  In addition to carrying out the above steps to maximize response rates, I will

6  assess non-response bias in the composition of a participating sample, following standard

7  best practices and also the guidance provided by Dr. Diamond above.  Specifically, one

8  approach I will take is to compare the participating respondents to the entire sample of

9  intended respondents and to the population in terms of as many available attributes as

10  possible.  If no differences are observed, then this will be reassuring about the match of the

11  participating sample to the population.  However, differences may indeed be observed, as

12  has often happened in high quality surveys in the past.  For example, in general, women

13  are more likely to participate in surveys than men, and participation is more likely among

14  more educated respondents (Holbrook, A. L., Krosnick, J. A., & Pfent, A. M. (2008). The

15  causes and consequences of response rates in surveys by the news media and government

16  contractor survey research firms.  In Lepkowski, J. M., Tucker, C., Brick, J. M., de Leeuw,

17  E. D., Japec, L., Lavrakas, P. J., Link, M. W., & Sangster, R. L. (Eds.), Advances in

18  telephone survey methodology.  New York: Wiley).

19      107.  Different response rates in different subgroups of the population do not

20  guarantee inaccurate results.  In fact, a difference in response rates between subgroups will

21  only bias the results of a survey if the subgroups differ from one another in their answers

22  to the questions of interest in the survey.  For example, if a survey measures the number of

23  hours that respondents worked for pay each week, and if men and women report equal

24  numbers of hours worked, then a higher response rate among women than among men will

25  not distort survey-based calculations of the number of hours worked.

26      108.  Furthermore, survey research best practices include a well-established

27  statistical procedure to adjust for unequal response rates and thereby minimize the impact

28  of non-response bias on survey conclusions: weighting (Kish, L. (1995). Survey sampling.

New York: Wiley).  This procedure, advocated by Dr. Diamond in the quote above, adjusts

GrahamHOLLIS APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103

44

a sample by placing more weight on members of subgroups with lower response rates and by placing more weight on members of subgroups with higher response rates to eliminate distortion of a survey's results by these differential response rates.  A variety of different procedures have been proposed for computing statistical weights for surveys, and a blue-ribbon panel of survey statisticians recently outlined the procedure that they believe is optimal for this purpose (DeBell, M., and Krosnick, J. A.  (2009). Computing weights for American National Election Study Survey Data. ANES Technical Report series, no. nes012427.  Ann Arbor, MI, and Palo Alto, CA: American National Election Studies).[6]  If evidence of non-response bias appears in the survey I conduct for this case, I will examine whether the subgroups with differing response rates differ in terms of any of the variables of interest in this survey.  If so, I will compute weights using this procedure to adjust the data according to yield unbiased respondents.  Thus, I will measure and correct for consequential non-response bias to the extent that it occurs.

109.    Another approach I will take to explore non-response bias is mentioned in the quote from Dr. Diamond above as well: comparing respondents who are easy to interview to respondents who are more difficult to interview (see, e.g., Lahaut, V. M. C. H., Jansen, H. A. M., van de Mheen, D., Garretsen, H. F. L., Verdurmen, J. E. E.,& van Dijk, A. (2003).  Estimating non-response bias in a survey on alcohol consumption Comparison of response waves. Alcohol and Alcoholism, 38, 128-134).  If these groups differ in their responses to reported rates of missing breaks, then that may be an indication of non-response bias, according to the "continuum of resistance" model of non-response.  That is, difficult-to-interview respondents may be more similar to non-respondents than easy-to-interview respondents.  So if difficult-to-interview respondents manifest fewer reported missed breaks than easy-to-interview respondents, this may suggest that intended respondents who were not interviewed might also have experienced fewer missed breaks. If so, then increasing the survey's response rate would reduce the number of observed missed breaks.

GRAHAM**HOLLIS** APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103

---

[6] Available at http://www.electionstudies.org/resources/papers/nes012427.pdf

**DECLARATION OF JON KROSNICK ISO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

110.     To explore this possibility, I will estimate differences between easy-to-interview respondents and difficult-to-interview respondents and implement standard practice adjustments to the survey's results to observe the results that would have been obtained if the response rate had been 100%.  I will then compare the implications regarding non-response bias observed with this method with the implications regarding answers to key survey questions after weighting, to see if they correspond with one another, which would reinforce confidence about the presence of non-response bias and confidence in adjustments to eliminate its biasing impact on the survey's results.

111.     Thus, I will do exactly what Dr. Diamond and the Office of Management and Budget advised: I will conduct analyses to assess potential non-response bias, conduct analyses to weight the survey data to adjust for any such bias present, and conduct additional analyses to gauge possible impact of non-response bias on final results and make adjustments accordingly as well.

112.     In sum, then, I will follow the profession's best practices to (1) maximize the response rate, (2) minimize non-response bias, (3) measure non-response bias, and (4) implemented statistical adjustments due to eliminate distortion due to non-response bias if it occurs.

Recall Errors

113.     In the present case, respondents will be asked about experiences that may have occurred years ago.  Asking people to remember what they experienced years ago is common in courtrooms.  Courts routinely seek to base verdicts on evidence regarding events that occurred ten or more years prior to testimony.  Simply because an event occurred that long ago does not preclude it from being the subject of legal inquiry.  So if witnesses to such events were brought to testify in court, their descriptions would not be barred simply because of the time interval between the event and testimony.  Surveys seek to collect exactly the same sorts of recollections.  Just as the length of the recall time interval would not preclude testimony in court, so it presumably would not preclude the collection and consideration of survey evidence on the same matter.

114.     Some published research evidence does exist regarding whether people are

46

less accurate at remembering events that occurred longer ago.  Such studies are relatively rare, because they require a researcher to be able to ask respondents questions about past events and to have an independent source of accurate information regarding those same events for those individuals.  Some such studies have been done by asking people to keep a diary reporting their experiences and then asking those individuals sometime later to remember what is in the diary.  Other studies compared answers to questions with records of the events kept by others (e.g., a company's records of a worker's missed work days, a person's elementary school report card, or a medical chart describing a patient's visit to a doctor).

115.     Such studies are inherently limited, because the criterion used to gauge memory accuracy is rarely flawless.  For example, medical charts and company records of worker absences are not necessarily complete and accurate and may sometimes be misread upon checking.  For example, researchers interested in confirming whether or not a person voted in a particular election have compared answers to survey questions with official government records of the same individuals' turnout.  But these researchers have found that discrepancies were attributable surprisingly often to errors in the record checks rather than errors in the survey reports (Presser, S., Traugott, M. W., & Traugott, S. (1990).  Vote 'over' reporting in surveys: The records or the respondents?  Paper presented at the International Conference on Measurement Errors, Tucson, Arizona; Traugott, S., (1989).  Validating self-reported vote: 1964–1988.  Paper presented at the annual meeting of the American Statistical Association, Washington D.C.).  However, such criterion errors are likely to be constant, regardless of how long ago a respondent is being asked to remember, so data from such studies can be used to assess whether recall accuracy declines as the length of the recall period increases.

116.     Interestingly, some such studies found no decline in recall accuracy as the recall interval increased.  For example, Hagburg (Hagburg (1968).  Validity of questionnaire data: Reported and observed attendance in an adult education program.  Public Opinion Quarterly, 32, 453-456) asked respondents to remember the number of times they had attended a class.  Surprisingly, recall accuracy was slightly lower for classes

GRAHAM**HOLLIS** APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103

**DECLARATION OF JON KROSNICK ISO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

held within the last 60 days (48%) than for classes held between 60 and 120 days previously (53%).

117.    In another study, Mathiowitz and Duncan (Mathiowitz and Duncan (1988). Out of work, out of mind: Response errors in retrospective reports of unemployment. Journal of Business and Economic Statistics, 6, 221-229) asked respondents to recall the number of unemployment spells they had experienced.  These researchers found no less accuracy in reports of events 29 months ago than in reports of events just a couple of months prior to the interview.

118.    In a third study by Skowronski et al. (Skowronski, J. J., Betz, A., Thompson, C. P., & Larsen, S. F. (1995).  Long-term performance in autobiographical event dating: Patterns of accuracy and error across a two-and-a-half year time span. In Healy, A. I.,  & Bourne, L. B. (Eds.), Acquisition and long-term retention of knowledge and skills: The durability and specificity of cognitive procedures. Newbury Park, CA: Sage), respondents were asked to report the dates on which particular events occurred.  Surprisingly, average error in recalling these dates was much lower for events that occurred 60 days previously than for events that occurred 30 days previously.  Indeed, average dating error was smaller for events occurring one year ago than for events 30 days ago.

119.    In a fourth study, Yuille and Cutshall (Yuille, J. C., & Cutshall, J. L., 1986; A case study of eyewitness memory of a crime. Journal of Applied Psychology, 71, 291-301) interviewed witnesses to a crime four months after it occurred and compared the accuracy of their descriptions to the accuracy of their descriptions of the same event immediately after it occurred.  No difference in accuracy was found – both sets of descriptions were highly accurate.

120.    In a fifth study by Bahrick et al. (Bahrick, H. P., Bahrick, P. O., & Wittlinger, R. P.  (1975).  Fifty years of memory for names and faces: A cross-sectional approach. Journal of Experimental Psychology: General 104, 54-75), memory for names of teachers and classmates from school was about as accurate 10 years later as it was at about the time of attending school.

121.    My purpose in describing these studies is not to conduct a complete review of

GRAHAM HOLLIS APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103

**DECLARATION OF JON KROSNICK ISO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

the memory accuracy literature.  Rather, I mention these studies because they are typical ones, and they found no consistent relation between the length of the recall period and the accuracy of recollections.

122.    That conclusion might seem to stand in sharp contrast to one reached by Rubin and Wenzel (Rubin, D. C., & Wenzel, A. E.  (1996).  One hundred years of forgetting: A quantitative description of retention.  Psychological Review, 103, 734-760), who reviewed numerous studies and concluded that they document a mathematically describable "law" that people are generally less accurate in remembering events that occurred longer ago. However, a close look at the studies on which Rubin and Wenzel (1996) based their conclusions shows that almost none are relevant to the type of recollections to be sought in a survey to be done for this case.

123.    When looked at on the surface, one quickly recognizes that the studies on which Rubin and Wenzel (1996) were studies of children, the elderly, mentally impaired people moderately drunk people, college students, monkeys, pigeons, and other types of animals.  And the recollections examined in these studies were often of numbers, words or pictures that they had seen seconds before or minutes before or hours before they were asked to remember them.  Not a single study examined employees reporting anything about their work experiences that occurred over months or years.

124.    Rubin and Wenzel (1996) talked about two types of studies: laboratory and observational.  In some laboratory studies, participants were presented with a list of words to learn in a quiet room setting.  Sometimes people were asked to memorize numbers, pictures, sentences, or longer text.  People were asked to remember the words immediately after exposure (called the "baseline" condition) and/or after a time delay of an hour, a day, a month or a year.  Everyone studied the same set of words and took a test under the same set of conditions, so as to eliminate distractions. In some studies, the words were presented up to 15 times. The test sometimes asked people to decide whether a word or phrase had been seen before, and in other studies, people were asked to try to remember sets of words. The numbers of participants in the studies were routinely tiny.

125.    The observational studies were less controlled and involved quizzing people

**DECLARATION OF JON KROSNICK ISO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

GRAHAM**HOLLIS** APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103

about events that had occurred earlier in their lives and the like, such as names of classmates in school and locations of buildings on school campuses. People were not randomly assigned to one of various recall intervals (e.g., the time period between the event being recalled and the time when the participants attempted to recall it). For example, college students were asked to describe the campus surroundings, and alumni (who had graduated up to 48 years before) were asked to describe the same campus surroundings. But the current students cannot be interchanged with alumni; much older people remember the campus less well than current students, that can be because of the passage of time or the aging of the former recallers. And all long-term recall studies involved this sort of confound in the design.

126.     Among the publications cited by Rubin and Wenzel (1996), 55 were empirical articles (many reporting multiple studies) involving human participants that could be obtained through extensive searching. I focus my discussion on the 109 studies described in those 55 articles. The remaining 72 publications discussed by Rubin and Wenzel (1996) included (1) 11 empirical articles studying people that could not be obtained, (2) 13 empirical articles studying animals, and (3) 52 theoretical, background, statistics, or software articles that provide no empirical evidence on memory accuracy. Of the relevant empirical studies, 62% were of college student who chose to enroll in a psychology course, 13% were of people younger than age 18, 37% involved samples of 25 or fewer people, and 81% involved recall intervals of seconds, minutes, hours, days, months, or one year. Most importantly, only 17% of the studies pertained to autobiographical memory of the sort to be studied here, and only 11% were observational.

127.     And the studies of long recall intervals were quirky, to say the least. These studies measurement recall of the map of the city where the respondent went to college, of Spanish learned in school, of names and faces of people known in school, of facts about programs on television, and the like (Bahrick, H. P. (1983). The cognitive map of a city: Fifty years of learning and memory. In G. H. Bower (Ed.), The psychology of learning and motivation (Vol. 17, pp. 125-163). New York: Academic Press; Bahrick, H. P. (1984). Semantic memory content in permastore: Fifty years of memory for Spanish learned in

Graham**Hollis** APC
3555 Fifth Avenue Suite 200
San Diego, California 92103

50

school. <u>Journal of Experimental Psychology: General</u>, <u>113</u>, 1-27; Bahrick, H. P., Bahrick, P. O., & Wittlinger, R. P. (1975). Fifty years of memory for names and faces: A cross-sectional approach. <u>Journal of Experimental Psychology: General</u> <u>104</u>, 54-75; Squire, L. R. (1989). On the course of forgetting in very long-term memory. <u>Journal of Experimental Psychology: Learning, Memory, and Cognition</u>, <u>15</u>, 241-245). Furthermore, some of these studies (e.g., Rubin, 1982) asked respondents to remember events but did not check on the accuracy of those recollections.

128. No studies reviewed by Rubin and Wenzel examined retention of any repetitious phenomena such overtime work performed as an adult or anything like that. Therefore, we should be cautious about over-generalizing from those findings to the context of the present case. I believe that the accumulated literature on memory accuracy does not provide a solid basis for the claim that respondents cannot remember experiences from years ago at a level of accuracy sufficient for acceptance by a Court.

129. Psychologists have learned that an event that occurred long ago may be more memorable than a recent event for a variety of reasons. First, people are especially likely to remember events that they have experienced first-hand (e.g., Skowronski, J. J., Betz, A., Thompson, C. P., & Shannon, L. (1991). Social memory in everyday life: Recall of self-events and other events. <u>Journal of Personality and Social Psychology</u>, <u>60</u>, 831-843). Second, an important determinant of memory accuracy is rehearsal – the more times a person thinks again about the same event, the more likely he or she is to remember it accurately later. Third, memory accuracy is typically greater for events that have been witnessed repeatedly.

130. All three of these factors suggest that Quest Diagnostics employees may be well prepared to remember and describe their work experiences, especially if they are repetitive and consistent over time. For example, if an employee's pattern of taking rest breaks one week was similar to his or her experiences doing so during many other weeks, and if departures from this regularity happen repeatedly at predictable times in predictable ways, and those unusual workdays or weeks are also repeated within each year and across years, this will enhance the accuracy of recollections of these experiences. Therefore, Quest

**DECLARATION OF JON KROSNICK ISO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

GRAHAM**HOLLIS** APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103

Diagnostics employees may be quite able to describe the profiles of their work experiences accurately, even experiences that occurred years ago, and even if they varied from day to day, week to week, or month to month.

131.    One example of literature that critics sometimes use to claim that people cannot recall the length of time they performed activities related to work is a chapter reviewing literature on measurement error in surveys by Bound, Brown, and Mathiowetz (Bound, J., Brown, C., & Mathiowetz, N.  (2001). Measurement error in survey data. In J. J. Heckman and E. Learner (Eds.) Handbook of econometrics, vol. 5, New York: Springer-Verlag). Those authors reviewed evidence available as of about 20 years ago on the accuracy of reports of a quantity not of interest in this case: the number of hours individuals worked per week or per year. Based on the literature they reviewed, Bound et al. (2001) concluded that such reports could be subject to inaccuracy and bias. However, a close look at the methodologies of the studies reviewed by Bound et al. (2001) reveals that they all had significant methodological limitations and failed to meet the criteria necessary in order to permit reaching the conclusion that survey respondents' reports of work hours are notably inaccurate or biased (for a review of those studies and their flaws, see Appendix D).

132.    Furthermore, a number of additional studies have been published on the same topic, and they are uniformly subject to the same serious problems that undermine their diagnosticity. In Appendix D of this report, I explain the flaws in these articles and highlight why they cannot reach reliable conclusions about the accuracy of people's reporting in surveys of their work hours. Thus, attempts to use this literature to make claims about inaccuracy in surveys about work experiences are unjustified and misleading.

133.    In order to minimize recall errors, I will incorporate features of questionnaire design that the scientific literature shows enhance recall accuracy.  For example, the psychological literature on memory indicates that people recall events better when that recollection occurs in the same context as the events occurred (Baddeley, A., M. W. Eysenck, and M. C. Anderson.  (2009).  Memory. Psychology Press, New York, NY).  In order to take advantage of this principle in a survey, I will ask participating respondents to

Graham**HOLLIS** APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103

remember their past experiences working for Quest Diagnostics before asking about taking breaks. A second technique shown to enhance recall accuracy in surveys is the use of event history calendars (Belli, R. F. (1998). The Structure of Autobiographical Memory and the Event History Calendar: Potential Improvements in the Quality of Retrospective Reports in Surveys, Memory, 6, 383-406). To take advantage of that approach, I will precede recall questions in the questionnaire with an exercise during which the participating respondent recalls the temporal sequence of general events involving his or her employment with Quest Diagnostics.

134.    In addition to taking these steps and others to enhance recall accuracy, I will perform empirical tests to assess whether memory accuracy might be related to the length of the recall interval. When Quest Diagnostics employees are interviewed, some people will be asked about experiences that occurred relatively recently, whereas others will be asked about experiences that occurred longer ago (because some respondents stopped working for Quest Diagnostics longer ago than others). I will examine whether reports from respondents differ depending upon length of recall interval.

135.    If I find no systematic variation along these lines, then that would be reassuring about the accuracy of the data. If I do find differences, I will build a statistical model predicting answers to key questions utilizing various criteria, such as length of the recall interval. The estimated statistical parameters will allow me to carry out a simple statistical adjustment of answers yielding a set of results based upon the assumption that people's recollections of more recent experiences are more accurate.

## VII.    REPORTING AND EVALUATING RESULTS
### Confidence Levels

136.    As outlined above, all statistics computed using survey data involve uncertainty due to random sampling of the intended respondents, and that uncertainty is normally characterized by "margins of error" and/or "confidence intervals". A confidence interval is twice the margin of error, and the proper interpretation of the confidence interval is as follows: If the same survey procedures were to be repeated 100 times, over and over, measuring the same quantity (e.g., number of overtime hours worked), the 100

53

1   measurements of that quantity would be slightly different from one another due to random

2   sampling. The confidence interval defines the region around the survey's measurement of

3   that quantity (e.g., 5 hours of overtime worked per week on average) within which a

4   specified percentage of the 100 measurements of the quantity would fall.

5       137.    For a single survey's measurement of a quantity, various different confidence

6   intervals can be computed, at various different "confidence levels". A confidence level is

7   a number between 0% and 100% that specifies, in this example, the percent of the 100

8   surveys' measurements of the quantity that are expected to fall within the confidence

9   interval. It is possible for a scientist to use any of various different confidence levels to

10  compute statistics of various sorts, including confidence intervals, and all such confidence

11  levels and confidence intervals are equally scientifically valid. It would be incorrect to

12  claim that a scientist must use a specific confidence level to compute a confidence interval

13  or that a scientist would be most accurate or most informative only if he/she uses a specific

14  confidence level to compute a confidence interval.

15      138.    In published scientific journal articles, it is common to see the 95% confidence

16  level used, and perhaps that is most common, but it is also common to see the 99%

17  confidence level used and the 90% confidence level and many other values near these

18  numbers, such as 91%, 92%, 94%, 97%, 98%, 99.3%, 99.9%, and other levels as well (e.g.,

19  MacInnis, B., Krosnick, J. A., Abeles, A., Caldwell, M. R., Prahler, E., & Dunne, D. D.

20  (2015). The American public's preference for preparation for the possible effects of global

21  warming: impact of communication strategies. Climatic Change, 128, 17-33; Pasek, J.,

22  Sood, G., & Krosnick, J. A.  (2015). Misinformed about the Affordable Care Act?

23  Leveraging Certainty to Assess the Prevalence of Misperceptions. Journal of

24  Communication, 65, 660-673). This is not unusual and is in fact typical of many scholars

25  and of top journal publications.

26      139.    Thus, use of the 95% confidence level is in no way scientifically superior to

27  others and is widely believed to be just a baseless habit, the result of the statistician R. A.

28  Fisher's relatively arbitrary decision about how to print numbers easily in his 1925 book,

    not a decision about the optimal confidence level to use in statistical assessment or testing.

GRAHAMHOLLIS APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103

**DECLARATION OF JON KROSNICK ISO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

For example, Stephen Stigler, Professor of Statistics at the University of Chicago, said:

> "R. A. Fisher played a major role in the canonization of the 5% level as a criterion for statistical significance … Fisher needed tables for his 1925 book and, evidently, Karl Pearson would not permit the free reproduction of the *Biometrika* tables, so Fisher computed his own. It would have been impractical to provide a full table of the distribution for each pair of values. … So, Fisher initially settled on only giving one table for the 5% point. … 5% is arbitrary (as Fisher knew well), but fulfills a general social purpose." (Stigler, S. (2008). Fisher and the 5% level. Chance, 21, 12).

140. Indeed, a committee appointed by the National Science Foundation (the federal government's principal agency that funds basic science research across all fields) recently issued a report on best practices in scientific evidence and argued strongly against the exclusive reliance on a 95% confidence level: (https://www.nsf.gov/sbe/AC_Materials/SBE_Robust_and_Reliable_Research_Report.pdf): "… a study's report must provide exact estimates of effect sizes and p-values or other such statistics. Unfortunately, however, use of the *arbitrary* (emphasis added) cut-off of p<.05 has often led researchers to report simply whether a p-value is above or below that threshold" (p. 8-9). This committee recommended not relying exclusively on the 95% confidence level when reporting statistics and instead recommended that researchers consider various different confidence levels to be informative for assessing the reliability of a scientific finding, since no single confidence level is most appropriate or most informative for use.

141. In recent years, scientists have become aware that the use of the arbitrary 95% confidence level has been counter-productive in science, which is why the NSF subcommittee on which I served recommended against exclusive reliance on it. In fact, many papers have been published arguing that it is necessary for medical and social scientists (and scientists more generally) to abandon the exclusive reliance on the arbitrary 95% confidence level. For example, among the especially visible arguments in this discussion is an article entitled "Inference by Eye", which says: "The very common choice of C = 95 … may be a legacy of NHST, but researchers can use C = 90 or 99, or some other

**DECLARATION OF JON KROSNICK ISO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

GRAHAM**HOLLIS** APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103

value if there is good reason." (p. 172 in Cumming G., & Finch, S. (2005). Inference by eye: Confidence intervals and how to read pictures of data." <u>American Psychologist</u>, <u>60</u>, 170-180). In fact, one journal, <u>Basic and Applied Social Psychology</u>, recently announced that it will no longer consider publishing papers that describe statistical findings as "significant" or "non-significant" or that describe statistics based on 95% confidence levels (or any other confidence intervals). Clearly, the state of statistical practice is in transition – traditional conventions, especially those without justifications, are now being called into question. Experts are encouraging researchers to treat confidence level as a continuous variable ranging from 0% to 100%, rather than bifurcating studies into those in which the result is "reliable" and those in which it is "not reliable".

142. Courts have issued opinions recognizing that confidence levels other than 95% are acceptable for use in litigation. For example, in *Turpin v. Merrell Dow Pharmaceuticals, Inc.* (9th Cir.1992) 959 F.2d 1349, 1353 n.1, the Ninth Circuit acknowledged the propriety of a variety of confidence levels, explaining "[t]he confidence interval has two components: a percentage, and an interval or range." Here, when saying "a percentage", the Court is referring to the confidence level. The Court said: "Frequently this percentage is set at 95 percent, although that value is somewhat arbitrary and 85 or 90 percent figures are also used." (*Ibid*.)

143. Similarly, the District Court in *In re High-Tech Employee Anti-Trust Litigation* (April 4, 2014, N.D. Cal. 2014) WL 1351040 found that the fact that two variables were "not statistically significant at the 1%, 5%, and 10% levels goes to the weight, not the admissibility of [the expert's] model." In doing so, the district court relied on a Seventh Circuit case explaining why the "5 percent test is arbitrary." (Id. at *15)

144. In *Blakes v. Illinois Bell Telephone Co.* (N.D. Ill., Dec. 17, 2013) LEXIS 176496, the district court concluded that a margin of error calculated with a 90% confidence level was admissible and created a jury/credibility/weight question.

145. In their chapter called "Reference Guide on Statistics" in the Reference Manual on Scientific Evidence (Third Edition), published by the Federal Judicial Center and the National Academies in 2011, Kaye and Freedman noted that although the 95%

GRAHAM**HOLLIS** APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103

56

confidence level is popular in general use, the 99% and 90% confidence levels are used as well.  Throughout their chapter, Kaye and Freedman discussed a variety of confidence levels, including 68%, 95% and 99.7%.

146.   In sum, all confidence levels are equally valid, and a researcher may legitimately choose to report survey statistics using any of various different possible confidence levels.  The recipient of the researcher's report of survey statistics (e.g., a Court) may then decide whether those statistics are acceptable in the context in which they might be applied.  No scientist can provide a basis for asserting that the confidence level used to compute survey statistics must be 95%, nor (in my opinion) should any Court decide that this is inevitably and indisputably the superior confidence level to use when computing a confidence interval.  Therefore, I will compute confidence intervals at various different confidence levels, including the 95% confidence level, to allow the Court to decide which statistics to consider to be potentially informative at trial.

Interpreting Confidence Intervals

147.   It is especially important to bear in mind one fact when examining survey estimates and their confidence intervals.  If I report 95% confidence intervals, it may be tempting for some people to think that the true value of the estimate in the population could be anywhere within that confidence interval.  For example, if I estimate that the sample of employees worked 5 hours per week of overtime on average, with a confidence interval ranging from 4 hours to 6 hours, then an observer might think it is equally likely that the true number of overtime hours for the population is 4 hours or 4.5 hours or 5 hours or 5.5 hours or 6 hours.

148.   But this is not true, as shown in numerous published quotes about this topic, which use the term "point estimate" to refer to a statistical measurement of a quantity (e.g., 5 hours of overtime worked per person per week on average), which is the number at the midpoint of the confidence interval: "In reality, the point estimate and values near it are far better estimates of the true value based on the data than values further away but still within the interval (Savitz, D. A. (2003).  Interpreting epidemiological evidence: Strategies for study design and analysis.  New York: Oxford University Press, p. 256).  "The true value

Graham**Hollis** APC
3555 Fifth Avenue Suite 200
San Diego, California 92103

57

is most likely to be close to the point estimate, less likely to be near the outer limits of the interval and could (5 times out of 100) fall outside these limits altogether." (Fletcher, R., Fletcher, S. W. (2012). Clinical epidemiology: The essentials. LWW, p. 183). "You can consider the 95% confidence interval as defining the range that includes the true [relative risk reduction] 95% of the time. You will seldom find the true [relative risk reduction] toward the extremes of this interval…" (Dicenso, A., Guyatt, G., & Ciliska, D. (2005). Evidence-based nursing: A guide to clinical practice. Mosby, p. 61). "The point estimate…is the one value most likely to represent the true [relative risk reduction]. As one considers values farther and farther from the point estimate, they become less and less consistent with the observed RRR." (Dicenso, A., Guyatt, G., & Ciliska, D. (2005). Evidence-based nursing: A guide to clinical practice. Mosby, p. 62). "Values around the center of the [confidence interval], say around 52% to 54%, are the most plausible, the most likely, for the true value in the population. Values toward either end of the [confidence interval] are progressively less plausible, and values outside the interval even less so." (Cumming, G., & Calin-Jageman, R. (2016). Introduction to the new statistics: Estimation, open science, and beyond. Routledge, p. 4). Thus, no matter how wide the confidence interval is, the Court can have confidence that the true value of the estimate for the population is more likely to be close to the observed estimate than values farther and farther away.

149.    To illustrate this logic, consider this graph:

**DECLARATION OF JON KROSNICK ISO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**



150.    In this graph, the vertical axis is the probability that the true value of a measured quantity is each of the values on the horizontal axis.  The shaded area shows the 95% confidence interval, each half of which is the margin of error.  The taller the shaded area above any point on the horizontal axis, the more likely the true percentage is to be the percentage on the horizontal axis.  The value X in the center of the horizontal axis can be thought of as the value estimated by the survey.

151.    As we move farther and farther to the left or right of X, the shaded area gets shorter and shorter, meaning that the likelihood that these values on the horizontal axis are the true values of the variable of interest.  For example, the chances that the true value is at the left-most point of the shaded area is extremely small, because the shaded area to the left of this point (which is marked "lower limit" in the graph) is very short.

152.    Thus, although people sometimes misinterpret the margin of error as describing the interval in which a true value could be, with no information about how likely the true value is to be any of the specific points within that interval, this isn't true.  As the graph above shows, we do know how likely each of various possible values within the margin of error is to be the true value.  And the most likely true value of any variable is the value observed with the data in hand, X.

153.    Put differently, it is reasonable to say that there is only about a 2.5% chance that the true value of the estimate in the population is above the very highest point in the

**DECLARATION OF JON KROSNICK ISO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

Graham**Hollis** APC
3555 Fifth Avenue Suite 200
San Diego, California 92103

95% confidence interval, and there is only a 2.5% chance that the true value is below the very lowest point in the 95% confidence interval. The probability that the true value in the population is the observed value in the survey is much higher than 2.5%.[7] So when considering survey evidence, the Court's best estimate of the truth is the observed statistical estimate, at the center of the confidence interval.

154. But if a Court wishes to use survey evidence to learn not the value most likely to be the truth (e.g., the percent of class members who asked not to be called) but instead a lower bound estimate of the truth (meaning that there is a 97.5% chance that the true proportion is at least that large or larger, as shown by the dark black arrow above the graph), then the Court can rely on the lower bound of the 95% confidence interval. When viewed in this way, the larger the margin of error, the more advantageous the survey computation is for the Defendant in a case like the present one, reducing the apparent prevalence of adverse conditions. And if adopting this approach, a Court can legitimately (on scientific grounds) choose to adopt whatever confidence level it wishes. In other words, the Court could use the lower bound of the 90% confidence interval (meaning that there is a 90% chance that the damages owed are at least that value) or the lower bound of an 80% confidence interval (meaning that there is an 80% chance that the damages owed are *at least* that value).

Sample Size and Relative Margin of Error

155. Courts are routinely interested in knowing how large a survey's sample must be in order to describe a population of interest with adequate precision. Put another way, this question asks how small the confidence interval must be. And it is understandable that Courts would like this guidance when confronted with evidence based on statistical sampling.

156. All survey measurements are made at a specific and describable level of precision, and it must be up to the users of survey results to determine whether the observed level of precision is "fit for purpose," meaning adequate for the application of interest

Graham**Hollis** APC
3555 Fifth Avenue Suite 200
San Diego, California 92103

---

[7] This statement is not precisely true, because it is not precisely faithful to the technical meaning of the confidence interval. But this statement appropriately captures the logic of a confidence interval.

**DECLARATION OF JON KROSNICK ISO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

GRAHAM**HOLLIS** APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103

157.    Recently, however, Courts have issued rulings discussing the admissibility of survey evidence based on a statistic called the "relative margin of error." This statistic is the ratio of a survey estimate's margin of error to the survey estimate itself. The margin of error is half the confidence interval. So if a survey estimates that employees worked an average of 5 hours per week of overtime with a margin of error of plus or minus 1 hour, the relative margin of error is 1/5 = 20%.

158.    Some Courts have identified relative margins of error that they considered to be too large. For example, in *Bell v. Farmers*, the California Appellate Court noted that a relative margin of error of 32 percent was "an issue of constitutional dimension."[8] And in *Duran v. US Bank*, the California Supreme Court said that a relative margin of error of 42.3 percent was "intolerably large."

159.    In other cases, Courts have concluded that specific relative margins of error were acceptable. For example, in *United States of American ex rel. Glenda Martin* and *State of Tennessee ex rel. Glenda Martin, Plaintiffs/Relator, v. Life Care Centers of America, Inc., Defendant* Case No 1:08-cv-251; *United States of American ex. Rel. v. Life Care Centers of American, Inc., Defendant*, Case No. 1:12-cv-64, the United States District Court Eastern District of Tennessee at Chattanooga (Order dated September 29, 2014) concluded that a relative margin of error of 25 percent was "sufficiently reliable" (p. 18). And in *Stone v. Advance America, Cash Advance Centers* (S.D. Cal. 2011) 278 F.R.D. 562 (in which I was an expert), the District Court found that a point estimate of 23% with an 18% margin of error at a 95% confidence level (a relative margin of error of 78%) was "admissible."

160.    To a scientist, a Court relying on a relative margin of error to gauge the survey's reliability is extraordinarily surprising, because this statistic is exceedingly rarely referred to or used by scientists. For example, the most cited and popular textbook on survey research methods is: Groves, R. M., Fowler, F. J., Couper, M. P., Lepkowski, J. M.,

---

[8] The Court also said that their conclusion in this regard was specific to the circumstances of the evidence considered in *Bell*: "We do not mean to suggest that the margin of error alone may afford a bright-line constitutional distinction. The reliability of an estimate subject to a large margin of error might conceivably be bolstered by evidence of a high response rate, probable distribution within the margin of error, absence of measurement error, or other matters."

**DECLARATION OF JON KROSNICK ISO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

Singer, E., & Tourangeau, R. (2009). <u>Survey methodology</u> (2nd ed.). Hoboken, NJ: John

Wiley & Sons.  This book never mentions a "relative margin of error" or the ratio of the

margin of error to the estimate.  The same is true of the other leading textbooks on survey

research methods: Fowler, F. J. (2014). <u>Survey research methods</u> (5th ed.). Thousand Oaks,

CA: SAGE Publications, Inc., and Babbie, E. (1990). <u>Survey research methods</u> (2nd ed.).

Belmont, CA: Wadsworth, Cengage Learning.  Thus, there is not only no consensus or

guidance in the scientific literature about acceptable relative margins of error, but there is

almost no mention of that concept in the literature.

161.    Furthermore, it is possible to calculate relative margins of error for widely

accepted statistics published in highly prestigious publications, and they are routinely

much, much larger than the relative margins of error deemed unacceptable by Courts

recently.  For example, Cunningham et al. (2014; Cunningham, S. A., Kramer, M. R., &

Narayan, K. V. (2014). Incidence of childhood obesity in the United States. <u>New England

Journal of Medicine</u>, <u>370</u>(5), 403-411) reported statistics with relative margins of error of

92% and 61%.  Satizabal et al. (2016; Satizabal, C. L., Beiser, A. S., Chouraki, V., Chêne,

G., Dufouil, C., & Seshadri, S. (2016). Incidence of dementia over three decades in the

Framingham Heart Study. <u>New England Journal of Medicine</u>, <u>374</u>(6), 523-532) reported a

statistic with a relative margin of error of 52%.  Bibbins-Domingo et al. (2009; Bibbins-

Domingo, K., Pletcher, M. J., Lin, F., Vittinghoff, E., Gardin, J. M., Arynchyn, A., ... &

Hulley, S. B. (2009).  Racial differences in incident heart failure among young adults. <u>New

England Journal of Medicine</u>, <u>360</u>(12), 1179-1190) reported a statistic with a relative

margin of error of 295%.  Zheng et al. (2016; Zheng, Z., Jayaram, R., Jiang, L., Emberson,

J., Zhao, Y., Li, Q., ... & Collins, R. (2016). Perioperative Rosuvastatin in cardiac surgery.

<u>New England Journal of Medicine</u>, <u>374</u>(18), 1744-1753) reported a statistic with a relative

margin of error of 90%.  Hamdy et al. (2016; Hamdy, F. C., Donovan, J. L., Lane, J. A.,

Mason, M., Metcalfe, C., Holding, P., ... & Oxley, J. (2016). 10-year outcomes after

monitoring, surgery, or radiotherapy for localized prostate cancer. <u>New England Journal of

Medicine</u>, <u>375</u>(15), 1415-1424) reported a statistic with a relative margin of error of 77%.

Doan et al. (2016; Doan, R. N., Bae, B. I., Cubelos, B., Chang, C., Hossain, A. A., Al-

Graham**Hollis** APC
3555 Fifth Avenue Suite 200
San Diego, California 92103

Saad, S., ... & Gascon, G. G. (2016). Mutations in human accelerated regions disrupt cognition and social behavior. *Cell, 167*(2), 341-354) reported a statistic with a relative margin of error of 76%.  Chudnovskiy (2016; Chudnovskiy, A., Mortha, A., Kana, V., Kennard, A., Ramirez, J. D., Rahman, A., ... & Amir, E. A. D. (2016). Host-protozoan interactions protect from mucosal infections through activation of the inflammasome. *Cell, 167*(2), 444-456) reported a statistic with a relative margin of error of 56%.  Zhong et al. (2016; Zhong, F. L., Mamaï, O., Sborgi, L., Boussofara, L., Hopkins, R., Robinson, K., ... & Tye, H. (2016). Germline NLRP1 mutations cause skin inflammatory and cancer susceptibility syndromes via inflammasome activation. Cell, 167(1), 187-202) reported a statistic with a relative margin of error of 58%.  Alem et al. (2016; Alem, S., Perry, C. J., Zhu, X., Loukola, O. J., Ingraham, T., Søvik, E., & Chittka, L. (2016). Associative mechanisms allow for social learning and cultural transmission of string pulling in an insect. PLoS <u>Biol</u>, <u>14</u>(10), e1002564) reported a statistic with a relative margin of error of 133%.  Rutz et al. (2016; Rutz, C., Klump, B. C., Komarczyk, L., Leighton, R., Kramer, J., Wischnewski, S., ... & Switzer, R. A. (2016). Discovery of species-wide tool use in the Hawaiian crow. <u>Nature</u>, <u>537</u>(7620), 403-407) reported statistics with relative margins of error of 83% and 61%.

162.  Most importantly, the relative margin of error is a meaningless concept for evaluating the reliability of survey measurements, because there is no one relative margin of error for many survey statistics and instead there are two, which can lead to very different implications and abuse regarding the reliability of survey measurements. Consider, for example, a survey such as that in *Duran v. US Bank* that sought to document the percent of bank employees who were <u>misclassified</u> as exempt employees when in fact they were non-exempt.  Imagine that according to the survey data, 91% of respondents were misclassified, with a margin of error of plus or minus 3 percentage points.  So a researcher could compute a relative margin of error of 3 divided by 91 to yield <u>3%,</u> which seems to be very small.  But that very same survey result can be described very differently: 9% of respondents were <u>properly</u> classified, and the relative margin of error of that statistic is 3 divided by 9 equals <u>33%.</u>  Thus, this single survey measurement can be said to have

GRAHAM**HOLLIS** APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103

two different relative margins of error, one small and the other much larger. Neither of these is more correct than the other, and most importantly, neither accurately describes the reliability of the survey measurement. Thus, it does not make sense and there is no scientific basis on which to reach conclusions about the reliability of the measurement (in this example, that 91% of respondents were misclassified) based on a ratio of a margin of error to an estimate.

163.    Thus, because there is no scientifically defensible standard for determining how small a relative margin of error must be in order for an estimate to be reliable, and because the computation of relative margin of error is itself meaningless in practice with most survey measurements, it seems unwise for Courts to rely on the relative margin of error to determine the acceptability of a survey estimate in this case or any other case. And indeed, the U.S. District Court, District of Massachusetts (*Massachusetts Mutual Life Insurance Company Plaintiff, v. Residential Funding Company LLC, et. A. Defendants*. Civil Action No. 11-30035-PBS, Memorandum and Order, December 9, 2013, p. 19) agreed with this conclusion: "… using a confidence interval of 20 percentage points does not make a statistical methodology inherently unreliable. Hr'g Tr. 185-87; Barnett Dep., Tr. 100-102. … As other courts have concluded, the ± 10 percentage point margin of error does not render Dr. Cowan's methodology unreliable. <u>The margin of error speaks to the "persuasive power of the sample, not its admissibility</u>." (emphasis added) *Fed. Hous. Fin. Agency*, 2012 WL 6000885, at *10; see also In re Countrywide, 2013 WL 6231713, at *8-9. Likewise, in Stone v. Advance America, Cash Advance Centers (S.D. Cal. 2011) 278 F.R.D. 562 (in which I was an expert), the District Court found that the size of the margin of error "goes to the weight of the evidence." Similarly, the Court in Bell v. Farmers said: "We do not mean to suggest that the margin of error alone may afford a bright-line constitutional distinction." The critical point here is the conclusion that margin of error and the relative margin of error are not in themselves useful to determine the admissibility of statistical evidence but can be suitably considered when determining weight.

164.    Nonetheless, in my final report, I will report confidence intervals, margins of error, and relative margins of error at various different confidence levels using this survey's

GRAHAM**HOLLIS** APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103

data.

Proportion of the Population Interviewed

165.    It is sometimes tempting to think that a survey that involved interviewing a small portion of a population cannot possibly be accurate in characterizing the population as a whole. In fact, though, surveys using best practices routinely interview very small proportions of the population and yet yield highly accurate results. Consider again these examples, which are all final scientific pre-election polls done with random samples of voters contracted by random digit dialing to landlines and cell phones predicted the proportions of votes cast in the 2016 U.S. Presidential Election:

| Candidate | Actual Results | Bloomberg | ABC/ WaPo | Fox News | NBC/ WSJ | CBS News |
|---|---|---|---|---|---|---|
| Clinton | **48%** | 48% | 50% | 50% | 48% | 48% |
| Trump | **46%** | 45% | 45% | 45% | 44% | 44% |

Each of these polls interviewed a tiny fraction of the population:

| Bloomberg | ABC/ WaPo | Fox News | NBC/ WSJ | CBS News |
|---|---|---|---|---|
| .001% | .002% | .001% | .001% | .001% |

166.    If a survey is designed to collect data from a random sample of the proposed class, then a simple random sample should be drawn from the list of proposed class members. In addition, a desired number of completed interviews should be specified in advance of sample drawing. Then, on the basis of prior experience conducting similar surveys, the selected survey firm should calculate the expected response rate for the survey. The desired number of completed interviews and the expected response rate can then be used to generate the number of proposed class members to be "released" for data collection within the specified time period (longer, the better to acquire data from a larger proportion

**DECLARATION OF JON KROSNICK ISO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

GRAHAM**HOLLIS** APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103

of sought respondents).  The number of proposed class members released should be optimized to maximize the survey response rate.  This is done by releasing the fewest number of proposed class members possible and devoting considerable effort to collecting data from these individuals.

Questionnaire Design

167.    A key factor that determines the accuracy of a survey is its questionnaire. Survey research is premised upon the notion that all respondents should be asked the same questions in the same way. The wordings of questions are typically specified through an extensive design process. Questions are drafted based upon a set of principles that seek to achieve comprehensibility, uniform understanding across respondents, and the absence of forces biasing respondents toward any given answer. A huge literature of thousands of scientific studies now exists identifying these principles and guiding researchers in how best to word questions to achieve these goals (Krosnick, J. A., & Presser, S.  (2010). Questionnaire design.  In J. D. Wright & P. V. Marsden (Eds.), Handbook of survey research (Second Edition).  West Yorkshire, England: Emerald Group).

168.    Based on these principles, I will design questions to be asked in a survey for this case to measure six key concepts: (1) whether Quest Diagnostics California Patient Service Representatives (CPSRs) were ever told that they are entitled to be free of duty for 10 minutes of uninterrupted time for a rest period compliant with California employment law, (2) whether CPSRs were impeded or discouraged from taking rest periods, (3) whether CPSRs were ever told that, under California law, they were entitled to premium payments for missed rest breaks, (4) whether CPSRs were told how to request payment of a rest period premium for each missed rest break, (5) whether any Quest Diagnostics employee took any steps to authorize and permit CPSRs to take rest breaks to which they were entitled under California law, (6) how often CPSRs took uninterrupted duty-free rest breaks of at least 10 minutes as prescribed by California law, (7) how much time CPSRs spend with patients providing treatment, to allow for calculation of whether it is possible to meet all job requirements while taking rest breaks prescribed by California law, and (8) what formal education, training, and professional experience CPSRs have that may influence their

Graham**Hollis** APC
3555 Fifth Avenue Suite 200
San Diego, California 92103

hourly compensation rate, to allow for assessment of the presence of racial disparities.

169. After questions are drafted, I will subject them to the standard procedure in survey research called "cognitive pretesting". Cognitive pretesting is a procedure developed to assure that questions can be easily understood by respondents and are understood as intended by researchers. The process involves (1) having respondents warm up by hearing a simple question (e.g., "How many windows are in your house?") and first restating the questions in their own words, not using any of the words in the original question, and then answering the questions while verbalizing their thoughts orally. Then respondents repeated that procedure in response to each of the questioned drafted for a survey. This allows researchers to evaluate whether respondents have any difficulty interpreting each question or interpret it in a way not intended. Questions can be revised based on the results of cognitive pretesting and then subjected to more such pretesting.

## VIII.  <u>PROCEDURE FOR IMPLEMENTING A QUEST DIAGNOSTICS SURVEY</u>

170. In order to implement a survey in this case as outlined above, the following sequence of events could be executed:

1) Draw a simple random sample of class members to be slated for interviewing.

2) Obtain up to date contacting information, including telephone numbers, for the selected class members.

3) Design a questionnaire to measure the key variables.

4) Subject the questionnaire to cognitive pretesting and revise it accordingly.

5) Write and test software to implement the questionnaire with a computer-assisted telephone interviewing system.

6) Prepare and mail "advance letters", which provide insight into who is conducting the survey and what will be discussed in general terms, including a small financial incentive (perhaps $2 in cash) and the promise of an additional financial incentive pending completion of the interview and an additional financial incentive if the respondent calls in before being called.

Graham**Hollis** APC
3555 Fifth Avenue Suite 200
San Diego, California 92103

7) Hire and train interviewers. The process of training involves (1) interviewers spending time with the written questionnaire to practice reading the questions as well as "FAQs", which are suggested answers to questions that respondents might ask the interviewer during the interview conversation, and text to use to make initial contact with the respondents and text to be left as voicemails. Then, once an interviewer is comfortable understanding and saying all of that, he/she practices administering the questionnaire with other interviewers acting as respondents. After the interviewer becomes comfortable in that process using the CATI software, he/she goes on to practice the interview with "faux respondents", who are members of the research staff who pretend to be respondents and behave in ways that challenge the interviewers. When the interviewer gains sufficient competence, he/she goes through a certification process to confirm that he/she is ready to begin main study interviewing.

8) Have certified interviewers complete interviews while being closely monitored and supervised, providing respondents with financial incentives. While the interviews are being conducted, analyze the obtained data to observe the distributions of responses and their margins of error in order to evaluate in real time whether interviews with additional respondents should be sought.

9) Verify a random subset of the interviews by having an independent firm call the respondents to confirm that they had in fact been interviewed.

10) Convert the obtained data into a suitably structured data file for statistical analysis and conduct statistical analyses. This process begins soon after data collection begins, and researchers monitor the incoming data to identify and fix any problems in the survey implementation.

11) Compare the interviewed respondents with the individuals in the released sample who did not provide data and with the entire population as a whole, to ascertain whether the two groups are notably different from one another

**DECLARATION OF JON KROSNICK ISO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

(in terms of as much obtainable information as possible), which would be evidence of non-response bias in the final sample. If such differences do appear, assess whether the variables manifesting non-response bias are associated with the key variables of interest in the survey. Then compute final results after weighting the sample to match the known characteristics of the full population.

12) Conduct auxiliary analyses comparing the answers describing more recent experiences with the answers describing experiences that happened longer ago in time. If these two types of reports differ, then implement statistical adjustments to the more distant memories so that they resemble the memories of recent events, on the assumption that more recent events are recalled more accurately.

13) Using the questionnaire items described above ascertaining knowledge of the existence and purpose of the lawsuit, conduct statistical analyses to test whether consumers who were aware of the purpose of the lawsuit provided systematically different answers than those provided by unaware respondents. If such differences appear, statistical adjustments can be made to the data provided by consumers who possessed such information so that they resemble the people who did not have such understanding, on the assumption that people without knowledge of the lawsuit's purpose provided more accurate reports.

171. This procedure is designed to produce an intended survey sample that is representative of the entire class of consumers. By selecting a sample randomly from the class list, the selected intended sample will, as a group, closely resemble the entire class. And by carrying out statistical analyses comparing the participating respondents with the entire class, we can assess deviations and carry out statistical adjustments if called for, so that the resulting survey data are representative of the class.

## IX.  CALCULATION PROCEDURES

172.  At present, I plan to use the following procedures to compute quantities of

**DECLARATION OF JON KROSNICK ISO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

GRAHAM**HOLLIS** APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103

value to the court in this case:

> (1) The proportion of California Patient Service Representatives (CPSRs) who were ever told that they are entitled to be free of duty for 10 minutes of uninterrupted time for a rest period compliant with California employment law,
>
> (2) The proportion of CPSRs who were impeded or discouraged from taking rest periods to which they were entitled under California law,
>
> (3) The proportion of CPSRs who were ever told that, under California law, they were entitled to premium payments for missed rest breaks,
>
> (4) The proportion of CPSRs who were told how to request payment of a rest period premium for each missed rest break,
>
> (5) The proportion of CPSRs who observed any Quest Diagnostics employee taking any steps to authorize and permit the CPSR to take rest breaks to which he or she was entitled under California law,
>
> (6) How often and when CPSRs took uninterrupted duty-free rest breaks of at least 10 minutes as prescribed by California law.

173.  With regard to (6) above, I will compare respondents' reports to when they took rest breaks to when California law prescribes that these respondents should have taken such breaks.  I will then calculate the number of breaks missed by each respondent.  I will then project that number up to the entire population of class members by multiplying by the inverse of the sampling fraction.  I will then use work time records and payroll records to calculate the hourly compensation rate earned by all class members and multiply the number of rest breaks missed by the class by this hourly compensation rate to yield a calculation of total damages due to the class for this reason.

174.  In addition, I will use survey responses to calculate how much time CPSRs spend with patients providing treatment.  I have been told that records exist that document how many patients have been scheduled for treatment and how many CPSRs have been scheduled to work each day.  With all of those figures, I will calculate whether it is possible for the CPSRs to meet all job requirements while taking rest breaks prescribed by

Graham**Hollis** APC
3555 Fifth Avenue Suite 200
San Diego, California 92103

70

California law.

175.   Lastly, I will use the survey's measurements of CPSRs' formal education, training, and professional experience, in conjunction with their hourly compensation rate and job promotion history, to explore whether, holding all relevant consideration constant, racial disparities appear in compensation.

## X.   DIAMOND'S (2011) CRITERIA

176.   In her 2011 chapter entitled "Reference Guide on Survey Research" in the <u>Reference Manual on Scientific Evidence</u>, Third Edition, published by the Federal Judicial Center and National Research Council of the National Academies)[9], Dr. Shari Diamond listed several questions that should be asked about any survey evidence that is submitted for a court's consideration.  I next explain how all the issues she raised have been handled in the survey:

*Was the Survey Designed to Address Relevant Questions?*

The survey will be designed to measure quantities of interest to answer the questions of interest in this case, as outlined above.

*Was Participation in the Design, Administration, and Interpretation of the Survey Appropriately Controlled to Ensure the Objectivity of the Survey?*

Administration of the telephone interviews will most likely be conducted by a highly reputable survey research firm with an established track record of excellence in the profession. All individuals at the firm who participate in the collection of the survey data will be unaware that this project is linked to litigation and will be unaware of who paid for the costs of the survey, with a few exceptions. These exceptions are individuals who are (1) high-level managers who have no direct conversations with the respondents and never discuss the litigation-relevance of the study with any other employees at the firm, or (2) financial staff who accept payment for the costs of the project and have no contact with the respondents and never discuss the litigation-

Graham**Hollis** APC
3555 Fifth Avenue Suite 200
San Diego, California 92103

---

[9] http://www.fjc.gov/public/pdf.nsf/lookup/SciMan3D01.pdf/$file/SciMan3D01.pdf

relevance of the study with any other employees at the firm.

The design and interpretation of the survey will be done by me. I will take all necessary steps to ensure objectivity in all of their activities and will not disclose the sponsor of the study or litigation-relevance to any interviewers or respondents. The design of the survey will be done according to principles of best practices in survey research and questionnaire design, and the analysis of the data and interpretation of the analysis results will be done according to widely-accepted principles in social science, all intended to assure objectivity and accuracy.

*Are the Experts Who Designed, Conducted, or Analyzed the Survey Appropriately Skilled and Experienced?*

I have appropriate training, skills, and experience.

*Are the Experts Who Will Testify About Surveys Conducted by Others Appropriately Skilled and Experienced?*

No testimony about surveys conducted by others will be offered. All offered testimony will address the survey that I have designed and am conducting for this case.

*Was an Appropriate Universe or Population Identified?*

For this survey, the population is the people named on the lists to be provided by Defendants to Plaintiffs' attorneys and to my research team.

*Did the Sampling Frame Approximate the Population?*

Defendants will disclose a complete list of all class members, and this will serve as the sampling frame - the population of interest.

*Does the Sample Approximate the Relevant Characteristics of the Population?*

*What Is the Evidence That Nonresponse Did Not Bias the Results of the Survey?*

All individuals in the population will be eligible to be included in the random sample to be interviewed, with known probabilities of selection. As outlined above, an accumulating literature demonstrates that if best practices of sampling and recruitment are implemented, the participating respondents are

mostly likely to closely resemble the population within known bounds of uncertainty. Statistical analyses will be conducted to gauge the match of the participating individuals with the population. If discrepancies are found, results will be obtained after weighting and adjusting the survey data to maximize resemblance of the participating sample to the population.

*What Procedures Were Used to Reduce the Likelihood of a Biased Sample?*

Several best practices in survey research will be used to maximize the response rate of the survey: first, all respondents will receive a pre-notification letter, accompanied by a small financial pre-incentive to thank each respondent for reading it. This letter will inform prospective respondents that they are being invited to participate in the survey, that an interviewer will be calling to invite their participation, and that they can call in to be interviewed. Respondents will be offered a financial incentive for their participation and added incentive if they call in before being reached by an interviewer.

Extensive tracing will be done to yield as much accurate information with which to contact each prospective respondent as possible. The tracking will be done using the contact information provided by Defendants via Plaintiffs' attorneys or other sources.

At the beginning of each telephone conversation with someone other than the potential respondent, several questions will be asked to acquire contact information to reach the potential respondent. This will include asking for other telephone numbers that might be used to reach the potential respondent and ascertaining times when the potential respondent could perhaps be reached. Interviewers will leave messages (including callback information) with household members to be given to potential respondents.

After a period of interviewing, additional letters will be mailed to class members who are still being actively dialed to encourage participation. Attempts to reach these individuals by telephone will continue.

*What Precautions Were Taken to Ensure That Only Qualified Respondents Were*

GRAHAM**HOLLIS** APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103

*Included in the Survey?*

Interviews will be attempted only with people who are listed (on the list provided by Defendants). When the contact information provided for these people by Defendants proves to be inaccurate or out of date, reputable firms will be used (who are in the business of tracing people) to provide updated contact information. Once an individual has been contacted who we believe is a class member, the individual will be asked to confirm that he or she worked for Defendants before the interview begins.

*Were Questions on the Survey Framed to Be Clear, Precise, and Unbiased?*

The questions will be drafted according to the principles of optimal questionnaire measurement identified in the published peer reviewed academic literatures on survey methodology and related fields, drawing on my expertise and years of experience in the field. I have published numerous papers on this topic and am known as an expert on this topic. I am very aware of what the relevant literature shows. These best practices principles are designed to maximize question clarity and precision and to avoid bias.

After a draft questionnaire is created, cognitive pretesting interviews will be conducted to evaluate the performance of the questionnaire, and appropriate revisions will be made and tested. This step ensures that respondents properly and easily understand the questions and is mentioned as a procedure to achieve this requirement in the Diamond (2011) chapter.

When the study interviewing begins, the researchers will monitor the interviews to observe whether the interviewers are administering the questionnaire as intended and also to observe whether the respondents are manifesting any difficulty interpreting or understanding the questions or provided answers that revealed misunderstandings of the questions. If any problems are observed, intervention to correct them will occur immediately.

*Were Some Respondents Likely to Have No Opinion? If So, What Steps Were Taken to Reduce Guessing?*

**DECLARATION OF JON KROSNICK ISO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

GRAHAM**HOLLIS** APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103

As describe above, respondents will be asked to report the certainty with which they express opinions in this case. Statistical analyses will be conducted using the certainty judgments, and if called for, adjustments will be made.

In addition, respondents will be told in the advance letter and at the beginning of the interviews that the project is for an important purpose and that it's critically important that they take their time to answer all questions carefully and accurately. Respondents will be asked to make an oral commitment to do so before beginning the interview. This has been shown to enhance the accuracy of survey reports (Cannell, C. F., Miller, P. V., & Oksenberg, L. (1981). Research on interviewing techniques. Sociological Methodology, 12, 389-437).

*Did the Survey Use Open-Ended or Closed-Ended Questions? How Was the Choice in Each Instance Justified?*

The large literature on optimal questionnaire design indicates that an open-ended format is optimal when the construct being measured is (1) a number, or (2) non-numeric and categorical, with a universe of possible answers that cannot be known in advance of administering the survey. Otherwise, closed-ended questions function well.

In this survey, all measurements will be made in accord with this guidance from the literature. Thus, the questionnaire will conform to the principles of best practices in this regard.

*If Probes Were Used to Clarify Ambiguous or Incomplete Answers, What Steps Were Taken to Ensure That the Probes Were Not Leading and Were Administered in a Consistent Fashion?*

No probes will be implemented.

*What Approach Was Used to Avoid or Measure Potential Order or Context Effects?*

Question order effects (also called context effects) occur when asking one question changes a person's answers to a subsequent question, which would

**DECLARATION OF JON KROSNICK ISO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

GRAHAM**HOLLIS** APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103

have been answered differently had the prior question not been asked. Although the scholarly literature has documented question order effects for particular types of questions (e.g., asking a general question before asking specific versions of the same question, such as whether you like your life overall and whether you like specific aspects of your life), in general, question order effects have been found to occur rarely. For example, Smith (1991) conducted a large-scale analysis of many experiments and found that "Overall the number of context effects created by the rotation design employed by the GSS prior to 1988 are minuscule; 11-12 probable order effects out of over 500 variables" (Smith, T. W. (1991). Context effects in the General Social Survey. In Paul P. Biemer, Robert M. Groves, Lars E. Lyberg, Nancy A. Mathiowetz, & Seymour Sudman (Eds.), Measurement Error in Surveys. New York: John Wiley, p. 69). Similarly, Schuman and Presser (1981) conducted a similar analysis with data from 113 different experiments and found 8 statistically significant effects, just two more than would be expected by chance alone (Schuman, H., & Presser, S. (1981). Questions and Answers in Attitude Surveys: Experiments on Question Form, Wording, and Context. New York: Academic Press). Therefore, the threat of question order effects is quite minimal.

Diamond (2011) suggested using a particular type of order when asking general and specific questions on the same topic, but this study's questionnaire will include no such sequences. Dr. Diamond also suggested randomizing the order of questions to minimize the potential for question order effects. I do this in any instances where past research indicates that a question sequence is at risk for question order effects. Completely randomizing question order would transform an orderly sequence of questions into an incomprehensible shuffling from question topic to question topic and thereby compromise measurement quality, so that is not typically done, and I will not do it.

**DECLARATION OF JON KROSNICK ISO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

*If the Survey Was Designed to Test a Causal Proposition, Did the Survey Include an Appropriate Control Group or Question?*

The survey will not be designed to test causal propositions.

*What Limitations Are Associated with the Mode of Data Collection Used in the Survey?*

Diamond (2011) said that Computer Assisted Interviewing (CAI) procedures are suitable in situations such as the present survey. Diamond (2011) said that when telephone interviewing is conducted, the survey report should specify:

- "The procedures that were used to identify potential respondents, including both the procedures used to select the telephone numbers that were called and the procedures used to identify the qualified individual to question" (p. 405). All of this will be discussed in my report.

- "The number of telephone numbers for which no contact was made" (p. 405). This will be discussed in my report.

- "The number of contacted potential respondents who refused to participate" (p. 405). This will be discussed in my report.

*Were the Interviewers Appropriately Selected and Trained?*

The telephone interviewers will be carefully selected by the telephone interviewing firm's supervisors and the researchers based upon their ability to carry out the required work properly, and they received extensive training and supervision. The researchers will oversee extensive training of the interviewers for this particular study, listen to each one conduct practice interviews, and certify that each interviewer is ready to conduct main study interviews before beginning to do so. After interviewer training is completed, conventional pretesting will be conducted. Specifically, while interviewers administer the questionnaire to respondents, the researchers will listen in and provide advice to the interviewers and supervisors about appropriate pacing, voice inflection, and delivery. To supplement the conventional pretest respondents, faux respondents will be interviewed by the interviewers to allow

**DECLARATION OF JON KROSNICK ISO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

GRAHAM**HOLLIS** APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103

further practice and refinement of their approach. This will constitute further training.

*What Did the Interviewers Know About the Survey and Its Sponsorship?*

The interviewers will not be informed of the sponsor of the survey or any purpose beyond the information provided in the interviewer training materials and the scripts. They will be told that I am the Principal Investigator of the project, but interviewers will not be told who hired me or who is paying for the survey.

*What Procedures Were Used to Ensure and Determine That the Survey Was Administered to Minimize Error and Bias?*

Diamond (2011) listed three potential methods for ensuring that a survey is administered to minimize error and bias: monitoring the interviews, validation of interviews, and reviewing the work done by individual interviewers.

In addition to regular monitoring of all interviewers by supervisors, my colleagues and I will monitor calling by all interviewers to ensure that the training principles were and are being implemented properly during the main survey.

To validate the interviews, a third-party research firm will conduct telephone interviews with a random sample of respondents who completed the main survey interviews. These people will be called to confirm that they completed interviews. The main study interviewing firm will provide the second firm with the names of the respondents who completed main study interviews, the date and time of each interview, and the telephone number used to reach each respondent. The second firm will then randomly select a subset of the respondents and attempt to reach them. This procedure will conform to exactly what Diamond (2011) recommended.

As prescribed by Diamond (2011), the data collected by the interviewers will be reviewed to identify problematic patterns.

*What Was Done to Ensure That the Data Were Recorded Accurately?*

**DECLARATION OF JON KROSNICK ISO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

During interviewer training, supervisors will monitor interviewer behavior to be sure that responses are recorded properly.

*What Was Done to Ensure That the Grouped Data Were Classified Consistently and Accurately?*

No data will be grouped in this survey.

*When Was Information About the Survey Methodology and Results Disclosed?*

Information about the survey methodology and results will be disclosed fully in the final report I will submit to the Court following conduct of all survey data collection and data analysis.

*Does the Survey Report Include Complete and Detailed Information on All Relevant Characteristics?*

Diamond (2011) listed several specific areas that should be discussed in any survey report. These include:

1. "The purpose of the survey" (p. 415).

2. "A definition of the target population and a description of the sampling frame" (p. 415).

3. "A description of the sample design, including the method of selecting respondents, the method of interview, the number of callbacks, respondent eligibility or screening criteria and method, and other pertinent information" (p. 415).

4. "A description of the results of sample implementation, including the number of Potential respondents contacted, Potential respondents not reached, Non eligible, Refusals, Incomplete interviews or terminations, Completed interviews" (p. 415).

5. "The exact wording of the questions used, including a copy of each version of the actual questionnaire, interviewer instructions, and visual exhibits" (p. 415).

6. "A description of any special scoring (e.g., grouping of verbatim

Graham**Hollis** APC
3555 Fifth Avenue Suite 200
San Diego, California 92103

responses into broader categories)" (p. 415).

7. "A description of any weighting or estimating procedures used" (p. 416).

8. "Estimates of the sampling error, where appropriate (i.e., in probability samples)" (p. 416).

9. "Statistical tables clearly labeled and identified regarding the source of the data, including the number of raw cases forming the base for each table, row, or column" (p. 416).

10. "Copies of interviewer instructions, validation results, and code books." (p. 416).

All of this information will be provided.

*In Surveys of Individuals, What Measures Were Taken to Protect the Identities of Individual Respondents?*

None of the principal researchers will have any information about who is selected to be invited to participate in the survey or who participates in any data collection.

All identifying information will be stored on password-protected computers. In the data files possessed by the principal researchers, respondents will be identified only by numbers that cannot be connected to their names. Only the interviewing firm will have access to that link for sample management and incentive fulfillment purposes, and they are professionally committed to protecting these identities and never revealing them, according to the code of ethics of the professional association of their industry, The American Association for Public Opinion Research.

Diamond (2011) said that "Copies of all questionnaires should be made available upon request so that the opposing party has an opportunity to evaluate the raw data. All identifying information, such as the respondent's name, address, and telephone number, should be removed to ensure respondent confidentiality" (p. 418). In keeping with this advice, the

**DECLARATION OF JON KROSNICK ISO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

GRAHAM**HOLLIS** APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103

identities of respondents will not be provided as part of the survey documentation in this or my final report, and the investigators will not possess such information.

Thus, all of Diamond's (2011) issues have been and will be addressed properly.

## XI.    **CONCLUSION**

177.    The Quest Diagnostics case constitutes a sensible context in which to take advantage of the science of survey research methodology for informing the Court.  By designing and implementing a survey conforming to the best practices of the field, I am confident that data can be generated on the central issues at stake in this case.

I make this declaration under penalty of perjury under the laws of the United States and the State of California this 29th day of November, 2020, at Portola Valley, California.

Jon A. Krosnick

**DECLARATION OF JON KROSNICK ISO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

GRAHAM**HOLLIS** APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Appendix A

Curriculum Vita of Jon A. Krosnick

**DECLARATION OF JON KROSNICK ISO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

<u>CURRICULUM VITAE</u>

Jon A. Krosnick

| | |
|---|---|
| <u>Home Address</u> | 10 La Sandra Way<br>Portola Valley, California 94028<br>(650) 851-9143 |
| <u>Office Address</u> | 434 McClatchy Hall<br>Stanford University<br>450 Serra Mall<br>Stanford, California 94305<br>(650) 725-3031<br><br>E-mail: Krosnick@stanford.edu<br>Fax: (650) 725-2472 |
| <u>Websites</u> | http:www.jonkrosnick.com<br>http://communication.stanford.edu/faculty/krosnick.html<br>http://www.stanford.edu/group/polisci/faculty/krosnick.html<br>http://climatepublicopinion.stanford.edu/<br>https://pprg.stanford.edu/<br>http://bps.stanford.edu/ |
| <u>Education</u> | The Lawrenceville School, with academic distinction, 1976.<br><br>A.B., Harvard University (in Psychology, Magna Cum Laude), 1980.<br><br>M.A., University of Michigan (in Social Psychology, with Honors), 1983.<br><br>Ph.D., University of Michigan (in Social Psychology), 1986. |

<u>Employment</u>

| | |
|---|---|
| 2020-2021 | Faculty Research Fellow, Center for Comparative Studies in Race and Ethnicity, Stanford University. |
| 2017- | Affiliated Faculty Member, Emmett Interdisciplinary Program in Environment and Resources, Stanford University. |
| 2015-2019 | Research Advisor, Gallup, Princeton, New Jersey. |
| 2015- | Affiliate, Woods Institute for the Environment, Stanford University. |
| 2014-2016 | Affiliated Faculty Member, Meta-Research Innovation Center at Stanford (METRICS), Stanford University. |
| 2013-2014 | Visiting Research Collaborator, Princeton Institute for International and Regional Studies and the Princeton Environmental Institute, Princeton University. |
| 2010- | Research Psychologist, Center for Survey Measurement, U.S. Census Bureau, United States Department of Commerce. |

| | |
|---|---|
| 2009-2010 | Research Psychologist, Statistical Research Division, U.S. Census Bureau, United States Department of Commerce. |
| 2006-2010 | Research Professor, Survey Research Laboratory, University of Illinois. |
| 2005-2011 | Co-Principal Investigator, American National Election Studies. |
| 2004- | Frederic O. Glover Professor in Humanities and Social Sciences, Stanford University. |
| 2004- | Professor, Department of Communication, Stanford University. |
| 2004- | Professor, Department of Political Science, Stanford University. |
| 2004- | Professor, Department of Psychology (by courtesy), Stanford University. |
| 2004-2008 | Associate Director, Institute for Research in the Social Sciences, Stanford University. |
| 2008-2014 | Senior Fellow, Woods Institute for the Environment (by courtesy), Stanford University. |
| 2005-2008 | Senior Fellow, Woods Institute for the Environment, Stanford University. |
| 2004-2007 | Director, Methods of Analysis Program in the Social Sciences, Stanford University. |
| 2004-2006 | Visiting Professor, Department of Psychology, The Ohio State University. |
| 2003-2004 | Visiting Professor, Department of Communication, Stanford University. |
| 1986-2004 | Assistant to Associate to Full Professor, Departments of Psychology and Political Science, The Ohio State University. |
| 1987-1989 | Adjunct Research Investigator, Survey Research Center, Institute for Social Research, University of Michigan. |
| 1987-1989 | Lecturer, Survey Research Center Summer Program in Survey Research Techniques, University of Michigan. |
| 1986-1987 | Visiting Scholar, Survey Research Center, Institute for Social Research, University of Michigan. |
| 1985 | Lecturer, Department of Psychology, The Ohio State University. |
| 1982-1985 | Research Assistant, Center for Political Studies and Survey Research Center, Institute for Social Research, University of Michigan. |
| 1980-1981 | Senior Research Assistant, Department of Psychology, Harvard University. |
| 1979-1981 | Senior Research Assistant, Department of Behavioral Sciences, School of Public Health, Harvard University. |
| 1975-1976 | General Manager, The Lawrence (newspaper), The Lawrenceville School. |

Honors

| | |
|---|---|
| 1976 | Bausch and Lomb Science Award. |
| 1982 | National Institute of Mental Health Graduate Training Fellowship. |
| 1984 | Phillip Brickman Memorial Prize for Research in Social Psychology. |
| 1984 | American Association for Public Opinion Research Student Paper Award. |
| 1984 | National Institute of Mental Health Graduate Training Fellowship. |
| 1984 | Pi Sigma Alpha Award for the Best Paper Presented at the 1983 Midwest Political Science Association Annual Meeting. |
| 1984 | Elected Departmental Associate, Department of Psychology, University of Michigan, recognizing outstanding academic achievement. |
| 1990 | Invited Guest Editor, Social Cognition (Special issue on political psychology, Vol. 8, #1, May) |
| 1993 | Brittingham Visiting Scholar, University of Wisconsin. |
| 1995 | Erik H. Erikson Early Career Award for Excellence and Creativity in the Field of Political Psychology, International Society of Political Psychology. |
| 1996-1997 | Fellow, Center for Advanced Study in the Behavioral Sciences, Stanford, California. |
| 1998 | Elected Fellow, American Psychological Association. |
| 1998 | Elected Fellow, Society for Personality and Social Psychology. |
| 1998 | Elected Fellow, American Psychological Society. |
| 2001- | Appointed University Fellow, Resources for the Future, Washington, DC. |
| 2003 | Prize for the Best Paper Presented at the 2002 Annual Meeting of the American Political Science Association, Section on Elections, Public Opinion, and Voting Behavior. |
| 2009. | Elected Fellow, American Academy of Arts and Sciences. |
| 2010 | Elected Fellow, American Association for the Advancement of Science. |
| 2013-2014 | Fellow, Center for Advanced Study in the Behavioral Sciences, Stanford, California. |
| 2014 | The AAPOR Award, the American Association for Public Opinion Research's lifetime achievement award, given for an outstanding contribution to the field of public opinion research, including: advances in theory, empirical research and methods; improvements in ethical standards; and promotion of understanding among the public, media and/or policy makers. |
| 2014-2015 | Consulting Scholar, Center for Advanced Study in the Behavioral Sciences, Stanford, California. |

| | |
|---|---|
| 2016 | The Nevitt Sanford Award from the International Society of Political Psychology, for professional contributions to political psychology, given to someone engaged in the practical application of political psychological principles or creating knowledge that is accessible and used by practitioners to make a positive difference in the way politics is carried out. |

Invited Addresses

| | |
|---|---|
| 1992 | Invited Address, Midwestern Psychological Association Annual Meeting, Chicago, Illinois. |
| 2003 | Invited Address, Midwestern Psychological Association Annual Meeting, Chicago, Illinois. |
| 2004 | Invited Address, Distinguished Lecture Series Sponsored by the Departments of Psychology and Political Science, University of California, Davis, California. |
| 2004 | Keynote Lecture, International Symposium in Honour of Paul Lazarsfeld, Katholieke Universiteit Leuven (Belgium). |
| 2005 | Invited Address, Joint Program in Survey Methodology Distinguished Lecture Series, University of Maryland, College Park, Maryland. |
| 2005 | Invited Address, "Climate Change: Science → Action", Conference Hosted by the Yale School of Forestry and Environmental Studies, Aspen, Colorado. |
| 2005 | Invited Commentator, "Science for Valuation of EPA's Ecological Protection Decisions and Programs," a U.S. Environmental Protection Agency Science Advisory Board Workshop, Washington, DC. |
| 2006 | Invited Address, "The Wonderful Willem Saris and his Contributions to the Social Sciences." Farewell Symposium for Willem Saris, University of Amsterdam, Amsterdam, the Netherlands. |
| 2006 | Invited Workshop, "The State of Survey Research." Annual Summer Meeting of the Society for Political Methodology, Davis, California. |
| 2006 | Invited Keynote Address, "Recent Lessons Learned About Maximizing Survey Measurement Accuracy in America: One Surprise After Another." 2006 Survey Research Methodology Conference, Center for Survey Research, Academia Sinica, Taipei, Taiwan. |
| 2006 | Invited Address, "Review of Nonresponse Analysis Across Multiple Surveys." Conference on "Sample Representativeness: Implications for Administering and Testing Stated Preference Surveys," Resources for the Future, Washington, D.C. |
| 2006 | Invited Address, "Introduction to Survey Issues in Ecological Valuation." Meeting of the U.S. Environmental Protection Agency Scientific Advisory Board Committee on Valuing the Protection of Ecological Systems and Services (CVPESS), Washington, D.C. |
| 2006 | Invited Address, "Gas Pumps and Voting Booths: Energy and Environment in the Midterm Elections." First Wednesday Seminar, Resources for the Future, Washington, D.C. |

2006        Invited Address, "What Americans Believe and Don't Believe about Global Warming: Attitude Formation and Change in Response to a Raging Scientific Controversy."  National Science Foundation Speaker Series, Washington, D.C.

2006        Invited Address, "Moving Survey Data Collection to the Internet? Surprising Ways that Mode, Sample Design and Response Rates Affect Survey Accuracy."  New York Chapter of the American Association for Public Opinion Research, Fordham University, New York, New York.

2006        Invited Address, "Climate change: What Americans Really Think."  Conference entitled "A Favorable Climate for Climate Action," sponsored by the Sustainable Silicon Valley, Santa Clara University, Santa Clara, California.

2006        Invited Lecture, "What Americans Really Think About Climate Change: Attitude Formation and Change in Response to a Raging Scientific Controversy."  Brown Bag Series, National Oceanic and Atmospheric Administration, Silver Spring, Maryland.

2007        Invited Lecture, "What Americans Really Think About Climate Change: Attitude Formation and Change in Response to a Raging Scientific Controversy."  Education And Outreach Colloquium, Earth Sciences Division, NASA Goddard Space Flight Center, Greenbelt, Maryland.

2007        Inaugural Lecture, "The Brave New World of Survey Research: One Surprise After Another." Survey Research Institute First Annual Speaker Series, Cornell University, Ithaca, New York.

2007        Inaugural Lecture, "What Americans Really Think About Climate Change: Attitude Formation and Change in Response to a Raging Scientific Controversy."  National Centers for Coastal Ocean Science/Center for Sponsored Coastal Ocean Research Ecosystem Science Seminar Series & NOS Science Seminar Series, National Oceanic and Atmospheric Administration, Silver Spring, Maryland.

2007        Plenary Speaker, "What Americans Really Think About Climate Change: Attitude Formation and Change in Response to a Raging Scientific Controversy."  Annual Ocean and Coastal Program Managers 'Meeting, Sponsored by the Office of Ocean and Coastal Resource Management in partnership with the National Estuarine Research Reserve Association, National Oceanic and Atmospheric Administration, Washington, DC.

2007        Oral Testimony on Assembly Bill 372 (to revise the order in which the names of candidates for an office must appear on the ballot) before the Nevada State Legislature, Carson City, Nevada.

2007        Invited Lecture, "What Americans Really Think About Climate Change: Attitude Formation and Change in Response to a Raging Scientific Controversy."  The White House Office of Science and Technology Policy, Washington, D.C.

2007        Invited Lecture, "What Americans Really Think About Climate Change: Attitude Formation and Change in Response to a Raging Scientific Controversy."  Workshop on Climate Science and Services: Coastal Applications for Decision Making through Sea Grant Extension and Outreach.  NOAA Coastal Services Center, Charleston, South Carolina.

| | |
|---|---|
| 2007 | Invited Lecture, "Climate Change: What Americans Think."  Capitol Hill briefing sponsored by the Environment and Energy Study Institute, Cannon House Office Building, Washington, D.C.  Broadcast live on C-SPAN. |
| 2007 | Invited Lecture, "The Impact of Candidate Name Order on Election Outcomes."  The Carter Center, Atlanta, Georgia. |
| 2007 | Invited Lecture, "What Americans Really Think About Climate Change: Attitude Formation and Change in Response to a Raging Scientific Controversy."  Google, Mountain View, California. |
| 2007 | Invited Lecture, "Climate Change: What Americans Really Think."  The Commonwealth Club, San Francisco, California. |
| 2007 | Invited Address, "Representativeness of Online Panels."  Time-Warner 2007 Research Conference, New York, New York. |
| 2007 | Invited Lecture, "What the Public Knows."  News Executives Roundtable: Covering Climate Change, Stanford, California. |
| 2007 | Invited Address, "The Top Ten Signs of an Excellent Survey Vendor."  Intuit Corporate Customer & Market Insight Offsite, Palo Alto, California. |
| 2007 | Invited Lecture, "What Americans Really Think About Climate Change."  Association of Science-Technology Centers Conference, Los Angeles, California. |
| 2007 | Invited Address, "The New American National Election Study Panel Survey Project." Survey Research in the 21st Century: Challenges and Opportunities, Royal Statistical Society, London, UK. |
| 2007 | Invited Testimony, "Aviation Safety: Can NASA Do More to Protect the Public?"  House Committee on Science and Technology, U.S. Congress, Washington, DC.  Broadcast live on C-SPAN. |
| 2007 | Invited Opening Keynote Address, "New Insights Into Optimizing Survey Questionnaire Design and Selecting a Model of Data Collection."  Panel Research 2007, ESOMAR World Research Conference, Orlando, Florida. |
| 2007 | Invited Plenary Address, "New Insights into Questionnaire Design: How to Maximize the Validity of Your Measurements."  Federal Committee on Statistical Methodology Research Conference, Arlington, Virginia. |
| 2007 | Invited Lecture, "What Americans Think and Do About Climate Change; Insights from a Psychological Perspective."  California Institute for Energy and Environment's Behavior, Energy, and Climate Change Conference, Sacramento, California. |
| 2007 | Invited Keynote Lecture, "What Americans Think About Climate Change."  2007 American Public Media Conference on Sustainability, Pocantico Conference Center, Tarrytown, New York. |
| 2007 | Invited Address, "What the American Public Really Thinks About Climate Change: New Evidence on Amelioration Strategies."  2007 American Geophysical Union Fall Meeting, San Francisco, California. |

| | |
|---|---|
| 2008 | Invited Address, "Climate Change and the 2008 U.S. Presidential Election."  Eighth National Conference on Science, Policy, and the Environment: Climate Change: Science and Solutions.  Conference sponsored by the National Council for Science and the Environment, Washington, DC. |
| 2008 | Invited Presentation, "Explaining the Relation of Aging with Susceptibility to Attitude Change."  Eighth Annual SPSP Attitudes Preconference, Albuquerque, New Mexico. |
| 2008 | Invited Lecture, "Comparisons of Survey Modes in Terms of Data Quality."  Department of Families, Housing, Community Services, and Indigenous Affairs, Australian Government, Canberra, Australia. |
| 2008 | Invited Lecture, "Applying Theories of Attitudes and Attitude Change to the Mission of the Australian Tax Office."  Australian Tax Office, Australian Government, Canberra, Australia. |
| 2008 | Invited Lecture, "The Theory of Survey Satisficing."  Tourism Australia, Canberra, Australia. |
| 2008 | Invited Lecture, "Lessons from the Field: A Blueprint for Optimizing Measurement Accuracy and Sample Composition."  40th Meeting of the Computer Market Analysis Group, Intuit, Mountain View, California. |
| 2008 | Invited Lecture, "Uses of Surveys in Court."  How to Find, Litigate, and Try Class Action Lawsuits, Educational Symposium sponsored by Consumer Attorneys of San Diego, San Diego, California. |
| 2008 | Invited Keynote Address, "What the American Public Really Thinks About Climate Change: New Evidence on Amelioration Strategies."  Union of Concerned Scientists Retreat, National Labor College, Silver Spring, Maryland. |
| 2008 | Invited Lecture, "The Challenges of Measuring Facts Accurately in Surveys: Small Changes in Question Wording can Make a Difference."  Survey Methodology Division, U.S. Census Bureau, Suitland, Maryland. |
| 2008 | Invited Lecture, "The Accuracy of Non-Probability Samples of People Who Volunteer to Do Surveys for Money."  Harvard Center for Survey Research 2008 Spring Conference: New Technologies and Survey Research, Harvard University, Cambridge, Massachusetts. |
| 2008 | Invited Presentation, "Writing an Effective Grant Proposal for NSF."  AAPOR Professional Development Breakfast.  Annual Meeting of the American Association for Public Opinion Research, New Orleans, Louisiana. |
| 2008 | Invited Commentary, "Reflections on the American Voter Revisited."  Annual Meeting of the American Association for Public Opinion Research, New Orleans, Louisiana. |
| 2008 | Invited Presentation, "Briefing on the NAOMS Survey Creation."  Presentation to the Committee to Assess NASA's National Aviation Operations Monitoring Service (NAOMS) Project, National Research Council, National Academy of Sciences, Washington, DC. |
| 2008 | Invited Address, "Public Attitudes, Perceptions, and Concern about Global Warming: Evidence from a New Survey."  Lecture at the Russell Senate Office Building in the Environmental Science Seminar Series Sponsored by the American Meteorological Society, Washington, D.C. |

8

2008        Invited Keynote Address, "Designing Ballots to Prevent Bias: How the Order of Candidate Names Determines Who Was Elected President."  EVT '08, 2008 Usenix/Accurate Electronic Voting Technology Workshop, San Jose, California.

2008        Invited Address, "What Americans Think about Climate Change: Insights from 10 Years of Psychology-Inspired National Surveys Tracking Public Attitudes."  Symposium on the Psychology of Global Climate Change, American Psychological Association Annual Meeting, Boston, Massachusetts.

2008        Invited Presentation, "The Accuracy of On-line Surveys with Non-Probability Samples."  Second Annual Workshop on Measurement and Experimentation with Internet Panels, Sponsored by CentERdata, Institute for Data Collection and Research (University of Tilburg), Zeist, The Netherlands.

2008        Invited Address, "What Americans Really Think About Climate Change: Is it Happening? What's Causing it? What Should Be Done About It?"  Conference entitled "Social Science and Humanities Facing the Climate Change Challenges," sponsored by the European Union, the Republic of France, the French Ministere de L'Enseignement Superieur Et De La Recherche, and the French Ministere De L'Ecologie, De L'Energie, Du Developpement Durable, Ett De L'Amenagmenet du Territoire, Paris, France.

2008        Invited Presentation, "Susceptibility to Response Effects in Surveys: Cognitive and Motivational Factors."  Seventh International Conference on Social Science Methodology – RC33 – Logic and Methodology in Sociology, Naples, Italy.

2008        Invited Presentation, "Satisficing When Answering Questions: A Theoretical Explanation for a Wide Range of Findings in the Questionnaire Design Literature."  Max Planck Institute for Human Development, Berlin, Germany.

2008        Invited Presentation, "Social Psychology Under the Microscope: Do Classic Laboratory Experiments Replicate When Participates Are Representative of the General Public Rather Than Convenience Samples of College Students?"  Max Planck Institute for Human Development, Berlin, Germany.

2008        Fathauer Lecturer, "How Do American Voters Decide?  Findings from Fifty Years of Scholarship on Electoral Choice."  Eller College of Management, University of Arizona, Tucson, Arizona.

2008        Invited Presentation, "What Are They Thinking?  Information, Persuasion, and the American Public's Response to Climate Change."  American Politics Research Workshop, Harvard University, Cambridge, Massachusetts.

2008        Invited Presentation, "The 2008 American Presidential Election: Psychological Insights from the AP-Yahoo News Poll."  Society of Experimental Social Psychology Annual Meeting, Sacramento, California.

2008        Invited Presentation, "Election Preview: Polls, Ballots, Fraud, and Misconceptions."  46th Annual New Horizons in Science Conference, Council for the Advancement of Science Writing, Palo Alto, California.

2008        Invited Presentation, "Getting Into the Heads of American Voters: Insights from Political Psychology."  Menlo School, Menlo Park, California.

2008        Invited Lecture, "Do We Really Care About Climate Change?  Grounding Climate Policy in
            Psychological Analysis."  The World Bank, Washington, DC.

2008        Invited Lecture, "Issue-Focused Passion in America: How and Why Issue Publics Determine
            Election Outcomes."  Seminario de Investigación en Ciencia Politica 2008, Instituto
            Tecnológico Autónomo de México (ITAM), Mexico City, Mexico.

2009        Invited Presentation, "Accounting for Biases in NAOMS."  Presentation to the Committee to
            Assess NASA's National Aviation Operations Monitoring Service (NAOMS) Project,
            National Research Council, National Academy of Sciences, NASA Ames Conference
            Center, Moffett Field, California.

2009        Presidential Symposium Lecture, "Why the 2008 U.S. Presidential Election Turned Out As It
            Did: Psychology Peers Into National Survey Data."  Annual Meeting of the Society for
            Personality and Social Psychology, Tampa, Florida.

2009        Stauffer Colloquium Series Lecture, "What Americans Really Think About Climate Change:
            Attitude Formation and Change in Response to a Raging Scientific Controversy."  School of
            Behavioral and Organizational Sciences, Claremont Graduate School, Claremont, California.

2009        RTI Fellow Lecture, "What Americans Really Think About Climate Change: Psychological
            Insights from 10 Years of National Surveys."  RTI International, Research Triangle Park,
            North Carolina.

2009        Walter H. Stellner Distinguished Speaker in Marketing, "Social Psychology Under the
            Microscope: Do Our Classic Experiments Replicate When Participants Are Representative of
            the General Public Rather Than Convenience Samples of College Students?"  College of
            Business, University of Illinois, Urbana-Champaign, Illinois.

2009        Invited Presentation, "Mediation: Why Bother?"  Twelfth Sydney Symposium of Social
            Psychology entitled "Attitudes and Attitude Change."  University of New South Wales,
            Sydney, Australia.

2009        Keynote Address, "Money for Surveys: What about Data Quality?"  GOR 09, 11th General
            Online Research Conference, University of Vienna, Vienna, Austria.

2009        Invited Presentation, "Comparing Various Measures of Survey Accuracy and Summarizing
            the Findings of Studies Using Each Method."  Conference on Survey Quality, Program on
            Survey Research, Harvard University, Cambridge, Massachusetts.

2009        Invited Lecture, "What Americans Really Think About Climate Change: Attitude Formation
            and Change in Response to a Raging Scientific Controversy."  Climate Policy Seminar
            Series, sponsored by the Climate Risk Management Initiative, Dickinson School of Law, the
            Environment & Natural Resources Institute, the Penn State Institute of Energy and the
            Environment, the Rock Ethics Institute, Communication Arts and Sciences, Department of
            Political Science, Department of Psychology, Schreyer Institute for Teaching Excellence,
            and the Social Science Research Institute, Pennsylvania State University.

2009        Invited Lecture, "The Accuracy of Online Surveys with Non-probability Samples of People
            who Volunteer to do Surveys for Money."  Center for Statistics and the Social Sciences
            Seminar, University of Washington, Seattle, Washington.

2009        Allen Edwards Endowed Lecture in Psychology, "Social Psychology Under the Microscope:
            Do Classic Experiments Replicate when Participates are Representative of the General

Public Rather Than Convenience Samples of College Students?" Department of Psychology, University of Washington, Seattle, Washington.

2009 Invited Lecture, "Why I Challenged the NASA Administrator in Congressional Testimony: The Shocking Story of a Groundbreaking Aviation Safety Survey Research Project Gone Awry." Google Tech Talk Series, Mountain View, California.

2009 Invited Lecture, "What Americans Really Think About Climate Change: Attitude Formation and Change in Response to a Raging Scientific Controversy." Climate Central, Princeton, New Jersey.

2009 Invited Plenary Lecture, "What Americans Really Think About Climate Change: Attitude Formation and Change in Response to a Raging Scientific Controversy." A National Workshop on Communicating Ocean Issues Based on Ocean on the Edge: Top Ocean Issues. Long Beach Convention Center, sponsored by the Aquarium of the Pacific, the National Oceanic and Atmospheric Administration, and the National Research Council's Marine Board and Ocean Studies Board, Long Beach, California.

2009 Invited Lecture, "What Americans Really Think About Climate Change." Air Resources Board Chair's Air Pollution Seminar, California Environmental Protection Agency Building, Sacramento, California.

2009 Invited Presentation, "What Americans Really Think About Climate Change." Stanford University Alumni Association – Sacramento Chapter. Sacramento, California.

2009 Keynote Address, "The End of Agree/Disagree Rating Scales: Acquiescence Bias and Other Flaws Suggest a Popular Measurement Method Should Be Abandoned." European Survey Research Association 2009 Conference, Warsaw, Poland.

2009 Invited Lecture, "Methods of Survey Data Collection and Determinants of Data Quality." German Research Foundation Summer Academy on Methods of Educational Research, University of Bamberg, Bamberg, Germany.

2009 Invited Panel Member, "Hopenhagen: Public support for a climate deal in Copenhagen." The Commonwealth Club of California, San Francisco, California.

2009 Invited Primary Paper Presentation, "Conducting Experiments to Evaluate Questions." Workshop on Question Evaluation Methods, National Center for Health Statistics, Hyattsville, Maryland.

2009 Invited Presentation, "The Use of Surveys in Court." Second Annual Class Action Symposium Sponsored by Consumer Attorneys of San Diego, San Diego, California.

2009 Invited Presentation, "The Accuracy of Internet Surveys." Attaining Accuracy, Maximum Coverage, and Representative in Web-Based Research. Conference at the Charles Hotel, Cambridge, Massachusetts.

2009 Keynote Address, "Scientific Survey Research: Sustainable in an Online World?" CASRO Data Collection Conference, Council of American Survey Research Organizations, Las Vegas, Nevada.

2009 Invited Webinar, "Best Practice Data Collection Online with a Probability Sample?" Australian Market & Social Research Society, Sydney, Australia.

2010            Invited Presentation, "A New Look at Racism in America: Evidence from National
                Surveys."  Political Psychology Pre-Conference 2010, Society for Personality and Social
                Psychology Annual Conference, Las Vegas, Nevada.

2010            Invited Presentation, "What Americans Really Think About Climate Change: Attitude
                Formation and Change in Response to a Raging Scientific Controversy."  Stanford Club of
                Las Vegas, Las Vegas, Nevada.

2010            Invited Address, "Tracking American Opinions About Climate Change."  Climate, Mind,
                and Behavior Symposium, The Garrison Institute, Garrison, New York.

2010            Invited Presentation, "Public Opinion and Climate Change: The Real Reason for the Recent
                Decline."  Climate Policy: Public Perception, Science, and the Political Landscape.
                Sponsored by the American Association for the Advancement of Science, the American
                Geophysical Union, the American Meteorological Society, and the American Statistical
                Association.  Hart Senate Office Building, Washington, DC.

2010            Invited Lecture, "Creating and Evaluating a new Method for Collecting Survey Data via the
                Internet: The Story of the FFRISP (Face-to-Face Recruited Internet Survey Platform)".
                Social, Behavioral, and Economic Sciences Lecture Series, National Science Foundation,
                Arlington, Virginia.

2010.           Invited Lecture, "Recent Research Findings from SRS Experiments."  Science Resources
                Statistics Program Colloquium, National Science Foundation, Arlington, Virginia.

2010            Invited Lecture, "What Americans Think About Climate Change."  Speaker Series, Center
                for Decision Sciences, Columbia University, New York, New York.

2010            Invited Lecture, "Social Psychology Under the Microscope: Do Our Classic Experiments
                Replicate When Participants Are Representative of the General Public Rather Than
                Convenience Samples of College Students?"  Colloquium Series, Psychology Department,
                Columbia University, New York, New York.

2010            Invited Lecture, "Public Opinion Research on Climate Change."  Rio Tinto Workshop on the
                Politics of Carbon, Meridian Institute, Washington, DC.

2010            Invited Lecture, "How to Measure Usability: Designing Your Questions Well."  Washington,
                DC, Chapter of the Usability Professionals 'Association, Arlington, Virginia.

2010            Invited Lecture, "Have Americans 'Views on Global Warming Changed?  A New Look at
                Public Opinion."  Briefing sponsored by the Environmental and Energy Study Institute,
                Capital Visitor Center, Washington, DC.

2010            Invited Lecture, "What Americans Really Think About Climate Change."  Climate Change
                Communication Forum, Hosted by the U.S. Fish and Wildlife Service and the U.S.
                Department of the Interior, George Mason University, Fairfax, Virginia.

2010            Invited Lecture, "What Americans Really Think About Climate Change."  Clean Energy
                Program, Third Way, Washington, DC.

2010            Invited Lectures, "Experimental Methods in the Social Sciences."  Workshop in
                Experimental Methods, Sponsored by the ELECDEM Training Network in Electoral
                Democracy, ICHEC, Brussels, Belgium.

2010 Invited Lecture, "Optimizing Survey Questionnaire Design: New Findings."  Interagency Response Error Group Monthly Meeting, Government Accountability Office, Washington, DC.

2010 Invited Lecture, "Creating and Evaluating a New Method for Collecting Survey Data via the Internet," Workshop sponsored by DC-AAPOR, Bureau of Labor Statistics, Washington, DC.

2010 Keynote Address, "Surveys and Statistical Evidence to Mange the Class Case".   Third Annual Class Action Symposium, San Diego, California.

2010 Invited Presentation, "Implicit Attitude Measurement in National Surveys."  Conference on Methodology in Political Psychology, Ohio State University, Columbus, Ohio.

2010 Invited Presentation, "What Americans Really Think About Climate Change," MZES Colloquium, Mannheimer Zentrum Fur Europaische Sozialforschung, University of Mannheim, Mannheim, Germany.

2010 Invited Workshop, "Attitudes in the World of Politics: Formation, Change, and Impact." Oberrhein-Program (cosponsored by the Universities of Mannheim, Heidelberg, Freiberg, and Basel), Social Sciences Graduate School, University of Mannheim, Mannheim, Germany.

2010 Lunchtime Brownbag Series, "Assessing Anti-Black Racism in Contemporary America via Surveys: New Measurement Approaches Yield New Insights."  National Opinion Research Center, University of Chicago, Chicago, Illinois.

2010 Invited Lecture, "What Americans Really Think About Climate Change."  AAAS Leadership Seminar in Science and Technology Policy, American Association for the Advancement of Science, Washington, DC.

2010 Invited Panelist, "Outlook for Climate and Energy Policy in the New Congress," Session in the "Science & Society: Global Challenges Discussion Series", Center for Science, Technology and Security Policy, American Association for the Advancement of Science, Washington, DC.

2010 Invited Guest Speaker, "What Americans Really Think About Climate Change."  World Resources Institute, Washington, DC.

2010 Invited Presentation to the Working Group on Immigration and Cultural Contact, "The Accuracy of Internet Surveys with Probability and Non-Probability Samples."  Russell Sage Foundation, New York, New York.

2010 Invited Lecture, "What Mainers Really Think About Global Warming: Results from an In-Depth Statewide Survey."  Environmental Studies Program, Bowdoin College, Brunswick, Maine.

2010 Invited Panelist, "Reflections on the Accomplishments and Future of Political Communication Research."  Conference on "Political Communication: The State of the Field in the 21st Century."  Annenberg Public Policy Center, University of Pennsylvania, Philadelphia, Pennsylvania.

2010 Invited Presentation, "The American Public's Understandings and Misunderstandings About Climate Change: Is There a Crisis of Confidence in Climate Science?"  Scientific

Symposium in Honor of Stephen H. Schneider, Stanford University, Stanford, California.

2011    Invited Lecture, "What Floridians Really Think About Global Warming: Results from an In-Depth Statewide Survey."  Lecture hosted by the FSU Department of Earth, Ocean, and Atmospheric Science, the FSU Department of Urban and Regional Planning, the Florida Climate Institute, the Tallahassee Democrat, and the FSU Institute for Energy Systems, Economics, and Sustainability, Florida State University, Tallahassee, Florida.

2011    Invited Presentation, "The Mega-Splice in the 2008 American National Election Studies Time Series Survey."  Design Issues in Longitudinal and Repeated Cross-Sectional Surveys. Duke Initiative on Survey Methodology.  Social Science Research Institute at Duke University, Durham, North Carolina.

2011    Invited Presentation, "What Americans Think About Global Warming: Attitude Formation and Change in Response to a Raging Scientific Controversy."  Monterey Bay Aquarium, Monterey, California.

2011    Invited Testimony, Comments on Assembly Bill No. 99 "Revises the Order in Which the Names of Candidates for an Office Must Appear on the Ballot", Committee on Legislative Operations and Elections, Nevada Assembly, State of Nevada.

2011.    Invited Discussant on Respondent Motivation, BLUE-Enterprise and Trade Statistics Conference on Business 'Burden and Motivation in Official Surveys.  Conference sponsored by Statistics Netherlands and the European Union, Heerlen, The Netherlands.

2011    Invited Presentation, "What Massachusetts Residents and Other Americans Think About Climate Change: Results from an In-Depth Statewide Study and National Surveys."  Boston University, Boston Massachusetts.

2011    Invited Presentation, "What Massachusetts Residents and Other Americans Think About Climate Change: Results from an In-Depth Statewide Study and National Surveys."  The Heller School for Social Policy and Management, Brandeis University, Waltham, Massachusetts.

2011    Invited Presentation, "What Massachusetts Residents and Other Americans Think About Climate Change: Results from an In-Depth Statewide Study and National Surveys."  Green Conversation Series, Harvard University Center for the Environment, Harvard University, Cambridge, Massachusetts.

2011    Invited Presentation, "What Massachusetts Residents and Other Americans Think About Climate Change: Results from an In-Depth Statewide Study and National Surveys."  Tufts Institute of the Environment, Tufts University, Medford, Massachusetts.

2011    Invited Presentation, "Adventures in Survey Research: A Workshop on the Dangers of Trying to Make the World a Better Place through Social Science."  Essex Short Course in Social Research, in Association with Methodology Institute LSE and IPSOS MORI, University of Essex, Essex, United Kingdom.

2011.    Invited Presentation, "Measuring Intent to Participate and Participation in the 2010 Census and Their Correlates and Trends: Comparisons of RDD Telephone and Non-probability

Sample Internet Survey Data."  U.S. Census Bureau, Suitland, Maryland.

2011          Invited Remarks, "Studying the Impact of Electoral Impact of Candidate Statements on
              Policy Issues."  Session entitled "Studying 2012 Campaign and elections: Current Plans and
              Future Directions," sponsored by the Omidyar Network and the National Institute for Civil
              Discourse at the University of Arizona.  American Political Science Association Annual
              Meeting, Seattle, Washington.

2011          Invited Presentation, "Social Psychology Under the Microscope: Do Our Classic
              Experiments Replicate When Participants Are Representative of the General Public Rather
              Than Convenience Samples of College Students?"  A Conference in Honor of Daniel
              Wegner, Harvard Business School, Harvard University.

2011          Invited Presentation, "American Public Opinion on Climate Change and Its Impact on
              Voting in Congressional and Presidential Elections."  Public lecture and webcast sponsored
              by Resources for the Future, Washington, D.C.

2011          Invited Webinar, "Advances in Questionnaire Design."  Australian Market & Social
              Research Society, Sydney, Australia.

2011          Invited Lecture, "Passion in American Politics: What Happens When Citizens Become
              Deeply Committed to Pressuring Government on a Policy Issue."  MZE-Colloquium, School
              of Social Sciences, University of Mannheim, Mannheim, Germany.

2011          Invited Lecture, "Creating the Face-to-Face Recruited Internet Survey Platform (FFRISP)."
              Collaborative Research Center, University of Mannheim, Mannheim, Germany.

2012          Invited Lecture, "Trends in American Public Attitudes about Global Warming: A
              Psychological Analysis."  Sustainability Psychology Preconference, Society for Personality
              and Social Psychology Annual Meeting, San Diego, California.

2012          Invited Lecture, "Americans 'Views on Climate Change and Their Impact on Voting
              Behavior."  2012 Climate, Mind, and Behavior Symposium, Garrison Institute, Garrison,
              New York.

2012.         Invited Presentation, "Changing Government Policy by Changing Public Attitudes."  Climate
              Central, Princeton, New Jersey.

2012          Invited Presentation, "Americans 'Views on Climate Change and Their Impact on Voting
              Behavior."  Skoll Global Threats Fund, San Francisco, California.

2012          Invited Presentation, "What Americans Think About Climate Change."  Webinar series on
              The Science of Policy Communication.  Society for the Psychological Study of Social Issues.

2012          Invited Lecture, "What Americans Really Think About Climate Change."  Lecture
              sponsored by the Water Sustainability Program, the Institute of the Environment, the
              Renewable Energy Network, the School of Earth and Environmental Sciences, and the
              School of Geography and Development, University of Arizona, Tucson, Arizona.

2012          Invited Lecture, "Trust in Scientists, Controversy Among Scientists, and American Public
              Opinion on Climate Change: How Attitude Formation and Change Unfold."  Presentation
              during "The Science of Science Communication", The Arthur M. Sackler Colloquia,
              National Academy of Sciences, Washington, DC.

| | |
|---|---|
| 2012 | Invited Short Course, "Maximizing the Accuracy of Online Surveys: Comparisons of Methods and Recommendations of Optimal Procedures." American Association for Public Opinion Research Annual Meeting, Orlando, Florida. |
| 2012 | Invited Lecture, "How Americans Form and Change Their Opinions About Climate Change." Outside-In Engagement Series sponsored by the Interagency Communication and Education Team, United States Global Change Research Program, Washington, DC. |
| 2012 | Invited Lecture, "Pursuing Excellence in Scientific Research: Challenges and Rewards." Second Annual Stanford University Postdoctoral Association Research Symposium, Stanford University, Stanford, California. |
| 2012 | Invited Lecture, "U.S. Public Views on Climate Change: Insights from Polling." Program on Communicating Uncertainty, Institute for International and Regional Studies, Princeton University, Princeton, New Jersey. |
| 2012 | Invited Keynote, "Public perceptions of Climate Change in the U.S." Planning for Local Government Climate Challenges: Connecting Research and Practice Workshop, Sponsored by the University of Arizona Institute of the Environment, Arizona State University Campus, Tempe, Arizona. |
| 2012 | Invited Presentation, "Optimizing the Design of Self-Reports." Engagement and Academic Tenacity: Making the Invisible Salient and Actionable, Workshop Sponsored by the Bill and Melinda Gates Foundation, Cambridge, Massachusetts. |
| 2012 | Invited Presentation, "Evidence of Decline in Effect Sizes: From Original Studies to Replications to Representative National Samples." The Decline Effect: Evidence, Explanations, and Future Directions. Symposium at the University of California Santa Barbara, Santa Barbara, California. |
| 2012 | Invited Presentation, "Has the American Public Turned Away from Climate Change?" Salon Sponsored by the Woods Institute for the Environment at Stanford University, Venice, California. |
| 2012 | Invited Presentation, "Questionnaire Design." Conference on the Future of Survey Research, National Science Foundation, Arlington, Virginia. |
| 2012 | Invited Speaker, "What's at Stake for California?" Event sponsored by the Division of Social Sciences, the Office of Government Relations, and the Politics Department, University of California - Santa Cruz, Santa Cruz, California. |
| 2012 | Invited Presentation, "Issue Publics and Candidate Evaluations; Contrasting Different Analytic Methods to Identify the Psychological Process of Candidate Evaluation." Directions in Political Science: Papers in Honor of George B. Rabinowitz. University of Michigan, Ann Arbor, Michigan. |
| 2012 | Invited Lecture, "What Americans Think About Climate Change: Explorations of Attitude and Belief Formation and Change in Response to a Raging Controversy", Lecture Series on Persuasion, Attitude, and Behavior Change, Sponsored by the Research Center for Group Dynamics, Institute for Social Research, University of Michigan. |
| 2013 | Invited Keynote Address, "The Future of Survey Research," Survey Research Methodology: |

|  | The Changing Landscape of Survey Research in the Field and at ICF.  Conference sponsored by ICF International, Fairfax, Virginia. |
|---|---|
| 2013 | Invited Lecture, "The Future of Survey Research," 2013 National Cancer Institute Division of Cancer Control and Population Sciences Workshop: Global and National Issues Shaping the Cancer Control Surveillance Landscape.  NIH Neuroscience Conference Center, Rockville, Maryland. |
| 2013 | Invited Lecture, "Public Perceptions about Global Warming and Government Involvement in the Issue."  Briefing at the Rayburn House Office Building, sponsored by the Environmental and Energy Study Institute, Washington, DC. |
| 2013 | Policy Briefing, "Preparing for the Effects of Global Warming: The American Public's Perspective on Sea Level Rise," National Press Club, sponsored by the Woods Institute for the Environment at Stanford University and the Center for Ocean Solutions at Stanford University, Washington, DC. |
| 2013 | Invited Lecture, "What Americans Really Think About Climate Change - Attitude Formation and Change Across the U.S. in Response to a Raging Scientific Controversy."  Sponsored by the "Middle America" Student Organization, Graduate School of Education, Harvard University, Cambridge, Massachusetts. |
| 2013 | Invited Remarks, "RFF University Fellows Roundtable: RFF's Next Decade."  Resources for the Future, Washington, DC. |
| 2013 | Invited Lecture, "The American Public's Views of Climate Change: An Update." Department of Global Ecology, Carnegie Institution for Science, Stanford, California. |
| 2013 | Invited Lecture, "Contingent Valuation."  Lecture sponsored by the Centre for Environmental Political Sciences, University of Gothenburg, Gothenburg, Sweden. |
| 2013 | Invited Lecture, "The Accuracy of Online Surveys with Non-probability Samples of People who Volunteer to Do Surveys for Money."  Workshop on Survey Methodology, Multidisciplinary Opinion and Democracy Research Group, Department of Political Science, University of Gothenburg, Gothenburg, Sweden. |
| 2013 | Invited Lecture, "Satisficing When Answering Questions: A Theoretical Explanation for a Wide Range of Findings in the Questionnaire Design Literature."  Workshop on Survey Methodology, Multidisciplinary Opinion and Democracy Research Group, Department of Political Science, University of Gothenburg, Gothenburg, Sweden. |
| 2013 | Invited Lecture, "What Americans Really Think About Climate Change: Attitude Formation and Change in Response to a Raging Scientific Controversy."  Sponsored by the Faculty of Social Sciences, University of Gothenburg, Gothenburg, Sweden. |
| 2013 | Invited Lecture, "Trust in Environmental Scientists and Public Opinion on Global Warming in the United States."  Presentation at the Brekfast Seminar on Climate and Opinion, sponsored by the Bergen Programme for Governance and Climate, Uni Rokkan Center, Bergen, Norway. |
| 2013 | Invited Lecture, "Survey Item Design."  Workshop on Survey Design for the Norwegian Citizen Panel, University of Bergen, Bergen, Norway. |
| 2013 | Invited Presentation, "American Public Opinion on Climate Change."  Conference on "What |

is the Value of Being First?  Perspectives from the California and Sweden Experiences."
Climate Policy Forum co-sponsored by Resources for the Future, the Swedish Mistra Indigo
program, and the ClimateWorks Foundation.  Hyatt Regency Embarcadero, San Francisco,
California.

2013   Invited Lecture, "The Psychology of American Public Opinion on Climate Change."
Symposium on Conservation Psychology, hosted by the University of Southern California
Environmental Sustainability Network, University of Southern California, Los Angeles,
California.

2013   Invited Keynote Presentation, "The History of Panel Internet Surveys."  Workshop on
Longitudinal Research in Internet Panels, Program on Political Economy of Reforms,
University of Mannheim, Mannheim, Germany.

2013   Invited Presentation, "Mode Comparisons."  Workshop on Longitudinal Research in Internet
Panels, Program on Political Economy of Reforms, University of Mannheim, Mannheim,
Germany.

2013   Short Course (with Mario Callegaro), "How to Publish in Survey Research: Strategies,
Venues, Opportunities, and Errors to Avoid."  American Association for Public Research
Annual Meeting, Boston, Massachusetts.

2013   Invited Keynote Address, "The Accuracy of Survey Measurements and the Impact of Data
Collection Methodology."  Canadian Political Science Association, Victoria, British
Columbia, Canada.

2013   Invited Presentation, "Debiasing."  Conference on Risk Communication for Better Long-
Term Decisions: Insights from Finance and Healthcare.  CenSoC - Centre for the Study of
Choice, University of Technology, Sydney, Sydney, Australia.

2013   Invited Webinar (with Arthur Lupia and Matthew K. Berent), "Survey Coding: Best
Practices for Coding Open-Ended Survey Data."  Webinar sponsored by the American
Association for Public Opinion Research.

2013   Invited Keynote Address, "The Accuracy of Survey Data Collected by Various American
On-line Survey Firms: A 2012 Comparison."  MESS Workshop, Sponsored by the
University of Tilburg CentERdata Institute for Data Collection and Research, Den Haag, The
Netherlands.

2013   Invited Keynote Address, "Social Desirability Response Bias: Real or an Illusion?"  Sixth
Webdatanet MC, WGs, TFs, Seminars, Webdatametrics Workshop and Conference: "Mixed
Mode and Multi-Mode Research."  Sponsored by the Universitatis Islandiae Sigillum,
Reykjavik, Iceland.

2013   Invited Keynote Address, "Choosing Mode of Data Collection for Surveys to Maximuze
Data Quality."  International Conference on Applied Statistics 2013, Ribno, Slovenia.

2013   Invited Address, "Online Surveys."  DSA2 Conference on Web Surveys, Faculty of Social
Sciences, University of Ljubljana, Ljubljana, Slovenia.

2013   Invited Address, "The Effects of Scientists 'Expressions of Uncertainty on Public Opinion
on Global Warming."  Australian Psychological Society Annual Meeting, Cairns Convention
Centre, Queensland, Australia.

2013          Invited Presentation, "Inequality in Public Conversations about Politics."  Cottrell Salon, Stanford, California.

2013          Invited Webinar, "Communicating About Climate Adaptation with the Public."  Sponsored by the Center for Ocean Solutions and the Woods Institute for the Environment, Stanford University.

2013          Invited Testimony, "Public Opinion on Global Warming in the States."  Bicameral Task Force on Climate Change, Committee on Energy and Commerce, U.S. House of Representatives, Washington, DC.

2013          Invited Presentation, "Public Opinion on Global Warming in the States."  Climate Action Campaign, Washington, DC.

2013          Invited Short Course, "Maximizing the Accuracy of Online Surveys: Comparisons of Methods and Recommendations of Optimal Procedures."  Annual Meeting of the Pacific Chapter of the American Association for Public Opinion Research, San Francisco, California.

2013          Invited Keynote Address, "Public Perceptions of Climate Change in the U.S."  Regional Climate Summit for Municipal Leaders: Economic, Health, Water, and Transportation Impacts.  Sponsored by Climate Assessment for the Southwest, University of Arizona. University Marriott, Tucson, Arizona.

2014          Invited Presentation, "The Quality of Data Obtained from Non-Probability Internet Panels." Google, Mountain View, California.

2014          Invited Presentation, "Satisficing When Answering Questions: A Theoretical Explanation for a Wide Range of Findings in the Questionnaire Design Literature."  CORE Colloquium Series, Southern Methodist University, Dallas, Texas.

2014          Invited Presentation, "Public Opinion on Global Warming."  Connecting the Dots Conference, Sponsored by the Woods Institute for the Environment, Stanford University, Stanford, California.

2014          Invited Keynote Address, "The Future of Survey Research."  Survey Research in the 21st Century: Lectures Celebrating the Survey Research Laboratory's 50th Anniversary, University of Illinois, Champaign, Illinois.

2014          Invited Keynote Address, "The Future of Survey Research."  Survey Research in the 21st Century: Lectures Celebrating the Survey Research Laboratory's 50th Anniversary, University of Illinois, Chicago, Illinois.

2014          Invited Webinar, "Experiments in Surveys: Tools for Determining How Marketers Can Shape People's Preferences."  Australian Market & Social Research Society, Sydney, Australia.

2014          Invited Keynote Presentation, "Conducting and Publishing Methodology Research."  Annual Meeting of the Association of Academic Survey Research Organizations, University of Illinois, Chicago, Illinois.

2014          Invited Lecture, "Climate Change and Clean Energy – A Survey of U.S. Public Attitudes." Resources for the Future, Washington, DC.

2014        Invited Presentation, "Public Attitudes About Climate Change and Clean Energy."
            Sponsored by the Environmental and Energy Study Institute, Rayburn House Office
            Building, Washington, DC.

2014        Invited Presentation, "Social Science as Combat: The Global Warming War."  Center for
            Advanced Study in the Behavioral Sciences, Palo Alto, California.

2014        Invited Keynote Address, "The Future of Survey Research."  World Association of Public
            Opinion Research Annual Meeting, Universidad Diego Portales, Santiago, Chile.

2014        Invited Presentation, "American Public Opinion on Global Warming."  S. D. Bechtel, Jr.
            Foundation.  San Francisco, California.

2014        Invited Presentation, "The Future of Survey Research."  IJMR Speaker Evening, Market
            Research Society, London, U.K.

2014        Invited Presentation, "Impact of the Merchants of Doubt and of Natural Scientists on
            American Public Opinion on Global Warming."  Conference entitled "Responding and
            Adapting to Climate Change: Recognizing and managing Uncertainty in the Physical, Social,
            and Public Spheres."  University of Bristol, Bristol, U.K.

2014        Invited Presentation, "Comments on Variables that Determine the Quality of Survey
            Responses."  ESS-DACE Quality Enhancement Meeting Entitled "Measurement Quality in
            the ESS".  Universitat Pompeu Fabra, Barcelona, Spain.

2014        Invited Presentation, "The Future of Survey Research."  ESS Seminar: Highlights in Survey
            Research, Campus de la Ciutadella of Universitat Pampeu Fabra, Barcenola, Spain.

2014        Invited Presentation "Inequality and Public Opinion on Global Warming."  Institute for the
            Study of Societal Issues, University of California, Berkeley, Berkeley, California.

2014        Invited Presentation, "The Role of Americans 'Attitudes on Global Warming in Political
            Campaigns."  Harris School for Public Policy, University of Chicago, Chicago, Illinois.

2014        Invited Keynote Address, "Exploring the Origins of Beliefs about Climate Change:
            Experimental Studies Embedded in National Surveys of the U.S."  The Norwegian Citizen
            Panel Conference 2014, University of Bergen, Bergen, Norway.

2015        Invited Keynote Address, "Optimizing the Design of Survey Questionnaires." Rethink
            Research: Research Intensification Series, sponsored by the Social Science Research
            Laboratories, University of Saskatchewan, Saskatchewan, Canada.

2015        Invited Presentation, "American Public Opinion on Climate Change: Motivated Cognition?"
            Harvard University Center for the Environment, Harvard University, Cambridge,
            Massachusetts.

2015        Invited Presentation, "Sampling on the Internet for Surveys and Experiments; The Good, the
            Bad, and he Ugly."  Data Gathering Methods Study Group, University of Virginia,
            Charlottesville, Virginia.

2015        Invited Presentation, "Can Surveys Measure Informed Public Preferences Regarding
            Government Policies?  An Evaluation of the Contingent Valuation Method."  Quantitative
            Collaborative, University of Virginia, Charlottesville, Virginia.

2015              Invited Presentation, "What Americans Really Think About Climate Change:  Attitude
                  Formation and Change in Response to a Raging Scientific Controversy."  Center for Survey
                  Research, University of Virginia, Charlottesville, Virginia.

2015              Invited Presentation, "Causes of Turnout."  Conference entitled "How Voters Think: Lessons
                  from Science and Practice." A meeting of political scientists with Democratic Party
                  campaign consultants.  Harris School of Public Policy, University of Chicago, Chicago,
                  Illinois.

2015              Invited Presentation, "Communicating about Climate Change: How Language Choices
                  Affect Public Thinking."  Sunnylands Speaker Series at Rancho Mirage Library, Rancho
                  Mirage, California.

2015              Invited Presentation, "The Impact of Acknowledging Bounded and Unbounded Uncertainty
                  on Persuasion: The Case of Scientific Uncertainty and Global Warming."  Conference
                  entitled "Third Annual UCSB Environmental Political Conference.  UCSB Center for Social
                  Solutions to Environmental Problems, Bren School of Environmental Science and
                  Management, University of California, Santa Barbara, California.

2015              Invited Presentation, "Fact-Checking and News Literacy."  Annual Journalism Funders
                  Gathering: "Journalism, Democracy, and Political Polarization."  William and Flora Hewlett
                  Foundation, Menlo Park, California.

2015              Invited Presentation, "Causes of Turnout."  Conference entitled "How Voters Think: Lessons
                  from Science and Practice." A meeting of political scientists with Republican Party
                  campaign consultants.  Harris School of Public Policy, University of Chicago, Chicago,
                  Illinois.

2015              Invited Lecture, "Social Psychology Under the Microscope: Do Our Classic Experiments
                  Replicate When Participants Are Representative of the General Public Rather Than
                  Convenience Samples of College Students?"  Lecture sponsored by the Quantitative
                  Initiative for Policy and Social Research, University of Kentucky, Lexington, Kentucky.

2015              Invited Lecture, "Political Thinking, Passion and Action in America: The Contributions of
                  Jon Krosnick to the Study of Political Psychology."  Lecture sponsored by the Quantitative
                  Initiative for Policy and Social Research, University of Kentucky, Lexington, Kentucky.

2015              Invited Presentation, "What Americans Really Think About Global Warming."  Invited
                  Lecture in the Distinguished Speaker Series, Department of Political Science, University of
                  British Columbia, Vancouver, British Columbia.

2015              Invited Remarks, "Samuel Popkin: Celebration of a Remarkable Career."  Institute of the
                  Americas, University of California, San Diego, California.

2015              Invited Lecture, "The Influence of the Media."  Academic Department of Political Science,
                  Instituto Tecnológico Autónomo de México, Mexico City, Mexico.

2015              Invited Workshop, "Developments in Survey Research Methodology."  Academic
                  Department of Political Science, Instituto Tecnológico Autónomo de México, Mexico City,
                  Mexico.

2015              Invited Remarks, "Pre-election Polling in the United States."  Foro El Panorama
                  Internacional Sobre El Papel de las Encuestas Electorales.  México Instituto Nacional

Electoral, Mexico, City, Mexico.

2015    Keynote Address, "How Accurate Are Surveys and What Can We Do to Maximize Accuracy."  Annual Conference of the Midwest Association for Public Opinion Research, Chicago, Illinois.

2015    Invited Presentation, "What Americans Really Think about Climate Change - Attitude Formation and Change in Response to a Raging Scientific Controversy."  UCCS Speaker Series, University of California Center, Sacramento, California.

2015    Invited Presentation, "Reasons to worry about social sciences and opportunities for improvement."  Improving Biomedical Research 2015: Challenges and Solutions.  Meta-Research Innovation Center at Stanford, Stanford University, Stanford, California.

2015    Invited Presentation, "Giving the Public a Voice in the Process of Democratic Policy Making."  Society of Experiment Social Psychology Annual Meeting, Denver, Colorado.

2016    Invited Presentation, "The Future of Internet Surveys: Why Bother with Random Sampling?"  The Inaugural Ross-Royall Symposium: From Individuals to Populations.  Department of Biostatistics, Bloomberg School of Public Health, Johns Hopkins University, Baltimore, Maryland.

2016    Invited Lecture, "Collapses of Research Integrity and Opportunities to Strengthen Science."  Lecture sponsored by the Office of Research Integrity, University of California, Riverside, Riverside, California.

2016    Invited Presentation, "Public Opinion on Climate Change."  Presentation at the California Association of Museums Annual Meeting, Riverside, California.

2016    2016 Gierach Lectureship, "Passion in American Politics: What Happens When Citizens Become Deeply Committed to Pressuring Government on a Policy Issue."  Department of Psychology, University of Florida, Gainesville, Florida.

2016    Invited Colloquium, "Best Practices in Science: Profound Problems and Wonderful Opportunities for Psychologists."  Department of Psychology, University of Florida, Gainesville, Florida.

2016    Invited Keynote Address, "Can Surveys Measure Informed Public Preferences Regarding Government Policies?  An Evaluation of the Contingent Valuation Method."  Conference on Political Communication, Conflict, Journalism, Public Opinion, Discourse, and Psychological Perspectives.  Noah Mozes Department of Communication and Journalism and the Smart Family Institute of Communication, Hebrew University, Jerusalem, Israel.

2016    Invited Keynote Address, "Reflections on an Extraordinary Career;  Elihu Katz and the Study of Mass Communication and Public Opinion."  Conference on Political Communication, Conflict, Journalism, Public Opinion, Discourse, and Psychological Perspectives.  Noah Mozes Department of Communication and Journalism and the Smart Family Institute of Communication, Hebrew University, Jerusalem, Israel.

2016    Invited Presentation, "What Americans Really Think About Climate Change.  Presentation sponsored by the Stanford Alumni Association.  Greenberg Traurig Law Firm, Tel Aviv, Israel.

2016    Invited Presentation, "Best Practices in Science: Profound Problems and Wonderful

Opportunities for Social and Behavioral Scientists."  Department of Communication, Tel Aviv University, Tel Aviv, Israel.

2016            Invited Lecture, "The Impact of Survey Mode and Sampling on the Accuracy of Survey Results."  Federal Trade Commission, Washington, DC.

2016            Invited Lecture, "Can Surveys Measure Informed Public Preferences Regarding Government Policies?  An Evaluation of the Contingent Valuation Method."  GESIS - Leibniz Institute for the Social Sciences, Mannheim, Germany.

2016            Invited lecture, "Impact of Survey Modes."  Workshop on Survey Mode Effects, Sponsored by the Faculty of Social Sciences, University of Ljubljana.  Ljubljana, Slovenia.

2016            Invited Moderator, "Discussion on Testing for Causal Mediation."  Ninth Annual meeting of the West Coast Experiments Conference, Graduate School of Business, Stanford University, Stanford, California.

2016            Invited Comments, "Research Ethics."  Meeting of the DIGSSCORE International Advisory Board, the Norwegian Citizen Panel Scientific Committee, and the Citizen Lab Scientific Committee.  University of Bergen, Bergen, Norway.

2016            Invited Keynote Address, "The Exciting Opportunities Afforded by Digitalization in the Social and Behavioral Science, and the Need for Academic Research to avoid Disasters." Kick-off Seminar for the University of Bergen's Digital Social Science Initiative, Bergen, Norway.

2016            Invited Address, "Are Democratic Citizens Capable of Offering Thoughtful Prescriptions on Policy Issues?  An Evaluation of the Contingent Valuation Method."  Sciences Po Methods Workshop, CEVIPOF, Centre de Recherches Politiques, Sciences Po, Paris, France.

2016            Invited Address, "Issue-focused Passion in American Politics."  Sciences Po Methods Workshop, CEVIPOF, Centre de Recherches Politiques, Sciences Po, Paris, France.

2016            Invited Address, "The Polling Blues."  Presentation sponsored by the DC Chapter of the American Association for Public Opinion Research, Washington, DC.

2016            Invited Presentation, "Survey Mode, Sampling Methods, and Response Rates."  Deep Water Horizon Total Value – Lessons Learned.  Workshop sponsored by the National Oceanic and Atmospheric Administration, Washington, DC.

2016            Invited Presentation, "Are American Elections Unfair?  Exploring the Impact of Candidate Name Order."  Presentation at Vi at Palo Alto, Palo Alto, California.

2016            Invited Presentation, "The Future of Survey Research."  Lecture sponsored by the DC Chapter of the American Association for Public Opinion Research, Washington, DC.

2016            Invited Presentation, "The Future of Survey Research."  Lecture sponsored by the New York Chapter of the American Association for Public Opinion Research, Washington, DC.

2016            Invited Presentation, "The Future of Survey Research."  Lecture sponsored by the Survey Research Center, The Woodrow Wilson School, and the Center for the Study of Democratic Politics, Princeton University, Princeton, New Jersey.

2016            Invited Presentation, "The Future of Survey Research."  Lecture Sponsored by the Center for

Survey Research, University of Massachusetts, Boston, Massachusetts.

2016     Invited Presentation, "Issue-Focused Passion in American Politics: What Happens When Citizens Become Deeply Committed to Pressuring Government on a Policy Issue.." Lecture Sponsored by the Departments of Psychology, Sociology, and Political Science, and the Center for Survey Research, University of Massachusetts, Boston, Massachusetts.

2016     Invited Commentary, "Science Gone Awry." Tanner Lectures on Human Values, Sponsored by the University Center for Human Values: Trust and Distrust in Science, Princeton University, Princeton, New Jersey.

2016     Invited Keynote Address, "Studying Political Attitudes as Survey Methodology Transforms." Conference on "Inequality and Fairness of Political Reforms." Hosted by the SFB 884 "Political Economy of Reforms" Project, University of Mannheim, Mannheim, Germany.

2017     Invited Presentation, "The Psychology of American Elections: Getting Into the Heads of Voters". Presentation sponsored by the Stanford Alumni Association. Stanford in New York Facility, New York, New York.

2017     Invited Presentation, "The Challenges of Accurate Survey Measurement: The Case of Household Rostering." Center for Survey Methodology, U.S. Census Bureau, Suitland, Maryland.

2017     Invited Address, "The Accuracy of Online Surveys with Non-probability Samples of People Who Volunteer to Do Surveys for Money." Conference Entitled "Towards the Future: Forecasting in Social Studies" VII Sociology Grushin Conference, Sponsored by the Russia Public Opinion Research Center, Moscow, Russia.

2017     Invited Lecture, "Are Elections in America Unfair? Exploring the Impact of Candidate Name Order." Lecture co-sponsored by the GESIS Leibniz Institute for Social Sciences and the Mannheim Center for European Social Research (MZES), University of Mannheim, Mannheim, Germany.

2017     Invited Presentation, "Attitude Measurement and Methodology". Attitudes Conference, Annenberg Public Policy Center of the University of Pennsylvania, Philadelphia, Pennsylvania.

2017     Invited Presentation, "Campaign Ads that are Good for America." Conference on Electoral Reform, Harris School for Public Policy, University of Chicago, Chicago, Illinois.

2017     Invited Presentation, "Eliminating Unfairness: The Impact of Candidate Name Order." Conference on Electoral Reform, Harris School for Public Policy, University of Chicago, Chicago, Illinois.

2017     Invited Lecture, "How the Media Influence American Public Opinion." Presentation at @America, sponsored by the U.S. Department of State, Jakarta, Indonesia.

2017     Invited presentation, "Challenges Impeding Comparability of Measurement Across Countries: Findings from an International Project Documenting Response Effects." Conference on Advances in Scale Development in the Social Sciences: Issues of Comparability, University of Mannheim, sponsored by GESIS, Mannheim, Germany.

2017     Invited presentation, "Challenges Impeding Comparability of Measurement Across

Countries: Findings from an International Project Documenting Response Effects."
Conference on Elections, parties, and Public Opinion in a Volatile World: A Comparative
Perspective.  University of Mannheim, sponsored by GESIS, the Mannheimer Zentrum fur
Europaische Sozialforschung, and the University of Michigan's Institute for Social Research,
Mannheim, Germany.

2017  Invited panel member, "Keynote: The Politics of Climate Change."  Sixth Annual LCFS &
OPIS Carbon Markets Workshop, San Francisco, California.

2017  Invited lecture, "The Elections in America: Surprising Twists and Turns."  Stanford Center
at Peking University Special Lecture, Beijing, China.

2017  Invited lecture, "Are Elections in America Unfair?  Exploring the Impact of Candidate Name
Order."   Methoden-Zentrum Sozialwissenschaften, Georg-August-Universitat Gottingen,
Gottingen, Germany.

2018  Inaugural Lecturer, Natalie Kahn Lecture Series, Department of Communication, University
of California, Los Angeles, Los Angeles, California.

2018  Invited Lecture, "Social and Psychology Experiments Under the Microscope: Do Our Classic
Experiments Replicate When Participant Are Representative of the General Public Rather
Than Convenience Samples of College Students?"  Centre for Experimental Social Sciences
Seminar, Nuffield College, University of Oxford, Oxford, United Kingdom.

2018  Invited Lecture, "Passion in American Politics: What Happens When Citizens Become
Deeply Committed to Pressuring Government on a Policy Issue".  Department of
Psychology, University of Bath, Bath, United Kingdom.

2018  Invited Keynote Address, "An Update on the Accuracy of Probability Sample Surveys and
Non-probability Sample Surveys."  Workshop on Probability-Based and Nonprobability
Survey Research, Program on Political Economy of Reforms – SFB 884, University of
Mannheim, Mannheim, Germany.

2018  Presentation, "Project Overview."  CPS Forum on Measuring Voter Turnout, Summer at
Census, U.S. Census Bureau, Suitland, Maryland.

2018  Presentation, "Mode and Proxy Effects."  CPS Forum on Measuring Voter Turnout, Summer
at Census, U.S. Census Bureau, Suitland, Maryland.

2018  Presentation, "Knowing More Than We Can Know."  CPS Forum on Measuring Voter
Turnout, Summer at Census, U.S. Census Bureau, Suitland, Maryland.

2018  Invited lecture, "Americans 'Opinions about Global Warming."  Enlightenment at SCPKU,
HKSAR Legislative Council Special Program, Stanford Center at Peking University,
Beijing, China.

2018  Invited lecture, "The Causes of Turnout and Candidate Choice."  Enlightenment at SCPKU,
HKSAR Legislative Council Special Program, Stanford Center at Peking University,
Beijing, China.

2018  Invited lecture, "The Psychology of Attitude Formation and Change."  Enlightenment at
SCPKU, HKSAR Legislative Council Special Program, Stanford Center at Peking

University, Beijing, China.

2018       Invited lecture, "Case Study: The 2008 American Presidential Election."  Enlightenment at SCPKU, HKSAR Legislative Council Special Program, Stanford Center at Peking University, Beijing, China.

2018       Invited Colloquium, "The Future of Survey Research: Meltdown or Opportunity?"  Roper Center Speaker Series, Roper Center for Public Opinion Research, Cornell University, Ithaca, New York.

2018       Invited Colloquium, "The Future of Survey Research: Meltdown or Opportunity?"  GESIS - Leibniz Institute for the Social Sciences, Mannheim, Germany.

2019       Invited Guest Lecture, "Are Elections in America Unfair?  The Impact of Candidate Name Order.  Psychology for Policy (WWS 502), Princeton University, Princeton, New Jersey.

2019       Invited Presentation, "How to Change Minds on Climate Change: Experimental Studies Documenting Surprising Effects of Persuasive Messages."  Presentation sponsored by the Kahneman-Triesman Center for behavioral Science and Public Policy, Princeton University, Princeton, New Jersey.

2019       Invited Presentation, "American Public Opinion on Global Warming."  Resources for the Future, New York, New York.

2019       Invited Presentation, "Illuminating Political Persuasion & Advertising Effects: New Experiments in Surveys."  New York Chapter of the American Association for Public Opinion Research, New York, New York.

2019       Stauffer Colloquium Lecture, "Are Elections in America Unfair? Exploring the Psychology of Candidate Name Order Effects."  Division of Behavioral & Organizational Sciences, Claremont Graduate University, Claremont, California.

2019       Invited Presentation, "The Impact of Mode and Sampling on the Accuracy of Survey Results."  Lake Research Partners, Washington, DC.

2019       Invited Presentation, "The Impact of Racism and Other Factors on the Outcome of the 2008 U.S. Presidential Election.  Lake Research Partners, Washington, DC.

2019       Invited Presentation, "The Butterfly Wing Flapped: The Impact of Candidate Name Order on Election Outcomes."  Lake Research Partners, Washington, DC.

2019       Invited Presentation, "Testing a New Form of Political Advertising: Advertising Parties Rather Than Candidates."  Lake Research Partners, Washington DC.

2019       Invited Presentation, "Surprising Evidence Regarding Social Desirability Response Bias in Measurement of Political Opinions and Behaviors."  Research Workshop in American Politics, Institute of Governmental Studies, University of California Berkeley, Berkeley, California.

2019       Invited Presentation, "Testing for Political Persuasion and Advertising Effects: New Experiments in Surveys."  Center for Behavioral Science Methods Seminar, U.S. Census Bureau, Suitland, Maryland.

2019       Invited Presentation, "Creating Infrastructure to College Data from Research Participants

|      |      |
|------|------|
|      | Maximizes Efficiency and Data Quality.  Workshop with Austin Public Schools, University of Texas, Austin, Texas. |
| 2019 | Invited Lecture, "Making Social Science Relevant to Policy-Making: Case Studies of Research Under the Microscope."  Summer Colloquium Sponsored by the Office of Graduate Studies and the Department of Sociology, University of Nebraska, Lincoln, Nebraska. |
| 2019 | Invited Lecture, "An Innovative Survey Approach to Gauging the Impact of Racism n the 2008 U.S. Presidential Election."  Political Economy of Reforms Seminar Series, University of Mannheim, Mannheim, Germany. |
| 2020 | Invited Opening Remarks, 2020 SurveyFest. Sponsored by the American Association for Public Opinion Research and Westat, Stanford University, Stanford, California. |
| 2020 | Invited Presentation, "The Accuracy of River Sample Surveys."  Neue Entwicklungen in der Onlineforschung: Moglichteiten und Grenzen von River-Sampling.  University of Mannheim and GESIS, Mannheim, Germany. |
| 2020 | Keynote Address, "Voters as Consumers."  Society for Consumer Psychology Annual Conference, Huntington Beach, California. |
| 2020 | Invited Presentation, "Climate Insights Survey Event"  Annual Meeting of the Resources for the Future Board, Washington, D.C. |
| 2020 | Invited Presentation, "Climate Insights 2020: Climate Change and the American Voter."  Climate Week Webinar, Resources for the Future, Washington, D.C. |
| 2020 | Invited Presentation, "Climate Change: What the American Public Believes and Wants."  Redwood City Library Webinar, Redwood City, California. |
| 2020 | Invited Presentation "Climate Insights 2020: Climate Change and the American Voter."  Resources for the Future Webinar. |

Editorial Board Member

| 1989-2000 2006-2008 | Journal of Personality and Social Psychology |
|------|------|
| 1990-1994 | Journal of Experimental Social Psychology |
| 1997-2003 | Basic and Applied Social Psychology |
| 1988-1991, 1994-2002 | Public Opinion Quarterly |
| 1. | Media Psychology |
| 2006-2008 | Sociological Methodology |
| 2008- | Pathways |
| 2012-2017 | Journal of Survey Statistics and Methodology |

| 2018-2022 | Measurement Instruments for the Social Sciences |
| 2020- | Journal of Quantitative Description: Digital Media |

Internal Grants

| 1986 | Ohio State University Office of Research and Graduate Studies Faculty Seed Grant, to support research on attitude importance. |
| 1986 | Ohio State University College of Social and Behavioral Sciences Research Expense Grant, to support research on social information processing and judgments about the self. |
| 1987 | Mershon Center Research Grant, to study the determinants of attitude importance. |
| 1987 | Ohio State University Office of Research and Graduate Studies Research Grant, to study the role of attitude importance in regulating political judgment. |
| 1988 | Ohio State University Office of Research and Graduate Studies, to support a study of the Arab/Israeli relations issue public in the United States (with Shibley Telhami). |
| 1988 | The Mershon Center, Ohio State University, to support a study of the Arab/Israeli relations issue public in the United States (with Shibley Telhami). |
| 1988 | Department of Political Science, Ohio State University, to support a study of the Arab/Israeli relations issue public in the United States (with Shibley Telhami). |
| 1988 | College of Social and Behavioral Sciences, Ohio State University, to support a study of the Arab/Israeli relations issue public in the United States (with Shibley Telhami). |
| 1991 | Ohio State University Office of Research and Graduate Studies Research Grant, to study the role of satisficing in shaping responses to survey questionnaire measures of attitudes. |
| 1993 | Ohio State University Office of the Vice President for Research, to support preparation of a book on questionnaire design. |
| 1995 | College of Social and Behavioral Sciences, Ohio State University, to support a study of the contingent valuation method of survey research. |
| 1995 | College of Social and Behavioral Sciences, Ohio State University, to support a survey of public attitudes toward global warming. |
| 1995 | College of Social and Behavioral Sciences, Ohio State University, to support research on questionnaire design. |
| 1999 | Mershon Center, Ohio State University.  Foreign policy and election outcomes: A proposal to study the 2000 American Presidential election. |
| 2003 | VPUE Faculty Grant for Undergraduate Research, Stanford University. |
| 2004 | VPUE Faculty Grant for Undergraduate Research, Stanford University. |
| 2005 | VPUE Faculty Grant for Undergraduate Research, Stanford University. |

2006            VPUE Faculty Grant for Undergraduate Research, Stanford University.

2007.           VPUE Faculty Grant for Undergraduate Research, Stanford University.

2007            Summer Research College Support for Undergraduates, Political Science Department, Stanford University.

2008            VPUE Faculty Grant for Undergraduate Research, Stanford University.

2008            Summer Research College Support for Undergraduates, Political Science Department, Stanford University.

2009            VPUE Faculty Grant for Undergraduate Research, Stanford University.

2009            Summer Research College Support for Undergraduates, Political Science Department, Stanford University.

2009            Summer Research College Support for Undergraduates, Public Policy Program, Stanford University.

2010            VPUE Faculty Grant for Undergraduate Research, Stanford University.

2010            Summer Research College Support for Undergraduates, Political Science Department, Stanford University.

2010            Summer Research College Support for Undergraduates, Public Policy Program, Stanford University.

2011            VPUE Faculty Grant for Undergraduate Research, Stanford University.

2011            Summer Research College Support for Undergraduates, Political Science Department, Stanford University.

2011            Summer Research College Support for Undergraduates, Woods Institute for the Environment, Stanford University.

2011            Summer Research College Support for Undergraduates, Public Policy Program, Stanford University.

2012            Summer Research College Support for Undergraduates, Political Science Department, Stanford University.

2012            Summer Research College Support for Undergraduates, Woods Institute for the Environment, Stanford University.

2012            Summer Research College Support for Undergraduates, Public Policy Program, Stanford University.

2012            VPUE Faculty Grant for Undergraduate Research, Stanford University.

2013            Summer Research College Support for Undergraduates, Political Science Department, Stanford University.

| | |
|---|---|
| 2013 | Summer Research College Support for Undergraduates, Woods Institute for the Environment, Stanford University. |
| 2013 | Summer Research College Support for Undergraduates, Public Policy Program, Stanford University. |
| 2014 | Summer Research College Support for Undergraduates, Political Science Department, Stanford University. |
| 2014 | Summer Research College Support for Undergraduates, Woods Institute for the Environment, Stanford University. |
| 2014 | Summer Research College Support for Undergraduates, Public Policy Program, Stanford University. |
| 2014 | Research Grant, Center for Advanced Study in the Behavioral Sciences. |
| 2015 | Summer Research College Support for Undergraduates, Political Science Department, Stanford University. |
| 2015 | Summer Research College Support for Undergraduates, Woods Institute for the Environment, Stanford University. |
| 2015 | Summer Research College Support for Undergraduates, Public Policy Program, Stanford University. |
| 2015 | Research Grant, Spectrum-Stanford Health Care Innovation Challenge Program, Stanford University. (with Julie Parsonnet) |
| 2016 | Summer Research College Support for Undergraduates, Political Science Department, Stanford University. |
| 2017 | Summer Research College Support for Undergraduates, Public Policy Program, Stanford University. |
| 2017 | Summer Research College Support for Undergraduates, Political Science Department, Stanford University. |
| 2017 | Summer Research College Support for Undergraduates, Psychology Department, Stanford University. |
| 2017 | Summer Research Program on Energy Research, Precourt Institute for Energy, Stanford University. |
| 2018 | Summer Research College Support for Undergraduates, Public Policy Program, Stanford University. |
| 2018 | Summer Research College Support for Undergraduates, Political Science Department, Stanford University. |
| 2018 | Summer Research College Support for Undergraduates, Psychology Department, Stanford University. |

| 2018 | Summer Research Program on Energy Research, Precourt Institute for Energy, Stanford University. |
| 2019 | Summer Research College Support for Undergraduates, Public Policy Program, Stanford University. |
| 2019 | Summer Research College Support for Undergraduates, Political Science Department, Stanford University. |

## External Grants and Contracts

| 1977 | CBS Research Grant, to support development and evaluation of a mass media promotional campaign for sound recordings. |
| 1984 | Society for the Psychological Study of Social Issues Doctoral Dissertation Grant-in-aid. |
| 1984 | CBS Research Grant, to support literature review/research on the causes of heavy television viewing among children and adolescents. |
| 1985 | CBS Research Grant, to support empirical research on the effect of television viewing on alcohol use among children and adolescents. |
| 1985 | CBS Research Grant, to support empirical research on the causes of heavy television viewing among children and adolescents. |
| 1987-1989 | National Institute on Aging Research Grant, to study changes in political orientations over the life span (with Duane F. Alwin). |
| 1987 | National Association of Broadcasters Research Grant, to study the causes of heavy television viewing among children and adolescents. |
| 1988 | Society for the Psychological Study of Social Issues Grant-in-Aid, to support research on the causes of heavy television viewing among children and adolescents. |
| 1990-1992 | National Science Foundation, The information processing consequences of attitude importance. |
| 1991 | National Science Foundation Research Experience for Undergraduates Grant Supplement, The information processing consequences of attitude importance. |
| 1992 | Society for the Psychological Study of Social Issues Grant-in-Aid, to support research on the impact of the Gulf War on the constituents of presidential evaluations. |
| 1992 | National Science Foundation Research Experience for Undergraduates Grant Supplement, The information processing consequences of attitude importance. |
| 1994 | National Science Foundation, Explaining the surprising accuracy of mail surveys. |
| 1995 | National Science Foundation Research Experience for Undergraduates Grant Supplement, Explaining the surprising accuracy of mail surveys. |

| | |
|---|---|
| 1995 | U.S. Department of the Interior/Minerals Management Service/University of California Coastal Marine Institute, Testing and calibrating the measurement of nonmarket values for oil spills via the contingent valuation method (with Michael Hanemann). |
| 1995 | Electric Power Research Institute/Industrial Economics, Elicitation of public perceptions regarding the potential ecological effects of climate change (part I). |
| 1996 | Electric Power Research Institute/Industrial Economics, Elicitation of public perceptions regarding the potential ecological effects of climate change (part II). |
| 1997 | National Science Foundation, Formation and change of public beliefs about global warming. |
| 1997 | National Oceanic and Atmospheric Administration/U.S. Environmental Protection Agency/Resources for the Future, Formation and change of public beliefs about global warming: Wave II of survey interviewing. |
| 1998, 1999, 2000, 2001 | Robert Dodd and Associates/The Battelle Memorial Institute/National Aeronautics and Space Administration, National aviation operational monitoring system questionnaire development. |
| 2000, 2001 | Resources for the Future, American public opinion on the environment. |
| 2001, 2002 | Columbus Airport Authority, The dynamics and causes of airport customer satisfaction. |
| 2002 | Time-sharing Experiments for the Social Sciences (TESS) grant (funded by the National Science Foundation), Social desirability and reports of voter turnout (with Allyson L. Holbrook). |
| 2003 | National Science Foundation, Social and psychological mechanisms of the relation between age and openness to attitude change (with Penny Visser). |
| 2003 | New York Academy of Medicine/W. K. Kellogg Foundation, Engaging the community in terrorism preparedness planning. |
| 2003 | Decade of Behavior 2000-2010 Distinguished Lecture Program Grant to feature Richard E. Petty at the 2003 annual meeting of the American Association for Public Opinion Research. |
| 2004 | National Science Foundation, Optimizing the number of points on rating scales. |
| 2004 | The Bureau of Labor Statistics, U.S Department of Labor, Refining the categorization of jobs in the biotechnology industry. |
| 2005 | National Science Foundation, 2005 Summer Institute in Political Psychology. |
| 2005 | National Science Foundation, Survey Research Methodology Optimization for the Science Resource Statistics Program. |
| 2005 | National Science Foundation, American National Election Studies 2005-2010 (with Arthur Lupia). |
| 2006 | American Psychological Association, The psychology of voting and election campaigns: A proposal for a stand-alone conference (with Wendy Wood, Arthur Lupia, and John Aldrich). |

| | |
|---|---|
| 2006 | National Science Foundation, Agenda-setting workshop in the area of e-science: Development of the next generation of cybertools applied to data collections in the social and behavioral sciences (with Arthur Lupia). |
| 2006 | National Science Foundation, Development of a computer network for experimental and non-experimental data collection via the Internet from a nationally representative sample of American households. |
| 2006 | National Science Foundation and the Department of Homeland Security, Expansion of the American National Election Study: Gauging the public's Attitudes on terrorism and homeland security (with Arthur Lupia). |
| 2007 | National Science Foundation, 2007 Summer Institute in Political Psychology. |
| 2007 | National Science Foundation, Survey Research Methodology Optimization for the Science Resource Statistics Program. |
| 2007 | National Science Foundation, Survey Research Methodology Optimization for the Science Resource Statistics Program (Supplement). |
| 2007 | National Science Foundation, Research Experience for Undergraduates Supplement for the American National Election Study. (with Arthur Lupia) |
| 2007 | National Science Foundation, The Impact of Polls on Political Behavior. |
| 2007 | National Science Foundation, American National Election Studies Supplement to Support Additional Pretesting of Questionnaire Items. (with Arthur Lupia) |
| 2007 | National Science Foundation, American National Election Studies Supplement to Support a Conference on Methodology for Coding Open-ended Question Responses. (with Arthur Lupia) |
| 2008 | National Science Foundation, SGER: DHS and NSF Collaboration: Developing Polls to Test Theories of Radicalization and Potential for Radicalization. (with Arthur Lupia) |
| 2008 | National Science Foundation, American National Election Studies Supplement to Create a Supplemental Panel to Study the 2008 American Presidential Election. (with Arthur Lupia) |
| 2008. | National Science Foundation, 2008 Summer Institute in Political Psychology. |
| 2009. | Time-sharing Experiments for the Social Sciences (TESS) grant (funded by the National Science Foundation), Does Mentioning 'Some People ' and 'Other People ' in an Attitude Question Improve Measurement Quality? (with David Yeager). |
| 2009 | National Science Foundation, 2009 Summer Institute in Political Psychology. |
| 2009 | Robert Wood Johnson Foundation, Surveying Public Opinion on Healthcare. |
| 2009 | Bill and Melinda Gates Foundation, Research and Polling Studies on Key Education Topics. |
| 2009 | National Science Foundation, 2010-2012 Summer Institute in Political Psychology. |

| 2010 | National Science Foundation, American National Election Studies Supplement to Develop and Test New Methods for Coding Open-ended Survey Data. (with Arthur Lupia) |
| 2010. | National Science Foundation, Discovering the Mechanisms of Belief and Attitude Change on Controversial Issues: The Case of Global Warming and Trust in Scientists. |
| 2011. | Marketing Science Institute, Establishing the Accuracy of Online Panels Research (with Lisa Brüggen, Rebecca Weiss, David Yeager, Rui Wang, and Yph Lelkes). |
| 2012. | National Science Foundation, Conferences on the Future of Survey Research. |
| 2013. | National Science Foundation, Supplement to Grant on the Future of Survey Research. |
| 2014 | National Science Foundation, American National Election Studies Supplement to Develop and Test New Methods for Coding Open-ended Survey Data. (with Arthur Lupia) |
| 2014 | Fetzer Franklin Fund, Exploring the Replicability of Psychological Findings. |
| 2014. | Center for Advanced Study in the Behavioral Sciences, Stanford University, CASBS Best Practices in Science Group: Empirical Studies, Article Writing, and Grant Proposal Preparation. (with Lee Jussim) |
| 2015. | The William and Flora Hewlett Foundation, Maximizing Scientific Integrity. (with Lee Jussim) |
| 2015 | Marketing Science Institute, Beyond the Promotion of Net Promoter Score: A Research Deep Dive on "The One Number You Need to Grow." (with Ellen Konar) |
| 2015 | Fetzer Franklin Fund, Maximizing Scientific Integrity: A Conference Proposal. (with Lee Jussim) |
| 2017 | National Science Foundation, Implicit Bias Conference |
| 2017. | National Science Foundation, Consumer Innovation Survey Development. |

Research Partnerships with News Media Organizations

The New York Times
ABC News
The Associated Press
Time Magazine
The Washington Post
USA Today
New Scientist Magazine

Books

Weisberg, H., Krosnick, J. A., & Bowen, B. (1989). Introduction to survey research and data analysis. Chicago: Scott, Foresman.

Krosnick, J. A.  (Ed.).  (1990).  Thinking about politics: Comparisons of experts and novices.  New York:
Guilford Press (Book version of a special issue of Social Cognition, Volume 8, Number 1, 1990).

Petty, R. E., & Krosnick, J. A.  (Eds.).  (1995).  Attitude strength: Antecedents and consequences.  Hillsdale, NJ:
Erlbaum.

Weisberg, H., Krosnick, J. A., & Bowen, B.  (1996).  Introduction to survey research, polling, and data analysis.
Thousand Oaks, CA: Sage.

Carson, R. T., Conaway, M. B., Hanemann, W. M., Krosnick, J. A., Mitchell, R. C., & Presser, S.  (2004).
Valuing oil spill prevention: A case study of California's central coast.  Dordrecht, The Netherlands:
Kluwer Academic Publishers.

Callegaro, M., Baker, R., Bethlehem, J., Göritz, A., Krosnick, J. A., & Lavrakas, P. J. (Eds.).  (2014).  Online
panel research: A data quality perspective.  West Sussex, UK: John Wiley and Sons.

Review: Cornesse, C., & Blom, A. G.  (2015).  Review of Online Panel Research: A Data Quality
Perspective.  Journal of Official Statistics, 31, 809-812.

Krosnick, J. A., Chiang, I.-C., & Stark, T.  (Eds.)  (2017).  Political psychology: New explorations.  Psychology
Press.  New York, New York.

Vannette, D. L., & Krosnick, J. A.  (Eds.)  (2018).  The Palgrave handbook of survey research.   London, UK:
Palgrave MacMillan.

Jussim, L. J., Stevens, S. T., & Krosnick, J. A.  (Eds.) (in press).  Research integrity in the behavioral sciences.
New York: Oxford University Press.

Krosnick, J. A., Stark, T. H., & Scott, A. L.  (Eds.)  (in press).  The Cambridge handbook of implicit bias and
racism.  Cambridge, U.K.: Cambridge University Press.

Krosnick, J. A., & Fabrigar, L. R.  (forthcoming).  The handbook of questionnaire design.  New York: Oxford
University Press.


Journal Articles and Book Chapters

Krosnick, J. A.  (1978).  One approach to the analysis of drumset playing.  Percussive Notes, Spring-Summer,
143-149.

Judd, C. M., Krosnick, J. A., & Milburn, M. A.  (1981).  Political involvement and attitude structure in the
general public.  American Sociological Review, 46, 660-669.

Krosnick, J. A., & Judd, C. M.  (1982).  Transitions in social influence at adolescence: Who induces cigarette
smoking?  Developmental Psychology, 18, 359-368.

Judd, C. M., & Krosnick, J. A.  (1982).  Attitude centrality, organization, and measurement.  Journal of
Personality and Social Psychology, 42, 436-447.

Krosnick, J. A.  (1982).  Teaching percussion: Growing with your students.  National Association of College
Wind and Percussion Instructors Journal, Summer, 4-7.

Judd, C. M., Kenny, D. A., & Krosnick, J. A.  (1983).  Judging the positions of political candidates: Models of
assimilation and contrast.  Journal of Personality and Social Psychology, 44, 952-963.

McAlister, A. L., Krosnick, J. A., & Milburn, M. A. (1984). Causes of adolescent cigarette smoking: Tests of a
structural equation model. Social Psychology Quarterly, 47, 24-36.

Iyengar, S., Kinder, D. R., Peters, M. D., & Krosnick, J. A. (1984). The evening news and presidential
evaluations. Journal of Personality and Social Psychology, 46, 778-787.

Reprinted in Peplau, L. A., Sears, D. O., Taylor, S. E., & Freedman, J. L. (Eds.) (1988), Readings in
social psychology: Classic and contemporary contributions. Englewood Cliffs, NJ: Prentice Hall.

Alwin, D. F., & Krosnick, J. A. (1985). The measurement of values in surveys: A comparison of ratings and
rankings. Public Opinion Quarterly, 49, 535-552.

Reprinted in Singer, E., & Presser, S. (Eds.) (1989). Survey research methods: A reader. Chicago:
University of Chicago Press.

Reprinted in Bartholomew, D. (Ed.) (2006). Measurement. Oxford, UK: The Bardwell Press.

Schuman, H., Ludwig, J., & Krosnick, J. A. (1986). The perceived threat of nuclear war, salience, and open
questions. Public Opinion Quarterly, 50, 519-536.

Krosnick, J. A., & Alwin, D. F. (1987). An evaluation of a cognitive theory of response order effects in survey
measurement. Public Opinion Quarterly, 51, 201-219.

Reprinted in Roberts, C., & Jowell, R. (Eds.) (2008). Attitude measurement. Thousand Oaks, CA:
Sage Publications.

Krosnick, J. A. (1988). Attitude importance and attitude change. Journal of Experimental Social Psychology,
24, 240-255.

Krosnick, J. A., & Schuman, H. (1988). Attitude intensity, importance, and certainty and susceptibility to
response effects. Journal of Personality and Social Psychology, 54, 940-952.

Reprinted in Roberts, C., & Jowell, R. (Eds.) (2008). Attitude measurement. Thousand Oaks, CA:
Sage Publications.

Krosnick, J. A. (1988). The role of attitude importance in social evaluation: A study of policy preferences,
presidential candidate evaluations, and voting behavior. Journal of Personality and Social Psychology,
55, 196-210.

Krosnick, J. A., & Alwin, D. F. (1988). A test of the form-resistant correlation hypothesis: Ratings, rankings,
and the measurement of values. Public Opinion Quarterly, 52, 526-538.

Judd, C. M., & Krosnick, J. A. (1989). The structural bases of consistency among political attitudes: The
effects of political expertise and attitude importance. In A. R. Pratkanis, S. J. Breckler, & A. G.
Greenwald (Eds.), Attitude Structure and Function. Hillsdale, NJ: Erlbaum.

Krosnick, J. A. (1989). Attitude importance and attitude accessibility. Personality and Social Psychology
Bulletin, 15, 297-308.

Krosnick, J. A. (1989). Question wording and reports of survey results: The case of Louis Harris and Aetna
Life and Casualty. Public Opinion Quarterly, 53, 107-113.

Reprinted in Bulmer, M. (Ed.) (2004), Questionnaires. Thousand Oaks, CA: Sage Publications.

Krosnick, J. A., & Alwin, D. F. (1989). Aging and susceptibility to attitude change. Journal of Personality and Social Psychology, 57, 416-425.

Krosnick, J. A. (1990). Government policy and citizen passion: A study of issue publics in contemporary America. Political Behavior, 12, 59-92.

Krosnick, J. A. (1990). Expertise in political psychology. Social Cognition, 8, 1-8. (also in J. Krosnick (Ed.), Thinking about politics: Comparisons of experts and novices. New York: Guilford, 1990, pp. 1-8).

Krosnick, J. A. (1990). Lessons learned: A review and integration of our findings. Social Cognition, 8, 154-158. (also in J. Krosnick (Ed.), Thinking about politics: Comparisons of experts and novices. New York: Guilford, 1990, pp. 154-158).

Krosnick, J. A., Li, F., & Lehman, D. (1990). Conversational conventions, order of information acquisition, and the effect of base rates and individuating information on social judgments. Journal of Personality and Social Psychology, 59, 1140-1152.

Krosnick, J. A., & Milburn, M. A. (1990). Psychological determinants of political opinionation. Social Cognition, 8, 49-72. (also in J. Krosnick (Ed.), Thinking about politics: Comparisons of experts and novices. New York: Guilford, 1990, pp. 49-72).

Krosnick, J. A., & Sedikides, C. (1990). Self-monitoring and self-protective biases in the use of consensus information to predict one's own behavior. Journal of Personality and Social Psychology, 58, 718-728.

Krosnick, J. A., & Kinder, D. R. (1990). Altering the foundations of support for the president through priming. American Political Science Review, 84, 497-512.

 Reprinted in J T. Jost and J. Sidanius (Eds.) (2004). Political psychology: Key readings. New York, NY: Psychology Press.

 Reprinted in K. Arzheimer & J. Evans (Eds.) (2008). Electoral behaviour. London: Sage Publications.

 Reprinted in T. Høgenhagen and S. Winther Nielsen (Eds.) (2009). Politisk psykologi-antologi. Århus, Denmark: Aarhus University Press.

Alwin, D. F., & Krosnick, J. A. (1991). Aging, cohorts, and the stability of sociopolitical orientations over the life span. American Journal of Sociology, 97, 169-195.

Alwin, D. F., & Krosnick, J. A. (1991). The reliability of survey attitude measurement: The influence of question and respondent attributes. Sociological Methods and Research, 20, 139-181.

Judd, C. M., Drake, R. A., Downing, J. W., & Krosnick, J. A. (1991). Some dynamic properties of attitude structures: Context induced response facilitation and polarization. Journal of Personality and Social Psychology, 60, 193-202.

Krosnick, J. A. (1990). Americans' perceptions of presidential candidates: A test of the projection hypothesis. Journal of Social Issues, 46, 159-182.

Krosnick, J. A. (1991). Response strategies for coping with the cognitive demands of attitude measures in surveys. Applied Cognitive Psychology, 5, 213-236.

Krosnick, J. A. (1991). The stability of political preferences: Comparisons of symbolic and non-symbolic attitudes. American Journal of Political Science, 35, 547-576.

Krosnick, J. A. (1992). The impact of cognitive sophistication and attitude importance on response order effects and question order effects. In N. Schwarz and S. Sudman (Eds.), Order effects in social and psychological research (pp. 203-218). New York: Springer-Verlag.

Krosnick, J. A., & Abelson, R. P. (1992). The case for measuring attitude strength in surveys. Pp. 177-203 in J. Tanur (Ed.), Questions about questions: Inquiries into the cognitive bases of surveys. New York: Russell Sage.

Krosnick, J. A., Betz, A. L., Jussim, L. J., & Lynn, A. R. (1992). Subliminal conditioning of attitudes. Personality and Social Psychology Bulletin, 18, 152-162.

Lehman, D. R., Krosnick, J. A., West, R. L., & Li, F. (1992). The focus of judgment effect: A question wording effect due to hypothesis confirmation bias. Personality and Social Psychology Bulletin, 18, 690-699.

Krosnick, J. A., & Berent, M. K. (1993). Comparisons of party identification and policy preferences: The impact of survey question format. American Journal of Political Science, 37, 941-964.

Krosnick, J. A., & Brannon, L. A. (1993). The impact of the Gulf War on the ingredients of presidential evaluations: Multidimensional effects of political involvement. American Political Science Review, 87, 963-975.

Reprinted in H. T. Reis (Ed.). (2014). Methodological Innovations in Social Psychology. Thousand Oaks, CA: Sage Publications.

Krosnick, J. A., & Brannon, L. A. (1993). The media and the foundations of Presidential support: George Bush and the Persian Gulf conflict. Journal of Social Issues, 49, 167-182.

Krosnick, J. A., Boninger, D. S., Chuang, Y. C., Berent, M. K., & Carnot, C. G. (1993). Attitude strength: One construct or many related constructs? Journal of Personality and Social Psychology, 65, 1132-1149.

Reprinted in S. T. Fiske (Ed.) (2013). Social Cognition. Thousand Oaks, CA: Sage Publications.

Krosnick, J. A., Berent, M. K., & Boninger, D. S. (1994). Pockets of responsibility in the American electorate: Findings of a research program on attitude importance. Political Communication, 11, 391-411.

Krosnick, J. A., & Smith, W. A. (1994). Attitude strength. In V. S. Ramachandran (Ed.), Encyclopedia of human behavior. San Diego, CA: Academic Press.

Ostrom, T. M., Bond, C., Krosnick, J. A., & Sedikides, C. (1994). Attitude scales: How we measure the unmeasurable. In S. Shavitt & T. C. Brock (Eds.), Persuasion: Psychological insights and perspectives. Boston, MA: Allyn and Bacon.

Rahn, W. M., Krosnick, J. A., & Breuning, M. (1994). Rationalization and derivation processes in survey studies of political candidate evaluation. American Journal of Political Science, 38, 582-600.

Berent, M. K., & Krosnick, J. A. (1995). The relation between political attitude importance and knowledge structure. In M. Lodge & K. McGraw (Eds.), Political judgment: Structure and process. Ann Arbor, MI: University of Michigan Press.

Boninger, D. S., Krosnick, J. A., & Berent, M. K. (1995). The origins of attitude importance: Self-interest, social identification, and value-relevance. Journal of Personality and Social Psychology, 68, 61-80.

Boninger, D. S., Krosnick, J. A., Berent, M. K., & Fabrigar, L. R. (1995). The causes and consequences of
attitude importance. In R. E. Petty and J. A. Krosnick (Eds.), Attitude strength: Antecedents and
consequences. Hillsdale, NJ: Erlbaum.

Fabrigar, L. R., & Krosnick, J. A. (1995). Attitude importance and the false consensus effect. Personality and
Social Psychology Bulletin, 21, 468-479.

Fabrigar, L. R., & Krosnick, J. A. (1995). Attitude measurement and questionnaire design. In A. S. R.
Manstead & M. Hewstone (Eds.), Blackwell encyclopedia of social psychology. Oxford: Blackwell
Publishers.

Fabrigar, L. R., & Krosnick, J. A. (1995). Voting behavior. In A. S. R. Manstead & M. Hewstone (Eds.),
Blackwell encyclopedia of social psychology. Oxford: Blackwell Publishers.

Krosnick, J. A., & Petty, R. E. (1995). Attitude strength: An overview. In R. E. Petty and J. A. Krosnick
(Eds.), Attitude strength: Antecedents and consequences. Hillsdale, NJ: Erlbaum.

Krosnick, J. A., & Telhami, S. (1995). Public attitudes toward Israel: A study of the attentive and issue publics.
International Studies Quarterly, 39, 535-554.

     Reprinted in Israel Affairs, vol. 2 (1995/1996).

     Reprinted in G. Sheffer (Ed.) (1997). U.S.-Israeli relations at the crossroads (Israeli history, politics,
     and society). London: Frank Cass & Co., Ltd.

Wegener, D. T., Downing, J., Krosnick, J. A., & Petty, R. E. (1995). Measures and manipulations of strength-
related properties of attitudes: Current practice and future directions. In R. E. Petty and J. A. Krosnick
(Eds.), Attitude strength: Antecedents and consequences. Hillsdale, NJ: Erlbaum.

Weisberg, H. F., Haynes, A. A., & Krosnick, J. A. (1995). Social group polarization in 1992. In H. F.
Weisberg (Ed.), Democracy's feast: Elections in America. Chatham, NJ: Chatham House.

Krosnick, J. A., Narayan, S. S., & Smith, W. R. (1996). Satisficing in surveys: Initial evidence. In M. T.
Braverman & J. K. Slater (Eds.), Advances in survey research (pp. 29-44). San Francisco: Jossey-Bass.

Miller, J. M., & Krosnick, J. A. (1996). News media impact on the ingredients of presidential evaluations: A
program of research on the priming hypothesis. In D. Mutz & P. Sniderman (Eds.), Political persuasion
and attitude change. Ann Arbor, MI: University of Michigan Press.

Narayan, S., & Krosnick, J. A. (1996). Education moderates some response effects in attitude measurement.
Public Opinion Quarterly, 60, 58-88.

     Reprinted in S. Gorard (Ed.) (2008). Quantitative research in education. London, UK: Sage
     Publications.

Visser, P. S., Krosnick, J. A., Marquette, J., & Curtin, M. (1996). Mail surveys for election forecasting? An
evaluation of the Columbus Dispatch poll. Public Opinion Quarterly, 60, 181-227.

Krosnick, J. A., & Fabrigar, L. R. (1997). Designing rating scales for effective measurement in surveys. In L.
Lyberg, P. Biemer, M. Collins, L. Decker, E. DeLeeuw, C. Dippo, N. Schwarz, and D. Trewin (Eds.),
Survey Measurement and Process Quality. New York: Wiley-Interscience.

Miller, J. M., & Krosnick, J. A. (1997). The anatomy of news media priming. In S. Iyengar and R. Reeves
(Eds.), Do the media govern? Politicians, voters, and reporters in America. Thousand Oaks, CA: Sage.

Carson, R. T., Hanemann, W. M., Kopp, R. J., Krosnick, J. A., Mitchell, R. C., Presser, S., Ruud, P. A., & Smith, V. K., with Conaway, M., & Martin, K. (1997). Temporal reliability of estimates from contingent valuation. Land Economics, 73, 151-163.

Carson, R. T., Hanemann, W. M., Kopp, R. J., Krosnick, J. A., Mitchell, R. C., Presser, S., Ruud, P. A., & Smith, V. K., with Conaway, M., & Martin, K. (1998). Referendum design and contingent valuation: The NOAA panel's no-vote recommendation. Review of Economics and Statistics, 80, 335-338.

Miller, J. M., & Krosnick, J. A. (1998). The impact of candidate name order on election outcomes. Public Opinion Quarterly, 62, 291-330.

Visser, P. S., & Krosnick, J. A. (1998). The development of attitude strength over the life cycle: Surge and decline. Journal of Personality and Social Psychology, 75, 1388-1409.

    Reprinted in G. Haddock and G. R. Maio (Eds.) (2012), The psychology of attitudes: Key readings. Thousand Oaks, CA: Sage Publications.

Krosnick, J. A. (1999). Maximizing questionnaire quality. In J. P. Robinson, P. R. Shaver, & L. S. Wrightsman (Eds.), Measures of political attitudes. New York: Academic Press.

Krosnick, J. A. (1999). Survey research. Annual Review of Psychology, 50, 537-567.

Bassili, J. N., & Krosnick, J. A. (2000). Do strength-related attitude properties determine susceptibility to response effects? New evidence from response latency, attitude extremity, and aggregate indices. Political Psychology, 21, 107-132.

Holbrook, A. L., Krosnick, J. A., Carson, R. T., & Mitchell, R. C. (2000). Violating conversational conventions disrupts cognitive processing of attitude questions. Journal of Experimental Social Psychology, 36, 465-494.

Holbrook, A. L., Bizer, G. Y., & Krosnick, J. A. (2000). Political behavior of the individual. In A. E. Kazdin (Ed.), Encyclopedia of psychology. Washington, DC, and New York, NY: American Psychological Association and Oxford University Press.

Krosnick, J. A., Holbrook, A. L., & Visser, P. S. (2000). The impact of the Fall 1997 debate about global warming on American public opinion. Public Understanding of Science, 9, 239-260.

Miller, J. M., & Krosnick, J. A. (2000). News media impact on the ingredients of presidential evaluations: Politically knowledgeable citizens are guided by a trusted source. American Journal of Political Science, 44, 301-315.

Visser, P. S., Krosnick, J. A., & Lavrakas, P. (2000). Survey research. In H. T. Reis & C. M. Judd (Eds.), Handbook of research methods in social psychology. New York: Cambridge University Press.

Visser, P. S., Krosnick, J. A., Marquette, J., & Curtin, M. (2000). Improving election forecasting: Allocation of undecided respondents, identification of likely voters, and response order effects. In P. Lavrakas & M. Traugott (Eds.), Election polls, the news media, and democracy. New York, NY: Chatham House.

Bizer, G. Y., & Krosnick, J. A. (2001). Exploring the structure of strength-related attitude features: The relation between attitude importance and attitude accessibility. Journal of Personality and Social Psychology, 81, 566-586.

Holbrook, A. L., Krosnick, J. A., Visser, P. S., Gardner, W. L., & Cacioppo, J. T. (2001). Attitudes toward presidential candidates and political parties: Initial optimism, inertial first impressions, and a focus on flaws. American Journal of Political Science, 45, 930-950.

Reprinted in Lavine, H. (Ed.) (2010). Political psychology. Thousand Oaks, CA: Sage Publications.

Krosnick, J. A. (2002). Is political psychology sufficiently psychological? Distinguishing political psychology from psychological political science. In J. Kuklinski (Ed.), Thinking about political psychology. New York: Cambridge University Press.

Krosnick, J. A. (2002). The challenges of political psychology: Lessons to be learned from research on attitude perception. In J. Kuklinski (Ed.), Thinking about political psychology. New York: Cambridge University Press.

Krosnick, J. A. (2002). The causes of no-opinion responses to attitude measures in surveys: They are rarely what they appear to be. In R. M. Groves, D. A. Dillman, J. L. Eltinge, & R. J. A. Little (Eds.), Survey nonresponse. New York: Wiley.

Krosnick, J. A., Holbrook, A. L., Berent, M. K., Carson, R. T., Hanemann, W. M., Kopp, R. J., Mitchell, R. C., Presser, S., Ruud, P. A., Smith, V. K., Moody, W. R., Green, M. C., & Conaway, M. (2002). The impact of "no opinion" response options on data quality: Non-attitude reduction or an invitation to satisfice? Public Opinion Quarterly, 66, 371-403.

Reprinted in Roberts, C., & Jowell, R. (Eds.) (2008). Attitude measurement. Thousand Oaks, CA: Sage Publications.

Krosnick, J. A., & McGraw K. M. (2002). Psychological political science vs. political psychology true to its name: A plea for balance. In K. R. Monroe (Ed.), Political psychology. Mahwah, NJ: Erlbaum.

Swait, J., Adamowicz, W., Hanemann, M., Diederich, A., Krosnick, J. A., Layton, D., Provencher, W., Schakade, D., & Tourangeau, R. (2002). Context dependence and aggregation in disaggregate choice analysis. Marketing Letters, 13, 195-205.

Anand, S., & Krosnick, J. A. (2003). The impact of attitudes toward foreign policy goals on public preferences among presidential candidates: A study of issue publics and the attentive public in the 2000 U.S. Presidential election. Presidential Studies Quarterly, 33, 31-71.

Chang, L., & Krosnick, J. A. (2003). Measuring the frequency of regular behaviors: Comparing the 'typical week 'to the 'past week.' Sociological Methodology, 33, 55-80.

Holbrook, A. L., Green, M. C., & Krosnick, J. A. (2003). Telephone vs. face-to-face interviewing of national probability samples with long questionnaires: Comparisons of respondent satisficing and social desirability response bias. Public Opinion Quarterly, 67, 79-125.

Krosnick, J. A., Anand, S. N., & Hartl, S. P. (2003). Psychosocial predictors of heavy television viewing among preadolescents and adolescents. Basic and Applied Social Psychology, 25, 87-110.

Visser, P. S., Krosnick, J. A., & Simmons, J. (2003). Distinguishing the cognitive and behavioral consequences of attitude importance and certainty: A new approach to testing the common-factor hypothesis. Journal of Experimental Social Psychology, 39, 118-141.

Bizer, G. Y., Krosnick, J. A., Holbrook, A. L., Wheeler, S. C., Rucker, D. D., & Petty, R. E. (2004). The impact of personality on cognitive, behavioral, and affective political processes: The effects of need to evaluate. Journal of Personality, 72, 995-1028.

Bizer, G. Y., Visser, P. S., Berent, M. K., & Krosnick, J. A. (2004). Importance, knowledge, and accessibility: Exploring the dimensionality of strength-related attitude properties. In W. E. Saris & P. M. Sniderman (Eds.), Studies in public opinion: Gauging attitudes, nonattitudes, measurement error and change. Princeton, NJ: Princeton University Press.

Krosnick, J. A., Miller, J. M., & Tichy, M. P. (2004). An unrecognized need for ballot reform: Effects of candidate name order. In A. N. Crigler, M. R. Just, and E. J. McCaffery (Eds.), Rethinking the vote: The politics and prospects of American election reform. New York, NY: Oxford University Press.

Miller, J. M., & Krosnick, J. A. (2004). Threat as a motivator of political activism: A field experiment. Political Psychology, 25, 507-523.

Anand, S., & Krosnick, J. A. (2005). Demographic predictors of media use among infants, toddlers, and preschoolers. American Behavioral Scientist, 48, 539-561.

Holbrook, A. L., Berent, M. K., Krosnick, J. A., Visser, P. S., & Boninger, D. S. (2005). Attitude importance and the accumulation of attitude-relevant knowledge in memory. Journal of Personality and Social Psychology, 88, 749-769.

Holbrook, A. L., & Krosnick, J. A. (2005). Meta-psychological vs. operative measures of ambivalence: Differentiating the consequences of perceived intra-psychic conflict and real intra-psychic conflict. In S. C. Craig & M. D. Martinez (Eds.), Ambivalence and the structure of public opinion. New York, NY: Palgrave Macmillan.

Krosnick, J. A, Judd, C. M., & Wittenbrink, B. (2005). The measurement of attitudes. In D. Albarracín, B. T. Johnson, & M. P. Zanna (Eds.), Handbook of attitudes and attitude change. Mahwah, NJ: Erlbaum.

Reprinted in Roberts, C., & Jowell, R. (Eds.) (2008). Attitude measurement. Thousand Oaks, CA: Sage Publications.

Schaeffer, E. M., Krosnick, J. A., Langer, G. E., & Merkle, D. M. (2005). Comparing the quality of data obtained by minimally balanced and fully balanced attitude questions. Public Opinion Quarterly, 69, 417-428.

Fabrigar, L. R., Krosnick, J. A., & MacDougall, B. L. (2006). Attitude measurement: Techniques for measuring the unobservable. In M. C. Green, S. Shavitt, & T. C. Brock (Eds.), Persuasion: Psychological insights and perspectives. Thousand Oaks, CA: Sage Publications.

Krosnick, J. A., Chang, L., Sherman, S. J., Chassin, L., & Presson, C. (2006). The effects of beliefs about the health consequences of cigarette smoking on smoking onset. Journal of Communication, 56, S18-S37.

Krosnick, J. A., Holbrook, A. L., Lowe, L. & Visser, P. S. (2006). The origins and consequences of democratic citizens 'policy agendas: A study of popular concern about global warming. Climatic Change, 77, 7-43.

Krosnick, J. A., Holbrook, A. L., & Visser, P. S. (2006). Optimizing brief assessments in research on the psychology of aging: A pragmatic approach to survey and self-report measurement. In National Research Council, When I'm 64. Committee on Aging Frontiers in Social Psychology, Personality, and Adult Developmental Psychology. Laura L. Carstensen and Christine R. Hartel, editors. Board on Behavioral, Cognitive, and Sensory Sciences, Division of Behavioral and Social Sciences and Education. Washington, DC: The National Academies Press.

Visser, P. S., Bizer, G. Y., & Krosnick, J. A.  (2006).  Exploring the latent structure of strength-related attitude attributes.  In M. Zanna (Ed.), Advances in Experimental Social Psychology.  New York, NY: Academic Press.

Cornell, D. G., Krosnick, J. A., & Chang, L.  (2006).  Student reactions to being wrongly informed of failing a high-stakes test: The case of the Minnesota Basic Standards Test.  Educational Policy, 20, 718-751.

Holbrook, A. L., Krosnick, J. A., Moore, D., & Tourangeau, R.  (2007).  Response order effects in dichotomous categorical questions presented orally:  The impact of question and respondent attributes.  Public Opinion Quarterly, 71, 325-348.

Malhotra, N., & Krosnick, J. A.  (2007).  The effect of survey mode on inferences about political attitudes and behavior:  Comparing the 2000 and 2004 ANES to internet surveys with non-probability samples.  Political Analysis, 15, 286-323.

Malhotra, N., & Krosnick, J. A.  (2007).  Retrospective and prospective performance assessments during the 2004 election campaign:  Tests of mediation and news media priming.  Political Behavior, 29, 249-278.

Malhotra, N. & Krosnick, J. A.  (2007).  Procedures for updating classification systems: A study of biotechnology and the standard occupational classification system.  Journal of Official Statistics, 23, 409-432.

Schneider, D., Tahk, A., & Krosnick, J. A.  (2007).  Reconsidering the impact of behavior prediction questions on illegal drug use: The importance of using proper analytic methods in social psychology.  Social Influence, 2, 178-196.

Holbrook, A. L., Krosnick, J. A., & Pfent, A. M.  (2008).  The causes and consequences of response rates in surveys by the news media and government contractor survey research firms.  In J. M. Lepkowski, C. Tucker, J. M. Brick, E. D. De Leeuw, L. Japec, P. J. Lavrakas, M. W. Link, & R. L. Sangster (Eds.), Advances in telephone survey methodology.  New York: Wiley.

Iyengar, S., Hahn, K. S., Krosnick, J. A., & Walker, J.  (2008).  Selective exposure to campaign communication: The role of anticipated agreement and issue public membership.  Journal of Politics, 70, 186-200.

Visser, P. S., Holbrook, A. L., & Krosnick, J. A.  (2008).  Knowledge and attitudes.  In W. Donsbach & M. W. Traugott (Eds.), Handbook of public opinion research. Thousand Oaks, CA:  Sage Publications

Harder, J., & Krosnick, J. A.  (2008).  Why do people vote?  A psychological analysis of the causes of voter turnout.  Journal of Social Issues, 64, 525-549.

Krosnick, J. A., Malka, A., & Yeager, D. S.  (2009).  State of the nation: Getting warmer.  Boston Review, 34, 6.

Krosnick, J. A., Visser, P. S., & Harder, J.  (2009).  The psychological underpinnings of political behavior.  In S. T. Fiske, D. T. Gilbert, & G. Lindzey (Eds.), Handbook of social psychology.  New York, NY: John Wiley.

Malka, A., & Krosnick, J. A.  (2009).  The association of knowledge with concern about global warming: Trusted information sources shape public thinking.  Risk Analysis, 29, 633-647.

Rabinowitz, J. L., Sears, D. O., Sidanius, J., & Krosnick, J. A.  (2009).  Why do white Americans oppose race-targeted policies?  Clarifying the impact of symbolic racism.  Political Psychology, 30, 805-828.

Chang, L., & Krosnick, J. A.  (2009).  National surveys via RDD telephone interviewing vs. the Internet:

Comparing sample representativeness and response quality.  Public Opinion Quarterly, 73, 641-678.

Eaton, A. A., Visser, P. S., Krosnick, J. A., & Anand, S.  (2009).  Social power and attitude strength over the life
     cycle.  Personality and Social Psychology Bulletin, 35, 1646-1660.

Malhotra, N., Krosnick, J. A., and Thomas, R. K.  (2009).  Optimal design of branching questions to measure
     bipolar constructs.  Public Opinion Quarterly, 73, 304-324.

Pasek, J., Tahk, A., Lelkes, Y., Krosnick, J. A., Payne, K., Akhtar, O., & Tompson, T.  (2009).  Determinants of
     turnout and candidate choice in the 2008 U.S. Presidential election: Illuminating the impact of racial
     prejudice and other considerations.  Public Opinion Quarterly, 73, 943-994.

Baker, R., Blumberg, S., Brick, J. M., Couper, M. P., Courtright, M., Dennis, M., Dillman, D., Frankel, M. R.,
     Garland, P., Groves, R. M., Kennedy, C., Krosnick, J. A., Lee, D., Lavrakas, P. J., Link, M., Piekarski,
     L., Rao, K., Thomas, R. K., & Zahs, D.  (2010).  AAPOR report on online panels.  Public Opinion
     Quarterly, 1-71.

Chang, L., & Krosnick, J. A.  (2010).  Comparing oral interviewing with self-administered computerized
     questionnaires: An experiment.  Public Opinion Quarterly, 74, 154-167.

Holbrook, A. L., & Krosnick, J. A.  (2010).  Social desirability bias in voter turnout reports:  Tests using the
     item count technique.  Public Opinion Quarterly, 74, 37-67.

Holbrook, A. L., & Krosnick, J. A.  (2010).  Measuring voter turnout by using the randomized response
     technique: Evidence calling into question the method's validity.  Public Opinion Quarterly, 74, 328-343.

Holbrook, A. L., & Krosnick, J. A. (2010). Operative and meta-psychological manifestations of attitude
     accessibility: Two different constructs, not two measures of the same construct. In J. P. Forgas, J.
     Cooper, & W. D. Crano (Eds.), The Psychology of Attitudes and Attitude Change.  Florence, Kentucky:
     Psychology Press.

Krosnick, J. A., & Presser, S.  (2010).  Questionnaire design.  In J. D. Wright & P. V. Marsden (Eds.),
     Handbook of survey research (Second Edition).  West Yorkshire, England: Emerald Group.

Pasek, J., & Krosnick, J. A.  (2010).  Optimizing survey questionnaire design in political science: Insights from
     psychology.  In J. Leighley (Ed.), Oxford handbook of American elections and political behavior.
     Oxford, UK: Oxford University Press.

Payne, B. K., Krosnick, J. A., Pasek, J., Lelkes, Y., Akhtar, O., & Tompson, T.  (2010).  Implicit and explicit
     prejudice in the 2008 American presidential election.  Journal of Experimental Social Psychology, 46,
     367-374.

Saris, W., Revilla, M., Krosnick, J. A., & Shaeffer, E.  (2010).  Comparing questions with agree/disagree
     response options to questions with item-specific response options.  Survey Research Methods, 4, 61-79.

Schneider, D., DeBell, M., & Krosnick, J. A.  (2010).  Using the American National Election Study surveys to
     test social psychological hypotheses.  In K. Trzesniewski, M. B. Donnellan, & R. E. Lucas (Eds),
     Secondary Data Analysis: An Introduction for Psychologists.  Washington, DC: American
     Psychological Association.

Yeager, D. S., & Krosnick, J. A.  (2010).  The validity of self-reported nicotine product use in the 2001-2008
     National Health and Nutrition Examination Survey.  Medical Care, 48, 1128-1132.

Krosnick, J. A. (2011).  Experiments for evaluating survey questions.  In K. Miller, J. Madans, G. Willis, & A.
Maitland (Eds.), Question evaluation methods.  New York, NY: Wiley.

Krosnick, J. A., & Lupia, A.  (2011).  The American National Election Studies and the importance of new ideas.
In J. A. Aldrich & K. M. McGraw (Eds.), Improving public opinion surveys: Interdisciplinary
innovation and the American National Election Studies.  Princeton, NJ: Princeton University Press.

Krosnick, J. A., & Lupia, A.  (2011).  How the ANES used online commons proposals and pilot study reports to
develop its 2008 questionnaires.  In J. A. Aldrich & K. M. McGraw (Eds.), Improving public opinion
surveys: Interdisciplinary innovation and the American National Election Studies.  Princeton, NJ:
Princeton University Press.

Villar, A., & Krosnick, J. A.  (2011).  Global warming vs. climate change, taxes vs. prices: Does word choice
matter?  Climatic Change, 105, 1-12.

Yeager, D. S., & Krosnick, J. A.  (2011).  Re: Response to the validity of self-reported nicotine product use in
the 2001-2008 National Health and Nutrition Examination Survey.  Medical Care, 49, 332.

Yeager, D. S., & Krosnick, J. A.  (2011).  Does mentioning "some people" and "other people" in a survey
question increase the accuracy of adolescents' self-reports?  Developmental Psychology, 47, 1674-1679.

Yeager, D. S., Larson, S. B., Krosnick, J. A., & Tompson, T.  (2011).  Measuring Americans 'issue priorities: A
new version of the most important problem question reveals more concern about global warming and
the environment.  Public Opinion Quarterly, 75, 125-138.

Yeager, D. S., Krosnick, J. A., Chang, L., Javitz, H. S., Levendusky, M. S., Simpser, A., & Wang, R.  (2011).
Comparing the accuracy of RDD telephone surveys and Internet surveys conducted with probability and
non-probability samples.  Public Opinion Quarterly, 75, 709-747.

Cor, K., Haertel, E., Krosnick, J. A., & Malhotra, N. (2012).  Improving ability measurement in surveys by
following the principles of IRT: The Wordsum vocabulary test in the General Social Survey.  Social
Science Research, 41, 1003-1016.

Daniels, D. P., Krosnick, J. A., Tichy, M. P., & Tompson, T.  (2012).  Public opinion on environmental policy in
the United States.  In M. Kraft & S. Kamieniecki (Eds.), Handbook of U.S. Environmental Policy.  New
York: Oxford University Press.

Lelkes, Y., Krosnick, J. A., Marks, D. M., Judd, C. M., & Park, B.  (2012).  Complete anonymity compromises
the accuracy of self-reports.  Journal of Experimental Social Psychology, 48, 1291-1299.

Yeager, D. S., & Krosnick, J. A.  (2012).  Does mentioning "some people" and "other people" in an opinion
question improve measurement quality?  Public Opinion Quarterly, 76, 131-141.

Holbrook, A. L., & Krosnick, J. A.  (2013).  A new question sequence to measure voter turnout in telephone
surveys: Results of an experiment in the 2006 ANES Pilot Study.  Public Opinion Quarterly, 77, 106-
123.

Krosnick, J. A., & MacInnis, B.  (2013).  Does the American public support legislation to reduce greenhouse gas
emissions?  Deadalus, 142, 26-39.

Revilla, M. A., Saris, W. E., & Krosnick, J. A.  (2014).  Choosing the number of categories in agree-disagree
scales.  Sociological Methods and Research, 43, 73-97.

Callegaro, M., Baker, R., Bethlehem, J., Göritz, A., Krosnick, J. A., & Lavrakas, P. J. (2014). Online panel research: History, concepts, applications, and a look at the future. In Callegaro, M., Baker, R., Bethlehem, J., Göritz, A., Krosnick, J. A., & Lavrakas, P. J. (Eds.). (2014). <u>Online panel research: A data quality perspective</u>. West Sussex, UK: John Wiley and Sons.

Callegaro M., Villar, A., Krosnick, J. A., & Yeager, D. (2014). A critical review of studies investigating the quality of data obtained with online panels. In Callegaro, M., Baker, R., Bethlehem, J., Göritz, A., <u>Krosnick</u>, J. A., & Lavrakas, P. J. (Eds.). (2014). <u>Online panel research: A data quality perspective</u>. West Sussex, UK: John Wiley and Sons.

Callegaro, M., & Krosnick, J. A. (2014). Introduction to Part I. In Callegaro, M., Baker, R., Bethlehem, J., Göritz, A., <u>Krosnick</u>, J. A., & Lavrakas, P. J. (Eds.). (2014). <u>Online panel research: A data quality perspective</u>. West Sussex, UK: John Wiley and Sons.

Chen, E., Simonovits, G., Krosnick, J. A., & Pasek, J. (2014). The impact of candidate name order on election outcomes in North Dakota. <u>Electoral Studies, 35</u>, 115-122.

Göritz, A., & Krosnick, J. A. (2014). Introduction to Part IV. In Callegaro, M., Baker, R., Bethlehem, J., Göritz, A., <u>Krosnick</u>, J. A., & Lavrakas, P. J. (Eds.). (2014). <u>Online panel research: A data quality perspective</u>. West Sussex, UK: John Wiley and Sons.

Krosnick, J. A., Malhotra, N., & Mittal, U. (2014). Public misunderstanding of political facts: How question wording affected estimates of partisan differences in birtherism. <u>Public Opinion Quarterly, 78</u>, 147-165.

Krosnick, J. A., Lavrakas, P., & Kim, N. (2014). Survey research. In H. T. Reis & C. M. Judd (Eds.), <u>Handbook of research methods in social psychology</u> (Second Edition). New York: Cambridge University Press.

Pasek, J., Schneider, D., Krosnick, J. A., Tahk, A., & Ophir, E. (2014). Prevalence and moderators of the candidate name-order effect: Evidence from all statewide general elections in California. <u>Public Opinion Quarterly, 78</u>, 416-439.

Pasek, J., Stark, T. H., Krosnick, J. A., Tompson, T., & Payne, B. K. (2014). Attitudes toward Blacks in the Obama era: Changing distributions and impacts on job approval and electoral choice, 2008-2012. <u>Public Opinion Quarterly, 78</u>, 276-302.

Vannette, D. L., & Krosnick, J. A. (2014). A comparison of mindless and survey satisficing. In A. Ie, C. T. Ngnoumen, & E. J. Langer (Eds), <u>The Wiley-Blackwell Handbook of Mindfulness</u>. West Sussex, UK: John Wiley & Sons.

Kim, N., Krosnick, J. A., & Casasanto, D. (2015). Moderators of candidate name order effects in elections: An experiment. <u>Political Psychology, 36</u>, 525-542.

Krosnick, J. A., & MacInnis, B. (2015). Fox and Not-Fox television news impact on opinions on global warming: Selective exposure, not motivated reasoning. In J. P. Forgas, K. Fiedler, & W. D. Crano (Eds.), <u>Social Psychology and Politics</u>. New York, NY: Psychology Press.

MacInnis, B., Krosnick, J. A., Abeles, A., Caldwell, M. R., Prahler, E., & Dunne, D. D. (2015). The American public's preference for preparation for the possible effects of global warming: Impact of communication strategies. <u>Climatic Change, 128</u>, 17-33.

Pasek, J., Sood, G., & Krosnick, J. A. (2015). Misinformed about the Affordable Care Act? Leveraging certainty to assess the prevalence of misperceptions. <u>Journal of Communication, 65</u>, 660-673.

Pasek, J., Stark, T. H, Krosnick, J. A., & Tompson, T. (2015). What motivates a conspiracy theory? Birther beliefs, partisanship, liberal-conservative ideology, and anti-Black attitudes. Electoral Studies, 40, 482-489.

Berent, M. K., Krosnick, J. A., & Lupia, A. (2016). Measuring voter registration and turnout in surveys: Do official government records yield more accurate assessments? Public Opinion Quarterly, 80, 597-621.

Chapman, D. J., Bishop, R. C., Hanemann, W. M., Kanninen, B. J., Krosnick, J. A., Morey, E. R., & Tourangeau, R. (2016). On the adequacy of scope test results: Comments on Desvousges, Mathews, and Train. Ecological Economics, 130, 356-360.

Harbridge, L., Krosnick, J. A., and Wooldridge, J. M. (2016). Presidential approval and gas prices: Sociotropic or pocketbook influence? In Krosnick, J. A., Chiang, I.-C., & Stark, T. (Eds.), Political Psychology: New Explorations. Psychology Press. New York, New York.

Krosnick, J. A., Stark, T. H., & Chiang, I.-C. (2016). The two core goals of political psychology. In Krosnick, J. A., Chiang, I.-C., & Stark, T. (Eds.), Political Psychology: New Explorations. Psychology Press. New York, New York.

MacInnis, B., & Krosnick, J. A. (2016). The impact of candidates 'statements about global warming on electoral success in 2008 to 2015: Evidence using five methodologies. In Krosnick, J. A., Chiang, I.-C., & Stark, T. (Eds.), Political Psychology: New Explorations. Psychology Press. New York, New York.

MacInnis, B., & Krosnick, J. A. (2016). Trust in scientists' statements about the environment and American public opinion on global warming. In Krosnick, J. A., Chiang, I.-C., & Stark, T. (Eds.), Political Psychology: New Explorations. Psychology Press. New York, New York.

Miller, J. M., Krosnick, J. A., & Fabrigar, L. R. (2016). The origins of policy issue salience: Personal and national importance impact on behavioral, cognitive, and emotional issue engagement. In Krosnick, J. A., Chiang, I.-C., & Stark, T. (Eds.), Political Psychology: New Explorations. Psychology Press. New York, New York.

Miller, J. M., Krosnick, J. A., Holbrook, A., Tahk, A., & Dionne, L. (2016). The impact of policy change threat on financial contributions to interest groups. In Krosnick, J. A., Chiang, I.-C., & Stark, T. (Eds.), Political Psychology: New Explorations. Psychology Press. New York, New York.

Thomas, R. K., Krosnick, J. A., Shook, N. J., & Chiang, I.-C. (2016). "Forever changed?" Some surprising findings about U.S. public opinion after the attacks of 9/11/2001 on the U.S. In Krosnick, J. A., Chiang, I.-C., & Stark, T. (Eds.), Political Psychology: New Explorations. Psychology Press. New York, New York.

Visser, P. S., Krosnick, J. A., & Norris, C. J. (2016). Attitude importance and attitude-relevant knowledge: Motivator and enabler. In Krosnick, J. A., Chiang, I.-C., & Stark, T. (Eds.), Political Psychology: New Explorations. Psychology Press. New York, New York.

Bishop, R.C., Boyle, K. J., Carson, R. T., Chapman, D., Hanemann, W. M., Kanninen, B., Kopp, R. J., Krosnick, J. A., List, J., Meade, N., Paterson, R., Presser, S., Smith, V. K., Tourangeau, R., Welsh, M., Wooldridge, J.M., DeBell, M., Donovan, C., Konopka, M., & Scherer, N. (2017). Putting a value on injuries to natural assets: The BP oil spill. Science, 356, 253-254.

Howe, L. C., & Krosnick, J. A. (2017). Attitude strength. Annual Review of Psychology, 68, 327-351.

47

Krosnick, J. A., Malhotra, N., Mo, C. H., Bruera, E. F., Chang, L., Pasek, J., & Thomas, R. K.  (2017).
Perceptions of health risks of cigarette smoking: A new measure reveals widespread misunderstanding.
PLoS ONE, 12(8): e0182063 https://doi.org/10.1371/journal.pone.0182063.

Lundberg, K. B., Payne, B. K., Pasek, J., & Krosnick, J. A.  (2017).  Racial attitudes predicted changes in
ostensibly race-neutral political attitudes under the Obama administration.  Political Psychology, 38,
313-330.

Stark, T. H., & Krosnick, J. A.  (2017).  GENSI: A new graphical tool to collect ego-centered network data.
Social Networks, 48, 36-45.

MacInnis, B., Krosnick, J. A., Ho, A. S., & Cho, M-J.  (2018).  The accuracy of measurements with probability
survey samples: Replication and extension.  Public Opinion Quarterly, 82, 707-744.

Abeles, A. T., Howe, L. C., Krosnick, J. A., & MacInnis, B.  (2019).  Perception of public opinion on global
warming and the role of opinion deviance.  Journal of Environmental Psychology, 63, 118-129.

Howe, L., MacInnis, B., Krosnick, J. A., Markowitz, E. M., & Socolow, R.  (2019).  Acknowledging uncertainty
impacts public acceptance of climate scientists 'predictions.  Nature Climate Change, 9, 863-867.

Kim, N., Krosnick, J. A., & Lelkes, Y.  (2019).  Race of interviewer effects in telephone surveys preceding the
2008 U.S. Presidential elections.  International Journal of Public Opinion Research, 31, 220-242.

Silber, H., Stark, T. H., Krosnick, J. A., & Blom, A. G.  (2019). Multi-national study of questionnaire design. In
Johnson, T., Dorer, B. Stoop, I., & Pennell, B-E. (Eds.), Advances in comparative survey methods:
Multicultural, multinational and multiregional (3MC) contexts.  New York, NY: Wiley.

Stark, T. H., Silber, H., Krosnick, J. A., Blom, A. G., Aoyagi, M., Belchior, A., Bosnjak, M., Clement, S. L.,
John, M., Jónsdóttir, G. A., Lawson, K., Lynn, P., Martinsson, Shamshiri-Petersen, D., Tvinnereim, E.,
Yu, R.  (2020).  Generalization of classic question order effects across cultures.  Sociological Methods
and Research, 49, 567-602.

Yeager, D. S., Krosnick, J. A., Visser, P. S., Holbrook, A. L., & Tahk, A. M.  (2019).  Moderation of classic
social psychological effects by demographics in a nationally representative sample: New opportunities
for theoretical advancement.  Journal of Personality and Social Psychology, 117, e84-e99.

Cornesse, C., Blom, A., Dutwin, D., Krosnick, J. A., DeLeeuw, E., Legleye, S., Pasek, J., Pennay, D., Philips,
B., Sakshaug, J., Struminskaya, B., & Wenz, A.  (2020).  A review of conceptual approaches and
empirical evidence on probability and nonprobability sample survey research.  Journal of Survey
Statistics and Methodology 8, 4-36.

DeBell, M., Krosnick, J. A., Gera, K., Yeager, D., & MacDonald, M.  (2018).  The turnout gap in surveys:
Explanations and solutions.  Sociological Methods and Research,1-30.

Howe, L. C., & Krosnick, J. A.  (in press).  The psychology of public opinion.  In Osborne, D., & Sibley, C. G.
(Eds.), Cambridge Handbook of Political Psychology. Cambridge, England: Cambridge University
Press.

Jussim, L., Krosnick, J. A., Stevens, S. T., & Anglin, S. M.  (2019).  A social psychological model of scientific
practices: Explaining research practices and outlining the potential for successful reforms.  Psychologica
Belgica 59, 353-372.

Krosnick, J. A., Jussim, L. J., Stevens, S. T., & Anglin, S.  (in press).  Reflections on the reform movement in
the behavioral sciences.  In Jussim, L. J., Stevens, S. T., & Krosnick, J. A. (Eds.)  Research integrity in
the behavioral sciences.  New York: Oxford University Press

Krosnick, J. A., Stark, T. H., & Scott, A. L.  (in press).  Forward by the editors: Advances and challenges in
research on implicit bias: An overview.  In Krosnick, J. A., Stark, T. H., & Scott, A. L. (Eds.), The
Cambridge handbook of implicit bias and racism.  Cambridge, U.K.: Cambridge University Press.

Krosnick, J. A., Stark, T. H., & Scott, A. L.  (in press).  Concluding thoughts.  In Krosnick, J. A., Stark, T. H., &
Scott, A. L. (Eds.), The Cambridge handbook of implicit bias and racism.  Cambridge, U.K.: Cambridge
University Press.

Langer, G., Baskakova, Y., Krosnick, J. A., & De Jong, A.  (in press).  Public attitudes on implicit bias.  In
Krosnick, J. A., Stark, T. H., & Scott, A. L. (Eds.), The Cambridge handbook of implicit bias and
racism.  Cambridge, U.K.: Cambridge University Press.

Pasek, J., & Krosnick, J. A.  (2020).  Relations between variables and trends over time in RDD telephone and
non-probability sample Internet surveys.  Journal of Survey Statistics and Methodology, 1-25.

Silber, H., Tvinnereim, E., Stark, T. H., Blom, A. G., Krosnick, J. A., Bosnjak, M., Clement, S. L., Cornilleau,
A., Cousteaux, John, M., Jónsdóttir, G. A., Lawson, K., A-S., Lynn, P., Martinsson, J., Shamshiri-
Petersen, D., & Tu, S.  (in press).  Lack of replication or lack of generalization?  Testing a classic
question wording effect across cultures.  Journal of Survey Statistics and Methodology.

Stark T. H., & Krosnick, J. A.  (in press).  The value of explicit measures of prejudice.  In Krosnick, J. A., Stark,
T. H., & Scott, A. L. (Eds.), The Cambridge handbook of implicit bias and racism.  Cambridge, U.K.:
Cambridge University Press.

Stark T. H., Sargent, M. J., Rabinowitz, J. L., Krosnick, J. A., & Shull, A. C.  (in press).  The relations among
explicit prejudice measures: Anti-black affect and perceptions of value violation as predictors of
symbolic racism and attitudes toward racial policies.  In Krosnick, J. A., Stark, T. H., & Scott, A. L.
(Eds.), The Cambridge handbook of implicit bias and racism.  Cambridge, U.K.: Cambridge University
Press.

Stark, T. H., van Maaren, F., Krosnick, J. A., & Sood, G.  (2019).  The impact of social desirability pressures on
whites 'endorsement of racial stereotypes: A comparison between oral and ACASI reports in a national
survey.  Sociological Methods and Research, 1-27.

Suh, A., Krosnick, J. A., Jussim, L. J., & Stevens, S. T.  (in press).  The reform movement in the behavioral
sciences.  In Jussim, L. J., Stevens, S. T., & Krosnick, J. A. (Eds.)  Research integrity in the behavioral
sciences.  New York: Oxford University Press.

Other Reports and Publications

Telhami, S., & Krosnick, J. A.  (1989).  American sentiment on Israeli-Palestinian fight: No favorites; Just make
peace.  Op-ed article in The Los Angeles Times, March 14, 1989.  (Reprinted in the Columbus
Dispatch, March 17, 1989)

Krosnick, J. A.  (1990).  The uses and abuses of public opinion polls: The case of Louis Harris and Associates.
Chronicles, 14, 47-49.

49

Krosnick, J. A. (1990). The impact of satisficing on survey data quality. In Proceedings of the Bureau of the
Census 1990 Annual Research Conference (pp. 835-845). Washington, D.C.: U.S. Government Printing
Office.

Smith, W. R., Culpepper, I. J., & Krosnick, J. A. (1992). The impact of question order on cognitive effort in
survey responding. In Proceedings of the Sixth National Conference on Undergraduate Research.
Minneapolis, MN: University of Minnesota Press.

Krosnick, J. A., & Hermann, M. G. (1993). Report on the 1991 Ohio State University Summer Institute in
Political Psychology. Political Psychology, 14, 363-373.

Carson, R. T., Hanemann, W. M., Kopp, R. J., Krosnick, J. A., Mitchell, R. C., Presser, S., Ruud, P. A., &
Smith, V. K. (1994). Prospective interim lost use value due to DDT and PCB contamination in the
Southern California Bight. La Jolla, CA: Natural Resource Damage Assessment.

Carson, R. T., Conaway, M. B., Hanemann, W. M., Krosnick, J. A., Martin, K. M., McCubbin, D. R., Mitchell,
R. C., Presser, S. (1995). The value of preventing oil spill injuries to natural resources along
California's central coast. La Jolla, CA: Natural Resource Damage Assessment.

Krosnick, J. A., Visser, P. S., & Holbrook, A. L. (1998). American opinion on global warming: The impact of
the Fall 1997 debate. Resources, 133, 5-9.

Krosnick, J. A. (2000). The threat of satisficing in surveys: The shortcuts respondents take in answering
questions. Survey Methods Newsletter, 20, 4-8.

Krosnick, J. A. (2000). Americans are ready for the debacle to end. Newsday, December 7, A63-A66.

Krosnick, J. A. (2001). The psychology of voting. The Psychology Place.
http://www.psychplace.com/editorials/krosnick/krosnick1.html.

Green, M. C., & Krosnick, J. A. (2001). Comparing telephone and face-to-face interviewing in terms of data
quality: The 1982 National Election Studies Method Comparison Project. In D. O'Rourke (Ed.), Health
survey research methods. Hyattsville, Maryland: Department of Health and Human Services. DHHS
Publication No. (PHS) 01-1013.

Silver, M. D., & Krosnick, J. A. (2001). Optimizing survey measurement accuracy by matching question
design to respondent memory organization. In Federal Committee on Statistical Methodology Research
Conference, 2001. NTIS: PB2002-100103. http://www.fcsm.gov/01papers/Krosnick.pdf

Krosnick, J. A. (2003). Introduction. In G. R. Walden, Survey research methodology, 1990-1999: An
annotated bibliography. Westpoint, Connecticut: Greenwood Press.

Krosnick, J. A. (2003). AAPOR in Nashville: The program for the 58th annual conference. AAPOR News, 31,
1, 3.

Krosnick, J. A. (2003). Response rates, Huffington, and More: Reflections on the 58th annual conference.
AAPOR News, 31, 1, 4-5.

Krosnick, J. A. (2003). Proceedings of the fifty-eighth annual conference of the American Association for
Public Opinion Research. Public Opinion Quarterly.

Fiorina, M., & Krosnick, J. A. (2004). The Economist/YouGov Internet Presidential poll.
http://www.economist.com/media/pdf/Paper.pdf.

Krosnick, J. A. (2006). What pilots could tell us. Op-ed essay in the New York Times, August 30, 2006.

Krosnick, J. A. (2006). Are we really safer in the skies today? Aviation Law Prof Blog, September 5.
http://lawprofessors.typepad.com/aviation/

Krosnick, J. A. (2006). In the voting booth, bias starts at the top. Op-ed in The New York Times, November 4,
2006.

Krosnick, J. A. (2006). In the voting booth, name order can sway an election. Opinion essay in the
"Perspective" section of The San Jose Mercury News, November 26, 2006.

Krosnick, J. A. (2008). Evaluation of NORC's cognitive pretesting of new items for the General Social Survey.
Report to the GSS Board of Overseers.

Krosnick, J. A. (2008). Ballot changes cited in vote's discrepancy with polls: Clinton's favorable placement on
ballots may account for part of poll mistakes. Opinion essay on ABCNews.com, January 9, 2008.

Chapman, D. J., Bishop, R. C., Hanemann, W. M., Kanninen, B. J., Krosnick, J. A., Morey, E. R., &
Tourangeau, R. 2009. Natural resource damages associated with aesthetic and ecosystem injuries to
Oklahoma's Illinois River System and Tenkiller Lake. Boulder, CO: Stratus Consulting.

Yeager, D. S., Krosnick, J. A., & Javitz, H.A. (2009). More on the problems with opt-in Internet surveys.
Guest blog, "The Numbers", http://blogs.abcnews.com/thenumbers/2009/09/guest-blog-more-on-the-
problems-with-optin-internet-surveys.html.

Yeager, D. S., & Krosnick, J. A. (2009). Were the benchmarks really wrong? Guest blog, "The Numbers",
http://blogs.abcnews.com/thenumbers/2009/12/survey-accuracy-revisiting-the-benchmarks-.html.

Krosnick, J. A. (2010). The climate majority. Op-ed in the New York Times, June 9, 2010.

Pasek, J., & Krosnick, J. A. (2010). Measuring intent to participate and participation in the 2010 census and
their correlates and trends: Comparisons of RDD telephone and non-probability sample internet survey
data. Survey Methodology Report #2010-15, Washington, DC: Statistical Research Division, U.S.
Census Bureau. http://www.census.gov/srd/papers/pdf/ssm2010-15.pdf

Berent, M. K., Krosnick, J. A., & Lupia, A. (2011). The quality of government records and "over-reporting" of
registration and voting in surveys: Lessons from the 2008 ANES Panel Study's registration and turnout
validation exercises. Technical report, American National Election Studies.
http://electionstudies.org/resources/papers/nes012554.pdf

Krosnick, J. A., Kim, N., & MacInnis, B. (2014). What Americans think about climate change. Resources.
187: 40-44.

Krosnick, J. A., Presser, S., Fealing, K. H., & Ruggles, S. with Vannette, D. L. (2015). The Future of Survey
Research: Challenges and Opportunities. A report to the National Science Foundation. Social,
Behavioral, and Economic Sciences Directorate, National Science Foundation.

Bollen, K., Cacioppo, J. T., Kaplan, R. M., Krosnick, J. A., & Olds, J. L. (2015). Social, behavioral, and
economic sciences perspectives on robust and reliable science. Report of the Subcommittee on
Replicability in Science, Advisory Committee to the Directorate for Social, Behavioral, and Economics
Sciences, National Science Foundation.

Krosnick, J. A., & MacInnis, B.  (2020).  Climate insights 2020: Surveying American public opinion on climate change and the environment: Overall trends.  Washington, D.C.: Resources for the Future.

MacInnis, B., & Krosnick, J. A.  (2020).  Climate insights 2020: Surveying American public opinion on climate change and the environment: Natural disasters.  Washington, D.C.: Resources for the Future.

Krosnick, J. A., & MacInnis, B.  (2020).  Climate insights 2020: Surveying American public opinion on climate change and the environment: Policies and politics.  Washington, D.C.: Resources for the Future.

MacInnis, B., & Krosnick, J. A.  (2020).  Climate insights 2020: Surveying American public opinion on climate change and the environment: Partisan divide.  Washington, D.C.: Resources for the Future.

MacInnis, B., & Krosnick, J. A.  (2020).  Climate insights 2020: Surveying American public opinion on climate change and the environment: Electric vehicles.  Washington, D.C.: Resources for the Future.

McDonald, J., MacInnis, B., & Krosnick, J. A.  (2020).  Climate insights 2020: Surveying American public opinion on climate change and the environment: Opinions in the States.  Washington, D.C.: Resources for the Future.

Krosnick, J. A., & Wong-Parodi, G.  (2020).  Conversations on climate challenges: Natural disasters, risk, and survey data.  Resources.  Washington, D.C: Resources for the Future.


Book Reviews

Krosnick, J. A.  (1987).  Review of **Political Cognition: The 19th Annual Carnegie Symposium on Cognition**, edited by R. R. Lau and D. O. Sears.  American Political Science Review, 81, 266-268.

Krosnick, J. A.  (1988).  Review of **The Choice Questionnaire**, by Peter Neijens.  Public Opinion Quarterly, 52, 408-411.

Krosnick, J. A.  (1993).  Review of **Measurement Errors in Surveys**, edited by P. P. Biemer, R. M. Groves, L. E. Lyberg, N. A. Mathiowetz, & S. Sudman.  Public Opinion Quarterly, 57, 277-280.

Krosnick, J. A.  (1994).  A new introduction to survey methods: Review of **Questionnaire Design, Interviewing and Attitude Measurement**, by A. N. Oppenheim.  Contemporary Psychology, 39, 221-222.

Krosnick, J. A.  (1997).  Review of **Thinking About Answers: The Application of Cognitive Processes to Survey Methodology**, by. S. Sudman, N. M. Bradburn, and N. Schwarz, and **Answering Questions: Methodology for Determining Cognitive and Communicative Processes in Survey Research**, edited by N. Schwarz and S. Sudman.  Public Opinion Quarterly, 61, 664-667.

Krosnick, J. A.  (1998).  Review of **What Americans Know about Politics and Why It Matters**, by M. X. Delli-Carpini and S. Keeter.  The Annals of the American Academy of Political and Social Science, 559, 189-191.


Book Jacket Endorsement of Books

Callegaro, C., Manfreda, K. L., & Vehovar, V.  (2015).  Web Survey Methodology.  London: Sage Publications.

Erikson, R. D., & Wlezien, C.  (2012).  The Timeline of Presidential Elections:  How Campaigns Do (and Do Not) Matter.  Chicago: University of Chicago Press.

Jussim, L. J.  (2012).  Social Perception and Social Reality: Why Accuracy Dominates Bias and Self-Fulfilling Prophecy.  New York, NY:  Oxford University Press.

Mutz, D. C., Brody, R. A., & Sniderman, P. M.  (1996).  Persuasion and Attitude Change.  Ann Arbor, MI: University of Michigan Press.

Albarracin, D.  (2020).  Action and Inaction in a Social World.  Cambridge, UK: Cambridge University Press.


Presentations

Milburn, M. A., & Krosnick, J. A.  (1979).  Social psychology applied to smoking and drug abuse prevention.  Paper presented at the New England Psychological Association Annual Meeting, Framingham, Massachusetts.

Krosnick, J. A., McAlister, A. L., & Milburn, M. A.  (1980).  Research design for evaluating a peer leadership intervention to prevent adolescent substance abuse.  Paper presented at the American Psychological Association Annual Meeting, Montreal, Canada.

McAlister, A. L., Gordon, N. P., Krosnick, J. A., & Milburn, M. A.  (1982).  Experimental and correlational tests of a theoretical model for smoking prevention.  Paper presented at the Society for Behavioral Medicine Annual Meeting, Chicago, Illinois.

Kinder, D. R., Iyengar, S., Krosnick, J. A., & Peters, M. D.  (1983).  More than meets the eye:  The impact of television news on evaluations of presidential performance.  Paper presented at the Midwest Political Science Association Annual Meeting, Chicago, Illinois.

Krosnick, J. A.  (1983).  The relationship of attitude centrality to attitude stability.  Paper presented at the American Sociological Association Annual Convention, Detroit, Michigan.

Alwin, D. F., & Krosnick, J. A.  (1984).  The measurement of values: A comparison of ratings and rankings.  Paper presented at the American Association for Public Opinion Research Annual Meeting, Delavan, Wisconsin.

Schuman, H., Ludwig, J., & Krosnick, J. A.  (1984).  Measuring the salience and importance of public issues over time.  Paper presented at the American Association for Public Opinion Research Annual Meeting, Delavan, Wisconsin.

Krosnick, J. A.  (1984).  Attitude extremity, stability, and self-report accuracy:  The effects of attitude centrality.  Paper presented at the American Association for Public Opinion Research Annual Meeting, Delavan, Wisconsin.

Krosnick, J. A.  (1984).  The influence of consensus information on predictions of one's own behavior.  Paper presented at the American Psychological Association Annual Meeting, Toronto, Canada.

Krosnick, J. A., & Alwin, D. F.  (1986).  An evaluation of a cognitive theory of response order effects in survey measurement.  Paper presented at the American Association for Public Opinion Research Annual Meeting, St. Petersburg, Florida.

Krosnick, J. A.  (1986).  A new look at question order effects in surveys.  Paper presented at the Symposium on Cognitive Sciences and Survey Research, Ann Arbor, Michigan.

53

Krosnick, J. A. (1987). The role of attitude importance in social evaluation: A study of policy preferences, presidential candidate evaluations, and voting behavior. Paper presented at the Midwest Political Science Association Annual Meeting, Chicago, Illinois.

Krosnick, J. A., Schuman, H., Carnot, C., Berent, M., & Boninger, D. (1987). Attitude importance and attitude accessibility. Paper presented at the Midwest Psychological Association Annual Meeting, Chicago, Illinois.

Krosnick, J. A., & Sedikides, C. (1987). Self-monitoring and self-protective biases in use of consensus information to predict one's own behavior. Paper presented at the Midwest Psychological Association Annual Meeting, Chicago, Illinois.

Krosnick, J. A., Stephens, L., Jussim, L. J., & Lynn, A. R. (1987). Subliminal priming of affect and its cognitive consequences. Paper presented at the Midwest Psychological Association Annual Meeting, Chicago, Illinois.

Krosnick, J. A., & Alwin, D. F. (1987). Satisficing: A strategy for dealing with the demands of survey questions. Paper presented at the American Association for Public Opinion Research Annual Meeting, Hershey, Pennsylvania.

Judd, C. M., & Krosnick, J. A. (1987). The structural bases of consistency among political attitudes: The effects of political expertise and attitude importance. Paper presented at the American Psychological Association Annual Meeting, New York, New York.

Krosnick, J. A., & Milburn, M. A. (1987). Psychological determinants of political opinionation. Paper presented at the American Political Science Association Annual Meeting, Chicago, Illinois.

Krosnick, J. A. (1987). The role of attitude importance in social evaluation: A study of policy preferences, presidential candidate evaluations, and voting behavior. Paper presented at the Society for Experimental Social Psychology Annual Meeting, Charlottesville, Virginia.

Krosnick, J. A. (1988). Psychological perspectives on political candidate perception: A review of research on the projection hypothesis. Paper presented at the Midwest Political Science Association Annual Meeting, Chicago, Illinois.

Krosnick, J. A., Boninger, D. S., Berent, M. K., & Carnot, C. G. (1988). The origins of attitude importance. Paper presented at the Midwest Psychological Association Annual Meeting, Chicago, Illinois.

Krosnick, J. A., Carnot, C. G., Berent, M. K., & Boninger, D. S. (1988). An exploration of the relations among dimensions of attitude strength. Paper presented at the Midwest Psychological Association Annual Meeting, Chicago, Illinois.

Krosnick, J. A., Li, F., & Ashenhurst, J. (1988). Order of information presentation and the effect of base-rates on social judgments. Paper presented at the Midwest Psychological Association Annual Meeting, Chicago, Illinois.

Krosnick, J. A., Berent, M. K., Carnot, C. G., & Boninger, D. S. (1988). Attitude importance and recall of attitude relevant information. Paper presented at the Midwest Psychological Association Annual Meeting, Chicago, Illinois.

Krosnick, J. A., & Carnot, C. G. (1988). A comparison of two theories of the origins of political attitude strength. Paper presented at the Midwest Psychological Association Annual Meeting, Chicago, Illinois.

54

Krosnick, J. A., & Alwin, D. F.  (1988).  The stability of political attitudes across the life span.  Paper presented at the American Association for Public Opinion Research Annual Meeting, Toronto, Canada.

Krosnick, J. A., & Carnot, C. G.  (1988).  Identifying the foreign affairs attentive public: A comparison of competing theories.  Paper presented to the Mershon Center Seminar on Foreign Policy Decision Making, The Ohio State University, Columbus, Ohio.

Alwin, D. F., & Krosnick, J. A.  (1988).  The reliability of attitudinal survey data.  Paper presented at the International Conference on Social Science Methodology, Dubrovnik, Yugoslavia.

Alwin, D. F., & Krosnick, J. A.  (1988).  Aging, cohort stability, and change in socio-political attitudes: Exploring the generational-persistence model.  Paper presented at the International Society of Political Psychology Annual Meeting, Secaucus, New Jersey.

Krosnick, J. A., & Kinder, D. R.  (1988).  Altering the foundations of popular support for the president through priming: Reagan, the Iran-Contra affair, and the American public.  Paper presented at the American Political Science Association Annual Meeting, Washington, D.C.

Krosnick, J. A., & Weisberg, H. F.  (1988).  Liberal/conservative ideological structures in the mass public: A study of attitudes toward politicians and social groups.  Paper presented at the American Political Science Association Annual Meeting, Washington, D.C.

Krosnick, J. A.  (1988).  Government policy and citizen passion: A study of issue publics in contemporary America.  Paper presented at the Shambaugh Conference on Communication, Cognition, Political Judgment, and Affect, Iowa City, Iowa.

Berent, M. K., Krosnick, J. A., & Boninger, D. S.  (1989).  Attitude importance and the valanced recall of relevant information.  Paper presented at the Midwest Psychological Association Annual Meeting, Chicago, Illinois.

Betz, A., & Krosnick, J. A.  (1989).  Can people detect the affective tone of subliminally presented stimuli?  Paper presented at the Midwest Psychological Association Annual Meeting, Chicago, Illinois.

Krosnick, J. A., & Berent, M. K.  (1989).  Age-related changes in peer and parental influence on heavy television viewing among children and adolescents.  Paper presented at the Midwest Psychological Association Annual Meeting, Chicago, Illinois.

Alwin, D. F., & Krosnick, J. A.  (1989).  The reliability of attitudinal survey data.  Paper presented at the American Association for Public Opinion Research Annual Meeting, St. Petersburg, Florida.

Krosnick, J. A.  (1989).  The implications of social psychological findings on compliance for recruiting survey respondents.  Paper presented at the American Association for Public Opinion Research Annual Meeting, St. Petersburg, Florida.

Telhami, S., & Krosnick, J. A.  (1989).  Public attitudes and American policy toward the Arab-Israeli conflict.  Paper presented at the International Society of Political Psychology Annual Meeting, Israel.

Krosnick, J. A., & Alwin, D. F.  (1989).  Symbolic versus non-symbolic political attitudes: Is there a distinction?  Paper presented at the American Political Science Association Annual Meeting, Atlanta, Georgia.

Krosnick, J. A.  (1989).  The impact of cognitive sophistication and attitude importance on response order effects and question order effects.  Paper presented at the conference entitled Order effects in social and psychological research, Nags Head Conference Center, Kill Devil Hills, North Carolina.

Krosnick, J. A. (1990). The impact of satisficing on survey data quality. Paper presented at the Annual Research Conference of the Bureau of the Census, U.S. Department of Commerce, Washington, D.C.

Krosnick, J. A. (1990). New perspectives on survey questionnaire construction: Lessons from the cognitive revolution. Invited presentation at the 1990 Technical Conference of the United States General Accounting Office, College Park, Maryland.

Krosnick, J. A. (1990). Americans' perceptions of presidential candidates: A test of the projection hypothesis. Paper presented at the Midwest Political Science Association Annual Meeting, Chicago, Illinois.

Krosnick, J. A., & Berent, M. K. (1990). The impact of verbal labeling of response alternatives and branching on attitude measurement reliability in surveys. Paper presented at the American Association for Public Opinion Research Annual Meeting, Lancaster, Pennsylvania.

Krosnick, J. A., & Alwin, D. F. (1990). The stability of political preferences: Comparisons of symbolic and non-symbolic attitudes. Paper presented at the International Society of Political Psychology Annual Meeting, Washington, D. C.

Krosnick, J. A. (1990). Confounding of attitude objects with attitude measurement techniques in studies of political attitude stability. Paper presented at the Summer Institute in Survey Research Techniques, University of Michigan.

Fabrigar, L. R., & Krosnick, J. A. (1991). The effect of question order and attitude importance on the false consensus effect. Paper presented at the Midwestern Psychological Association Annual Meeting, Chicago, Illinois.

Berent, M. K., & Krosnick, J. A. (1991). Attitude measurement reliability: The impact of verbal labeling of response alternatives and branching. Paper presented at the Midwestern Psychological Association Annual Meeting, Chicago, Illinois.

Lehman, D. R., Krosnick, J. A., West, R. L., & Li, F. (1991). The focus of judgment effect: A question wording effect due to hypothesis confirmation bias. Paper presented at the American Association for Public Opinion Research Annual Meeting, Phoenix, Arizona.

Krosnick, J. A., Boninger, D. S., Chuang, Y. C., & Carnot, C. G. (1991). Attitude strength: One construct or many related constructs? Paper presented at the Nags Head Conference on Attitude Strength, Nags Head, North Carolina.

Krosnick, J. A. (1991). Research on attitude importance: A summary and integration. Paper presented at the Nags Head Conference on Attitude Strength, Nags Head, North Carolina.

Krosnick, J. A., & Berent, M. K. (1991). Memory for political information: The impact of attitude importance on selective exposure, selective elaboration, and selective recall. Paper presented at the Society for Experimental Social Psychology Annual Meeting, Columbus, Ohio.

Krosnick, J. A., & Brannon, L. A. (1992). The impact of war on the ingredients of presidential evaluations: George Bush and the Gulf conflict. Paper presented at the Conference on the Political Consequences of War, The Brookings Institution, Washington, D.C.

Berent, M. K., & Krosnick, J. A. (1992). The relation between attitude importance and knowledge structure. Paper presented at the Midwest Political Science Association Annual Meeting, Chicago, Illinois.

56

Smith, W. R., Culpepper, I. J., & Krosnick, J. A. (1992). The impact of question order on cognitive effort in survey responding. Paper presented at the Sixth National Conference on Undergraduate Research, University of Minnesota, Minneapolis, Minnesota.

Krosnick, J. A., & Brannon, L. A. (1992). The impact of war on the ingredients of presidential evaluations: George Bush and the Gulf conflict. Paper presented at the American Association for Public Opinion Research Annual Meeting, St. Petersburg, Florida.

Narayan, S. S., & Krosnick, J. A. (1992). Response effects in surveys as a function of cognitive sophistication. Paper presented at the Midwestern Psychological Association Annual Meeting, Chicago, Illinois.

Boninger, D. S., Krosnick, J. A., & Berent, M. K. (1992). Imagination, perceived likelihood, and self-interest: A path toward attitude importance. Paper presented at the Midwestern Psychological Association Annual Meeting, Chicago, Illinois.

Culpepper, I. J., Smith, W., & Krosnick, J. A. (1992). The impact of question order on satisficing in attitude surveys. Paper presented at the Midwestern Psychological Association Annual Meeting, Chicago, Illinois.

Berent, M. K., & Krosnick, J. A. (1992). Attitude importance, information accessibility, and attitude-relevant judgments. Paper presented at the Midwestern Psychological Association Annual Meeting, Chicago, Illinois.

Krosnick, J. A., & Brannon, L. A. (1992). The impact of war on the ingredients of presidential evaluations: George Bush and the Gulf conflict. Paper presented at the International Society of Political Psychology Annual Meeting, San Francisco, California.

Rahn, W. M., Krosnick, J. A., & Breuning, M. (1992). Rationalization and derivation processes in political candidate evaluation. Paper presented at the American Political Science Association Annual Meeting, Chicago, Illinois.

Krosnick, J. A., & Brannon, L. A. (1992). Effects of knowledge, interest, and exposure on news media priming effects: Surprising results from multivariate analysis. Paper presented at the Society for Experimental Social Psychology Annual Meeting, San Antonio, Texas.

Berent, M. K., & Krosnick, J. A. (1993). Attitude importance and selective exposure to attitude-relevant information. Paper presented at the Midwestern Psychological Association Annual Meeting, Chicago, Illinois.

Fabrigar, L. R., & Krosnick, J. A. (1993). The impact of personal and national importance judgments on political attitudes and behavior. Paper presented at the Midwestern Psychological Association Annual Meeting, Chicago, Illinois.

Miller, J. M., & Krosnick, J. A. (1993). The effects of candidate ballot order on election outcomes. Paper presented at the Midwestern Psychological Association Annual Meeting, Chicago, Illinois.

Narayan, S. S., & Krosnick, J. A. (1993). Questionnaire and respondents characteristics that cause satisficing in attitude surveys. Paper presented at the Midwestern Psychological Association Annual Meeting, Chicago, Illinois.

Narayan, S. S., & Krosnick, J. A. (1993). Response effects in surveys as a function of cognitive sophistication. Paper presented at the American Psychological Society Annual Meeting, Chicago, Illinois.

Smith, W. R., & Krosnick, J. A.  (1993).  Need for cognition, prior thought, and satisficing in attitude surveys.  Paper presented at the Midwestern Psychological Association Annual Meeting, Chicago, Illinois.

Smith, W. R., & Krosnick, J. A.  (1993).  Cognitive and motivational determinants of satisficing in surveys.  Paper presented at the American Psychological Society Annual Meeting, Chicago, Illinois.

Berent, M. K., & Krosnick, J. A.  (1994).  Attitude importance and selective exposure to attitude-relevant information.  Paper presented at the Midwest Political Science Association Annual Meeting, Chicago, Illinois.

Fabrigar, L. R., & Krosnick, J. A.  (1994).  The impact of attitude importance on consistency among attitudes.  Paper presented at the Midwestern Psychological Association Annual Meeting, Chicago, Illinois.

Krosnick, J. A.  (1994).  Survey methods and survey results: Overturning conventional wisdom.  Paper presented to the American Marketing Association, Columbus Chapter.

Krosnick, J. A., & Fabrigar, L. R.  (1994).  Attitude recall questions: Do they work?  Paper presented at the American Association for Public Opinion Research Annual Meeting, Danvers, Massachusetts.

Miller, J. M., & Krosnick, J. A.  (1994).  Does accessibility mediate agenda-setting and priming?  Paper presented at the Midwestern Psychological Association Annual Meeting, Chicago, Illinois.

Smith, W. R., & Krosnick, J. A.  (1994).  Sources of non-differentiation and mental coin-flipping in surveys: Tests of satisficing hypotheses.  Paper presented at the American Association for Public Opinion Research Annual Meeting, Danvers, Massachusetts.

Visser, P. S., & Krosnick, J. A.  (1994).  Mail surveys for election forecasting?  An evaluation of the Columbus Dispatch Poll.  Paper presented at the Midwestern Psychological Association Annual Meeting, Chicago, Illinois.

Visser, P. S., Krosnick, J. A., & Curtin, M.  (1994).  Mail surveys for election forecasting?  Paper presented at the American Association for Public Opinion Research Annual Meeting, Danvers, Massachusetts.

Krosnick, J. A., & Brannon, L. A.  (1995).  News media priming and the 1992 U.S. presidential election.  Paper presented at the American Political Science Association Annual Meeting, Chicago, Illinois.

Krosnick, J. A., & Cornet, P. J.  (1995).  Attitude importance and attitude change revisited: Shifts in attitude stability and measurement reliability across a presidential election campaign.  Paper presented at the American Psychological Society Annual Meeting, New York, New York.

Krosnick, J. A., & Fabrigar, L. R.  (1995).  Designing rating scales for effective measurement in surveys.  Invited address at the International Conference on Survey Measurement and Process Quality, Bristol, England.

Krosnick, J. A., Narayan, S. S., & Smith, W. R.  (1995).  The causes of survey satisficing: Cognitive skills and motivational factors.  Paper presented at the Midwest Association for Public Opinion Research, Chicago, Illinois.

Miller, J. M., Fabrigar, L. R., & Krosnick, J. A.  (1995).  Contrasting attitude importance and collective issue importance: Attitude properties and consequences.  Paper presented at the Midwestern Psychological Association Annual Meeting, Chicago, Illinois.

Miller, J. M., & Krosnick, J. A.  (1995).  Ballot order effects on election outcomes.  Paper presented at the Midwest Political Science Association Annual Meeting, Chicago, Illinois.

Miller, J. M., & Krosnick, J. A. (1995). Mediators and moderators of news media priming: It ain't accessibility, folks. Paper presented at the International Society of Political Psychology Annual Meeting, Washington, D.C.

Narayan, S. S., & Krosnick, J. A. (1995). Education moderates response effects in surveys. Paper presented at the American Association for Public Opinion Research Annual Meeting, Ft. Lauderdale, Florida.

Smith, W. R., & Krosnick, J. A. (1995). Mental coin-flipping and non-differentiation in surveys: Tests of satisficing hypotheses. Invited address at the Midwestern Psychological Association Annual Meeting, Chicago, Illinois.

Visser, P. S., & Krosnick, J. A. (1995). The relation between age and susceptibility to attitude change: A new approach to an old question. Paper presented at the Midwestern Psychological Association Annual Meeting, Chicago, Illinois.

Visser, P. S., & Krosnick, J. A. (1995). Mail surveys win again: Some explanations for the superior accuracy of the Columbus Dispatch poll. Paper presented at the American Association for Public Opinion Research Annual Meeting, Ft. Lauderdale, Florida.

Ankerbrand, A. L., Krosnick, J. A., Cacioppo, J. T., & Visser, P. S. (1996). Candidate assessments and evaluative space. Paper presented at the Midwestern Psychological Association Annual Meeting, Chicago, Illinois.

Bizer, G. Y., & Krosnick, J. A. (1996). Attitude accessibility and importance revisited. Paper presented at the Midwestern Psychological Association Annual Meeting, Chicago, Illinois.

Krosnick, J. A. (1996). Linking survey question structure to data quality: The impact of no-opinion options. Paper presented at the conference on "Quality Criteria in Survey Research," sponsored by the World Association for Public Opinion Research, Cadenabbia, Italy.

Krosnick, J. A., & Brannon, L. A. (1996). News media priming during the 1992 U.S. presidential election campaign. Paper presented at the International Society of Political Psychology Annual Meeting, Vancouver, British Columbia.

Miller, J. M., Fabrigar, L. R., & Krosnick, J. A. (1996). The roles of personal importance and national importance in motivating issue public membership. Paper presented at the Midwest Political Science Association Annual Meeting, Chicago, Illinois.

Miller, J. M., & Krosnick, J. A. (1996). Can issue public membership be triggered by the threat of a policy change? Paper presented at the International Society of Political Psychology Annual Meeting, Vancouver, British Columbia.

Krosnick, J. A., & Visser, P. S. (1996). Changes in political attitude strength through the life cycle. Paper presented at the Society for Experimental Social Psychology Annual Meeting, Sturbridge, Massachusetts.

Miller, J. M., & Krosnick, J. A. (1997). The impact of policy change threat on issue public membership. Paper presented at the Midwest Political Science Association Annual Meeting, Chicago, Illinois.

Ankerbrand, A. L., Krosnick, J. A., Cacioppo, J. T., Visser, P. S., & Gardner, W. (1997). Attitudes toward political candidates predict voter turnout. Paper presented at the Midwestern Psychological Association Annual Meeting, Chicago, Illinois.

59

Ankerbrand, A. L., & Krosnick, J. A. (1997). Response order effects in dichotomous questions: A social
    desirability explanation. Paper presented at the American Psychological Society Annual Meeting,
    Washington, DC.

Krosnick, J. A. (1997). Miraculous accuracy in political surveys: The keys to success. Presentation in the
    Federation of Behavioral, Psychological, and Cognitive Sciences Seminar on Science and Public Policy,
    Library of Congress, Washington, D.C.

Krosnick, J. A. (1997). Non-attitudes and no-opinion filters. Paper presented at the Conference on no opinion,
    instability, and change in public opinion research. University of Amsterdam, the Netherlands.

Krosnick, J. A. (1997). Attitude strength. Paper presented at the Conference on no opinion, instability, and
    change in public opinion research. University of Amsterdam, the Netherlands.

Bizer, G. Y., & Krosnick, J. A. (1998). The relation between attitude importance and attitude accessibility.
    Paper presented at the Midwestern Psychological Association Annual Meeting, Chicago, Illinois.

Holbrook, A., Krosnick, J. A., Carson, R. T., & Mitchell, R. C. (1998). Violating conversational conventions
    disrupts cognitive processing of survey questions. Paper presented at the American Association for
    Public Opinion Research Annual Meeting, St. Louis, Missouri.

Krosnick, J. A. (1998). Applying stated preference methods to assessing the value of public goods. Paper
    presented at the National Oceanic and Atmospheric Administration Application of Stated Preference
    Methods to Resource Compensation Workshop, Washington, DC.

Krosnick, J. A. (1998). Implications of psychological research on justice and compensation for handling of
    natural resource damage cases. Paper presented at the National Oceanic and Atmospheric
    Administration Application of Stated Preference Methods to Resource Compensation Workshop,
    Washington, DC.

Krosnick, J. A. (1998). Acquiescence: How a standard practice in many survey organizations compromises
    data quality. Paper presented at the conference on "Quality Criteria in Survey Research," sponsored by
    the World Association for Public Opinion Research, Cadenabbia, Italy.

Krosnick, J. A., Lacy, D., & Lowe, L. (1998). When is environmental damage Americans 'most important
    problem? A test of agenda-setting vs. the issue-attention cycle. Paper presented at the International
    Society of Political Psychology Annual Meeting, Montreal, Quebec, Canada.

Visser, P. S., Krosnick, J. A., Marquette, J., & Curtin, M. (1998). Improving election forecasting: Allocation of
    undecided respondents, identification of likely voters, and response order effects. Paper presented at the
    American Association for Public Opinion Research Annual Meeting, St. Louis, Missouri.

Krosnick, J. A. (1998). The impact of science on public opinion: How people judge the national seriousness of
    global warming and form policy preferences. Paper presented at the American Political Science
    Association Annual Meeting, Boston, Massachusetts.

Krosnick, J. A. (1998). Response choice order and attitude reports: New evidence on conversational
    conventions and information processing biases in voting and in election forecasting polls. Paper
    presented at the Society of Experimental Social Psychology Annual Meeting, Lexington, Kentucky.

Krosnick, J. A. (1998). The impact of the Fall 1997 debate about global warming on American public opinion.
    Paper presented at Resources for the Future, Washington, D.C.

Krosnick, J. A. (1998). What the American public believes about global warming: Results of a national longitudinal survey study. Paper presented at the Amoco Public and Government Affairs and Government Relations Meeting, Woodruff, Wisconsin.

Krosnick, J. A. (1998). What the American public believes about global warming: Results of a national longitudinal survey study. Paper presented in the Second Annual Carnegie Lectures on Global Environmental Change, Carnegie Museum of Natural History, Pittsburgh, Pennsylvania.

Green, M. C., & Krosnick, J. A. (1999). Survey satisficing: Telephone interviewing increases non-differentiation and no opinion responses. Paper presented at the Midwestern Psychological Association Annual Meeting, Chicago, Illinois.

Green, M. C., & Krosnick, J. A. (1999). Comparing telephone and face-to-face interviewing in terms of data quality: The 1982 National Election Studies Method Comparison Project. Paper presented at the Seventh Annual Conference on Health Survey Research Methods, Williamsburg, Virginia.

Holbrook, A. L., Krosnick, J. A., Carson, R. T., & Mitchell, R. C. (1999). Violating conversational conventions disrupts cognitive processing of attitude questions. Paper presented at the American Association for Public Opinion Research Annual Meeting, St. Petersburg, Florida.

Krosnick, J. A. (1999). What happens when survey respondents don't try very hard? The notion of survey satisficing. Paper presented at the National Center for Social Research, London, United Kingdom.

Krosnick, J. A. (1999). Satisficing: A single explanation for a wide range of findings in the questionnaire design literature. Paper presented at Linking the Path: A Conference for Analysts, Researchers, and Consultants, sponsored by the Gallup Organization, Lincoln, Nebraska.

Krosnick, J. A. (1999). Methodology for the NAOMS Survey. Presentation at the Workshop on the Concept of the National Aviation Operational Monitoring System (NAOMS), Sponsored by the National Aeronautics and Space Administration, Alexandria, Virginia.

Krosnick, J. A. (1999). Refining measurement of public values for policy-making: A test of contingent valuation procedures. Paper presented at the American Political Science Association Annual Meeting, Atlanta, Georgia.

Krosnick, J. A. (1999). The threat of satisficing in surveys: The shortcuts respondents take in answering questions. Paper presented at the National Center for Social Research Survey Methods Seminar on Survey Data Quality, London, England.

Krosnick, J. A. (1999). Optimizing questionnaire design: How to maximise data quality. Paper presented at the National Center for Social Research Survey Methods Seminar on Survey Data Quality, London, England.

Krosnick, J. A. (1999). The causes and consequences of no-opinion responses in surveys. Paper presented at the International Conference on Survey Nonresponse, Portland, Oregon.

Miller, J. M., & Krosnick, J. A. (1999). The impact of threats and opportunities on political participation. Paper presented at the Midwest Political Science Association Annual Meeting, Chicago, Illinois.

O'Muircheartaigh, C., Krosnick, J. A., & Helic, A. (1999). Middle alternatives, acquiescence, and the quality of questionnaire data. Paper presented at the American Association for Public Opinion Research Annual Meeting, St. Petersburg, Florida.

Bizer, G. Y., & Krosnick, J. A. (2000). The importance and accessibility of attitudes: Helping explain the structure of strength-related attitude attributes. Paper presented at the Midwestern Psychological Association Annual Meeting, Chicago, Illinois.

Holbrook, A. L., Krosnick, J. A., Visser, P. S., Gardner, W. L., & Cacioppo, J. T. (2000). The formation of attitudes toward presidential candidates and political parties: An asymmetric nonlinear process. Paper presented at the American Psychological Society Annual Meeting, Miami, Florida.

Holbrook, A. L., Krosnick, J. A., Visser, P. S., Gardner, W. L., & Cacioppo, J. T. (2000). The formation of attitudes toward presidential candidates and political parties: An asymmetric, nonlinear, interactive process. Paper presented at the American Political Science Association Annual Meeting, Washington, D.C.

Krosnick, J. A. (2000). Peering into the future of thinking and answering: A psychological perspective on internet survey respondents. Paper presented at *Survey Research: Past, Present, and Internet*, the 2000 Nebraska Symposium on Survey Research, University of Nebraska, Lincoln, Nebraska.

Krosnick, J. A. (2000). The present and future of research on survey non-responses: Reflections on Portland '99 and beyond. Roundtable presentation at the American Association for Public Opinion Research Annual Meeting, Portland, Oregon.

Holbrook, A. L., Krosnick, J. A., Moore, D. W., & Tourangeau, R. (2000). Response order effects in Gallup surveys: Linguistic structure and the impact of respondent ability, motivation, and task difficulty. Paper presented at the American Association for Public Opinion Research Annual Meeting, Portland, Oregon.

Miller, J. M., Krosnick, J. A., & Lowe, L. (2000). The impact of policy change threat on financial contributions to interest groups. Paper presented at an invited conference, Political Participation: Building a Research Agenda, Center for the Study of Democratic Politics, Princeton University, Princeton, New Jersey.

Miller, J. M., & Krosnick, J. A. (2000). Attitude change outside the laboratory: News media "priming" turns out not to be priming after all. Paper presented at the Society of Experimental Social Psychology Annual Meeting, Atlanta, Georgia.

Saris, W., & Krosnick, J. A. (2000). The damaging effect of acquiescence response bias on answers to agree/disagree questions. Paper presented at the American Association for Public Opinion Research Annual Meeting, Portland, Oregon.

Visser, P. S., & Krosnick, J. A. (2000). Exploring the distinct mechanisms through which strength-related attitude attributes confer resistance to attitude change. Paper presented at the Society for Personality and Social Psychology Annual Meeting, Nashville, Tennessee.

Bizer, G. Y., & Krosnick, J. A. (2001). Need to evaluate and need for cognition predict political attitudes and behavior. Paper presented at the Midwestern Psychological Association, Chicago, Illinois.

Krosnick, J. A. (2001). Who shapes public policy? Presentation made at the Annual Conference of the Ohio Farm Bureau Federation, Columbus, Ohio.

Krosnick, J. A., & Bizer, G. Y. (2001). Exploring the structure of strength-related attitude features: The relation between attitude importance and attitude accessibility. Paper presented at the Society for Personality and Social Psychology Annual Meeting, San Antonio, Texas.

Krosnick, J. A., Visser, P. S., & Holbrook, A. L. (2001). Real-time attitude change outside the laboratory: The case of the 1997 national debate on global warming. Paper presented at the Society for Personality and Social Psychology Annual Meeting, San Antonio, Texas.

Krosnick, J. A., & Miller, J. M.  (2001).  An unrecognized need for ballot reform: Effects of candidate name
    order.  Paper presented at the conference entitled Election Reform: 2000 and Beyond, sponsored by the
    USC-Caltech Center for the Study of Law and Politics and the Jesse M. Unruh Institute of Politics,
    University of Southern California, Los Angeles, California.

Miller, J. M., & Krosnick, J. A.  (2001).  What motivates political cognition and behavior?  Paper presented at
    the Midwest Political Science Association Annual Meeting, Chicago, Illinois.

Green, M. C., Krosnick, J. A., & Holbrook, A. L.  (2001).  Experimental comparisons of the quality of data
    obtained from face-to-face and telephone surveys.  Paper presented at the American Association for
    Public Opinion Research Annual Meeting, Montreal, Canada.

Silver, M. D., & Krosnick, J. A.  (2001).  An experimental comparison of the quality of data obtained in
    telephone and self-administered mailed surveys with a listed sample.  Paper presented at the American
    Association for Public Opinion Research Annual Meeting, Montreal, Canada.

Chang, L., & Krosnick, J. A.  (2001).  The representativeness of national samples: Comparisons of an RDD
    telephone survey with matched Internet surveys by Harris Interactive and Knowledge Networks.  Paper
    presented at the American Association for Public Opinion Research Annual Meeting, Montreal, Canada.

Chang, L., & Krosnick, J. A.  (2001).  The accuracy of self-reports: Comparisons of an RDD telephone survey
    with Internet Surveys by Harris Interactive and Knowledge Networks.  Paper presented at the American
    Association for Public Opinion Research Annual Meeting, Montreal, Canada.

O'Muircheartaigh, C., & Krosnick, J. A.  (2001).  A cross-national comparison of middle alternatives,
    acquiescence, and the quality of questionnaire data.  Paper presented at the American Association for
    Public Opinion Research Annual Meeting, Montreal, Canada.

Marquette, J., Green, J., & Krosnick, J. A.  (2001).  Experimental analysis of the accuracy of pre-election vote
    choice reports.   Paper presented at the American Association for Public Opinion Research Annual
    Meeting, Montreal, Canada.

Holbrook, A. L., Krosnick, J. A., Carson, R. T., & Mitchell, R. C.  (2001).  Violating conversational conventions
    disrupts cognitive processing of attitude questions.  Paper presented at the 2001 Fifth Tri-Annual UC
    Berkeley Invitational Choice Symposium, Pacific Grove, California.

Krosnick, J. A.  (2001).  Americans 'perceptions of the health risks of cigarette smoking: A new opportunity for
    public education.  Paper presented at the invited conference "Survey Research on Household
    Expectations and Preferences," Institute for Social Research, University of Michigan, Ann Arbor,
    Michigan.

McCready, W., Skitka, L., & Krosnick, J. A.  (2001).  Using a web-enabled national panel to conduct social
    psychological experiments.  Workshop presented at the Society of Experimental Social Psychology
    Annual Meeting, Spokane, Washington.

Krosnick, J. A., Courser, M., Mulligan, K., & Chang, L.  (2001).  Exploring the determinants of vote choices in
    the 2000 Presidential election: Longitudinal analyses to document causality.  Paper presented at the
    American Political Science Association Annual Meeting, San Francisco, California.

Silver, M. D., & Krosnick, J. A.  (2001).  Optimizing survey measurement accuracy by matching question
    design to respondent memory organization.  Paper presented at the Federal Committee on Statistical
    Methodology Research Conference, Arlington, Virginia.

63

Krosnick, J. A., Courser, M., Mulligan, K., & Chang, L.  (2002).  Exploring the causes of vote choice in the 2000 Presidential election: Longitudinal analyses to document the causal determinants of candidate preferences.  Paper presented at a conference entitled "Assessing the Vitality of Electoral Democracy in the U.S.: The 2000 Election," The Mershon Center, Ohio State University, Columbus, Ohio.

Miller, J. M., & Krosnick, J. A.  (2002).  Mediators and moderators of news media agenda-setting.  Paper presented at the Midwest Political Science Association Annual Meeting, Chicago, Illinois.

Shaeffer, E. M., Krosnick, J. A., & Holbrook, A. L.  (2002).  Assessing the efficacy of object rankings following ratings.  Paper presented at the Midwestern Psychological Association Annual Meeting, Chicago, Illinois.

Lampron, S., Krosnick, J. A., Petty, R. E., & See, M.  (2002).  Self-interest, values, involvement, and susceptibility to attitude change.  Paper presented at the Midwestern Psychological Association Annual Meeting, Chicago, Illinois.

Krosnick, J. A.  (2002).  Comments on Baruch Fischhoff's "Environmental Risk: What's Worth Knowing – and Saying?"  Paper presented at the 2nd Annual Public Policy Symposium, "Responding to Contemporary Environmental Risks."  Sponsored by the Ohio State University Environmental Policy Initiative, Fischer College of Business, Ohio State University, Columbus, Ohio.

Thomas, R. K., Uldall, B. R., & Krosnick, J. A.  (2002).  More is not necessarily better: Effects of response categories on measurement stability and validity.  Paper presented at the American Association for Public Opinion Research Annual Meeting, St. Petersburg, Florida.

Uldall, B. R., Thomas, R. K., & Krosnick, J. A.  (2002).  Reliability and validity of web-based surveys: Effects of response modality, item format, and number of categories.  Paper presented at the American Association for Public Opinion Research Annual Meeting, St. Petersburg, Florida.

Shook, N., Krosnick, J. A., & Thomas, R. K.  (2002).  Following the storm: Public opinion changes and political reactions in surveys.  Paper presented at the American Association for Public Opinion Research Annual Meeting, St. Petersburg, Florida.

Chang, L., & Krosnick, J. A.  (2002).  Comparing self-administered computer surveys and auditory interviews: An experiment.  Paper presented at the American Association for Public Opinion Research Annual Meeting, St. Petersburg, Florida.

Silver, M. D., & Krosnick, J. A.  (2002).  Optimizing survey measurement accuracy by matching question design to respondent memory organization.  Paper presented at the American Association for Public Opinion Research Annual Meeting, St. Petersburg, Florida.

Krosnick, J. A., Visser, P. S., Holbrook, A. L., & Berent, M. K.  (2002).  Challenging the common-factor model of strength-related attitude attributes: Contrasting the antecedents and consequences of attitude importance and attitude-relevant knowledge.  Paper presented at the General Meeting of the European Association of Experimental Social Psychology, San Sebastian, Spain.

Krosnick, J. A., Miller, J. M., & Tichy, M. P.  (2002).  An unrecognized need for ballot reform: Effects of candidate name order.  Paper presented at the International Society for Political Psychology Annual Meeting, Berlin, Germany.

Chang, L., & Krosnick, J. A.  (2002).  RDD telephone vs. Internet survey methodology for studying American presidential elections: Comparing sample representativeness and response quality.  Paper presented at the American Political Science Association Annual Meeting, Boston, Massachusetts.

Bizer, G. Y., Krosnick, J. A., Holbrook, A. L., Petty, R. E., Rucker, D. D., & Wheeler, S. C. (2002). The impact of personality on electoral behavior and cognition: A study of need for cognition and need to evaluate. Paper presented at the American Political Science Association Annual Meeting, Boston, Massachusetts.

Krosnick, J. A., Visser, P. S., & Holbrook, A. L. (2002). Social psychology under the microscope: Do classic experiments replicate when participants are representative of the general public rather than convenience samples of college students? Paper presented at the Society of Experimental Social Psychology Annual Meeting, Columbus, Ohio.

Visser, P. S., Krosnick, J. A., Simmons, J. (2002). Distinguishing the cognitive and behavioral consequences of attitude importance and certainty. Paper presented at the Society of Experimental Social Psychology Annual Meeting, Columbus, Ohio.

Chang, L., & Krosnick, J. A. (2002). RDD telephone vs. Internet survey methodology for studying American presidential elections: Comparing sample representativeness and response quality. Invited presentation at Westat, Rockville, Maryland.

Chang, L., & Krosnick, J. A. (2002). Comparing the quality of data obtained from telephone and Internet surveys: Field and laboratory experiments. Invited paper presented at the FCSM Statistical Policy Seminar "Challenges to the Federal Statistical System in Fostering Access to Statistics.' Bethesda, Maryland.

Lampron, S. F., Krosnick, J. A., Shaeffer, E., Petty, R. E., & See, M. (2003). Different types of involvement moderate persuasion (somewhat) differently: Contrasting outcome-based and value-based involvement. Paper presented at the Society for Personality and Social Psychology Annual Meeting, Los Angeles, California.

Visser, P. S., & Krosnick, J. A. (2003). Attitude strength: New insights from a life-course development perspective. Paper presented at the Society for Personality and Social Psychology Annual Meeting, Los Angeles, California.

Krosnick, J. A. (2003). Basic methodological work for and in repeated cross-sectional and longitudinal surveys: A few thoughts. Paper presented at the National Science Foundation Workshop on Repeated Cross-sectional and Longitudinal Surveys, Arlington, Virginia.

Pfent, A. M., & Krosnick, J. A. (2003). Rationalization of presidential candidate preferences. Paper presented at the Midwestern Psychological Association Annual Meeting, Chicago, Illinois.

Holbrook, A. L., & Krosnick,, J. A. (2003). Meta-psychological and operative measures of psychological constructs: The same or different? Paper presented at the Midwestern Psychological Association Annual Meeting, Chicago, Illinois.

Krosnick, J. A., Visser, P. S., & Holbrook, A. L. (2003). Social psychology under the microscope: Do classic experiments replicate when participants are representative of the general public rather than convenience samples of college students? Invited presentation at the Midwestern Psychological Association Annual Meeting, Chicago, Illinois.

Saris, W. E., Krosnick, J. A., & Shaeffer, E. M. (2003). Comparing the quality of agree/disagree and balanced forced choice questions via an MTMM experiment. Paper presented at the Midwestern Psychological Association Annual Meeting, Chicago, Illinois.

Anand, S., & Krosnick, J. A. (2003). Satisficing in attitude surveys: The impact of cognitive skills and motivation on response effects. Paper presented at the Midwestern Psychological Association Annual Meeting, Chicago, Illinois.

Bizer, G. Y., Krosnick, J. A., Holbrook, A. L., Petty, R. E., Rucker, D. D., & Wheeler, S. C. (2003). The impact of personality on political beliefs, attitudes, and behavior: Need for cognition and need to evaluate. Paper presented at the American Psychological Society Annual Meeting, Atlanta, Georgia.

Holbrook, A. L., Pfent, A., & Krosnick J. A. (2003). Response rates in recent surveys conducted by non-profits and commercial survey agencies and the news media. Paper presented at the American Association for Public Opinion Research Annual Meeting, Nashville, Tennessee.

Shaeffer, E. M., Langer, G. E., Merkle, D. M., & Krosnick, J. A. (2003). A comparison of minimal balanced and fully balanced forced choice items. Paper presented at the American Association for Public Opinion Research Annual Meeting, Nashville, Tennessee.

Pfent, A., Krosnick, J. A., & Courser, M. (2003). Rationalization and derivation processes in presidential elections: New evidence about the determinants of citizens 'vote choices. Paper presented at the American Association for Public Opinion Research Annual Meeting, Nashville, Tennessee.

Krosnick, J. A., Visser, P. S., & Holbrook, A. L. (2003). How to conceptualize attitude strength and how to measure it in surveys: Psychological perspectives. Paper presented at the American Association for Public Opinion Research Annual Meeting, Nashville, Tennessee.

Chang, L., & Krosnick, J. A. (2003). Comparing data quality in telephone and internet surveys: Results of lab and field experiments. Invited paper presented at the American Statistical Association Annual Meetings, San Francisco, California.

Pfent, A., & Krosnick, J. A. (2003). Post-decisional dissonance reduction by a new method: Rationalization of political candidate choices illuminates the basic dynamics of decision-making. Paper presented at the Society of Experimental Social Psychology Annual Meeting, Boston, Massachusetts.

Krosnick, J. A., & Fabrigar, L. R. (2003). "Don't know" and "no opinion" responses: What they mean, why they occur, and how to discourage them. Invited paper presented at the Basel Workshop on Item Non-response and Data Quality in Large Social Surveys, University of Basel, Basel, Switzerland.

Krosnick, J. A. (2003). Comments on theories of persuasion. Invited discussant at the conference entitled "Integrating Message Effects and Behavior Change Theories in Cancer Prevention, Treatment, and Care," Annenberg Public Policy Center, Annenberg School for Communication, University of Pennsylvania, Philadelphia, Pennsylvania.

Krosnick, J. A. (2003). Survey methodology – scientific basis. Presentation at the National Aviation Operations Monitoring Service Working Group Meeting #1, Seattle, Washington.

Krosnick, J. A. (2003). Survey methodology – NAOMS design decisions. Presentation at the National Aviation Operations Monitoring Service Working Group Meeting #1, Seattle, Washington.

Krosnick, J. A. (2004). Survey methodology – scientific basis. Presentation at the National Transportation Safety Board, Washington, DC.

Krosnick, J. A. (2004). Survey methodology – NAOMS design decisions. Presentation at the National Transportation Safety Board, Washington, DC.

Krosnick, J. A.  (2004).  Public uses of the news media.  Presentation as a part of the symposium "Politics and the media," Social Sciences Resource Center, Stanford Libraries, Stanford University, Stanford, CA.

Krosnick, J. A.  (2004).  Peering into the minds of respondents: The cognitive and social processes underlying answers to survey questions.  Invited keynote lecture at the International Symposium in Honour of Paul Lazarsfeld, Katholieke Universiteit Leuven (Belgium).

Krosnick, J. A., Shook, N., & Thomas, R. K.  (2004).  Public opinion change in the aftermath of 9/11.  Paper presented at the American Association for Public Opinion Research Annual Meeting, Phoenix, Arizona.

Holbrook, A. L., & Krosnick, J. A.  (2004).  Vote over-reporting: A test of the social desirability hypothesis.  Paper presented at the American Association for Public Opinion Research Annual Meeting, Phoenix, Arizona.

Chang, L., & Krosnick, J. A.  (2004).  Assessing the accuracy of event rate estimates from national surveys.  Paper presented at the American Association for Public Opinion Research Annual Meeting, Phoenix, Arizona.

Shaeffer, E. M., Lampron, S. F., Krosnick, J. A., Tompson, T. N., Visser, P. S., & Hanemann, W. M.  (2004).  A comparison of open vs. closed survey questions for valuing environmental goods.  Paper presented at the American Association for Public Opinion Research Annual Meeting, Phoenix, Arizona.

Holbrook, A. L., Berent, M. K., Krosnick, J. A., Visser, P. S., & Boninger, D. S.  (2004).  Attitude importance and the accumulation of attitude-relevant knowledge in memory.  Paper presented at the American Political Science Association Annual Meeting, Chicago, Illinois.

Chang, L., & Krosnick, J. A.  (2004).  Measuring the frequency of regular behaviors: Comparing the 'typical week ' to the 'past week.'  Paper presented at the American Political Science Association Annual Meeting, Chicago, Illinois.

Krosnick, J. A.  (2004).  What do Americans want government to do about global warming?  Evidence from national surveys.  Invited presentation at the "Workshop on Global Warming: The Psychology of Long Term Risk," Cooperative Institute for Climate Science, Woodrow Wilson School of Public and International Affairs, Princeton University, Princeton, New Jersey.

Krosnick, J. A., & Malhotra, N.  (2004).  The causes of vote choice in the 2004 American Presidential Election: Insights from the 2004 YouGov surveys.  Paper presented at the conference "The 2004 American Presidential Election: Voter Decision-Making in a Complex World," Stanford University, Stanford, California.

Krosnick, J. A., Visser, P. S., & Holbrook, A. L.  (2004).  The impact of social psychological manipulations embedded in surveys on special populations.  Paper presented at the Pacific Chapter of the American Association for Public Opinion Research Annual Meeting, San Francisco, California.

Krosnick, J. A.  (2005).  The future of the American National Election Studies.  Roundtable: The political psychology of surveys.  Paper presented at the Midwestern Political Science Association Annual Meeting, Chicago, Illinois.

Malhotra, N., & Krosnick, J. A.  (2005).  What motivated Americans' views of the candidates and vote preferences across the 2004 presidential campaign?  Paper presented at the American Association for Public Opinion Research Annual Meeting, Miami, Florida.

Garland, P., Krosnick, J. A., & Clark, H. H. (2005). Does question wording sometimes send unintended signals about expected answers? Paper presented at the American Association for Public Opinion Research Annual Meeting, Miami, Florida.

Callegaro, M., De Keulenaer, F., Krosnick, J. A., & Daves, R. (2005). Interviewer effects in an RDD telephone pre-election poll in Minneapolis 2001: An analysis of the effects of interviewer race and gender. Paper presented at the American Association for Public Opinion Research Annual Meeting, Miami, Florida.

Krosnick, J. A., & Rivers, D. (2005). Web survey methodologies: A comparison of survey accuracy. Paper presented at the American Association for Public Opinion Research Annual Meeting, Miami, Florida.

Krosnick, J. A., & Rivers, D. (2005). Comparing major survey firms in terms of survey satisficing: Telephone and internet data collection. Paper presented at the American Association for Public Opinion Research Annual Meeting, Miami, Florida.

Holbrook, A. L., & Krosnick, J. A. (2005). Vote over-reporting: Testing the social desirability hypothesis in telephone and internet surveys. Paper presented at the American Association for Public Opinion Research Annual Meeting, Miami, Florida.

Anand, S., Krosnick, J. A., Mulligan, K., Smith, W., Green, M., & Bizer, G. (2005). Effects of respondent motivation and task difficulty on nondifferentiation in ratings: A test of satisficing theory predictions. Paper presented at the American Association for Public Opinion Research Annual Meeting, Miami, Florida.

Krosnick, J. A. (2005). Thought piece on survey participation. Paper presented at the conference entitled "New Approaches to Understanding Participation in Surveys," Belmont Conference Center, Elkridge, Maryland.

Malhotra, N., & Krosnick, J. A. (2005). Pilot test of new procedures for identifying new and emerging occupations and their places in the SOC: A study of biotechnology. Paper presented at the U.S. Bureau of Labor Statistics, Washington, DC.

Holbrook, A. L., & Krosnick, J. A. (2005). Do survey respondents intentionally lie and claim that they voted when they did not? New evidence using the list and randomized response techniques. Paper presented at the American Political Science Association Annual Meeting, Washington, DC.

Malhotra, N., & Krosnick, J. A. (2005). The determinants of vote choice in the 2004 U.S. Presidential Election. Paper presented at the American Political Science Association Annual Meeting, Washington, DC.

Krosnick, J. A. (2005). Effects of survey data collection mode on response quality: Implications for mixing modes in cross-national studies. Paper presented at the conference "Mixed Mode Data Collection in Comparative Social Surveys," City University, London, United Kingdom.

Krosnick, J. A., & Malhotra, N. (2006). The impact of presidential job performance assessments on vote choices in 2004. Paper presented at the conference "The Wartime Election of 2004," Ohio State University, Columbus, Ohio.

Rabinowitz, J. L. & Krosnick, J. A. (2006). Investigating the discriminant validity of symbolic racism. Paper presented at the annual meeting of the Society for Personality and Social Psychology, Palm Springs, California.

Krosnick, J. A. (2006). An evaluation framework: Total survey error in research practice. Paper presented at the Survey Methods Symposium sponsored by Central Market Research and Insights, Microsoft, Redmond, Washington.

Krosnick, J. A. (2006). Data quality from phone vs. internet surveys. Paper presented at the Survey Methods Symposium sponsored by Central Market Research and Insights, Microsoft, Redmond, Washington.

Krosnick, J. A. (2006). The distinguishing characteristics of frequent survey participants. Paper presented at the annual meeting of the Midwest Political Science Association, Chicago, Illinois.

Krosnick, J. A. (2006). An overview of the mission of the American National Election Studies. Presentation at the annual meeting of the Midwest Political Science Association, Chicago, Illinois.

Krosnick. J. A. (2006). The use of the internet in valuation surveys. Presentation at the workshop "Morbidity and Mortality: How Do We Value the Risk of Illness and Death?", sponsored by the U.S. Environmental Protection Agency, the National Center for Environmental Research, and the National Council on Economic Education, Washington, DC.

Krosnick, J. A. (2006). What the American public thinks about climate change: Findings from a new Stanford/ABC/Time Magazine Survey. Presentation at the "California Climate Change Policy Workshop," sponsored by the Woods Institute for the Environment, California State Capital Building, Sacramento, California.

Holbrook, A. L., & Krosnick, J. A. (2006). Vote over-reporting: A test of the social desirability hypothesis. Paper presented at the American Psychological Association Annual Meeting, New Orleans, Louisiana.

Bannon, B., Krosnick, J. A., & Brannon, L. (2006). News media priming: Derivation or rationalization? Paper presented at the American Political Science Annual Meeting, Philadelphia, Pennsylvania.

Malhotra, N., Krosnick, J. S., & Thomas, R. (2006). The effect of polls on political behavior. Paper presented at the American Political Science Annual Meeting, Philadelphia, Pennsylvania.

Krosnick J. A. (2006). Doing social psychology that's relevant and valued and valuable. Paper presented at the Society of Experimental Social Psychology Annual Meeting, Philadelphia, Pennsylvania.

Krosnick, J. A. (2006). Overview of the American National Election Studies: Lessons learned about the causes of voter turnout and candidate choice. Paper presented at the conference "The Psychology of Voting and Election Campaigns," Social Science Research Institute, Duke University, Durham, North Carolina.

Krosnick, J. A. (2006). What Americans really think about climate change. Presentation to the Stanford Women's Club of the East Bay, Contra Costa County Library, Orinda, California.

Krosnick, J. A. (2006). The impact of survey mode and the merging of face-to-face recruitment with Internet data collection. Paper presented at the 2006 Federal Committee on Statistical Methodology Statistical Policy Seminar, "Keeping Current: What We Know – What We Need to Learn." Washington, DC.

Krosnick, J. A. (2006). Comparisons of the accuracy of information obtained by face-to-face, telephone, internet, and paper and pencil data collection. Paper presented at the Pacific Chapter of the American Association for Public Opinion Research Annual Meeting, San Francisco, California.

Bizer, G. Y., Krosnick, J. A., Holbrook, A. L., Wheeler, S. C., Rucker, D. D., & Petty, R. E. (2007). The impact of personality on political beliefs, attitudes, and behavior: Need for cognition and need to evaluate. Paper presented at the Society for Personality and Social Psychology Annual Meeting, Memphis, Tennessee.

Sargent, M. J., Rabinowitz, J., Shull, A., & Krosnick, J. A. (2007). Support for government efforts to promote racial equality: Effects of antigroup affect and perceptions of value violation. Paper presented at the Society for Personality and Social Psychology Annual Meeting, Memphis, Tennessee.

Krosnick, J. A. (2007). Americans 'beliefs about global climate change: New national survey findings. Paper presented at the American Association for the Advancement of Science Annual Meeting, San Francisco, California.

Krosnick, J. A. (2007). Comparisons of survey modes and a new hybrid. Paper presented at the American Association for the Advancement of Science Annual Meeting, San Francisco, California.

Garland, P., & Krosnick, J. A. (2007). The impact of race on evaluations of artistic products: Evidence of 'ownership 'bias among prejudiced whites. Paper presented at the National Conference of Black Political Scientists, Burlingame, California.

Lupia, A., & Krosnick, J. A. (2007). Remaking the American National Election Studies. Paper presented at the National Conference of Black Political Scientists, Burlingame, California.

Krosnick, J. A. (2007). What Americans really think about climate change: Attitude formation and change in response to a raging scientific controversy. Presentation sponsored by the California Research Bureau at the California State House, Sacramento, California.

Harbridge, L., & Krosnick, J. A. (2007). Presidential approval and gas prices: The Bush presidency in historical context. Paper presented at the American Association for Public Opinion Research annual meeting, Garden Grove, California.

Krosnick, J. A., & Smith, T. (2007). Proposing questionnaire design experiments for the General Social Survey. Paper presented at the American Association for Public Opinion Research annual meeting, Garden Grove, California.

Cote, F., Tahk, A., & Krosnick, J. A. (2007). Comparing the validity of public predictions of changes in the economy: RDD telephone data vs. volunteer samples completing paper and pencil questionnaires. Paper presented at the American Association for Public Opinion Research annual meeting, Garden Grove, California.

Schneider, D., Krosnick, J. A., & Ophir, E. (2007). Ballot order effects in California from 1976 to 2006. Paper presented at the American Association for Public Opinion Research annual meeting, Garden Grove, California.

O'Muircheartaigh, C., Krosnick, J. A., & Dennis, J. M. (2007). Face-to-face recruitment of an Internet survey panel: Lessons from an NSF-sponsored demonstration project. Paper presented at the American Association for Public Opinion Research annual meeting, Garden Grove, California.

Malhotra, N., & Krosnick, J. A. (2007). The effect of survey mode and sampling on inferences about political attitudes and behavior: Comparing the 2000 and 2004 ANES to Internet surveys with non-probability samples. Paper presented at the American Association for Public Opinion Research annual meeting, Garden Grove, California.

Krosnick, J. A., Malhotra, N., & Miller, L. (2007). Survey mode in the 21st Century: Probability vs. non-probability samples of a nation's population. Paper presented at the conference entitled "Cyberinfrastructure and National Election Studies: The Wivenhoe House Conference." University of Essex, Colchester, UK.

Pasek, J., & Krosnick, J. A. (2007). Trends over time in America: Probability/telephone vs. non-probability/internet. Paper presented at the conference entitled "Cyberinfrastructure and National Election Studies: The Wivenhoe House Conference." University of Essex, Colchester, UK.

Krosnick, J. A. (2007). Methods and results from the New Scientist Survey on Climate Change Policy. Presentation at the National Press Club, Washington, DC.

Krosnick, J. A. (2007). The ANES Recompetition and its Implications for the GSS recompetition. Presentation at the American Sociological Association annual meeting, New York, New York.

Harder, J., & Krosnick, J. A., (2007). Causes of voter turnout: A social psychological perspective. Paper presented at the American Psychological Association annual meeting, San Francisco, California.

Schneider, D., Berent, M. K., Thomas, R., & Krosnick, J. A. (2007). Measuring customer satisfaction and loyalty: Improving the 'net promoter 'score. Paper presented at the World Association for Public Opinion Research annual meeting, Berlin, Germany.

Cobb, C., & Krosnick, J. A. (2007). The impact of postdoc appointments on science and engineering career outcomes and job satisfaction. Paper presented at the conference "Using Human Resource Data", Science Resources Statistics Workshop, Washington, DC.

Krosnick, J. A. (2007). Some of the lessons learned from analyses of data from the American National Election Studies. Presentation at a conference facilitating learning about the American National Election Studies by leading news media pollsters. Gallup World Headquarters, Washington, DC.

Berent, M. K., & Krosnick, J. A. (2007). For example … How different cue types in survey questions influence frequency. Pacific Association for Public Opinion Research, San Francisco, California.

Schneider, D., Krosnick, J. A., Ofir, E., Milligan, C., Tahk, A. (2008). The psychology of voting: How and why the order of candidate names on the ballot and election laws influence election outcomes. Society for Personality and Social Psychology annual meeting, Albuquerque, New Mexico.

Saller, R., & Krosnick, J. A. (2008). Modern democracy and the Roman Empire: Ancient perspectives on the 2008 elections. The Claremont Hotel, Berkeley, California.

Pasek, J., & Krosnick, J. A. (2008). Marketing of political candidates and voter choice. Paper presented at the Association for Consumer Research Annual Meeting, San Francisco, California.

Berent, M. K., & Krosnick, J. A. (2008). For example … How different example types in online surveys influence frequency estimates. Paper presented at the General Online Research 2008 Conference, Hamburg, Germany.

Bowen, K., Visser, P., Krosnick, J. A., & Anand, S. (2008). Embedded attitudes: How social network features regulate individual-level attitude strength. Paper presented at the Association for Psychological Science Annual Meeting, Chicago, Illinois.

Pasek, J., DeBell, M., & Krosnick, J. A. (2008). Measuring voters 'values in the American National Election Studies. Paper presented at the American Association for Public Opinion Research Annual Meeting, New Orleans, Louisiana.

Malhotra, N., Yee, N., Krosnick, J. A., Scott, A., Thomas, R. K., Anand, S., & Chang, L. (2008). Response order effects in rating scales. Paper presented at the American Association for Public Opinion Research Annual Meeting, New Orleans, Louisiana.

Berent, M., & Krosnick, J. A. (2008). "For example": How different example types in online surveys influence frequency estimates. Paper presented at the American Association for Public Opinion Research Annual Meeting, New Orleans, Louisiana.

Blocksom, D. T., Schneider, D., & Krosnick, J. A. (2008). Moderators of the name-order effect: The 2004 Presidential Election in Ohio. Paper presented at the American Association for Public Opinion Research Annual Meeting, New Orleans, Louisiana.

Holbrook, A. L., & Krosnick, J. A. (2008). Results of the 2008 ANES voter turnout experiment. Paper presented at the American Association for Public Opinion Research Annual Meeting, New Orleans, Louisiana.

Schneider, D., Berent, M. K., Thomas, R. K., & Krosnick, J. A. (2008). Measuring customer satisfaction and loyalty: improving the 'net-promoter 'score. Paper presented at the American Association for Public Opinion Research Annual Meeting, New Orleans, Louisiana.

Wang, R., & Krosnick, J. A. (2008). Comparing the results of probability and non-probability telephone and internet survey data. Paper presented at the American Association for Public Opinion Research Annual Meeting, New Orleans, Louisiana.

Malhotra, N., & Krosnick, J. A. Perceptions of mass opinion and voting in presidential primaries. Paper presented at the American Political Science Association Annual Meeting, Boston, Massachusetts.

Krosnick, J. A., Yeager, D., & Wang, R. (2008). The validity of political surveys with non-probability samples of respondents who volunteer to answer questions for money. Paper presented at the American Political Science Association Annual Meeting, Boston, Massachusetts.

Pasek, J. M., & Krosnick, J. A. (2008). Studying trends in public opinion over time with probability sample surveys and surveys of people who volunteer to do surveys for money. Paper presented at the American Political Science Association Annual Meeting, Boston, Massachusetts.

Thomas, R. K., & Krosnick, J. A. (2008). Number of response categories and scale compression: Effects on validity and reliability. Paper presented at the Seventh International Conference on Social Science Methodology – RC33 – Logic and Methodology in Sociology, Naples, Italy.

Malka, A., & Krosnick, J. A. (2009). Conservative-liberal self-label and responsiveness to ideological cues. Paper presented at the Society for Personal and Social Psychology Annual Meeting, Tampa, Florida.

Cobb, C., & Krosnick, J. A. (2009). Experimental test of the accuracy of proxy reports compared to target report with third-party validity. Paper presented at the American Association for Public Opinion Research Annual Meeting, Hollywood, Florida.

Yeager, D., & Krosnick, J. A. (2009). Does weighting improve the accuracy of data from non-probability internet survey panels of people who volunteer to do surveys for money? Paper presented at the American Association for Public Opinion Research Annual Meeting, Hollywood, Florida.

Payne, K., Lelkes, Y., Krosnick, J. A., Akhtar, O., Pasek, J., & Tompson, T. (2009). The effect of implicit prejudice on vote choice during the 2008 Presidential election: Insights from the Associated Press-Yahoo! News-Stanford University study. Paper presented at the American Association for Public Opinion Research Annual Meeting, Hollywood, Florida.

Pasek, J., Krosnick, J. A. Akhtar, O., Lelkes, Y., Payne, K., & Tompson, T. (2009). A new approach to simultaneous modeling of the causes of turnout and candidate choice with data collected before elections: Insights from the Associated Press-Yahoo! News-Stanford University study. Paper presented at the American Association for Public Opinion Research Annual Meeting, Hollywood, Florida.

Yeager, D., & Krosnick, J. A. (2009). Comparison study of probability and non-probability sample surveys conducted by Internet and face to face. Paper presented at the American Association for Public Opinion Research Annual Meeting, Hollywood, Florida.

DeBell, M., Krosnick, J. A., Malka, A., Ackermann, A., & Turakhia, C. (2009). Assessing the FFISP's representative of the American adult population. Paper presented at the American Association for Public Opinion Research Annual Meeting, Hollywood, Florida.

Krosnick, J. A., Ackermann, A., DeBell, M., Malka, A., & Turakhia, C. (2009). A comparison of behavioral and attitudinal findings from the FFISP with those of major national surveys. Paper presented at the American Association for Public Opinion Research Annual Meeting, Hollywood, Florida.

Ackermann, A., Krosnick, J. A., Turakhia, C., DeBell, M., Malka, A., & Jarmon, R. (2009). Lessons learned about how to accomplish effective in-person recruitment of a web-equipped survey panel. Paper presented at the American Association for Public Opinion Research Annual Meeting, Hollywood, Florida.

Sakshaug, J., Tourangeau, R., Krosnick, J. A., Ackerman, A., Malka, A., DeBell, M., & Turakhia, C. (2009). Dispositions and outcome rates in the Face-to-face Internet Survey Platform (the FFISP). Paper presented at the American Association for Public Opinion Research Annual Meeting, Hollywood, Florida.

Lelkes, Y., Krosnick, J. A., Akhtar, O., Pasek, J., & Tompson, T., & Payne, K. (2009). An exploration of the forces driving vote choices in the 2008 American Presidential Election: Insights from the Associated Press-Yahoo! News-Stanford University study. Paper presented at the American Association for Public Opinion Research Annual Meeting, Hollywood, Florida.

Light, A. E., Visser, P. S., Krosnick, J. A., & Anand, S. (2009). Variability without and within: Self-concept clarity and varied social networks. Paper presented at the Midwestern Psychological Association Annual Meeting, Chicago, Illinois.

Krosnick, J. A., Ackermann, A., Malka, A., Yeager, D., Sakshaug, J., Tourangeau, R., DeBell, M., & Turakhia, C. (2009). Creating the face-to-face recruited internet survey platform (FFRISP). Paper presented at the Third Annual Workshop on Measurement and Experimentation with Internet Panels: Innovative Features of Internet Interviewing, Santpoort Noord, the Netherlands.

Krosnick, J. A., Achermann, A., Malka, A., Yeager, D., Sakshaug, J., Tourangeau, R., DeBell, M., & Turakhia, C. (2009). Creation of a new representative sample Internet survey panel via face-to-face recruitment and providing free computers to all respondents: Evaluation of the FFISP. Paper presented at the American Political Science Association Annual Meeting, Toronto, Canada.

Krosnick, J. A., Pasek, J., Tahk, A., Lelkes, Y., Payne, K., Tompson, T., & Akhtar, O. (2009). The 2008 American Presidential election: An exploration of the forces driving vote choices. Paper presented at the American Political Science Association Annual Meeting, Toronto, Canada.

Krosnick, J. A., Lupia, A., & DeBell, M. (2009). The activities of the American National Election Studies. Paper presented at the American Political Science Association Annual Meeting, Toronto, Canada.

Yeager, D., Krosnick, J. A., Holbrook, A. L., & Visser, P. S. (2010). Pulling social psychology out of the laboratory, kicking and screaming. Paper presented at the Society for Personality and Social Psychology Annual Meeting, Las Vegas, Nevada.

Gross, W., & Krosnick, J. A. (2010). Issue publics and candidate evaluations: Explaining inconsistent results in the moderation of issue agreement by individual issue importance. Paper presented at the Midwest Political Science Association Annual Meetings, Chicago, Illinois.

Gross, W., Kropko, J., Krosnick, J. A., Macdonald, S. E., & Rabinowitz, G. (2010). The influence of personal importance in issue voting models. Paper presented at the Midwest Political Science Association Annual Meetings, Chicago, Illinois.

Kim, N., & Krosnick, J. A. (2010). Moderators of candidate name order effects. Paper presented at the American Association for Public Opinion Research Annual Conference, Chicago, Illinois.

DeBell, M., Villar, A., & Krosnick, J. A. (2010). Measuring the number of land line and cellular telephones used for voice calls in households to properly weight RDD surveys for unequal probability of selection. Paper presented at the American Association for Public Opinion Research Annual Conference, Chicago, Illinois.

Pasek, J., DeBell, M., & Krosnick, J. A. (2010). Toward a standardization of survey weights: The American National Election Studies weighting system. Paper presented at the American Association for Public Opinion Research Annual Conference, Chicago, Illinois.

Lelkes, Y., Krosnick, J. A., Marx, D. M., Judd, C. M., & Park, B. (2010). Unmotivated anonymity: Social desirability, accuracy, and satisficing under conditions of anonymity. Paper presented at the American Association for Public Opinion Research Annual Conference, Chicago, Illinois.

Sood, G., Krosnick, J. A., & DeBell, M. (2010). Differences between confidentially and orally administered overt racism measures: Evidence from the 2008 ANES. Paper presented at the American Association for Public Opinion Research Annual Conference, Chicago, Illinois.

Tompson, T., Krosnick, J. A., Junius, D., & Pasek, J. (2010). Support for health care reform: It all depends on how you ask the question. Paper presented at the American Association for Public Opinion Research Annual Conference, Chicago, Illinois.

Pasek, J., Tompson, T., & Krosnick, J. A. (2010). Who supports health care reform? Explaining the determinants of support for various health care reforms. Paper presented at the American Association for Public Opinion Research Annual Conference, Chicago, Illinois.

Yeager, D. S., Carter, A., Tewoldemedhin, H., & Krosnick, J. A. (2010). Study of non-probability sample internet surveys 'estimates of consumer product usage and demographic characteristics of consumer product users. Paper presented at the American Association for Public Opinion Research Annual Conference, Chicago, Illinois.

Berent, M. K., Krosnick, J. A., & DeBell, M. (2010). Confirming the validity of survey respondent reports of voter registration and turnout: Checking the records turns up surprisingly bad news. Paper presented at the American Association for Public Opinion Research Annual Conference, Chicago, Illinois.

Villar, A., Malka, A., & Krosnick, J. A. (2010). Assessing the accuracy of the Face-to-Face Recruited Internet Survey Platform: A comparison of behavioral and health-related findings from the FFRISP with those of major national surveys. Paper presented at the American Association for Public Opinion Research Annual Conference, Chicago, Illinois.

Krosnick, J. A., Malka, A., & Villar, A. (2010). Manipulation of public opinion on global warming: The
impact of news media coverage and the weather. Paper presented at the International Society of
Political Psychology Annual Meeting, San Francisco, California.

Shockley, E., Krosnick, J. A., & Visser, P. S. (2010). The impact of aging on political ideology. Paper
presented at the International Society of Political Psychology Annual Meeting, San Francisco,
California.

Yeager, D., Krosnick, J. A., Tewoldemedhin, H., & Carter, A. (2010). Evaluating non-probability sample
internet surveys 'estimates of consumer product usage and demographic characteristics of consumer
product users: Do different panels produce the same results? Paper presented at the Fourth Annual
Workshop on Measurement and Experimentation with Internet Panels: Innovative Features of Internet
Interviewing, Noordwijk, the Netherlands.

Krosnick, J. A., Tompson, T., & Villar, A. (2010). Change in public opinion about climate change 2006-2010:
How trusted sources and personal experience combine. Paper presented at the American Political
Science Association Annual Meeting, Washington, DC.

Gera, K. Yeager, D., Krosnick, J. A., DeBell, M., & McDonald, M. (2010). Comparing estimates of voter
turnout from the American National Election Studies, the General Social Survey, and the Current
Population Survey. Paper presented at the American Political Science Association Annual Meeting,
Washington, DC.

Pasek, J., Krosnick, J. A., & Tompson, T. (2010). Taking a position on health care: Selfish, group interest, and
sociotropic determinants of citizens 'attitudes on proposals for health care reform. Paper presented at
the American Political Science Association Annual Meeting, Washington, DC.

Sood, G., & Krosnick, J. A. (2010). The impact of satire in television news: Differential impact on the usual
audience and on other viewers. Paper presented at the American Political Science Association Annual
Meeting, Washington, DC.

Tahk, A., & Krosnick, J. A. (2010). Do the news media shape how Americans think about politics? New
statistical procedures cast new light on an old hypothesis. Paper presented at the American Political
Science Association Annual Meeting, Washington, DC.

Kim, N., & Krosnick, J. A. (2010). Moderators of candidate name order effects. Paper presented at the
American Political Science Association Annual Meeting, Washington, DC.

Krosnick, J. A. (2010). We just want to help: How social science can sometimes be successful and sometimes
crash and burn when in the public spotlight. Paper presented at the Society of Experimental Social
Psychology Annual Meeting, Minneapolis, Minnesota.

Berent, M. K., Krosnick, J. A., & Lupia, A. (2011). Lying survey respondents or flawed government records?
An examination of turnout over-reporting and vote validation in the 2008 ANES Panel Study. Paper
presented at the Midwest Political Science Association Annual Meeting, Chicago, Illinois.

Cobb, C., Krosnick, J. A., & Bannon, B. (2011). Optimizing the design of a question intended to measure
expected starting salary. Paper presented at the American Association for Public Opinion Research
Annual Meeting, Phoenix, Arizona.

MacInnis, B., & Krosnick, J. A. (2011). The persistence of American public opinion on climate policy. Paper
presented at the American Association for Public Opinion Research Annual Meeting, Phoenix, Arizona.

Yeager, D. S., Larson, S., & Krosnick, J. A. (2011). Measuring Americans 'issue priorities: A new version of the most important problem question reveals more concern about global warming and the environment. Paper presented at the American Association for Public Opinion Research Annual Meeting, Phoenix, Arizona.

Krosnick, J. A. (2011). The stability of American public opinion on global warming: Towards explaining the existence beliefs trends. Paper presented at the American Association for Public Opinion Research Annual Meeting, Phoenix, Arizona.

Romano Bergstrom, J. C., Olmsted-Hawala, E. L., Rogers, W. A., & Krosnick, J. A. (2011). Age-related differences in reported computer and internet usage based on question type: 'A great deal 'of variability. Paper presented at the American Association for Public Opinion Research Annual Meeting, Phoenix, Arizona.

Jans, M., Bergstrom, J. C., Ashenfelter, K. T., & Krosnick, J. A. (2011). Measuring user satisfaction in the lab: Questionnaire mode, physical location, and social presence concerns. Paper presented at the American Association for Public Opinion Research Annual Meeting, Phoenix, Arizona.

MacInnis, B., & Krosnick, J. A. (2011). Complete satisficing in surveys: An exploratory investigation. Paper presented at the American Association for Public Opinion Research Annual Meeting, Phoenix, Arizona.

Yeager, D. S., & Krosnick, J. A. (2011). Does mentioning 'some people 'and 'other people 'in an attitude question improve measurement quality? Paper presented at the American Association for Public Opinion Research Annual Meeting, Phoenix, Arizona.

Chang, L., Krosnick, J. A., & Tompson, T. (2011). The impact of healthcare utilization on satisfaction with health insurance plans. Paper presented at the American Association for Public Opinion Research Annual Meeting, Phoenix, Arizona.

Chang, L. & Krosnick, J. A. (2011). Assessing survey accuracy across multiple domains. Paper presented at the American Association for Public Opinion Research Annual Meeting, Phoenix, Arizona.

Pasek, J., & Krosnick, J. A. (2011). Measuring intent to participate and participation in the 2010 census and their correlates and trends: Comparisons of RDD telephone and non-probability sample internet survey data. Paper presented at the American Association for Public Opinion Research Annual Meeting, Phoenix, Arizona.

Weiss, R., Krosnick, J. A., & Yeager, D. S. (2011). More comparisons of probability and non-probability sample internet surveys: The Dutch NOPVO study. Paper presented at the American Association for Public Opinion Research Annual Meeting, Phoenix, Arizona.

Gilbert, E., Allum, N., Villar, A., & Krosnick, J. A. (2011). Do reluctant respondents provide poor data? Evidence from the Face-to-Face Recruited Internet Survey Platform (FFRISP). Paper presented at the American Association for Public Opinion Research Annual Meeting, Phoenix, Arizona.

Lelkes, Y., & Krosnick, J. A. (2011). Measuring perceptions and probabilities: Verbal or numerical response options? Paper presented at the American Association for Public Opinion Research Annual Meeting, Phoenix, Arizona.

Krosnick, J. A., MacInnis, B., & Villar, A. (2011). The impact of candidates 'statements about climate change on electoral success in 2008 and 2010: Evidence using three methodologies. Paper presented at the American Political Science Association Annual Meeting, Seattle, Washington.

Berent, M. K., Krosnick, J. A., & Lupia, A. (2011). Measuring voter registration and turnout in surveys: Do
    official government records yield more accurate assessments? Paper presented at the American Political
    Science Association Annual Meeting, Seattle, Washington.

Krosnick, J. A., MacInnis, B., & Villar, A. (2012). Polarization of opinions about global warming between
    1997 and 2011: Appearances are sometimes misleading. Paper presented at the Society for Personality
    and Social Psychology Annual Meeting, San Diego, California.

MacInnis, B., Krosnick, J. A., & Villar, A. (2012). Motivated social cognition in the realm of politics: The case
    of news media dissemination of information about climate change. Paper presented at the Society for
    Personality and Social Psychology Annual Meeting, San Diego, California.

Villar, A., & Krosnick, J. A. (2012). An investigation of nonresponse error due to breakoffs in telephone
    surveys. Paper presented at the American Association for Public Opinion Research Annual Meeting,
    Orlando, Florida.

Anand, S., Krosnick, J. A., & Yeager, D. S. (2012). What number of scale points in an attitude question
    optimizes response validity and administrative practicality? Paper presented at the American
    Association for Public Opinion Research Annual Meeting, Orlando, Florida.

Kim, N., Lelkes, Y., & Krosnick, J. A. (2012). Race of interviewer effects in the 2008 Presidential election.
    Paper presented at the American Association for Public Opinion Research Annual Meeting, Orlando,
    Florida.

Berent, M. K., Krosnick, J. A., & Lupia, A. (2012). Lying vs. fail-to-match: Self-reported turnout and validated
    turnout in the 2008-2009 ANES Panel Study. Paper presented at the American Association for Public
    Opinion Research Annual Meeting, Orlando, Florida.

Young, C., Jackson, C., & Krosnick, J. A. (2012). Comparison of dual frame telephone and non-probability
    online panels regarding accuracy of political opinion polling. Paper presented at the American
    Association for Public Opinion Research Annual Meeting, Orlando, Florida.

Callegaro, M., Villar, A., Krosnick, J. A., & Yeager, D. S. (2012). A systematic review of studies investigating
    the quality of data obtained with online panels. Paper presented at the American Association for Public
    Opinion Research Annual Meeting, Orlando, Florida.

Weiss, R. J., Berent, M. K., Krosnick, J. A., & Lupia, A. (2012). Investigating automated coding of open-ended
    survey questions. Paper presented at the American Association for Public Opinion Research Annual
    Meeting, Orlando, Florida.

Pasek, J., Sood, G., & Krosnick, J. A. (2012). A certain truth? How Americans received and perceived
    information about the Obama health care plan. Paper presented at the Midwest Political Science
    Association Annual Meeting, Chicago, Illinois.

Kropko, J., Gross, W., & Krosnick, J. A. (2012). Issue publics and candidate evaluations: Selecting the best
    fitting models of the moderation of issue agreement by individual issue importance. Paper presented at
    the Midwest Political Science Association Annual Meeting, Chicago, Illinois.

Pasek, J., Krosnick, J. A., & Tahk, A. M. (2012). Prevalence and moderators of the candidate name order
    effect: Evidence from all statewide general elections in California. Paper presented at the Midwest
    Political Science Association Annual Meeting, Chicago, Illinois.

MacInnis, B., Krosnick., J. A., Suh, A., & Cho, Mu-Jung. (2013). Assessments of survey accuracy: A
    multimode national field experiment. Paper presented at the American Association for Public Opinion

Research Annual Meeting, Boston, Massachusetts.

Santa Cruz, H., & Krosnick, J. A. (2013). Shocking misbehavior by face-to-face interviewers: The 2008 ANES office recognition questions. Paper presented at the American Association for Public Opinion Research Annual Meeting, Boston, Massachusetts.

Vannette, D., Krosnick., J. A. (2013). Mindful responding to questions: The dangers of survey satisficing. Paper presented at the American Association for Public Opinion Research Annual Meeting, Boston, Massachusetts.

Stark, T. H., Pasek, J., Tompson, T., & Krosnick., J. A. (2013). Measuring anti-Black racism in the U.S. Paper presented at the American Association for Public Opinion Research Annual Meeting, Boston, Massachusetts.

Kiley, J., Keeter, S., Frei, M., Motel, S., Christian, L.M., Dimock, M., McDonald, M. P., Berent, M., & Krosnick., J. A. (2013). Validating likely voter measures in 2012 pre-election polling. Paper presented at the American Association for Public Opinion Research Annual Meeting, Boston, Massachusetts.

MacInnis, B., Howe, L., Krosnick, J. A., Markowitz, E., & Socolow, R. (2013). Confidently uncertain: When expressing uncertainty enhances trust and persuasion. Paper presented at the Society of Experimental Social Psychology Annual Meeting, Berkeley, California.

Silber, H., Krosnick, J. A., & Yeager, D. (2013). Replication of experimental results across telephone and internet survey panels. Paper presented at the Pacific Chapter of the American Association for Public Opinion Research Annual Meeting, San Francisco, California. (Winner of Second Place in the PAPOR Student Paper Competition)

Holbrook, A. L., & Krosnick, J. A. (2013). A new question sequence to measure voter turnout in telephone surveys: Results of an experiment in the 2006 ANES pilot study. Public Opinion Quarterly Special Issue Conference: Topics in Survey Measurement and Public Opinion. Barbara Jordan Conference Center, Washington, DC.

Yeager, D., & Krosnick, J. A. (2014). Generalizability as a scientific integrity issue. Paper presented at the Association for Psychological Science Annual Meeting, San Francisco, California.

Stark, T. H., & Krosnick, J. A. (2014). A new tool for ego-centered networks in online surveys. Paper presented at the European Congress of Methodology, Utrecht, The Netherlands.

Stark, T. H., Krosnick, J. A., Pasek, J., & Tompson, T. (2014). Comparing measures of anti-Black racial prejudice. Paper presented at the Society for Personality and Social Psychology Annual Meeting, Austin, Texas.

Stark, T. H., & Krosnick, J. A. (2014). A new tool for ego-centered networks. Paper presented at the American Association for Public Opinion Research Annual Meeting, Anaheim, California.

Krosnick, J. A., & MacInnis, B. (2014). Public opinion on global warming: Contradictory results among surveys. Paper presented at the American Association for Public Opinion Research Annual Meeting, Anaheim, California.

Silber, H., Krosnick, J. A., Stark, T. H., & Blom, A. G. (2014). Exact replication of question design experiments from Schuman and Presser. Paper presented at the American Association for Public Opinion Research Annual Meeting, Anaheim, California.

Krosnick, J. A., Kim, S., & Berman, R.  (2014).  Testing the principles of optimal questionnaire design: Does a questionnaire supposedly designed better actually work better?  Paper presented at the American Association for Public Opinion Research Annual Meeting, Anaheim, California.

Callegaro, M., Lavrakas, P. J., & Krosnick, J. A.  The status of online panel research from a data quality perspective.  Paper presented at the American Association for Public Opinion Research Annual Meeting, Anaheim, California.

Pasek, J., Sood, G., & Krosnick, J. A.  (2014).  Certain gains in measurement of political knowledge (and misinformation).  Paper presented at the International Communication Association Annual Meeting, Seattle, Washington.

Krosnick, J. A., & MacInnis, B.  (2014).  How should Congressional representatives decide how to vote? A study of the American public's prescriptions.  Paper presented at the American Political Science Association's Annual Meeting, Washington, D.C.

Krosnick, J. A., & MacInnis, B.  (2014).  A new method for measuring public opinion in the States and causes of differences: The case of global warming.  Paper presented at the American Political Science Association's Annual Meeting, Washington, D.C.

Krosnick, J. A.  (2014).  An overview of scientific integrity issues: Worse than you thought.  Paper presented at the Society for Experimental Social Psychology Annual Meeting, Columbus, Ohio.

Yeager, D., & Krosnick, J. A.  (2014).  An example of (partial) failure to replicate: How important (but not so new) lessons can be (re)learned from relentless pursuit of the ease of retrieval effect.  Paper presented at the Society for Experimental Social Psychology Annual Meeting, Columbus, Ohio.

Krosnick, J. A.  (2015).  Scientific integrity: The problem is much bigger than we think.  Paper presented at the Society for Personality and Social Psychology Annual Meeting, Long Beach, California.

Stark, T. H., & Krosnick, J. A.  (2015).  Measuring social networks in large-scale surveys: Challenges and practice of ego-centered and complete network approaches.  Paper presented at the European Survey Research Association Annual Meeting, Reykjavik, Iceland.

Srinivasan, R., Suh, A., & Krosnick, J. A.  (2015).  Comparing direct and filtered frequency questions: Which produces more accurate measurements?  Paper presented at the American Association for Public Opinion Research Annual Meeting, Hollywood, Florida.

Clement, S., & Krosnick, J. A.  (2015).  Does candidate order matter? Impact of matching ballot order on pre-election poll accuracy.  Paper presented at the American Association for Public Opinion Research Annual Meeting, Hollywood, Florida.

Stark, T. H., & Krosnick, J. A.  (2015).  A new tool to collect ego-centered network data in online surveys.  Paper presented at the American Association for Public Opinion Research Annual Meeting, Hollywood, Florida.

Vannette, D. L., & Krosnick, J. A.  (2015).  The effects and effectiveness of likely voter models in pre-election surveys.  Paper presented at the American Association for Public Opinion Research Annual Meeting, Hollywood, Florida.

Krosnick, J. A., MacInnis, B., & Villar, A.  (2015).  Does an introductory sentence in an opinion question cause acquiescence response bias?  Paper presented at the American Association for Public Opinion Research Annual Meeting, Hollywood, Florida.

Krosnick, J. A.  (2015).  Ballot design: The impact of candidate name order.  Paper presented at the Electoral
Integrity Project Pre-APSA Workshop: What works?  Strengthening Electoral Integrity.  San Francisco,
California.

Silber, H., Stark, T. H., Blom, A. G.  & Krosnick, J. A.  (2016).  Multi-national replication of experiments on
acquiescence from Schuman and Presser.  Paper presented at the American Association for Public
Opinion Research Annual Meeting, Austin, Texas.

Yang, S., Yeager, D. S., Krosnick, J. A., & Anand, S.  (2016).  Directly testing accepted wisdom regarding the
validity of different scale lengths.  Paper presented at the American Association for Public Opinion
Research Annual Meeting, Austin, Texas.

Kim, S., & Krosnick, J. A.  (2016).  Perceptions about scientific agreement, trust in scientists, and the American
public's beliefs about global warming.  Paper presented at the American Association for Public Opinion
Research Annual Meeting, Austin, Texas.

Yang, Y., Callegaro, M., Chin, K., Villar, A., & Krosnick, J. A.  (2016).  Assessing the accuracy of 51
nonprobability online panels and river samples: A study of the Advertising Research Foundation 2013
online panel comparison experiment.  Paper presented at the American Association for Public Opinion
Research Annual Meeting, Austin, Texas.

Silber, H., Stark, T., Blom, A., & Krosnick, J. A.  (2016).  Do response effects generalize across countries?
Paper presented at the Second International Conference on Survey Methods in Multinational,
Multiregional, and Multicultural Contexts (3MC 2016), sponsored by the International Workshop on
Comparative Survey Design and Implementation, Chicago, Illinois.

Silber, H., Stark, T., Blom, A., & Krosnick, J. A.  (2016).  Multi-national study of questionnaire design.  Paper
presented at the Second International Conference on Survey Methods in Multinational, Multiregional,
and Multicultural Contexts (3MC 2016), sponsored by the International Workshop on Comparative
Survey Design and Implementation, Chicago, Illinois.

MacInnis, B., Anderson, A., & Krosnick, J. A.  (2016).  How do Americans want their elected representatives to
make laws?  Paper presented at the American Political Science Association Annual Meeting,
Philadelphia, Pennsylvania.

Kim, S., & Krosnick, J. A.  (2016).  An exploration of the effect of advertising: The mediating role of
perceptions of social proof.  Paper presented at the National Communication Association Annual
Meeting, Philadelphia, Pennsylvania.

Abeles, A., & Krosnick, J. A.  (2017).  Communicating about climate change: Labels unwittingly signal opinion.
Paper presented at the International Communication Association Annual Meeting, San Diego,
California.

Pasek, J., Stark, T., Krosnick, J. A., & Tompson, T.  (2017).  How would better knowledge influence support for
the Affordable Care Act?  A simulation and experiment.  Paper presented at the American Association
for Public Opinion Research Annual Meeting, New Orleans, Louisiana.

Wu, J., Krosnick, J. A., & DeBell, M.  (2017).  Raking and weighting ANES Time Series.  Poster presented at
the American Association for Public Opinion Research Annual Meeting, New Orleans, Louisiana.

Stark, T., Krosnick, J. A., Silber, H., & Blom, A.  (2017).  A text of generalization of classic question order
effects in different cultures.  Paper presented at the American Association for Public Opinion Research
Annual Meeting, New Orleans, Louisiana.

Lundmark, S., Azevedo, F., Krosnick, J. A., & Marcus, G. E.  (2017).  Evaluation of the impact of the response
  slide scales: Validity, cognitive effort, and moderation of experimental treatment effects.  Paper
  presented at the American Association for Public Opinion Research Annual Meeting, New Orleans,
  Louisiana.

McLean, A., & Krosnick, J. A.  (2017).  Accuracy of national and state polls in the 2016 election.  Paper
  presented at the American Association for Public Opinion Research Annual Meeting, New Orleans,
  Louisiana.

Krosnick, J. A., Cho, A., McLean, A., Middleton, C., Kay, D., Abruzzo, J., Munroe, J., & Carrington, M.
  (2017).  Assessing the accuracy of pre-election polls: 2008-2012.  Paper presented at the American
  Association for Public Opinion Research Annual Meeting, New Orleans, Louisiana.

Abeles, A., Howe, L., Krosnick, J. A., & MacInnis, B.  (2017).  Misperceptions of public opinion: Americans
  underestimate belief in global warming.  Paper presented at the American Association for Public
  Opinion Research Annual Meeting, New Orleans, Louisiana.

McLean, A., & Krosnick, J. A.  (2017).  Discrepancies between 2016 pre-election polls and election outcomes:
  Electoral integrity failure?  Paper presented at the pre-APSA workshop entitled "Protecting Electoral
  Security and Voting Rights: The 2016 U.S. Elections in Comparative Perspective."  Sponsored by the
  Electoral Integrity Project, San Francisco, California.

McLean, A., & Krosnick, J. A.  (2017).  Fake news preceding the 2016 U.S. Presidential election: Non-
  scientific "surveys" masquerading as science.  Paper presented at the pre-APSA Political
  Communication Preconference, sponsored by the Political Communication Section of the American
  Political Science Association, San Francisco, California.

Krosnick, J. A.  (2017).  Conference goals.  Workshop on Implicit Bias, National Science Foundation,
  Alexandria, Virginia.

Krosnick, J. A.  (2017).  Critiques of implicit bias.  Workshop on Implicit Bias, National Science Foundation,
  Alexandria, Virginia.

Sekar, S., Krosnick, J. A., & MacInnis, B.  (2018).  Can we just skip doing surveys altogether?  Comparing the
  accuracy of MRP and LAP to real survey data.  Paper presented at the American Association for Public
  Opinion Research Annual Meeting, Denver, Colorado.

Kephart, K., Henderson, A., & Krosnick, J. A.  (2018).  To list or not to list, that is the question: An examination
  of existing research on the challenges and best practices of household rostering.  Paper presented at the
  American Association for Public Opinion Research Annual Meeting, Denver, Colorado.

Krosnick, J. A., Silber, H., Stark, T., & Blom, A.  (2018).  Generalization of classic response order effects across
  cultures.  Paper presented at the American Association for Public Opinion Research Annual Meeting,
  Denver, Colorado.

Pasek, J., Stark, T., Krosnick, J. A., & Tompson, T.  (2018).  Does knowledge influence support for the ACA? A
  simulation and experiment.  Paper presented at the American Political Science Annual Meeting, Boston,
  Massachusetts.

Corbett, C., Mo, C., & Krosnick, J. A.  (2019).  Sexism in the 2016 U.S. Presidential election: The impact of
  prejudice against women leaders on voter turnout and candidate choice.  Paper presented at the
  American Association for Public Opinion Research Annual Meeting, Toronto, Canada.

Abeles, A., Krosnick, J. A., & Lundmark, S. (2019). Communicating about public opinion on climate change: how labels unwittingly signal speakers 'attitudes. Paper presented at the American Association for Public Opinion Research Annual Meeting, Toronto, Canada.

Chen. C, Krosnick, J. A., MacInnis, B., & Waltman, M. (2019). How often do response effects occur in survey questions? Paper presented at the American Association for Public Opinion Research Annual Meeting, Toronto, Canada.

Krosnick, J. A., & Silber, H. (2019). Generalizability and heterogeneity of a psychological effect in a multi-national replication study conducted in representative samples. Paper presented at the Society of Experimental Social Psychology Annual Meeting, Toronto, Canada.

Krosnick, J. A. (2020). Lessons learned from statistical analysis of election returns to help improve ballot design: The case of name order. Paper accepted for presentation at the Federal Committee on Statistical Methodology Annual Meeting, Washington, DC. Cancelled due to the Corona Virus.

MacInnis, B. Krosnick, J. A., Cho, A., Protzko, J., Perfecto, H. (2020). Political parties 'long-term economic performance affects Americans 'attitudes and behavioral intentions. Paper accepted for presentation at the Barcelona-Gothenburg-Bergen Workshop on Experimental Political Science, University of Bergen, Bergen, Norway. Cancelled due to the Corona Virus.

Abeles, A., & Krosnick, J. A. (2020). Effects of question order on perceptions of public opinion on global warming. Paper accepted for presentation at the American Association for Public Opinion Research Annual Meeting, Atlanta, Georgia. Cancelled due to the Corona Virus.

Chen, C., MacInnis, & Krosnick, J. A. (2020). Do people lie when reporting their beliefs on global warming and support for green policies? A test using the item count technique. Poster accepted for presentation at the American Association for Public Opinion Research Annual Meeting, Atlanta, Georgia. Cancelled due to the Corona Virus.

Maitland, A., Berent, M. K., & Krosnick, J. A. (2020). Acquiescence bias in true/false knowledge questions. Paper accepted for presentation at the American Association for Public Opinion Research Annual Meeting, Atlanta, Georgia. Cancelled due to the Corona Virus.

Sekar, S., MacInnis, B., & Krosnick, J. A. (2020). A recipe for political activism: Social norms, emotions, and efficacy. Paper accepted for presentation at the American Association for Public Opinion Research Annual Meeting, Atlanta, Georgia. Cancelled due to the Corona Virus.

Amsalem, E., Yeager, D. S., Yang, S., Anand, S., & Krosnick, J. A. (2020). How long should rating scales measuring attitudes be? A meta-analysis of 39 experiments. Paper accepted for presentation at the American Association for Public Opinion Research Annual Meeting, Atlanta, Georgia. Cancelled due to the Corona Virus.

Blom, A., John, M. Silber, H., Stark, T., & Krosnick, J. A. (2020). Non-attitudes or satisficing? Replication, cross-national generalization, and extension of research on selecting non-substantive answer options. Paper accepted for presentation at the American Association for Public Opinion Research Annual Meeting, Atlanta, Georgia. Cancelled due to the Corona Virus.

Langer, G., Bashkova, Y., & Krosnick, J. A. (2020). Unconscious bias: Public claims and public perceptions. Paper accepted for presentation at the American Association for Public Opinion Research Annual Meeting, Atlanta, Georgia.

Sekar, S., MacInnis, B., & Krosnick, J. A. (2020). A recipe for political activism:: Social norms, emotions, and efficacy. Paper accepted for presentation at the American Political Science Association Annual Meeting, San Francisco, California. Cancelled due to the Corona Virus.

Amsalem, E., Yeager, D. A., Yang, S., & Krosnick, J. A. (2020). How to measure political attitudes: A meta-analysis and a large-scale experiment. Paper accepted for presentation at the American Political Science Association Annual Meeting, San Francisco, California. Cancelled due to the Corona Virus.

MacInnis, B., & Krosnick, J. A. (2020). Does natural scientists endorsing climate change policies enhance public support? Paper accepted for presentation at the American Political Science Association Annual Meeting, San Francisco, California. Cancelled due to the Corona Virus.

Cornesse, C., Blom, A., Dutwin, D., Krosnick, J. A., DeLeeuw, E., Legleye, S., Pasek, J., Pennay, D., Philips, B., Sakshaug, J., Struminskaya, B., & Wenz, A. (2020). A review of conceptual approaches and empirical evidence on probability and nonprobability sample survey research. General Online Research 20 Annual Meeting, Berlin, Germany. Cancelled due to the Corona Virus.

Tong, L. C. P., Krosnick, J. A., & Knutson, B. (2020). Neuroforecasting political campaign survival. Presentation at the 18th Society for Neuroeconomics Annual Meeting. Virtual.


Off-Campus Academic Colloquia

| | |
|---|---|
| 1985 | State University of New York at Stony Brook, Department of Political Science. |
| | Princeton University, Department of Sociology. |
| | Princeton University, Department of Politics. |
| | University of California at Berkeley, Department of Sociology. |
| | Yale University, Department of Sociology. |
| | Yale University, Department of Political Science. |
| | Ohio State University, Department of Psychology. |
| | University of Southern California, Annenberg School for Communication. |
| 1986 | University of Michigan, Department of Sociology. |
| 1987 | Yale University, Department of Psychology. |
| | Yale University, Department of Political Science. |
| | University of Michigan, Department of Sociology. |
| 1988 | University of Minnesota, Department of Political Science. |
| 1990 | University of Florida, Department of Psychology. |
| | University of Florida, Bureau of Economic and Business Research. |
| | Denison University, Department of Psychology. |
| 1991 | University of Michigan, Summer Institute in Survey Research Techniques. |
| 1992 | University of Michigan, Summer Institute in Survey Research Techniques. |
| | University of Michigan, Department of Communication. |
| 1993 | University of Wisconsin, Departments of Psychology, Sociology, and Political Science. |
| | University of Michigan, Summer Institute in Survey Research Techniques. |
| 1994 | Yale University, Department of Psychology. |
| | University of Michigan, Research Center for Group Dynamics. |

Cornell University, Peace Studies Center.

1995 University of Michigan, Summer Institute in Survey Research Techniques.
 University of Minnesota, Department of Political Science.

1996 University of Pennsylvania, Annenberg School for Communication.
 University of Chicago, Center for Decision Research.
 Purdue University, Department of Psychology.

1997 Stanford University, Department of Psychology.
 University of California – Berkeley, Institute of Governmental Studies.
 University of California – Berkeley, Institute of Personality and Social Research.
 University of California – Irvine, Department of Social Sciences.
 University of California – Los Angeles, Institute for Social Science Research.
 University of California – Santa Barbara, Department of Psychology.
 University of California – Santa Cruz, Board of Psychology.
 Center for Advanced Study in the Behavioral Sciences.
 London School of Economics and Political Science, Methodology Institute.

1998 Arizona State University, Department of Psychology.
 London School of Economics and Political Science, Methodology Institute.
 University of Amsterdam, Department of Psychology.
 Carnegie Mellon University, Center for the Integrated Study of the Human Dimensions of
  Global Change, Department of Engineering and Public Policy.

1999 University of Chicago, American Politics Workshop, Department of Political Science.
 Indiana University, Departments of Political Science and Psychology.
 University of Minnesota, Departments of Political Science and Psychology.

2000 University of California, Los Angeles, Department of Political Science.
 University of Southern California, Jesse M. Unruh Institute of Politics.
 University of Michigan, Institute for Social Research, Survey Research Center.

2001 The William and Flora Hewlett Foundation, Menlo Park, California.
 London School of Economics and Political Science, Methodology Institute.
 Resources for the Future, Washington, DC.

2002 University of Colorado - Boulder, Department of Psychology.
 University of Florida - Gainesville, Department of Psychology.
 Stanford University, Department of Communication.
 University of Chicago, Harris School of Public Policy.
 Uppsala University (Sweden), Department of Government.
 University of North Carolina, Department of Political Science.
 University of Chicago, Political Psychology Workshop, Departments of Psychology and
  Political Science.
 Pitzer College, Department of Political Science.

2003 University of Illinois at Chicago, College of Urban Planning and Public Affairs.
 University of Illinois at Chicago, Survey Research Laboratory.
 Stanford University, Social Psychology Research Seminar (April).
 Stanford University, Social Psychology Research Seminar (October).
 Stanford University, Department of Psychology Colloquium Series.

2004 Harvard University, Research Workshop in American Politics, Department of Government.

Stanford University, Organizational Behavior Seminar, Graduate School of Business.
Stanford University, Marketing Seminar, Graduate School of Business.
Stanford University, American Empirical Seminar, Stanford Institute for the Quantitative Study of Society.
University of California, Davis, Distinguished Lecture Series, Departments of Psychology and Political Science.

2005        The Rand Organization, Santa Monica, California.

2006        Harvard University, Department of Psychology.
            Duke University, Social Science Research Institute.
            University of North Carolina, Chapel Hill, Department of Political Science.
            University of Florida, Department of Psychology.
            University of Florida, Department of Political Science.
            University of California, Santa Barbara, Department of Psychology.

2007        The Rand Organization, Santa Monica, California.
            The University of Essex (UK), Department of Government.
            The University of Essex (UK), Institute for Social and Economic Research.

2008        University of Minnesota, Department of Political Science.
            University of California - Berkeley, Department of Political Science – Institute of Governmental Studies.
            Northwestern University, School of Communication.
            University of California - Berkeley, Institute for Personality and Social Research.

2009.       Center for Population Research, University of California - Los Angeles, Los Angeles, California.
            Institute for Science, Technology, and Public Policy, Texas A&M University, College Station, Texas.
            Annette Strauss Institute for Civic Participation, Department of Communication Studies, University of Texas – Austin, Austin, Texas.
            Department of Political and Social Sciences, Universitat Pompeu Fabra, Barcelona, Spain.
            Department of Psychology, University of Washington, Seattle, Washington.
            Department of Psychology, University of California, San Diego.

2010.       Behavioral Science Workshop, Booth School of Business, University of Chicago, Chicago, Illinois.
            Social Psychology Colloquium, Department of Psychology, New York University, New York, New York.

2011        Colloquium Series, Department of Psychology, Arizona State University, Tempe, Arizona.
            Colloquium Series, School of Politics and Global Studies, Arizona State University, Tempe, Arizona.

2012        Political Psychology Colloquium Series, Institute of Governmental Studies, University of California, Berkeley, Berkeley, California.
            Department of Geosciences and Woodrow Wilson School of Public and International Affairs, Princeton, University.
            Department of Psychology, University of Mannheim, Mannheim, Germany.

On-campus Colloquia

| | |
|---|---|
| 1986 | Department of Political Science, Ohio State University.<br>Department of Psychology, Ohio State University. |
| 1987 | Department of Psychology, Ohio State University. |
| 1988 | Department of Psychology, Ohio State University. |
| 1990 | Department of Psychology, Ohio State University. |
| 1991 | Mershon Center World Affairs Seminar, Mershon Center, Ohio State University. |
| 1996 | Behavioral Decision Theory Colloquium Series, Department of Psychology, Ohio State University.<br>CIC Interactive Video Methods Seminar, Department of Political Science, Ohio State University. |
| 1997 | Interdisciplinary Seminar on Survey Research Methods, Center for Human Resource Research, Ohio State University. |
| 1999 | Department of Agricultural, Environmental, and Development Economics, Ohio State University. |
| 2000 | Center for Survey Research, Ohio State University. |
| 2002 | Social Psychology Colloquium Series, Department of Psychology, Ohio State University.<br>Department of Agricultural, Environmental, and Development Economics, Ohio State University. |
| 2003 | Mershon Center Lunch Lecture, The Mershon Center, Ohio State University. |
| 2004 | Global Climate and Energy Project Fall Seminar Series, Stanford University.<br>John S. Knight Fellowship Program Seminar, Stanford University. |
| 2005 | Workshop in Statistical Modeling, Department of Political Science, Stanford University.<br>Environmental Policy Forum, Center for Environmental Science and Policy, Stanford University.<br>Humanities and Sciences Forum, Stanford University.<br>Seminar Series, Summer Research College in Public Policy and Economics, Stanford University. |
| 2006 | Seminar Series, Summer Research College in Public Policy and Economics, Stanford University.<br>Woods Energy Series, Woods Institute for the Environment, Stanford University. |
| 2007 | Ethics @ Noon, Barbara and Bowen McCoy Program in Ethics in Society Lecture Series, Stanford University.<br>Seminar Series, Summer Research College in Public Policy and Economics, Stanford University.<br>Opening Plenary, Society of Environmental Journalists Annual Conference, Stanford University. |

2008 How America Votes: Stanford Professors Answer the Fundamental Questions Raised When
  U.S Citizens Vote.  Workshop sponsored by Stanford in Government.
 Transformational Insights: Participation, Collaboration, and Virtual Worlds for
  Sustainability, Medicine, and Education.  Sixth Media X Annual Meeting, Stanford
  University.
 Social Psychology Research Seminar, Stanford University.
 Lunch Colloquium Series, Public Policy Program, Stanford University.
 Seminar Series, Summer Research College in Public Policy and Economics, Stanford
  University.
 Stanford Parents 'Advisory Board Meeting, Stanford University.

2009 Environmental Forum, Woods Institute for the Environment, Stanford University.
 Woods Institute and School of Earth Sciences Summer Seminar Series, Stanford University.

2010 Research Seminar Series, Center for International Security and Cooperation, Stanford
  University (discussant).
 Faculty Speaker Series, Stanford High School Summer College, Stanford University.
 Seminar Series, Summer Research College in Public Policy and Economics, Stanford
  University.
 The Prison Lunch Series, Stanford Law and Policy Review, Stanford Law School.
 Social Psychology Research Seminar, Stanford University.

2011 Address to the Advisory Council of the Woods Institute for the Environment, Stanford
  University.
 Address to the Advisory Council of the Precourt Institute for Energy, Stanford University.
 Seminar Series, Summer Research College in Public Policy and Economics, Stanford
  University.
 Summer Short Course on Marine Policy, Center for Ocean Solutions, Stanford University.
 Energy @ Stanford & SLAC, Stanford Graduate Summer Institute, Stanford University.
 Engaging with Faculty: Stories from Undergraduate Research and Learning Beyond the
  Classroom, New Student Orientation, Stanford University.
 Energy Seminar sponsored by the Woods Institute for the Environment and the Precourt
  Institute for Energy, Stanford University.
 Invited Presentation, Summer Research College Speaker Series, Public Policy Program,
  Stanford University, Stanford, California.

2012 Member of a Faculty Discussion Panel during the Joint Young Environmental Scholars
  Conference sponsored by the Woods Institute for the Environment and the
  Environmental Norms Workshop sponsored by the Stanford Humanities Center,
  Stanford University.
 Invited Lecture, "Peering Inside the Mind of the American Voter: The Psychology of
  Democracy in Action."  Back to School Class, 2012 Parents 'Weekend, Stanford
  University. http://parentsweekend.stanford.edu/overview/biography - mackey
 Invited Presentation, "A Program of Research on Americans' Thinking about Climate
  Change."  Woods Institute for the Environment Community Retreat, Aptos, California.
 Invited Presentation, "American Public Opinion on Climate Change."  School of Earth
  Sciences Undergraduate Research Program Seminar Series (cosponsored by SURGE
  and the Woods Institute for the Environment).  Stanford University.
 Invited Presentation, Engaging with Faculty: Stories from Undergraduate Research and
  Learning Beyond the Classroom, New Student Orientation, Stanford University.
 Invited Presentation, "Are Elections in America Unfair?  Exploring the Impact of Candidate
  Name Order."  Stanford Parents Association, Stanford University.
 Panel Member, "Election 2012: Reality Check.  A Bloomberg News Post-Presidential-

Debate Debate." Sponsored by the Stanford Graduate Program in Journalism and the Stanford Graduate School of Business Politics and Government Club.

Invited Presentation, Summer Research College Speaker Series, Public Policy Program, Stanford University, Stanford, California.

2013    Invited Presentation, "The Psychology of American Elections: Getting Into the Heads of Voters", Yost House After-Dinner Presentation.

Invited Presentation, Engaging with Faculty: Stories from Undergraduate Research and Learning Beyond the Classroom, New Student Orientation, Stanford University.

Invited Presentation, Summer Research College Speaker Series, Public Policy Program, Stanford University, Stanford, California.

2014    Invited Presentation, "Is it Americans' Fault that the U.S. Government Has Yet to Seriously Limit Greenhouse Gas Emissions?" School of Earth Sciences Undergraduate Research Program Seminar Series (cosponsored by SURGE and SESUR and the Woods Institute for the Environment). Stanford University.

Invited Presentation, "Why Elections Go Wrong: The Impact of the Order of Candidates ' Names on the Ballot." Fred Hillier Lecture Series, English for Foreign Students Program, Stanford University.

Invited Presentation, Engaging with Faculty: Stories from Undergraduate Research and Learning Beyond the Classroom, New Student Orientation, Stanford University.

Invited Panel Member, Sustainable World Coalition's Planet Earth New Play Festival, Stanford University.

Invited Panel Member, "The Climate Debate Demystified: The Psychology, Media, and Communication Behavior Climate Change." Sponsored by Students for a Sustainable Stanford, Stanford University.

Invited Presentation, Summer Research College Speaker Series, Public Policy Program, Stanford University.

Invited Panelist, "Climate Change: From Science to Action." Classes without Quizzes, Stanford University.

2015    Invited Presentation, Engaging with Faculty: Stories from Undergraduate Research and Learning Beyond the Classroom, New Student Orientation, Stanford University.

Invited Presentation, Summer Research College Speaker Series, Political Science Department, Stanford University.

2016    Energy Seminar sponsored by the Woods Institute for the Environment and the Precourt Institute for Energy, Stanford University.

Invited Presentation, Summer Research College Speaker Series, Political Science Department, Stanford University.

Invited Presentation, Engaging with Faculty: Stories from Undergraduate Research and Learning Beyond the Classroom, New Student Orientation, Stanford University.

Invited Presentation, Psychology of the 2016 Election. Stanford in Government Policy Lunch.

Invited Presentation, "The 2016 Election." Epidemiology Supper Club, Stanford University Medical School, Stanford, CA.

2017    Invited Presentation, "Public Opinion on Climate Change", SUPER Faculty Seminar Lunches, Precourt Institute for Energy, Stanford University, Stanford, CA.

Invited Presentation, Summer Research College Speaker Series, Public Policy Program, Stanford University, Stanford, California.

Invited Presentation, Summer Research College Methodology Speaker Series, Political Science Department, Stanford University, Stanford, California.

Invited Presentation, "Why Elections Go Wrong: The Impact of the Order of Candidates ' Names on the Ballot."  Fred Hillier Lecture Series, English for Foreign Students Program, Stanford University.

Invited Presentation, Engaging with Faculty: Stories from Undergraduate Research and Learning Beyond the Classroom, New Student Orientation, Stanford University.

Presentation, Communication Department Faculty Retreat, Stanford University.

2018       Invited Presentation, "The Accuracy of the 2016 Pre-Election Polls."  Seminar Series of the John S. Knight Journalism Fellowship Program, Stanford University, Stanford, CA.

Invited Presentation, "The Impact of Candidate Name Order on Election Outcomes." Neurosciences Journal Club and Professional Development Court, Stanford University, Stanford, CA.

2019       Invited Presentation, Summer Research College Methodology Speaker Series, Political Science Department, Stanford University, Stanford, California.

2020       Presentation, Communication Department Faculty Retreat, Stanford University.

Invited Presentation, "Public Opinion on Climate Change", SUPER Faculty Seminar Lunches, Precourt Institute for Energy, Stanford University, Stanford, CA.

Invited Presentation, Summer Research College Speaker Series, Public Policy Program, Stanford University, Stanford, California.

Invited Presentation, Summer Research College Methods Speaker Series, Political Science Department, Stanford University, Stanford, California.

Wednesdays @ Woods, Woods Institute for the Environment, Stanford University, Stanford, California.

Gender and Politics Tea, Department of Political Science, Stanford University, Stanford, California.

## Other Presentations

2012       Coauthor of presentation by Elisabeth Brüggen (Maastricht University).  "Establishing the Accuracy of Online Panel Research", Waikato Management School, University Of Waikato, Hamilton, New Zealand.

2011.      Coauthor of presentation by Elisabeth Brüggen (Maastricht University).  "Establishing the Accuracy of Online Panel Research", Department of Marketing, Faculty of Business and Economics, Monash University, Melbourne, Australia.

2012.      Coauthor of presentation by Elisabeth Brüggen (Maastricht University).  "Establishing the Accuracy of Online Panel Research", Department of Management and Marketing, Faculty of Business and Economics, University of Melbourne, Melbourne, Australia.

2013.      Coauthor of presentation by Elisabeth Brüggen (Maastricht University).  "Establishing the Accuracy of Online Panel Research", Center for the Study of Choice (CenSoC), University of Technology, Sydney, Australia.

2012       Coauthor of presentation by Elisabeth Brüggen (Maastricht University).  "Establishing the Accuracy of Online Panel Research", School of Marketing, Australian School of Business, University of New South Wales, Sydney, Australia

Conferences Coordinated

1991   Conference Coordinator, Annual Meeting, Society of Experimental Social Psychology, Columbus, Ohio.

1991   Conference Coordinator, "Nags Head Conference on Attitude Strength," Nags Head, North Carolina.

1998   Program Coordinator, Annual Meeting, International Society for Political Psychology, Montreal, Canada.

1.   Conference Chair, Annual Meeting, American Association for Public Opinion Research, Nashville, Tennessee.

2005   Conference Co-Coordinator, "New Approaches to Understanding Participation in Surveys", Belmont Conference Center, Elkridge, Maryland.

2007   Conference Co-Coordinator, "Cyberinfrastructure and National Election Studies: The Wivenhoe House Conference".  University of Essex, Colchester, UK.

2007   Conference Co-Coordinator, "News Media Pollster Input to the American National Election Studies".  Gallup World Headquarters, Washington, DC.

2008   Conference Co-Coordinator, "Optimal Coding of Open-Ended Survey Data, Institute for Social Research, University of Michigan, Ann Arbor, Michigan.

2013   Conference Co-Coordinator, "The Future of Survey Research 1", National Science Foundation, Arlington, Virginia.

2013   Conference Co-Coordinator, "The Future of Survey Research 2", National Science Foundation, Arlington, Virginia.

2014   Conference Co-Coordinator, "Robust Research in the Social, Behavioral, and Economic Sciences", National Science Foundation, Arlington, Virginia.

2015   Conference Co-Coordinator, "Best Practices in Science", Center for Advanced Study in the Behavioral Sciences, Stanford University, Stanford, California.

2015   Conference Co-Coordinator, "How Voters Think: Lessons from Science and Practice."  A meeting of political scientists with Democratic Party campaign consultants.  Harris School of Public Policy, University of Chicago, Chicago, Illinois.

2015   Conference Co-Coordinator, "How Voters Think: Lessons from Science and Practice."  A meeting of political scientists with Republican Party campaign consultants.  Harris School of Public Policy, University of Chicago, Chicago, Illinois.

2017   Conference Coordinator, "Workshop on Implicit Bias."  National Science Foundation, Alexandria, Virginia.

2019   Co-organizer, "Metascience 2019 Symposium."  Sponsored by the Fetzer Franklin Fund, Stanford University, Stanford, California.

Professional Service

| | |
|---|---|
| 1989-1990 | Chair, Student Paper Competition Committee, American Association for Public Opinion Research. |
| 1990 | Member, Planning Committee for the 1990 National Election Study. |
| 1990 | Member, Conference Committee for the 1991 Annual Meeting, American Association for Public Opinion Research. |
| 1991 | Participant in an Expert Questionnaire Evaluation Panel as a part of a Project Comparing Pre-Testing Methods, National Center for Health Statistics. |
| 1994 | Member, Student Paper Competition Committee, American Association for Public Opinion Research. |
| 1995 | Member, National Science Foundation Special Grant Proposal Evaluation Panel on Valuation for Environmental Policy. |
| 1996 | Member, Student Paper Competition Committee, American Association for Public Opinion Research. |
| 1996 | Member, Planning Committee for the 1996 National Election Study. |
| 1997-2001 2003, 2004 | Member, Conference Committee, American Association for Public Opinion Research Annual Meeting. |
| 1998 | Member, Planning Committee for the 1998 National Election Pilot Study. |
| 1999 | Senior Research Advisor, The Gallup Organization. |
| 1997-2006 | Member, Board of Overseers, National Election Studies, Institute for Social Research, University of Michigan. |
| 2000-2003 | Member, Governing Council, International Society of Political Psychology. |
| 2000-2003 | Member, Conference Committee, International Society of Political Psychology. |
| 2000-2002 | Member, Survey Methodology Group of the National Longitudinal Survey of Youth. |
| 2000-2008 | Member, Board of Overseers, General Social Survey, National Opinion Research Center, University of Chicago. |
| 2001 | Member, Advisory Board of the Canadian Election Study, McGill University, University of Montreal, and University of Toronto. |
| 1. | Associate Conference Chair, American Association for Public Opinion Research. |
| 1. | Chair, Committee to Award the Erik H. Erikson Early Career Award for Excellence and Creativity in the Field of Political Psychology, International Society of Political Psychology. |
| 2001 | Member, Visiting Committee to Evaluate a Proposed Ph.D. Program in Survey Research and Methodology, University of Nebraska, Lincoln, Nebraska. |

| | |
|---|---|
| 2002 | Member, Advisory Panel, Special Competition to Fund Research on Survey and Statistical Methodology; Methodology, Measurement, and Statistics Program, National Science Foundation. |
| 2003 | Member, Advisory Board of the Canadian Election Study, McGill University, University of Montreal, and University of Toronto. |
| 2004-2006 | Member, Advisory Committee for the Division of Social, Behavioral, and Economic Sciences, National Science Foundation. |
| 2004-2006 | Member, Scientific Advisory Board, Polimetrix, Palo Alto, California. |
| 2004 | Member, Workshop on Cyberinfrastructure and the Social Sciences, National Science Foundation. |
| 2005 | Organizing committee, Conference entitled "New Approaches to Understanding Participation in Surveys," Belmont Conference Center, Elkridge, Maryland, sponsored by the National Science Foundation. |
| 2005 | Member, Philip E. Converse Book Award Committee, American Political Science Association. |
| 2005 | Member, Nominating committee, International Society for Political Psychology. |
| 2005 | Member, Working Group on Public Attitudes and Ethical Issues, Global Roundtable on Climate Change, Earth Institute, Columbia University. |
| 2006 | Dissertation committee member, William M. van der Veld, Faculty of Social and Behavioral Sciences, University of Amsterdam. |
| 2007 | Participant, "Public Understanding of Mathematics/Mathematicians Understanding the Public" Conference, Mathematical Sciences Education Board, The National Academies, Washington, D.C. |
| 2007 | Associated Scientist, Statistics and Methodology Department, National Opinion Research Center, University of Chicago, Chicago, Illinois. |
| 2007 | Participant, "Workshop on Planning for the Future of the General Social Survey," National Science Foundation, Washington, D.C. |
| 2007- | Member, Advisory Board, Book Series on Political Psychology, Oxford University Press. |
| 2007- | Member, International Advisory Board, Measurement and Experiments in the Social Sciences, Institute for Data Collection and Research, University of Tilburg, The Netherlands. |
| 2008 | Participant, "Meeting to Assess Public Attitudes about Climate Change," sponsored by the National Oceanic and Atmospheric Administration, NASA, and the Center for Excellence in Climate Change Communication Research, Silver Spring, Maryland. |
| 2008 | Participant, The Harvard Globalization Survey Workshop, Harvard University, Cambridge, Massachusetts. |

2008-2012      Member, Board of Directors, Climate Central, Princeton, New Jersey, and Palo Alto,
               California.

2008.          Panel Participant, Career Day, Menlo School, Menlo Park, California.

2009-2010      Member, AAPOR Opt-in Panel Online Panel Task Force.

2012.          Chair, Committee to Conduct a Site Visit Review of the General Social Survey for the
               National Science Foundation.

2011-2016      Member, Advisory Committee for the Division of Social, Behavioral, and Economic
               Sciences, National Science Foundation.

2012           Member, Policy Impact Award Committee, American Association for Public Opinion
               Research.

2012           Member, Advisory Committee on Study to Evaluate the Impact of Survey Response Rates,
               Pew Researcher Center, Washington, DC.

2012-          Member, Advisory Board, Voice of the People.

2012           Chair, Subcommittee on the Future of Survey Research, Advisory Committee for the
               Division of Social, Behavioral, and Economic Sciences, National Science Foundation.

2013-2016      Member, Governing Council, International Society of Political Psychology.

2012-2015      Member, Subcommittee on Replication in Social, Behavioral, and Economic Science
               Research, Advisory Committee for the Division of Social, Behavioral, and Economic
               Sciences, National Science Foundation.

2014-          Member, International Advisory Board, Norwegian Citizen Panel, Digital Social Science
               Core Faculty, University of Bergen, Bergen, Norway.

2015-2016      Member, Standing Committee on the Future of NSF-Supported Social Science Surveys,
               Committee on National Statistics, Division of Behavioral and Social Science and
               Education, The National Academies of Sciences, Engineering, and Medicine.

2016           Chair, Committee to Award the Noel Markwell Media Award, International Society of
               Political Psychology.

2016-2017      Member, Committee to Award the AAPOR Mitofsky Innovators Award, American
               Association for Public Opinion Research.

2016-2017      Member, Subcommittee on Workplace Climate and Harassment, Working Group on
               Diversity, National Institutes of Health.

2017           Member, Committee on AAPOR Standard and Litigation Surveys.  American Association
               for Public Opinion Research.

2018           Co-convener, CPS Forum on Measuring Voter Turnout, Summer at Census, U.S. Census
               Bureau, Suitland, Maryland.

| | |
|---|---|
| 2019 | Member, Dissertation Committee of Elias Assaf, Department of Political Science, Ohio State University, Columbus, Ohio. |
| 2020 | Chair, Selection Committee for the Frontiers of Knowledge Award in Humanities and Social Sciences, BBVA Foundation, Madrid, Spain. |

## Department and University Service

| | |
|---|---|
| 1985-1996 1985-1996 2001-2003 | Faculty Advisor, Social Psychology Colloquium Series, Ohio State University. |
| 1985-1990 | Chair, Social Psychology Area Admissions Committee, Ohio State University. |
| 1985-1990 | Member, Psychology Department Admissions Committee, Ohio State University. |
| 1986-1987 | Member, Psychology Department Stipends Committee, Ohio State University. |
| 1986-1988 | Member, Lazenby Equipment Committee, Ohio State University. |
| 1986-1987 | Member, Social Psychology Area Search Committee for Two Permanent Senior Faculty Members, Ohio State University. |
| 1988-1989 | Member, Social Psychology Area Search Committee for Junior Faculty Member, Ohio State University. |
| 1990-1991 | Member, Search Committee for Junior Faculty Member in Industrial/Organizational Psychology, Ohio State University. |
| 1989-1994 | Co-Coordinator, Political Psychology Minor Program Steering Committee, Political Science Department, Ohio State University. |
| 1989-1996, 1999-2003 | Member, Psychology Department Speakers Committee, Ohio State University. |
| 1990-1996 | Member, Psychology Department Subject Pool Supervisory Committee, Ohio State University. |
| 1. | Chair, College of Social and Behavioral Sciences Survey Research Advisory Committee, Ohio State University. |
| 1. | Member, Political Science Department Search Committee, Ohio State University. |
| 1997-2003 | Member, College of Social and Behavioral Sciences Center for Survey Research Advisory Committee, Ohio State University. |
| 2000 | Chair, Social Psychology Senior Faculty Search Committee, Ohio State University. |
| 2000 | Member, College of Social and Behavioral Sciences Oversight Committee for the Center for Human Resource Research, Ohio State University. |
| 2001-2003 | Member, Psychology Department Promotion and Tenure Committee, Ohio State University. |
| 1. | Chair, Social Psychology Junior Faculty Search Committee, Ohio State University. |

| | |
|---|---|
| 2002 | Faculty advisor, Summer Research Opportunity Program, Committee on Instructional Cooperation (CIC), Ohio State University. |
| 1. | Member, Planning Committee for the Social Science Research Institute, Stanford University. |
| 2003-2004 | Member, Steering Committee for the Methods of Analysis Program in the Social Sciences, Stanford University. |
| 2004- | Faculty Affiliate, Center for Comparative Studies in Race and Ethnicity, Stanford University. |
| 2004 | Grant proposal review committee, Environmental Interdisciplinary Initiatives Program, Stanford Institute for the Environment, Stanford University. |
| 2004-2005 | Planning Committee for the Stanford Center on Longevity, Stanford University. |
| 2005-2008 | Member, Faculty Leadership Committee, Stanford Institute for the Environment, Stanford University. |
| 2006 | Grant proposal review committee, Environmental Venture Grants Program, Woods Institute for the Environment, Stanford University. |
| 2007 | Co-chair, Grant proposal review committee, Environmental Venture Grants Program, Woods Institute for the Environment, Stanford University. |
| 2012- | Member, Grant proposal review committee, Environmental Venture Grants Program, Woods Institute for the Environment, Stanford University. |
| 2012-2016 | Member, Course Evaluation Committee, Stanford University. |
| 2012-2013 | Member, Provost's Advisory Committee on Postdoctoral Affairs, Stanford University. |
| 2012 | Member, Evaluation committee for applicants to the Emmett Interdisciplinary Program in Environment & Resources, Stanford University. |
| 2013 | Member, Evaluation committee for applicants to the Emmett Interdisciplinary Program in Environment & Resources, Stanford University. |
| 2014 | Member, Evaluation committee for applicants to the Emmett Interdisciplinary Program in Environment & Resources, Stanford University. |

Ad Hoc Reviewer

Journal of Personality and Social Psychology
Journal of Experimental Social Psychology
Personality and Social Psychology Bulletin
Social Psychology Quarterly
European Journal of Social Psychology
Social Cognition
Basic and Applied Social Psychology
Journal of Personality
Psychological Review
Psychological Bulletin

Psychological Science
Psychological Assessment
Personality and Social Psychology Review
Psychology and Aging
Risk Analysis
Psychology, Public Policy, and Law
American Political Science Review
American Journal of Political Science
British Journal of Political Science
American Politics Quarterly
Western Political Quarterly
Political Research Quarterly
Political Behavior
Research and Politics
Journal of Politics
Political Analysis
Harvard International Journal of Press/Politics
Southeastern Political Review
Public Opinion Quarterly
International Journal of Public Opinion Research
Journal of Survey Statistics and Methodology
Journal of the Royal Statistical Society
Political Psychology
Political Communication
Election Law Journal
International Studies Quarterly
American Sociological Review
Sociological Methods and Research
Sociological Methodology
Social Science Quarterly
Social Problems
Journal of Official Statistics
Journal of the American Statistical Association
Journal of Economic Psychology
Journal of Law, Economics, and Organization
Communication Research
Journal of Consumer Research
Journal of Science Communication
Journal of Research in Personality
Developmental Psychology
Environmental Research Letters
Tobacco Control
Motivation and Emotion
Psychophysiology
Climatic Change
Climate Change Letters
Review of Policy Research
Annals of Epidemiology
Communication Methods and Measures
Preventive Medicine
New Jersey Medicine
Health Education and Behavior
Journal of Medical Internet Research
Academic Press

Praeger Publishers
Alfred A. Knopf Publishers
Brooks/Cole Publishing Company
Harper and Row Publishers
MacMillan Publishing Company
Cambridge University Press
Oxford University Press
W. W. Norton
W. H. Freeman
National Academy of Sciences
National Science Foundation - Social Psychology Program
National Science Foundation - Sociology Program
National Science Foundation - Political Science Program
National Science Foundation - Program in Methodology, Measurement, and Statistics in the Social Sciences
Society for Consumer Psychology
American Psychological Association
Time-sharing Experiments for the Social Sciences (TESS)
University of Michigan, Department of Political Science (P&T)
University of Minnesota, Department of Political Science (P&T)
University of Minnesota, Department of Psychology (P&T)
University of Southern California, Department of Psychology (P&T)
University of Texas – Austin, Department of Communication Studies (P&T)
London School of Economics and Political Science, Methodology Institute (P&T)
University of Nebraska, Department of Political Science (P&T)
University of Nebraska, Department of Psychology (P&T)
University of Nebraska, Department of Sociology (P&T)
Massachusetts Institute of Technology, Department of Political Science (P&T)
University of Chicago, Harris School of Public Policy (P&T)
University of Chicago, Department of Political Science (P&T)
Iowa State University, Department of Psychology (P&T)
Ohio State University, University Libraries (P&T)
University of Florida, Department of Psychology (P&T)
University of Nebraska, Lincoln, Department of Sociology (P&T)
University of Pennsylvania, Department of Political Science (P&T)
Institute for Social Research, University of Michigan (P&T)
Columbia University, Department of Political Science (P&T)
American University, School of Public Affairs (P&T)
Center for Advanced Study in the Social and Behavioral Sciences
University of Mannheim, School of Social Sciences, Department of Political Science (P&T)
Netherlands Institute for Advanced Study in the Humanities and Social Sciences
Netherlands Organisation for Scientific Research, Division of Social Sciences
Workers 'Compensation Board of British Columbia
Fund for Scientific Research – Flanders, Brussels, Belgium


Consulting and Court Testimony

Office of Science and Technology Policy, The White House, Washington D.C.
Socio-Environmental Studies Laboratory, National Institutes of Health, Washington, D.C.
National Oceanic and Atmospheric Administration, Washington, D.C.
Environmental Protection Agency, Washington, D.C.
National Aeronautics and Space Administration (Robert Dodd and Associates/The Battelle Memorial Institute),
        Mountain View, California.
Center for Survey Methods Research, U.S. Bureau of the Census, Washington, D.C.

Office of Survey Methods Research, U.S. Bureau of Labor Statistics, Washington, D.C.
Leadership Analysis Group, U.S. Central Intelligence Agency, McLean, Virginia.
United States Government Accountability Office, Washington, DC.
Centers for Disease Control and Prevention, Atlanta, Georgia.
National Cancer Institute, Rockville, Maryland.
Centre for Comparative Social Surveys, City University, London, United Kingdom.
Rand Corporation, Santa Monica, California.
SRI International, Arlington, Virginia.
YouGov, London, United Kingdom.
Momentum Market Intelligence, Portland, Oregon.
Central Market Research and Insights, Microsoft, Redmond, Washington.
The Urban Institute, Washington, D.C.
Industrial Economics, Cambridge, Massachusetts.
Healthcare Research Systems, Columbus, Ohio.
Survey Research Center, University of Maryland, College Park, Maryland.
Center for Human Resource Research, Columbus, Ohio.
Washington State University, Pullman, Washington.
Stanford University Alumni Association, Stanford, California.
Turner Research, Jacksonville, Florida.
NuStats, Austin, Texas.
Kaiser Family Foundation, Menlo Park, California.
University of Pittsburgh Medical Center, Pittsburgh, Pennsylvania.
Achievement Associates, Darnestown, Maryland.
The Saguaro Seminar: Civic Engagement in America, Harvard University, Cambridge, Massachusetts.
Office of Social Research, CBS Inc., New York, New York.
ABC News, New York, New York.
Home Box Office, New York, New York.
Google, Mountain View, California.
Pfizer, Inc., New York, New York.
Amgen, Thousand Oaks, California.
Beau Townsend Ford Dealership, Dayton, Ohio.
United States Trotting Association, Columbus, Ohio.
Berlex Laboratories, Inc., Wayne, New Jersey.
MJ Research, Waltham, Massachusetts.
Empire Blue Cross/Blue Shield, New York, New York.
Nike, Inc., Portland, Oregon.
U.S. Senator Brian Schatz (Hawaii)
The Attorney General of Oklahoma.
Office of Lake County Prosecuting Attorney, Painesville, Ohio.
The Attorney General of the State of Ohio, Columbus, Ohio.
Donald McTigue, Esq., Columbus, Ohio.
Thompson Coburn LLP, St. Louis, Missouri.
Shook, Hardy, & Bacon LLP, Kansas City, Missouri.
Arnold and Porter LLP, New York, New York.
Bradley W. Hertz, Esq., Los Angeles, California.
Larson King LLP, Minneapolis, Minnesota.
Paul, Hastings, Janofsky, and Walker, LLP, San Francisco, California.
Carr, Korein, Tillery, LLP, Chicago, Illinois.
Milberg, Weiss, Bershad, Hynes, and Lerach, LLP, New York, New York.
Bourgault & Harding, Las Vegas, Nevada.
Akin Gump Strauss Hauer & Feld, LLP, Washington, DC.
McManemin and Smith, PC, Dallas, Texas.
Zimmerman Reed, PLLP, Minneapolis, Minnesota.
Spolin Silverman, Cohen, and Bertlett LLP, Santa Monica, California.

Righetti Wynne P.C., San Francisco, California.
Blackwell Sanders Peper Martin LLP, Kansas City, Missouri.
Davis Wright Tremaine LLP, Seattle, Washington.
Storch Amini & Munves, P.C., New York, New York.
Marc O. Stern, APC, La Jolla, California.
Morris, Sullivan, & Lemkul, LLP, San Diego, California.
Twomey Law Office, Epsom, New Hampshire.
KamberLaw LLC, New York, New York.
Righetti Law Firm, P.C., San Francisco, California.
Dostart Clapp Gordon & Coveney LLP, San Diego, California.
Wynne Law Firm, Greenbrae, California.
Lorens and Associates, San Diego, California.
Arias, Ozzello & Gignac, LLP, Los Angeles, California.
Righetti Glugoski, P.C., San Francisco, California.
Kaplan Fox, & Kilsheimer LLP, San Francisco, California.
Perkins Coie, LLP, Washington, DC.
Levi & Korsinsky LLP, Stamford, Connecticut.
King, Blackwell, Zehnder, & Wermuth, P. A., Orlando, Flor
Keller Grover, LLP, San Francisco, California.
Law Offices of Kevin T. Barnes, Los Angeles, California.
Cohelan & Khoury, San Diego, California.
Rastegar & Matern, Torrance, California.
Law Offices of Joseph Antonelli, West Covina, California.
Minter Ellison Lawyers, Sydney, Australia.
Silverman Thompson Slutkin White LLC, Baltimore, Maryland.
Namanny Byrne, & Owens, P.C.  Lake Forest, California
Robbins, Geller, Rudman, & Dowd, LLP, Boca Raton, Florida.
Callahan and Blaine, Santa Ana, California.
Richardson, Patrick, Westbrook, and Brickman, Mount Pleasant, South Carolina.
Hurst and Hurst, San Diego, California.
Leonard Carder, San Francisco, California.
Initiative Legal Group, Los Angeles, California.
Khorrami Pollard & Abir, Los Angeles, California.
Rukin, Hyland, Doria, and Tindall, San Francisco, California.
Carlson, Calladine, & Peterson, San Francisco, California.
Munger, Tolles, & Olson, Los Angeles, California.
American Civil Liberties Union of Northern California/Brad Seligman/Howard, Rice, Nemerovski, Canady,
          Falk, & Rabkin, San Francisco/Berkeley, California.
Foley & Lardner LLP, San Francisco, California.
Law Offices of Sima Fard, Irvine, California.
Rifkin, Livingston, Levitan, & Silver, Annapolis, Maryland.
Altshuler Berzon LLP, San Francisco, California.
Law Offices of Hathaway, Perrett, Webster, Powers, Chrisman, & Gutierrez, Ventura, California.
R. Rex Parris Law Firm, Lancaster, California.
McCune Wright, LLP, Redlands, California.
Gustafson Gluek PLLC, Minneapolis, Minnesota.
Saltz, Mongeluzzi, Barrett, & Bendesky, P.C.  Philadelphia, Pennsylvania.
Reinhardt, Wendorf, & Blanchfield, St. Paul, Minnesota.
Wexler Wallace LLP, Chicago, Illinois.
Cotchett, Pitre, & McCarthy, Burlingame, California.
Berman De Valerio, San Francisco, California.
Marlin & Saltzman, Agoura Hills, California
Lawyers for Justics, Glendale, California.
Klafter, Olsen, & Lesser LLP, Rye Brook, New York.

Shavitz Law Group, P.A., Boca Raton, Florida.
Capstone Law APC, Los Angeles, California.
Law Offices of Ronald A. Marron, San Diego, California.
Del Mar Law Group, San Diego, California.
Stonebarger Law, Folsom, California.
Cahill Gordon & Reindel, New York, New York.
Hogue & Belong, San Diego, California.
Morris Sullivan Lemkul, San Diego, California.
Traber & Voorhees, Pasadena, California.
Workman Law Firm, San Francisco, California.
Kingsley & Kingsley, Encino, California.
Shenoi Koes, Pasadena, California.
KamberLaw, Denver, Colorado.
Powell and Majestro, Charleston, West Virginia.
Coopersmith Brockelman, Phoenix, Arizona.
Lieff Cabraser Heimann & Bernstein, San Francisco, California.
Setareh Law Group, Beverly Hills, California.
U.S. Federal Trade Commission, Washington, DC.
Matern Law Group, Manhattan Beach, California.
Sultzer Law Group, New York, New York.


Short Courses on Questionnaire Design

Internal Revenue Service, Washington, DC.
United States General Accounting Office, Washington, DC.
Office of Management and Budget, The White House, Washington, DC.
United States Government Accountability Office, Washington, DC.
United States Federal Trade Commission, Washington, DC.
United State Census Bureau, Suitland, Maryland.
Science Resources Statistics Program, National Science Foundation, Washington, DC.
National Opinion Research Center, Chicago, Illinois.
Survey Research Laboratory, University of Illinois at Chicago, Chicago, Illinois.
Center for AIDS Prevention Studies, Department of Epidemiology and Biostatistics, University of California,
    San Francisco, California.
Monitor Company, Cambridge, Massachusetts.
American Association for Public Opinion Research Annual Meeting, St. Louis, Missouri.
American Association for Public Opinion Research Annual Meeting, Portland, Oregon
American Association for Public Opinion Research Annual Meeting, Miami, Florida
New York Chapter of the American Association for Public Opinion Research, New York, New York.
Office for National Statistics, London, United Kingdom.
Market Strategies, Southfield, Michigan.
Lake Research Partners, Washington, DC.
Total Research Corporation, Princeton, New Jersey.
Pfizer, Inc., New York, New York.
Worldwide Market Intelligence Conference, IBM, Rye, New York.
American Society of Trial Consultants Annual Meeting, Williamsburg, Virginia.
American Society of Trial Consultants Annual Meeting, Westminster, Colorado.
American Society of Trial Consultants Annual Meeting, Memphis, Tennessee.
American Marketing Association Advanced Research Techniques Forum, Vail, Colorado.
Satisfaction Research Division, IBM, White Plains, New York.
American Marketing Association Marketing Effectiveness Online Seminar Series.
Faculty of Education, University of Johannesburg, Johannesburg, South Africa.
Odom Institute, University of North Carolina, Chapel Hill, North Carolina (2005 and 2009)

Google, Mountain View, California.
Eric M. Mindich Encounters with Authors, Harvard University, Cambridge, Massachusetts.
RTI International, Research Triangle Park, North Carolina.
BC Stats, Province of British Columbia Ministry of Labour and Citizens 'Services, Victoria, British Columbia, Canada.
Alphadetail, San Mateo, California.
Amgen, Thousand Oaks, California.
Center for Political Studies, Institute for Social Research, University of Michigan, Ann Arbor, Michigan.
San Jose State University, San Jose, California.
Summer School 2008, Australian Market and Social Research Society, Coffs Harbour, New South Wales, Australia.
Professional Development Program, Australian Market and Social Research Society, Sydney, Australia (2008 and 2009).
Professional Development Program, Australian Market and Social Research Society, Melbourne, Australia.
Professional Development Program Webinar, Australian Market and Social Research Society (2012).
Zentrum für Umfragen, Methoden und Analysen (ZUMA), Mannheim, Germany.
Department of Marketing, University of Illinois, Urbana-Champaign, Illinois.
Comparative Survey Research and Methodology Workshop, sponsored by TNS Opinion and the Centre for the Study of Political Change at the University of Siena, Brussels, Belgium (2010 and 2011).
Department of Survey Design and Methodology, GESIS - Leibniz Institute for the Social Sciences, Mannheim, Germany.
Methodology Institute, London School of Economics and Political Science, London, United Kingdom.
Summer School 2013, Australian Market and Social Research Society, Gold Coast, Australia.
Social Science Research Laboratories, University of Saskatchewan, Saskatchewan, Canada (2015).


University Teaching

Summer Institute in Political Psychology (Instructor and Co-Director), Political Science and Psychology 892A, 892B, Ohio State University.

Research Methods in Social Psychology, Psychology 872, Ohio State University.

Systematic Theory in Social Psychology, Psychology 873C, Ohio State University.

Psychological Perspectives on Political Behavior, Psychology 873D, Ohio State University.

The Psychology of Mass Politics, Political Science 894, Ohio State University.

Questionnaire Design for Attitude Measurement, Psychology 788, Ohio State University.

Supervisor of graduate student TAs teaching Introduction to Social Psychology, Psychology 320, Ohio State University.

Introduction to Social Psychology, Psychology H320 & H367.01, Ohio State University.

The Psychology of Public Attitudes, Psychology 630, Ohio State University.

Survey Design, Clinical Research Curriculum Program, College of Medicine, College of Optometry, and School of Public Health, Ohio State University.

Questionnaire Design for Attitude Measurement, Psychology 711, Summer Institute in Survey Research Techniques, University of Michigan.

Cognitive Psychology and Survey Methods, Psychology 988, Summer Institute in Survey Research Techniques, University of Michigan.

Response Scales for Satisfaction Measurement, Joint Program in Survey Methodology, University of Maryland-University of Michigan.

Designing Effective Questionnaires, Methodology Institute, London School of Economics and Political Science, London, United Kingdom.

Techniques for Assessing Questionnaire Quality, Department of Methodology and Statistics, University of Amsterdam, The Netherlands.

Assessment of Questionnaire Quality, Interuniversity Graduate School of Psychometrics and Sociometrics, University of Amsterdam, The Netherlands.

Advanced Issues in Questionnaire Design, Psychology 688, Summer Institute in Survey Research Techniques, University of Michigan.

The Study of Political Change at the Individual Level: The Panel Study, 2001 TMR Winter School in Comparative Electoral Research, University of Amsterdam, The Netherlands.

Aviation Marketing (guest lecture), Aviation and Aeronautical Engineering 654, Ohio State University.

Advanced Questionnaire Design: Maximizing Reliability and Validity, Essex Summer School in Social Science Data Analysis and Collection, Department of Government, University of Essex, UK.

Introduction to Communication Theory (guest lecturer), Communication 311, Stanford University.

Media Technologies, People, and Society (guest lecturer), Communication 1, Stanford University.

Graduate Research Methods (guest lecturer), Psychology 290, Stanford University.

Questionnaire Design for Surveys and Laboratory Experiments: Social and Cognitive Perspectives, Communication 239, Stanford University.

Survey Research Methods: Describing Large Populations with Small Samples and Precise Measures, Communication 135, Stanford University.

Advanced Research Design, Communication 318, Stanford University.

Subjective Measurement in Surveys, Joint Program in Survey Methodology, University of Maryland-University of Michigan.

Summer Institute in Political Psychology (instructor, co-director, and director), Stanford University.

Communication Research Methods, Communication 106/206, Stanford University.

New Models and Methods in the Social Sciences (lecturer), Sociology 384, Stanford University, 2000, 2011, 2012, 2013, 2014, 2017.

Coping with Climate Change: Life after Copenhagen (guest lecturer), Continuing Studies Sci 31, Stanford University.

What the American Public Believes about Climate Change (guest lecture), Introduction to Earth Systems, Earth
    Systems 10, Stanford University.

Language and Attitudes (guest lecture), Topics in Sociolinguistics, Linguistics 259, Stanford University.
The Psychology of Communication about Politics in America, Communication 164, 264; Political Science
    224L, 324, Psychology 170, Stanford University.

Introduction to Communication (guest lecture), Communication 1A, Stanford University.

Research Methods Lecture Series (guest lecture on Questionnaire Design), Summer Research College Program,
    Political Science Department, Stanford University.


Mentions of Research in newspaper Editorials

New York Times Editorial Board (September 20, 2020).  After fire and floods, glimmers of hope.  New York
    Times.


Selected News Media Coverage of Research, Interviews, and Quotes

The New York Times
The Washington Post
The Wall Street Journal
The Christian Science Monitor
USA Today
US News and World Report
The Economist
New Scientist Magazine
Science
Scientific American
Nature
Popular Science
Glamour
Time
Newsweek
Business Week
The Akron Beacon Journal
The Alameda Times-Star
The Appeal-Democrat (Marysville, CA)
The Athens Banner-Herald
The Anchorage Daily News
The Austin American-Statesman
The Bellingham Herald (Bellingham, WA)
The Boston Globe
The Bryan-College Station Eagle
The Bucks County Courier Times
The Buffalo News
The Centre Daily Times (State College, PA)
The Charlotte Observer
The Chattanooga Times Free Press
The Chicago Tribune
The Chicago Sun-Times
The Chronicle Telegram (Elyria, OH)

Chronicle of Higher Education
The Cleveland Plain Dealer
The Clovis News Journal (Clovis, NM)
The Columbus Dispatch
The Contra Costa Times (Walnut Creek, CA)
The Courier Times (Levittown, PA)
The Daily Review (Hayward, CA)
The Dallas Morning News
The Dayton Daily News
The Denver Post
The Desert Sun
The Detroit Free Press
The Durango Herald
The Fort Wayne Journal Gazette
The Fort Worth Star-Telegram
The Grand Rapids Press
The Herald Sun (Durham, NC)
The Houston Chronicle
Idaho Press
The Indianapolis Star
The Kansas City Star
The Kentucky Post
The Ledger (Lakeland, Florida)
The Lansing State Journal
The Lexington Herald Leader
The Lincoln Journal Star (Lincoln, NE)
The Los Angeles Sentinel
The Los Angeles Times
The Louisville Courier-Journal
The Manitowoc Herald Times Reporter
The Metropolitan News-Enterprise (Los Angeles,
    CA)
The Miami Herald

The Minneapolis Star Tribune
The Mobile Register
The Monterey County Herald
The Morning Call (Allentown, PA)
The Nashua Telegraph
The New Haven Register
Niagara Gazette, Niagara Falls, New York
The Oakland Post
The Oakland Tribune
The Ohio County Monitor
The Orlando Sentinel
The Palm Beach Daily News
The Philadelphia Inquirer
The Portland Press Herald
The Reading Eagle (Reading, PA)
The Rocky Mountain News
The Sacramento Bee
The St. Petersburg Times, St. Petersburg, Florida
The San Francisco Chronicle
The San Francisco Examiner
The Sarasota Herald Tribune
Savannah Morning News
The Seattle Times
The Seattle Post Intelligencer
The Southern Ledger
The Spokane Spokesman-Review
The Springfield News Leader
The Springville Journal
The Staten Island Advance
The Statesman Journal (Salem, Oregon)
The Scranton Times-Tribune (Scranton,
Pennsylvania)
The Star Democrat (Easton, MD)
The Syracuse Post-Standard
The Tampa Tribune
The Titusville Herald
The Union-News and Sunday Republican
The Washington Examiner
The Washington Times
The Wenatchee World
The Wichita Eagle
The Wisconsin State Journal
The Worcester Telegram (Massachusetts)
The York Daily Record
The York Dispatch (York, PA)
Wyoming Tribune Eagle
The Barre Montpelier Times Argus
The Rutland Herald
The La Crosse Tribune
The Eagle (Bryan-College Station, Texas)
The Times-Tribune (Northeast Pennsylvania)
The Pocono Record
The Tribune Review (Pittsburgh Pennsylvania)
The Mercury (Pottstown)

The Reporter (Vacaville, California)
The Spectrum and Daily News (Mesquite, Nevada)
The Corpus Christi Caller Times
The Palladium-Item (Richmond, Indiana)
Standard Speaker (Hazelton, Pennsylvania)
LNP (Lancaster, Pennsylvania)
The Canton Repository
The Ocala Star Banner (Ocala, Florida)
The Gainesville Sun
The Times Standard (Eureka, California)
The Arizona Daily Sun
The Times-Reporter (New Philadelphia, Ohio)
The Patriot Ledger (Quincy, Massachusetts)
The Berkshire Eagle (Pittsfield, Massachusetts)
The Herald Bulletin (Anderson, Indiana)
Journal Review (Indianapolis, Indiana)
Post Bulletin (Minnesota)
Times Leader (Pennsylvania)
The Union Democrat (California)
The Gulf Today
Aftenposten (Norway)
Journal de Montreal
Journal de Quebec
Le Point (France)
L'Express (France)
Sciences Et Evenir (France)
RTL Info (Luxembourg)
RTBF.be (Belgium)
10 Minuten (Switzerland)
Infobae (Argentina)
Estado de Minas (Brazil)
Yahoo! Brazil
El Heraldo (Honduras)
UOL (Brazil)
MSN Brasil
Courrier International (France)
Tampa Bay Times
Ottawa Citizen
The Jerusalem Post
Black Star News
The Economist
The Financial Times (London)
The Guardian
The International Herald Tribune
The Birmingham Post
The International Herald Tribune
Raleigh News & Observer
Strait Times (Singapore)
EcoWatch
Greentech Media
Yahoo! News Malaysia
The Canary (UK)
Marseille News (France)
One Green Planet

Callaway Climate Insights
Le Tribune (Canada)
Le Droit (Canada)
Le Soleil (Canada)
Le Nouvelliste (Canada"
Fair Planet
MarketWatch
Next Avenue
The Scotsman
The Sunday Mail
The Express
El Espectador (Columbia)
Dagens Nyheter (Sweden)
Japan Today
Global Times
UDG TV (Mexico)
Le Journal de Montreal (Canada)
Philstar (The Phillipines)
El Heraldo (Columbia)
Istoe Dinheiro (Brazil)
La Masellaise (France)
Channel News Asia
The Stanford Daily
The Ohio State University Lantern
The Telegraph-Journal, Saint John, New
Brunswick, Canada
Campaigns and Elections
Newhouse News Service
The Associated Press
United Press International
Gannett News Service
Barrons
AFP
Bloomberg
Bloomberg Green
The Atlantic
Forbes
Fortune
The Nation
This Magazine
Good Housekeeping
OneGreenPlanet
Carbon Pulse
Clean Technica
Texas Cliamte News
Inside Climate News
Missoula Current
Axios
The Canary
The Daily Beast
E&E News
Grist
Politifact
Law 360

The Fulcrum
Psychology Today
California
Air Safety Weekly
Mother Jones
National Journal
New York Magazine
Columbia Journalism Review
American Psychological Association Monitor
The Voice of America
ABC World News Sunday
ABC World News This Morning
ABC World News Now
BBC News
BBC World Service
Colorado Public Radio News
MSNBC
CBC Television News
CNN, Lou Dobbs Tonight
Fox News
WCMH TV, Columbus, Ohio
WBNS TV, Columbus, Ohio
Ohio News Network TV, Columbus, Ohio
WSYX TV, Columbus, Ohio
WOSU AM, Columbus, Ohio
WOSU FM, Columbus, Ohio
KGO-TV, San Francisco, California
KGO AM, San Francisco, California
KPCC, Pasadena, California
KTVU, Oakland, California
Bloomberg Radio
Pentagon Channel, Sirius Radio
Air America
Rush Limbaugh
Jerry Doyle
Morning in American (syndicated radio program)
CSPAN-1
Washington Week with Gwen Ifill
New Hampshire Public Radio.
KCBS, San Francisco.
WDET, Detroit.
Weekend Edition Saturday, National Public Radio
(1992, 2006;
http://www.npr.org/templates/story/story.ph
p?storyId=6471972)
Science Friday, National Public Radio (2012,
http://sciencefriday.com/segment/10/26/201
2/in-twitter-we-trust-can-social-media-
sway-voters.html)
Living on Earth, National Public Radio
(http://www.loe.org/shows/shows.htm?prog
ramID=06-P13-00015#feature5)
The Savage Nation (nationally syndicated radio
program)

Andrew Wilkow, Sirius Patriot 144, Sirius Radio
The Climate Code, The Weather Channel.
OnPoint, E&E TV
(http://www.eande.tv/video_guide/612?search_terms=krosnick&page=1&sort_type=date)
Conde Naste Portfolio
The Hill
Discovery News
International Business Times
ABCNews.com
CBSNews.com
Slate.com
Aero-news.net
Naturalnews.com
Huffingtonpost.com
Realclearpolitics.com
PhysOrg.com
Bigpicnews.com
Climatecrocks.com
Sandwich Climate
Climateprogress.org
Climatesciencewatch.org
DailyKos.com
Tucson.com
Pinal Central
AZ Law
KAWC News
AZCentral
Phoenix New Times
Blog for Arizona
AccuWeather
KTAR News
KJZZ News
The Omnibus Online
The Daily Athenaeum
YubaNet
Eurasia Review
Clean Technica
OOSKAnews
Hamodia

WBUR News
Aemrican Enterprise Institute
Deccanherald
NBC News.com
Sciencecentric.com
Miller-McCune.com
Scienceblogs.com
Energysavingsweekly.com
Scientificblogging.com
Careerscientist.com
Scienceblogs.com
Sierraclub.com
Hillheat.com
Projectgroundswell.com
Climatewatch (KQED.org)
Pollster.com
Kuratkull.com
Nature.com
National Review Online
CNYcentral.com
WTOP.com
WBUR
Treehugger
Inside EPA
Grist
Channel4000.com
AARP.org
Pentagraph.com
Environmentalhealthnews.com
Wattsupwiththat.com
Daily.sightline.org
Alternet.org
Greenreport.it
Word.Emerson.edu
DailyFreePress.com
Thnkprogress.org
Podcast: Stanford School of Medicine 1:2:1:
      http://med.stanford.edu/121/2010/krosnick.html
"Gibson on Fox",  Fox News Radio
"To the Point", KCRW Radio

Theses and Dissertations Supervised

Boninger, D. S.  (1988).  The determinants of attitude importance.  Master's Thesis.  Ohio State University.

Chuang, Y. C.  (1988).  The structure of attitude strength.  Master's Thesis.  Ohio State University.

Roman, R. J.  (1988).  A cognitive dissonance interpretation of the timing of punishment.  Honors Thesis.  Ohio State University.

Chuang, Y. C.  (1989).  Policy voting and persuasion in American presidential elections: The role of attitude importance.  Ph.D. Dissertation.  Ohio State University.

Kost, K. A. (1989). Complexity as a situationally modifiable property of cognitive structure. Master's Thesis. Ohio State University.

Li, F. (1989). Order of information acquisition and the effect of base-rates on social judgments. Master's Thesis. Ohio State University.

Berent, M. K. (1990). Attitude importance and the recall of attitude-relevant information. Master's Thesis. Ohio State University.

Betz, A. L. (1990). Backward conditioning of attitudes using subliminal photographic stimuli. Master's Thesis. Ohio State University.

Fabrigar, L. R. (1991). The effect of question order and attitude importance on the false consensus effect. Master's Thesis. Ohio State University.

Reed, D. R. (1991). Associative memory structure and the evaluation of political leaders. Ph.D. Dissertation. Ohio State University.

Berent, M. K. (1994). Attitude importance and information processing. Ph.D. Dissertation. Ohio State University.

Narayan, S. S. (1994). Response effects in attitude surveys: An examination of the satisficing explanation. Master's Thesis. Ohio State University.

Miller, J. M. (1994). Mediators and moderators of agenda-setting and priming. Master's Thesis. Ohio State University.

Smith, W. A. (1995). Mental coin-flipping and non-differentiation in surveys: Tests of satisficing hypotheses. Honors Thesis. Ohio State University.

Visser, P. S. (1995). The relation between age and susceptibility to attitude change: A new approach to an old question. Master's Thesis. Ohio State University.

Narayan, S. S. (1995). Satisficing in attitude surveys: The impact of cognitive skills, motivation, and task difficulty on response effects. Ph.D. Dissertation. Ohio State University.

Ankerbrand, A. L. (1997). Attitude formation and the bivariate model: A study of the relationship between beliefs and attitudes. Master's Thesis. Ohio State University.

Bizer, G. Y. (1997). The relation between attitude importance and attitude accessibility. Master's Thesis. Ohio State University.

Visser, P. S. (1998). Testing the common-factors model of attitude strength. Ph.D. Dissertation. Ohio State University.

Miller, J. M. (2000). Threats and opportunities as motivators of political activism. Ph.D. Dissertation. Ohio State University.

Chang, L. (2001). A comparison of Samples and response quality obtained from RDD telephone survey methodology and Internet survey methodology. Ph.D. Dissertation. Ohio State University.

Holbrook, A. L. (2002). Operative and meta-psychological strength-related attitude features: A study of knowledge volume, ambivalence, and accessibility. Ph.D. Dissertation. Ohio State University.

Lampron, S. F.  (2002).  Self-interest, values, involvement, and susceptibility to attitude change.  Master's
Thesis.  Ohio State University.

Shaeffer, E. M.  (2003).  Response effects in questionnaires: A comparison of minimally balanced and fully
balanced forced choice questions and rating and ranking procedures.  Master's Thesis.  Ohio State
University.

Pfent, A.  (2004).  Rationalization of candidate preferences: New evidence of determinants of attitude change.
Master's Thesis.  Ohio State University.

Lein, J.  (2006).  Issue saliency in proximity and directional voting models: A 1996 case study.  Honors thesis.
Stanford University.

Miller, L. E.  (2007).  Voting in ballot initiative elections.  Ph.D. Dissertation.  Stanford University.

Bannon, B.  (2008).  Tell it like it is: News media priming – Extensions and applications.  Ph.D. Dissertation.
Stanford University.

Blocksom, D.  (2008).  The ballot order effect: The 2004 Presidential election in Ohio.  Honors Thesis.  Stanford
University.

Chen, E.  (2008).  Me first! Assessing the significance of ballot order effects on elections in North Dakota.
Honors Thesis.  Stanford University.

Chiang, I. A.  (2008).  The principle of congruence in asking questions.  Ph.D. Dissertation.  Stanford
University.

Garland, P.  (2008).  Still hoping for separate and unequal: New perspective son racial attitudes and media in
America.  Ph.D. Dissertation.  Stanford University.

Harder, J.  (2008).  Why do people vote?  The relationship between political efficacy and voter turnout.  Honors
Thesis.  Stanford University.

Malhotra, N.  (2008).   Essays on survey methodology and bandwagon effects.  Ph.D. Dissertation.   Stanford
University.

Schneider, D.  (2008).  Measurement in surveys and elections: Interviewer effects in election surveys, name
order on election ballots, and customer satisfaction surveys.  Ph.D. Dissertation.  Stanford University.

Gauthier, L. D.  (2010).  The false consensus effect: Projection or conformity?  Ph.D. Dissertation.  Stanford
University.

Abbasi, D. R.  (2011).  Americans and climate change: Elite understanding of the gap between science and
action.  Ph.D. Dissertation.  Stanford University.

Pasek, J. M. H.  (2011).  Communication through elections: Three studies exploring the determinants of citizen
behavior.  Ph.D. Dissertation.  Stanford University.

Larson, S.  (2011).  American concern for the environment: Survey question wording and why it matters for
environmental policy.  Honors Thesis.  Stanford University.

Lelkes, Y.  (2012).  Essays on the measurement of public opinion.  Ph.D. Dissertation.  Stanford University.

Gross, W.  (2012).  Opinions about Hispanics: Causes and consequences.  Ph.D. Dissertation.  Stanford

University.

PonTell, E. (2012). Do sweets make you sweeter?  Sweet food consumption and acquiescence response bias. Honors Thesis.  Stanford University.

Kim, N. (2013). Difference and Democracy: Encountering difference in Democratic dialogues.  Ph.D. Dissertation.    Stanford University.

Eddy, G. M. (2013).  Remedying a data deficit: A regression analysis of public opinion on healthcare reform. Honors Thesis.  Stanford University.

Cho, A. (2016).  The psychology of economic voting: How voters use economic information to inform their political choices.  Honors Thesis.  Stanford University.

Slavec, A. (2016).  Improving survey question wording using language resources.  Ph.D. Dissertation. University of Ljubljana, Slovenia.

Vannette, D. L. (2017).  Predicting and influencing behavior with surveys.  Ph.D. Dissertation.  Stanford University.

Kim, S. (2017).  The influence of others: The impact of perceptions of others 'opinions on individual attitudes and behavioral intentions.  Ph.D. Dissertation.  Stanford University.

Höhne, J. K. (2017).  Question format, response effort, and response quality – A methodological comparison of agree/disagree and item-specific questions.  Ph.D. Dissertation.  Georg-August-Universität Göttingen.

Abeles, A. T. (2020).  Perceptions of Americans 'beliefs about global warming: Forces that shape them and their consequences.  Ph.D. Dissertation.  Stanford University.

Sekar, S. (2020).  Misrepresented: Understanding he gap between U.S. public opinion and policy on climate change.  Ph.D. Dissertation.  Stanford University.

Keefe, M. (2020).  Disconfirming the media priming effect: A replication experiment.  Undergraduate Honors Thesis.  Stanford University.


Professional Association Memberships

American Psychological Association
Society of Experiment Social Psychology
Society for Personal and Social Psychology
American Political Science Association
American Association for Public Opinion Research


Revised:  November, 2020.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Appendix B

AAPOR/CASRO Brief

GRAHAM**HOLLIS** APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103

**DECLARATION OF JON KROSNICK ISO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT COURT OF OKLAHOMA**

STATE OF OKLAHOMA, *et al.*,

        Plaintiffs,

    v.

TYSON FOODS, INC., *et al.*,

        Defendants.

Case No. 4:05-CV-329-GKF-PJC

**BRIEF OF COUNCIL OF AMERICAN SURVEY RESEARCH ORGANIZATIONS, INC. AND AMERICAN ASSOCIATION OF PUBLIC OPINION RESEARCH AS AMICI CURIAE IN SUPPORT OF PLAINTIFF'S MOTION FOR PROTECTIVE ORDER**

Duane L. Berlin, CT Bar No. 302216
Lev & Berlin, P.C.
200 Connecticut Avenue
5th Floor
Norwalk, CT 06854
Telephone: (203) 838-8500
Facsimile: (203) 854-1652

Attorney for Amici Curiae

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ……………………………………….   ii.

I.       INTRODUCTION …………………………………………   1

II.      INTEREST OF THE AMICI CURIAE …………………….   1

         A.   Council of American Survey Research
              Organizations………………………………………   1

         B.   American Association of Public Opinion Research….   2

         C.   Impact on Survey and Public Opinion Research…….   4

III.     BACKGROUND OF MOTION FOR PROTECTIVE
         ORDER ………………………………………………….   4

IV.      ARGUMENT ………………………………………………   5

         A.   Public Interest Demands Confidential Treatment
              of Survey Research Sources ………………………..   5

         B.   Courts Have Repeatedly Recognized the Importance
              and Legitimacy of Respondent Confidentiality …….   10

V.       CONCLUSION ………………………………………….   16

EXHIBITS

A.   CASRO: "Who we are. What we do."

B.   CASRO Code of Standards for Survey Research

C.   AAPOR Code of Professional Ethics & Practices
     Best Practices for Survey and Public Opinion Research

TABLE OF AUTHORITIES

Page

**Cases**

Andrews v. Eli Lilly & Co.,
    97 F.R.D. 494 (N.D. Ill. 1983) ………………………………     6, 10

Apel v. Murphy
    70 F.R.D. 78 (D.R.I. 1976) ………………………………     14

Apicella v. McNeil Laboratories, Inc.
    66 F.R.D. 78 (E.D.N.Y. 1975) …………………………....     7

Applera Corporation v. MJ Research, Inc.
    389 F. Supp. 2d 344 (D. Conn. 2005) ………………………     9

Army Times Pub. Co. v. Dept. of Air Force
    998 F.2d 1067 (D.C. Cir. 1993) …………………………….     10

Baker V. F. & F. Investment
    470 F.2d 778 (2d Cir. 1972)
    cert. denied, 411 U.S. 966 (1973) ………………………….     7

Cimino v. Raymark Industries, Inc.
    751 F. Supp. 649 (E.D. Tex. 1990) …………………………     6, 9

Comm-Tract Corp. v. Northern Telecom, Inc.
    143 F.R.D. 20 (D. Mass. 1992) ……………………………..     14

Deitchman v. E.R. Squibb & Sons, Inc.
    740 F.2d 556 (7th Cir. 1984) ………………………………     11

Dow Chemical Co. v. Allen
    672 F.2d 1262 (7th Cir. 1982) ………………………………     6

EEOC v. U. of Notre Dame de Lac
    715 F.2d 331 (7th Cir. 1983) ………………………………     14

Farnsworth v. Procter & Gamble Co.
    758 F.2d 1545 (11th Cir. 1985) ……………………………..     10

Harris v. Upjohn Co.
    115 F.R.D. 191 (S.D. Ill. 1987) ……………………………..     14

In re Data General Corp. Antitrust Litigation
    MDL 369 (N.D. Cal. 1981) ……………………………....     10

In re Eli Lilly & Co., Prozac Products Lit.
    142 F.R.D. 454 (S.D. Ind. 1992) ……………………………     11

Marrese v. American Academy of Orthopedic Surgeons
    726 F.2d 1150 (7th Cir. 1984)………………………….     11

|  | Page |
|---|---|
| Mt. Sinai School of Medicine v. The American Tobacco Co. <br> 880 F.2d 1520 (2d Cir. 1989) ..................................... | 10 |
| Plough, Inc. v. National Academy of Sciences <br> 530 A2d 1152 (D.C. Ct. App. 1987) ............................. | 14 |
| Richards of Rockford Inc. v. Pacific G.E. Co. <br> 71 F.R.D. 388 (N.D. Cal. 1976) .................................. | 10, 13 |
| Solarex Corp. v. Arco Solar, Inc. <br> 121 F.R.D. 163 (E.D. N.Y. 1988) ............................... | 11 |
| Star Editorial, Inc. v. USDC for the Central District of California <br> 7 F.3d 856 (9th Cir. 1993) ......................................... | 7 |
| Summit Technology, Inc. v. Healthcare Capital Group, Inc. <br> 141 F.R.D. 381 (D. Mass. 1992) ................................ | 14 |
| Thornbury v. Delta Airlines, Inc. <br> No. C-76-0798 RFP (N.D. Cal. 1979) ......................... | 10 |
| Times Journal Co. v. Department of Air Force <br> 793 F. Supp. 1 (D.D.C. 1991) ................................... | 10 |
| United States v. ALCOA <br> 35 F. Supp. 820 (S.D. N.Y. 1940) .............................. | 14 |
| United States v. Angiulo <br> 847 F.2d 956 (1st Cir. 1988) ..................................... | 14 |
| United States v. IBM Corp. <br> 83 F.R.D. 92 (S.D. N.Y. 1979) .................................. | 10 |
| United States of America; State of California, <br> ex rel. v. Montrose Chemical Corp. of Cal. et al. <br> Case No. CV 90-3122 AAH (C.D. Cal. 1995) ................ | 15 |
| Upjohn Company v. United States <br> 449 U.S. 383 (1981) ................................................... | 8 |
| Wright v. Patrolmen's Benevolent Assn. <br> 79 F.R.D. 161 (S.D. N.Y. 1976) ................................ | 10 |
| Zippo Mfg. Co. v. Rogers Imports, Inc. <br> 216 F. Supp. 670 (S.D. N.Y. 1963) ............................ | 14 |

**Federal Rules**

| | |
|---|---|
| Fed. R. Civ. P. 26................................................. | 11, 13 |
| Fed. R. Evid. 501 ................................................ | 11, 13 |

iii.

Page

**Miscellaneous**

H. Barksdale, The Use of Survey Research
    Findings as Legal Evidence (1957) ……………………………    9, 13

Federal Judicial Center, The Reference Manual on
    Scientific Evidence, (2nd, 2000) …………………………....    2, 8

W. Finfrock & D. Spradlin, How to Organize
    and Present Statistical Evidence,
    24 Prac. Law. 67 (1978) ……………………………………    9

M. Finkelstein, Quantitative Methods in Law (1978)………………    9

M. Hansen, W. Hurwitz & W. Madow, Sample Survey
    Methods and Theory (1953) …………………………….....    13

Hendel & Bard, Should There Be a Researcher's Privilege?
    59 Am. A. U. Professors Bull. 398 (1973) …………………    8

I. McCarthy, Trademarks and Unfair
    Competition, (2d ed. 1984) ………………………………..    9

McCormick, Evidence (Cleary ed. 1972) ………………………….    8

Note, Protection from Discovery of
    Researcher's Confidential Information,
    9 Conn. L. Rev. 425 (1977) ……………………………..    14

Wigmore, Evidence (McNaughton rev. ed. 1961) …………………    12

## I.      INTRODUCTION

The Council of American Survey Research Organizations, Inc. ("CASRO") and the American Association for Public Opinion Research ("AAPOR") appear in this litigation as amici curiae for the limited purpose of supporting plaintiffs' motion for a protective order protecting the identities of respondents and any respondent identifiable information from disclosure. For the reasons set forth below, CASRO and AAPOR urge that the Court issue a protective order protecting the identities of respondents and any respondent identifiable information from disclosure. Mandating the disclosure of respondent identifiable information would be devastating to all forms of survey research and contrary to public interest. The reliability of any survey evidence may be fully and fairly litigated by the parties without infringing upon the privacy of survey respondents and without threatening important social interests advanced by survey research.

## II.     INTERESTS OF THE AMICI CURIAE.

A.     CASRO:

CASRO is a not-for-profit trade association representing over three hundred (300) United States survey research companies engaged in professional survey research regarding a wide variety of technical, scientific, economic, and other public and private issues. (See Exhibit A.) CASRO's members are in aggregate responsible for the overwhelming majority of the survey research conducted each year in the United States. Two of CASRO's principal purposes are (1) to promote the establishment, maintenance, and strict observance of professional and ethical standards in survey research and (2) to protect the privacy interests of those who volunteer to participate in survey research activities. These principles reflect the social utility of survey research and our need to protect this valuable resource.

In furtherance of its purpose, CASRO has established a detailed Code of Standards for Survey Research (the "CASRO Code") (set forth herein as Exhibit B), which establishes specific requirements and responsibilities for professional survey researchers to maintain the confidentiality of information that might reveal the identities of survey respondents. The

1

CASRO Code includes carefully drawn rules of ethical and professional conduct for survey research organizations. Among other things, the CASRO Code provides that the survey research organization has the responsibility to protect the identities of respondents and to insure that individuals and their responses cannot be related in published or publicly-available survey reports or other information. See Section A(3) of the CASRO Code. The CASRO Code strictly limits access to information identifying respondents, and imposes restrictions upon post-research retention of such identifying information. See Section A(3) of the CASRO Code. Further, the CASRO Code states that "the use of survey results in a legal proceeding does not relieve the Survey Research Organization of its ethical obligation to maintain in confidence all Respondent-Identifiable Information or lessen the importance of Respondent anonymity." See Section A(3)(f) of the CASRO Code. The CASRO Code's provisions regarding confidentiality are consistent with professional practice and standards within the survey research industry, as well as consistent with the legal trend recognizing the importance of this issue as evidenced by reasoned judicial precedent. In acknowledgment of this legal trend, *The Reference Manual on Scientific Evidence*, published by the Federal Judicial Center, directs that based on the ethical obligations of survey researchers, all identifying information, such as a respondent's name, address and telephone number, should be redacted to ensure respondent confidentiality. Federal Judicial Center, *The Reference Manual on Scientific Evidence* (2nd 2000) (the "Reference Manual").

    B.    AAPOR:

AAPOR is a leading professional organization of public opinion and survey research professionals in the United States, consisting of seven (7) chapters, with members from academia, media, government, the non-profit sector and private industry. AAPOR's members embrace the principle that public opinion research is essential to a healthy democracy, providing information crucial to informed policymaking and giving voice to the nation's beliefs, attitudes and desires. Two of AAPOR's principal purposes are (1) to promote the establishment, maintenance, and strict observance of high ethical and professional standards in survey and public opinion research and (2) to protect the privacy interests of respondents.

2

In furtherance of its purpose, AAPOR has established a detailed Code of Professional Ethics and Practices (the "AAPOR Code") and the Best Practices for Survey and Public Opinion Research ("AAPOR Best Practices") (both set forth herein as Exhibit C), both of which establish specific responsibilities for professional survey and public opinion researchers to maintain the confidentiality of information that might identify survey respondents. The AAPOR Code includes carefully drawn rules of ethical and professional conduct for survey and public opinion research organizations. Among other things, the AAPOR Code provides that the survey and public opinion research organizations shall respect respondents' concerns about their privacy, shall hold as privileged and confidential all information that might identify a respondent with his or her responses and shall not disclose or use the names of respondents for non-research purposes unless the respondents grant permission for such disclosure or use. See Section II(D) of the AAPOR Code. Further, similar to the CASRO Code, the AAPOR Code explicitly states that the ethical and professional obligation to maintain the confidentiality of respondent identifiable information is not extinguished or relieved by legal proceedings. See Section II(D)(6) of the AAPOR Code. The AAPOR Code's provisions regarding confidentiality are consistent with professional practice and standards within the survey research industry, as well as consistent with the legal trend recognizing the importance of this issue as evidenced by reasoned judicial precedent.

Similarly, the AAPOR Best Practices establish important procedures and practices for the industry. The AAPOR Best Practices require research organizations to establish clear intentions and meticulous procedures to assure privacy of respondents and the confidentiality of the information provided by respondents. The AAPOR Best Practices state that "Exemplary survey research practice requires that one literally do 'whatever is possible' to protect the privacy of research participants and to keep collected information they provide confidential or anonymous." Additionally, the AAPOR Best Practices require that all interviewers and other research staff be carefully trained and indoctrinated to uphold and maintain the confidentiality of respondents' identities and information they provide and take/sign an explicit oath or pledge of confidentiality to do so before beginning work.

3

C.    Impact on Survey and Public Opinion Research.

Adherence to these industry codes, guidelines and principles impose substantial costs and burdens upon survey and public opinion researchers. The willingness of survey and public opinion researchers to accept and assume such additional costs and burdens reflects the great importance that the survey and public opinion research industry places on respondent confidentiality and indirectly the great importance that the clients of survey and public opinion researchers and the general public, place on respondent confidentiality. Without such protection, members of the public who are asked to participate in survey projects may be reluctant to do so because of fear of harassment and possible invasions of privacy. Those who do agree to participate may respond less candidly or reliably in order to portray themselves in a more favorable light and may represent an inappropriate or unrepresentative population sample. Such a result would create a distortion; it would devalue the benefit of statistical data, rendering it unnecessarily deficient.

Confidentiality, therefore, is an _essential_ prerequisite to reliable and accurate survey and public opinion research. Such research contributes significantly to the public interest by assisting the analyses of a wide variety of technical, scientific, economic, sociological, psychological, and political issues. In short, survey and public opinion research is the lifeblood in this information age.

As leading representatives of the United States survey and public opinion research industry, CASRO and AAPOR have direct and unique interests in articulating the strong need for preserving the confidentiality of survey data that would reveal the identity of individual respondents. This memorandum is submitted by CASRO and AAPOR to describe the relevant public needs for, and advantages of, such confidentiality.

## III.    BACKGROUND OF MOTION FOR PROTECTIVE ORDER

CASRO and AAPOR understand that the proceedings in this litigation are subject to various confidentiality provisions. Indeed, CASRO's and AAPOR's interest in this case is limited to the issue of respondent confidentiality as it is herein challenged. CASRO and AAPOR understand that the defendant in this case seeks disclosure of the identities of the respondents in connection with surveys, focus groups and interviews conducted by Status Consulting, Consumer Logic, Inc., Westat, Inc., and Wilson Research Strategies, as well as

4

information which would connect the individual respondent with his or her specific responses. CASRO and AAPOR also understand that in this survey research, the respondents were assured that their responses would not be attributed to them personally and that their identities would remain confidential. In accordance with professional survey research standards, the State of Oklahoma, Status Consulting, Consumer Logic, Inc., Westat, Inc., and Wilson Research Strategies have declined to breach that assurance of confidentiality. CASRO and AAPOR further understand that the plaintiffs have provided substantial materials relating to the results, methods and manner of the survey research, excluding respondent-identifiable information.

Accordingly, it is CASRO's and AAPOR's belief that important public interests demand that the court issue a protective order protecting the identities of respondents and respondent identifiable information from disclosure. Some or all of the survey respondents undoubtedly agreed to participate in these surveys only because of the assurance of confidentiality and that their responses would not be connected with their identities. The interests involved in this matter therefore are not merely those of the litigants, nor even those of the survey and public opinion research industries. Those interests are relevant and important, but no less important are the interests of the survey respondents themselves and the public in general. As we explain below, courts have often held that in situations similar to the situation in this matter both the public interest and the legitimate private expectations of survey respondents require careful protection of respondent identifiable information.

## IV. ARGUMENT

A. Public Interest Demands Confidential Treatment of Survey Research Sources.

The public plainly has an important interest in the conduct and reliability of survey and public opinion research. Such research is now widely used by universities (in the fields of medicine and social sciences, for example), corporations, research institutes, litigants, as well as governmental agencies, to assist in the analyses of technical, scientific, economic, and other questions. No other tool permits researchers to obtain comparable data. Without such data many issues affecting both public and private interests could not be addressed as intelligently or resolved as reliably. There is, as one court rightly summarized the situation, "undoubtedly a

5

compelling social interest in promoting research." Andrews v. Eli Lilly & Co., 97 F.R.D. 494,
500 (N.D. Ill. 1983). See also, Dow v. Allen, 672 F.2d 1262 (7th Cir. 1982).

In Cimino v. Raymark Industries, Inc., 751 F. Supp. 649 (E.D. Tex. 1990), the court
articulated the value of survey data as a unique and important research tool:

". . . the science of statistics is now universally accepted, exerting the most
profound influence on our daily lives. 'The objective of statistics is to make
an inference about a population of interest based on information obtained
from a sample . . . of that population.' For example, statistical sampling plays
a critical role in medical and pharmaceutical research. . . [a]s in medical research,
private industries employ statistical techniques in the development and testing of
new products . . . [it is used] for many diverse tasks, such as maintaining the
dimension requirements for the plastic cards used in automatic bank teller machines
or testing the specific gravity of laundry detergent. Statistical techniques
are particularly valuable in the field of marketing . . . the insurance industry
. . . education . . . in the administration and evaluation of various standardized
tests . . . [and] in the political arena." Id. at 660.

It is therefore clear that quantitative research, as well as qualitative research, is
extremely valuable; it cannot however be effectively conducted without meaningful assurances
of confidentiality to cooperative sources. Such assurances are essential for two purposes. First,
many individuals will not participate in a study if they believe that the information given by
and attributed to them may be used for purposes other than research. For many respondents,
any rewards for participation in a survey, which typically are merely the satisfaction of having
provided helpful information, would not outweigh the real or imagined risks and burdens of
public disclosure. Furthermore, even if some individuals might still be induced to participate in
a research project without assurances of strict confidentiality, the researcher could not be
certain that those who do agree to participate fairly represent the larger population that is to be
sampled. The simple fact is that survey and public opinion research must guarantee strict
confidentiality in order to preserve the representative nature of his or her research sample and
correspondingly the value of the quantitative and qualitative data. Given the enormous value of
survey data, and the social importance inherent therein, protection of the statistical source, i.e.,
survey respondents, is of utmost importance, and only for an extremely compelling reason
should a court jeopardize the usefulness of survey results by infringing on the confidential
relationship which exists between the researcher and respondent.

6

In many respects the researcher's needs in terms of source protection is analogous to those of a news reporter. In both situations, the researcher and the reporter face the reality that without meaningful promises of confidentiality they would have many fewer sources of reliable information. Both the researcher and the reporter depend for their effectiveness upon the willingness of the public to volunteer help; neither can offer anything in return except anonymity and protection against harassment.[1] The news reporter is generally afforded a constitutionally-derived privilege to maintain the confidentiality of his sources unless the party seeking disclosure can show a compelling need, which is unlikely to exist in most civil actions. See Baker V. F. & F. Investment, 470 F.2d 778 (2d Cir. 1972), cert. denied, 411 U.S. 966 (1973); Apicella v. McNeil Laboratories, Inc., 66 F.R.D. 78 (E.D. N.Y. 1975); and Star Editorial, Inc. v. USDC for the Central District of California, 7 F.3d 856 (9th Cir. 1993).[2]

Another important reason to preserve strict confidentiality of the identities of research respondents is to protect the results of the research against inaccuracies or bias. In this respect, survey research is analogous to the communications between attorney and client, where the courts have long recognized the overriding importance of encouraging full, open and honest

Another important reason to preserve strict confidentiality of the identities of research respondents is to protect the results of the research against inaccuracies or bias. In this respect, survey research is analogous to the communications between attorney and client, where the courts have long recognized the overriding importance of encouraging full, open and honest disclosure by promising and respecting the communications' confidentiality.  See, e.g., Upjohn Company v. United States, 449 U.S. 383 (1981); McCormick, Evidence, Section 87, at 176 (Cleary Ed. 1972). In survey research, respondents who believe that their answers may be publicly attributed to them may hedge, qualify or even wholly alter their responses to avoid harassment or to present themselves or others in a more favorable light. Consciously or not, the candor of their responses may be inhibited by the likelihood of public disclosure.

---

[1] The same principles apply to informers who reveal criminal or other abuses, and the public interests supporting protection for such informers also support protection for the privacy of survey respondents.

[2] In these cases, there was strong evidence that the reporters' confidential sources could provide information important for the resolution of the underlying disputes. Nonetheless, the courts held that the public interest in confidentiality outweighed the litigants' individual interests in disclosure.

7

disclosure by promising and respecting the communications' confidentiality. See, e.g., Upjohn Company v. United States, 449 U.S. 383 (1981); McCormick, Evidence, Section 87, at 176 (Cleary Ed. 1972).

Another important reason to preserve strict confidentiality of the identities of research respondents is to protect the results of the research against inaccuracies or bias. In this respect, survey research is analogous to the communications between attorney and client, where the courts have long recognized the overriding importance of encouraging full, open and honest disclosure by promising and respecting the communications' confidentiality. See, e.g., Upjohn Company v. United States, 449 U.S. 383 (1981); McCormick, Evidence, Section 87, at 176 (Cleary Ed. 1972). In survey research, respondents who believe that their answers may be publicly attributed to them may hedge, qualify or even wholly alter their responses to avoid harassment or to present themselves or others in a more favorable light. Consciously or not, the candor of their responses may be inhibited by the likelihood of public disclosure.

To diminish this natural impulse, the researcher must credibly reassure the respondent that neither approval nor disapproval will attach to his responses. The respondent must be reliably assured that his response will be combined with those of many others in the form of statistical data, the overall significance of which will be scientifically evaluated on the basis of cumulative trends. The respondent must be, and must understand himself to be, the source of statistical data and not a witness. He must believe himself to be merely one datum, submerged among many others. To provide such an assurance, the researcher must effectively guarantee the respondent that his individual identity will remain strictly confidential.

The importance of confidentiality to ensure the free flow of information and to provide the foundation for unbiased survey data is widely recognized by professional researchers. See generally, Hendel & Bard, Should There Be a Researcher's Privilege?, 59 Am. A. U. Professors Bull. 398 (1973); See also The Reference Manual. Moreover, because the credibility of any researcher's promise of confidentiality is affected by the conduct of other researchers, any breach of confidentiality by any researcher, whether because of a court order or any other cause, adversely affects all survey research. Accordingly, CASRO and AAPOR have incorporated strict confidentiality provisions in their respective codes of standards, and the U.S. survey and public opinion research industry has embraced them wholeheartedly. The promises

8

of confidentiality that professional researchers make both to their respondents and to their fellow research professionals are only meaningful if courts recognize the public interest in validating those promises. In Applera Corporation v. MJ Research Inc., 389 F. Supp. 2d 344, 350 (D. Conn. 2005), the court acknowledged researchers' ethical prohibition on disclosure of the actual individual identities of the survey respondents as a legitimate need for confidentiality.

Our society has a strong public interest in protecting the confidential relationship between researcher and respondent. It has no interest in discouraging and inhibiting that relationship by unwarranted intrusions upon the respondent's privacy. As described above, survey research plays an increasingly important role in public and private planning.

The judicial process itself is a significant beneficiary of survey and public opinion research. In Cimino v. Raymark Industries, Inc., 751 F. Supp. 661 (E.D. Tex. 1990) it was reported that ". . . [a]cceptance of statistical evidence is now commonplace in the courts . . . [it] occurs frequently in Title VII employment discrimination cases, most often demonstrating a pattern or practice of discrimination on the part of the employer . . . it has been used in anti-trust cases to project pre and post merger market share and market concentration . . . [and] in trademark infringement suits [it] is useful in determining consumer product identification and confusion regarding trademarks . . ." These and other valuable applications of survey research[3] can only be effectively fostered, as the public interest plainly requires, if the confidentiality necessary for their continued success is guaranteed. CASRO and AAPOR urge, therefore, that respondent confidentiality be afforded the protection it needs and that in the instant case the Court issue a protective order protecting the identities of respondents and respondent identifiable information from disclosure.

---

[3] See generally M. Finkelstein, Quantitative Methods in Law (1978), quantitative techniques of proof as applied in various legal claims; H. Barksdale, The Use of Survey Research Findings as Legal Evidence (1957) (same); W. Finfrock & D. Spradlin, How to Organize and Present Statistical Evidence, 24 Prac. Law. 67, 67-68 (1978), antitrust evidence increasingly economic and statistical; I. McCarthy, Trademarks and Unfair Competition, Section 32:46 ff. (2d ed. 1984), important and growing role of survey evidence.

9

B.    Courts Have Repeatedly Recognized the Importance and Legitimacy of
       Respondent Confidentiality.

The important public interest in the confidentiality of research respondents' identities
has been frequently recognized by the courts. For example, in a survey regarding economic
issues and military personnel, the United States District Court for the District of Columbia
found that ". . . the survey presents a unique opportunity for candid exchange.....[i]f survey
respondents are not promised confidentiality they will . . . be less likely to express their
opinions candidly, thus depriving . . . policy makers of valuable and necessary information. The
absence of these candid opinions would likely result in the implementation of . . . policies
which do not respond to the actual needs of Department personnel." Times Journal Co. v.
Department of Air Force, 793 F. Supp. 1 (D.D.C. 1991).  See also Army Times Pub. Co. v.
Dept. of the Air Force, 998 F.2d 1067 (D.C. Cir. 1993).

Further support is found in Richards of Rockford Inc. v. Pacific G. & E. Co., 71 F.R.D.
388 (N.D. Cal. 1976); where the court rejected a demand for confidential data precisely
because effective assurances of confidentiality are imperative for the continuation of accurate
and reliable research. Similarly, the court in Farnsworth v. Procter & Gamble Co., 758 F.2d
1545 (11th Cir. 1985), rejected an effort to compel the disclosure of respondent identities
because such disclosures could have seriously damaged the voluntary reporting program
involved there. In the same way, the court in Andrews v. Eli Lilly & Co., 97 F.R.D. 494, 500
(N.D. Ill. 1983), found that such disclosures might well "chill []" research projects that depend
for their effectiveness on strict confidentiality. In Mt. Sinai v. American Tobacco, the Second
Circuit Court upheld the redaction of the identities of medical subjects in health studies. Mt.
Sinai School of Medicine, et al. v. The American Tobacco Company, et al., 880 F.2d 1520 (2d
Cir. 1989).  See also In re Data General Corp. Antitrust Litigation, MDL 369 (N.D. Cal. 1979);
Thornbury v. Delta Airlines, Inc., No. C-76-0798 RFP (N.D. Cal. 1979); United States v. IBM
Corp., 83 F.R.D. 92, 95n. (S.D. N.Y. 1979); Wright v. Patrolmen's Benevolent Assn., 79
F.R.D. 161, 163 (S.D. N.Y. 1976).

The courts in deciding cases similar to the instant case, wherein they must choose between protecting the identities of research sources and compelling their disclosure, necessarily engage in a balancing test between two competing interests. The court in Solarex Corp. v. Arco Solar, Inc., 121 F.R.D. 163 (E.D. N.Y. 1988) (a case wherein the discovery of the identity of research sources was denied) articulates the balancing process: "Under Rule 26 of the Federal Rules of Civil Procedure, the court is required to compare the potential hardship to the party against whom discovery is sought if discovery is granted, with that to the party seeking discovery if it is denied." The court goes on to recognize that the court must balance the need for the information against the injury that would result from disclosure, and "[i]n balancing conflicting interests, courts are admonished not only to consider the nature and magnitude of the competing hardships, but also to 'give more weight to interests that have a distinctively social value than to purely private interests.'" Id. at 169. (Quoting from Marrese v. American Academy of Orthopedic Surgeons, 726 F.2d 1150, 1159 (7th Cir. 1984) See also, Summit Technology, Inc. v. Healthcare Capital Group, Inc., 141 F.R.D. 381 (D. Mass. 1992) wherein the court rightly recognized the importance of the public's interest in the free flow of information and the role it plays in the court's application of the balancing test in deciding discovery matters affecting non-party research sources.

All these cases illustrate the courts' recognition that the confidentiality of respondent identities is consistent with the respondents' own privacy expectations and, even more importantly, in the public interest. See also Deitchman v. E.R. Squibb & Sons, Inc., 740 F.2d 556 (7th Cir. 1984); In re Eli Lilly & Co., Prozac Products Lit., 142 F.R.D. 454 (S.D. Ind. 1992).

Relatedly, the inappropriateness of compelling the disclosure of respondent identities is further confirmed by the rules that have been developed to decide whether a privilege should be granted. Under Fed. R. Evid. 501, federal courts are required to decide such issues in nondiversity cases by applying the common law, as interpreted in light of "reason and experience." A four (4) part test has been developed for this purpose. As articulated in Wigmore's classic formulation, those standards are:

> (1)   The communications must originate in a confidence that they will not be disclosed.

11

(2)     This element of <u>confidentiality must be essential</u> to the full and satisfactory maintenance of the relation between the parties.

(3)     The <u>relation</u> must be one which in the opinion of the community ought to be sedulously <u>fostered</u>.

(4)     The <u>injury</u> that would inure to the relation by the disclosure of the communications must be <u>greater than the benefit</u> thereby gained for the correct disposal of litigation.

<u>See</u> 8 Wigmore, <u>Evidence</u> Section 2285 at 527 (McNaughton rev. ed. 1961).

The relationship between researcher and survey respondent clearly satisfies all four branches of the test. The confidentiality of that relationship is an essential prerequisite to its success; it is plainly in the public interest to foster the relationship; the communications originated in a confidence that the respondents would not be identified; and any breach of confidentiality would result in public losses that would far outweigh any short-term benefit that might be thought to result from an invasion of the respondents' privacy. In these circumstances, a privilege is obviously appropriate, and <u>a fortiori</u> it would be contrary to the public interest to breach the relationship's confidentiality by complying with defendants' discovery request.

Moreover, no litigant has a genuine need to discover the identities of research respondents (or information which would match sources to their individual responses). If a litigant wishes to challenge survey evidence, it can readily attempt to do so without breaching the confidentiality promised to the survey respondents. It can, for example, depose some or all of the researchers who conducted the research, or retain its own expert regarding the proper conduct of such research, or conduct its own research to check the accuracy of the survey's findings. Such steps offer ample protection to a litigant's interests without any breach of respondent confidentiality.

Efforts to breach survey respondents' privacy are based upon a misconception of the function of such respondents. Survey respondents are not witnesses, but merely sources of statistical data. Survey and public opinion research does not depend on the unique or personal characteristics of each individual in the sample; its usefulness lies instead in the evidence it offers of statistical trends; a summary description of the degree to which certain characteristics are common to the population under study. It provides an entirely different kind of information from the usual testimony of witnesses. Disclosure of the individual identities of survey

12

respondents could not "improve" the statistical information offered by the survey; it would only supply access to the unique and, usually irrelevant, characteristics of individual respondents.

Moreover, survey research is conducted on the basis of standardized methodologies for selecting a representative sample from the population of possible subjects, designing the instruments to record the data, gathering data and analyzing the results. See, e.g., H. Barksdale, The Use of Survey Research Findings as Legal Evidence (1957); M. Hansen, W. Hurwitz & W. Madow, Sample Survey Methods and Theory (1953). Accordingly, the weakness of specific methodologies, and any cures for those weaknesses, are widely known to experts in the field. In this case, for example, defendants can cross-examine plaintiffs' experts on the methodologies used in performing the surveys, focus groups and interviews, and can engage its own expert to testify regarding any shortcomings in their methods. Since there is, in CASRO's and AAPOR's view, no professional objection to the disclosure of all of the data and records regarding the survey and public opinion research, other than that which identifies the source(s) and matches identity with a response(s), the defendants' expert could reanalyze the resulting data. Finally, no litigant is confined merely to criticism of his opponent's research. The litigant can draw his own samples and replicate the research. Alternatively, the litigant can counter the opponent's research by conducting his own study using another design or methodology.

The defendants have numerous methods available to them by which they might seek to challenge the underlying methods and findings. The availability of those alternative methods is analogous to Richards of Rockford, Inc. v. Pacific G. & E. Co., 71 F.R.D. 388 (N.D. Cal. 1976); where there was an attempt to discover respondent identifiers in interviews, obtained under a pledge of confidentiality, conducted by an academic researcher of PG&E's employees regarding PG&E's decision to purchase equipment manufactured by Richards. The court was unable to apply a privilege under federal common law because the case arose in diversity under state law, See Fed. R. Evid. 501, but nonetheless the court denied the motion to compel by applying principles derived from Fed. R. Civ. Proc. 26. Explaining its refusal to permit the discovery, the court stated that the case was a civil proceeding and that the relevant facts were "independently and readily adducible" so that the information sought [was] largely supplementary." Id. at 390. The court emphasized that any contrary rule requiring the disclosure of respondent identities would "severely stifle research into questions of public

13

policy . . ." Id.; See also Apel v. Murphy, 70 F.R.D. 651, 653 (D.R.I. 1976), discovery related to an insubstantial assertion may be refused; Summit Technology, Inc. v. Healthcare Capital Group, Inc., 141 F.R.D. 381 (D. Mass. 1992), while identity of research source was relevant for discovery purposes, the identity was more tangential than primary; Note, Protection from Discovery of Researcher's Confidential Information, 9 Conn. L. Rev. 425 (1977).

Furthermore, it has been held that survey evidence is admissible, notwithstanding the confidentiality of the respondents' identities, whenever the survey was conducted by professionals according to professional standards and was disclosed in a fashion that permits the court and opposing party to evaluate the professionalism and reliability of the survey. See, e.g., Zippo Mfg. Co. v. Rogers Imports, Inc., 216 F. Supp. 670, 683-84 (S.D. N.Y. 1963); United States v. ALCOA, 35 F. Supp. 820, 823-28 (S.D. N.Y. 1940).

In these circumstances, public policy mandates against the intrusion on the confidential nature of the researcher/source relationship. That is, the public's need, in this age of information, for professional, reliable research far outweighs the defendant's need for survey respondent identifiers. See generally, EEOC v. U. of Notre Dame de Lac, 715 F.2d 331 (7th Cir. 1983); Harris v. Upjohn Co., 115 F.R.D. 191 (S.D. Ill. 1987); United States v. Angiulo, 847 F.2d 956 (1st Cir. 1988); Plough, Inc. v. National Academy of Sciences, 530 A.2d 1152 (D.C. Ct. App. 1987).

It would be remiss not to mention Comm-Tract Corp. v. Northern Telecom, Inc., 143 F.R.D. 20 (D. Mass. 1992). In Comm-Tract Corp, the court evaluated the need for survey respondent identifiers based on the manner the particular survey would be utilized as evidence. The court bases its evaluation on the notion that the survey report was hearsay. This ruling is not authority in this District. CASRO and AAPOR vigorously disagree with the notion that a survey report is hearsay. The survey report is the raw data in the aggregate, in conclusory form, based on expert analysis and management by the survey researcher. The survey researcher is a social scientist. The declarant of the evidence offered is the survey researcher, not the respondents in the survey. The survey and public opinion researcher(s) in the instant case are available for cross-examination and confrontation by the defendant.

14

In February 1995, CASRO appeared as amicus curiae on the limited issue of respondent confidentiality in United States of America; State of California, ex rel. v. Montrose Chemical Corporation of California, et al., Case No. CV 90-3122 AAH, U.S. Dist. Court, Central Dist. of California. In that case, before it was later dismissed for unrelated reasons, the Honorable Harry V. Peetris, Special Master, ruled on this identical issue. During the discovery hearing, Judge Peetris stated, in sum and substance, that although respondent identifiers should be turned over, it would be only for the limited purpose of re-surveying the respondents; not for deposition or trial or investigation. He stated, ". . . and in balancing the need for the information against the injury to the public, generally, I find that confidentiality must be retained" (from Transcript of Hearing, U.S.; Cal. v. Montrose et al., CV 90-3122 AAH, Feb. 28, 1995, p. 12, lines 23 and 24).

Finally, in contrast to these substantial public interests, litigants have only the most insubstantial basis for seeking to breach the respondent's confidentiality. In this case, the plaintiffs have been provided with a substantial amount of materials and information, on the results, methods and manner of the survey and public opinion research, which are more than sufficient to advance any argument questioning the reliability of the research. Therefore, disclosing respondent identifiable information does not provide any advantage, whether material or not, to aid the defendants in this case. Disclosing respondent-identifiable information would seriously erode important public interests and depart unjustifiably from well-settled and soundly reasoned legal principles. Accordingly, we respectfully ask this Court to issue a protective order protecting the identities of respondents and respondent identifiable information from disclosure. At trial, the parties may dispute the weight and significance of the survey evidence without the use of respondent-identifiable information.

15

## V.    CONCLUSION

Disclosure of the identities of survey research respondents and of respondent-identifiable information would invade a confidential relationship whose continuing privacy is of vital social importance and essential to the public interest. It is urged that this Court not jeopardize the usefulness, validity and reliability of survey results. Accordingly, we respectfully urge that this Court issue a protective order protecting the identities of respondents and respondent identifiable information from disclosure.

Dated: February 23, 2009                    Respectfully submitted,

                                            Duane L. Berlin, CT Bar No. 302216
                                            LEV & BERLIN, P.C.
                                            200 Connecticut Avenue
                                            5th Floor
                                            Norwalk, CT 06854
                                            (203) 838-8500

                                            Attorney for Amici Curiae
                                            Council of American Survey
                                            Research Organizations, Inc.
                                            and American Association of
                                            Public Opinion Research

16

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of February, 2009, I served a true and correct copy of this Amicus Brief in Support of Plaintiff's Motion for a Protective Order on the Clerk of Court for filing and a copy of this Amicus Brief in Support of Plaintiff's Motion for a Protective Order on the following:

| | |
|---|---|
| W. A. Drew Edmondson, Attorney General | fc_docket@oag.state.ok.us |
| Kelly H. Burch, Assistant Attorney General | kelly_burch@oag.state.ok.us |
| J. Trevor Hammons, Assistant Attorney General | trevor_hammons@oag.state.ok.us |
| Daniel P. Lennington, Assistant Attorney General | daniel.lennington@oag.ok.gov |
| | |
| M. David Riggs | driggs@riggsabney.com |
| Joseph P. Lennart | jlennart@riggsabney.com |
| Richard T. Garren | rgarren@riggsabney.com |
| Sharon K. Weaver | sweaver@riggsabney.com |
| Robert A. Nance | rnance@riggsabney.com |
| D. Sharon Gentry | sgentry@riggsabney.com |
| David P. Page | dpage@riggsabney.com |
| RIGGS, ABNEY, NEAL, TURPEN, ORBISON & LEWIS | |
| | |
| Louis Werner Bullock | lbullock@bullock-blakemore.com |
| Robert M. Blakemore | bblakemore@bullock-blakemore.com |
| BULLOCK, BULLOCK & BLAKEMORE | |
| | |
| Frederick C. Baker | fbaker@motleyrice.com |
| Lee M. Heath | lheath@motleyrice.com |
| Elizabeth C. Ward | lward@motleyrice.com |
| Elizabeth Claire Xidis | cxidis@motleyrice.com |
| William H. Narwold | bnarwold@motleyrice.com |
| Ingrid L. Moll | imoll@motleyrice.com |
| Jonathan D. Orent | jorent@motleyrice.com |
| Michael G. Rousseau | mrousseau@motleyrice.com |
| Fidelma L. Fitzpatrick | ffitzpatrick@motleyrice.com |
| MOTLEY RICE, LLC | |
| **Counsel for State of Oklahoma** | |
| | |
| | |
| Robert P. Redemann | rredemann@pmrlaw.net |
| PERRINE, MCGIVERN, REDEMANN, REID, BARRY & TAYLOR, P.L.L.C. | |
| | |
| David C. Senger | david@cgmlawok.com |

| | |
|---|---|
| Robert E Sanders | rsanders@youngwilliams.com |
| Edwin Stephen Williams | steve.williams@youngwilliams.com |
| YOUNG WILLIAMS P.A. | |
| **Counsel for Cal-Maine Farms, Inc and Cal-Maine Foods, Inc.** | |
| | |
| | |
| John H. Tucker | jtucker@rhodesokla.com |
| Theresa Noble Hill | thill@rhodesokla.com |
| Colin Hampton Tucker | ctucker@rhodesokla.com |
| Kerry R. Lewis | klewis@rhodesokla.com |
| RHODES, HIERONYMUS, JONES, TUCKER & GABLE | |
| | |
| Terry Wayen West | terry@thewestlawfirm.com |
| THE WEST LAW FIRM | |
| | |
| Delmar R. Ehrich | dehrich@faegre.com |
| Bruce Jones | bjones@faegre.com |
| Krisann C. Kleibacker Lee | kklee@faegre.com |
| Todd P. Walker | twalker@faegre.com |
| Christopher H. Dolan | cdolan@faegre.com |
| Melissa C. Collins | mcollins@faegre.com |
| FAEGRE & BENSON, LLP | |
| | |
| Dara D. Mann | dmann@mckennalong.com |
| MCKENNA, LONG & ALDRIDGE LLP | |
| **Counsel for Cargill, Inc. & Cargill Turkey Production, LLC** | |
| | |
| | |
| James Martin Graves | jgraves@bassettlawfirm.com |
| Gary V Weeks | gweeks@bassettlawfirm.com |
| Woody Bassett | wbassett@bassettlawfirm.com |
| K. C. Dupps Tucker | kctucker@bassettlawfirm.com |
| BASSETT LAW FIRM | |
| | |
| George W. Owens | gwo@owenslawfirmpc.com |
| Randall E. Rose | rer@owenslawfirmpc.com |
| OWENS LAW FIRM, P.C. | |
| **Counsel for George's Inc. & George's Farms, Inc.** | |
| | |
| | |
| A. Scott McDaniel | smcdaniel@mhla-law.com |
| Nicole Longwell | nlongwell@mhla-law.com |
| Philip Hixon | phixon@mhla-law.com |

| | |
|---|---|
| Craig A. Merkes | cmerkes@mhla-law.com |
| MCDANIEL, HIXON, LONGWELL & ACORD, PLLC | |
| | |
| Sherry P. Bartley | sbartley@mwsgw |
| MITCHELL, WILLIAMS, SELIG, GATES & WOODYARD, PLLC | |
| **Counsel for Peterson Farms, Inc.** | |
| | |
| | |
| John Elrod | jelrod@cwlaw.com |
| Vicki Bronson | vbronson@cwlaw.com |
| P. Joshua Wisley | jwisley@cwlaw.com |
| Bruce W. Freeman | bfreeman@cwlaw.com |
| D. Richard Funk | rfunk@cwlaw.com |
| CONNER & WINTERS, LLP | |
| **Counsel for Simmons Foods, Inc.** | |
| | |
| | |
| Stephen L. Jantzen | sjantzen@ryanwhaley.com |
| Paula M. Buchwald | pbuchwald@ryanwhaley.com |
| Patrick M. Ryan | pryan@ryanwhaley.com |
| RYAN, WHALEY, COLDIRON & SHANDY, P.C. | |
| | |
| Mark D. Hopson | mhopson@sidley.com |
| Jay Thomas Jorgensen | jjorgensen@sidley.com |
| Timothy K. Webster | twebster@sidley.com |
| Thomas C. Green | tcgreen@sidley.com |
| Gordon D. Todd | gtodd@sidley.com |
| SIDLEY, AUSTIN, BROWN & WOOD LLP | |
| | |
| Robert W. George | robert.george@tyson.com |
| L. Bryan Burns | bryan.burns@tyson.com |
| TYSON FOODS, INC | |
| | |
| Michael R. Bond | michael.bond@kutakrock.com |
| Erin W. Thompson | erin.thompson@kutakrock.com |
| Dustin R. Darst | dustin.darst@kutakrock.com |
| KUTAK ROCK, LLP | |
| **Counsel for Tyson Foods, Inc., Tyson Poultry, Inc., Tyson Chicken, Inc., & Cobb-Vantress, Inc.** | |
| | |
| | |
| R. Thomas Lay | rtl@kiralaw.com |
| KERR, IRVINE, RHODES & ABLES | |
| Frank M. Evans, III | fevans@lathropgage.com |
| Jennifer Stockton Griffin | jgriffin@lathropgage.com |

| | |
|---|---|
| David Gregory Brown | |
| LATHROP & GAGE LC | |
| **Counsel for Willow Brook Foods, Inc.** | |
| | |
| | |
| Robin S Conrad | rconrad@uschamber.com |
| NATIONAL CHAMBER LITIGATION CENTER | |
| | |
| Gary S Chilton | gchilton@hcdattorneys.com |
| HOLLADAY, CHILTON AND DEGIUSTI, PLLC | |
| **Counsel for US Chamber of Commerce and American Tort Reform Association** | |
| | |
| | |
| D. Kenyon Williams, Jr. | kwilliams@hallestill.com |
| Michael D. Graves | mgraves@hallestill.com |
| HALL, ESTILL, HARDWICK, GABLE, GOLDEN & NELSON | |
| **Counsel for Poultry Growers/Interested Parties/ Poultry Partners, Inc.** | |
| | |
| | |
| Richard Ford | richard.ford@crowedunlevy.com |
| LeAnne Burnett | leanne.burnett@crowedunlevy.com |
| CROWE & DUNLEVY | |
| **Counsel for Oklahoma Farm Bureau, Inc.** | |
| | |
| | |
| Kendra Akin Jones, Assistant Attorney General | Kendra.Jones@arkansasag.gov |
| Charles L. Moulton, Sr Assistant Attorney General | Charles.Moulton@arkansasag.gov |
| **Counsel for State of Arkansas and Arkansas National Resources Commission** | |
| | |
| Mark Richard Mullins | richard.mullins@mcafeetaft.com |
| MCAFEE & TAFT | |
| **Counsel for Texas Farm Bureau; Texas Cattle Feeders Association; Texas Pork Producers Association and Texas Association of Dairymen** | |
| | |
| | |
| Mia Vahlberg | mvahlberg@gablelaw.com |
| GABLE GOTWALS | |
| | |
| James T. Banks | jtbanks@hhlaw.com |
| Adam J. Siegel | ajsiegel@hhlaw.com |
| HOGAN & HARTSON, LLP | |
| **Counsel for National Chicken Council; U.S. Poultry and Egg Association & National Turkey Federation** | |

| | |
|---|---|
| | |
| John D. Russell | jrussell@fellerssnider.com |
| FELLERS, SNIDER, BLANKENSHIP, BAILEY & TIPPENS, PC | |
| | |
| William A. Waddell, Jr. | waddell@fec.net |
| David E. Choate | dchoate@fec.net |
| FRIDAY, ELDREDGE & CLARK, LLP | |
| **Counsel for Arkansas Farm Bureau Federation** | |
| | |
| | |
| Barry Greg Reynolds | reynolds@titushillis.com |
| Jessica E. Rainey | jrainey@titushillis.com |
| TITUS, HILLIS, REYNOLDS, LOVE, DICKMAN & MCCALMON | |
| | |
| Nikaa Baugh Jordan | njordan@lightfootlaw.com |
| William S. Cox, III | wcox@lightfootlaw.com |
| LIGHTFOOT, FRANKLIN & WHITE, LLC | |
| **Counsel for American Farm Bureau and National Cattlemen's Beef Association** | |
| | |

21

# EXHIBIT A

We represent 350 research companies in the U.S., the
Americas and abroad, all of which must abide by the
<u>CASRO Code of Standards</u>, the research industry's
enforceable ethical standard for businesses for 35 years.

**HOME | ABOUT US | FOR THE PUBLIC/MEDIA | GOV'T & PUBLIC AFFAIRS | EVENTS | CARE**

# CASRO - Who We Are - What We Do

Founded in 1975, the Council of American Survey Research Organizations (CASRO) represents over 300 companies and research operations in the United States and abroad.

CASRO is the "Voice and Values" of the survey research industry.

- We promote a rigorous code of conduct that enhances the image of survey research and protects the public's rights an privacy

- We advocate our industry's effective self-regulation when legislators propose bills that threaten legitimate survey research

- We champion legitimate research companies and marginalize disreputable research "pretenders" who threaten to tarni the industry's reputation and alienate respondents

CASRO requires members to adhere to the CASRO Code of Standards and Ethics for Survey Research, a tough, internationally-cited set of standards, which has long been the benchmark for the industry.

CASRO provides its members with numerous benefits, including access invaluable industry data, and superb staff training and networking opportunities at workshops and conferences throughout the country.

CASRO has achieved unique status among all North American associations by serving as an active representative on numerous global initiatives and as chief liaison with several leading international associations.

CASRO's "Research Career Development" initiative reaches out to colleges and universities with information and resource to attract the best and brightest students and to make the survey research profession a career of choice.

# EXHIBIT B

Case 2:10-cv-02052-NBF Document 32-6 Filed 12/31/00 PageID 61047 Page 221 of 352

# CASRO®

## CODE OF STANDARDS AND ETHICS FOR SURVEY RESEARCH



Council of American Survey Research Organizations® (CASRO®)
170 North Country Road, Suite 4
Port Jefferson, New York 11777 USA
(631) 928-6954  •  Fax: (631) 928-6041
www.casro.org  •  email: casro@casro.org

©1997 - 2009 CASRO - Council of American Survey Research Organizations. All Rights Reserved. First Adopted 1977.  Revised as needed. This document is
protected under the copyright laws of the United States and other countries and may not be reprinted or reproduced without permission from CASRO, provided that
it may be referenced and quoted with attribution and credit given to CASRO.

# TABLE OF CONTENTS

Introduction ................................................................. 4

I.   Responsibilities to Respondents ...................................... 5

     A. Confidentiality ................................................... 5

     B. Privacy and the Avoidance of Harassment .......................... 7

          Internet Research ............................................. 8

          Privacy Laws and Regulations ................................. 14

II.  Responsibilities to Clients ......................................... 16

III. Responsibilities in Reporting to Clients and the Public ............ 17

IV.  Responsibilities to Outside Contractors and Interviewers ........... 19


Appendix: Personal Data Classification .................................. 20

Addendums (for CASRO Members Only)

    *Found on Members Only section of CASRO website:*

        1. Standards regarding disclosure of respondent-identifiable data to clients

           (Suggested Client Agreement)

        2. Suggested CASRO Client Certification of Email Sample List Compliance



CODE OF STANDARDS AND ETHICS FOR SURVEY RESEARCH

The Voice and Value of Research

CASRO®
COUNCIL OF AMERICAN SURVEY RESEARCH ORGANIZATIONS®

## INTRODUCTION

This Code of Standards and Ethics for Survey Research sets forth the agreed upon rules of ethical conduct for Survey Research Organizations. Acceptance of this Code is mandatory for all CASRO® Members.

The Code has been organized into sections describing the responsibilities of a Survey Research Organization to Respondents, Clients and Outside Contractors and in reporting study results.

This Code is not intended to be, nor should it be, an immutable document. Circumstances may arise that are not covered by this Code or that may call for modification of some aspect of this Code. The Standards Committee and the Board of Directors of CASRO® will evaluate these circumstances as they arise and, if appropriate, revise the Code. The Code, therefore, is a living document that seeks to be responsive to the changing world of Survey Research. To continue to be contemporary, CASRO® advocates ongoing, two-way communication with Members, Respondents, Clients, Outside Contractors, Consultants and Interviewers.

Please also refer to other CASRO® Publications, which may provide detail relevant to many sections of the CASRO® *Code of Standards and Ethics for Survey Research.*

# I. RESPONSIBILITIES TO RESPONDENTS

## Preamble

Researchers have professional and legal responsibilities to their respondents that are embodied in the procedures of a research study. Underlying these specific responsibilities are four fundamental ethical principles:

Respondents should be:

a. willing participants in survey research;

b. appropriately informed about the survey's intentions and how their personal information and survey responses will be used and protected;

c. sufficiently satisfied with their survey experience;

d. willing to participate again in survey research.

## A. Confidentiality

1. Since individuals who are interviewed are the lifeblood of the Survey Research Industry, it is essential that Survey Research Organizations be responsible for protecting from disclosure to third parties—including Clients and members of the Public—the identity of individual Respondents as well as Respondent-identifiable information, unless the Respondent expressly requests or permits such disclosure.

2. This principle of confidentiality is qualified by the following exceptions:

   a. A minimal amount of Respondent-identifiable information will be disclosed to the Client to permit the Client: (1) to validate interviews and/or (2) to determine an additional fact of analytical importance to the study (including the practice of appending Client-owned database information to the Survey Research Organization's data file as an analytic aid). Where additional inquiry is indicated, Respondents must be given a sound reason for the re-inquiry; a refusal by Respondent to continue must be respected.

   Before disclosing Respondent-identifiable information to a Client for purposes of interview validation or re-inquiry, the Survey Research Organization must take whatever steps are needed to ensure that the Client will conduct the validation or recontact in a fully professional manner. This includes the avoidance of multiple validation contacts or other conduct that would harass or could embarrass Respondents. It also includes avoidance of any use of the information (e.g., lead generation) for other than legitimate and ethical Survey Research purposes or to respond to Customer/Respondent complaints. Assurance that the Client will respect such limitations and maintain Respondent confidentiality should be confirmed in writing before any confidential information is disclosed.

   Where Respondent-identifiable data is disclosed to clients so that the Survey Research Organization may analyze survey data in combination with other respondent-level data such as internal customer data, respondent-level data from another survey, etc., it is understood that the information will be used for

CODE OF STANDARDS AND ETHICS FOR SURVEY RESEARCH  CASRO
The Voice and Values of Research
COUNCIL OF AMERICAN SURVEY RESEARCH ORGANIZATIONS

5

model building, internal (Survey Research Organization) analysis, or the like and not for individual marketing efforts and that <u>no action can be taken toward an individual respondent</u> simply because of his or her participation in the survey. To assure Client compliance, the Survey Research Organization must obtain written confirmation from the Client before releasing any data. (A suggested CASRO® Client agreement clause is available.)

Further, with respect to such research uses as Database Segmentation and/or Modeling (see preceding paragraph), specific action(s) may not be taken toward an <u>individual</u> Respondent as a result of his/her survey information and participation beyond those actions taken toward the <u>entire database population group</u> the Respondent <u>by chance</u> has been selected to represent. In order for such specific action, the following two elements must be met:

The Respondent has first given his/her permission to do so, having been told the <u>general purpose and limitations</u> of such use; and

The research firm has obtained <u>a written agreement from the Client</u> assuring that no other use will be made of Respondent-identifiable information.

Predictive equations which integrate a segmentation scheme into a Client database may be applied so long as **no action is taken toward an individual Respondent simply because of his or her participation in the survey.** Respondents must be treated like all other individuals in the database according to the segment(s) to which they belong or have been assigned.

b.  The identity of individual Respondents and Respondent-identifiable information may be disclosed to other Survey Research Organizations whenever such organizations are conducting different phases of a multi-stage study (e.g., a trend study). The initial Research Company should confirm in writing that Respondent confidentiality will be maintained in accordance with the Code.

c.  In the case of research in which representatives of the Client or others are present, such Client representatives and others should be asked not to disclose to anyone not present the identity of individual Participants or other Participant-identifying information except as needed to respond, with the Participant's prior specific approval, to any complaint by one or more of the Participants concerning a product or service supplied by the Client.

3.  The principle of Respondent confidentiality includes the following specific applications or safeguards:

a.  Survey Research Organizations' staff or personnel should not use or discuss Respondent-identifiable data or information for other than legitimate internal research purposes.

b.  The Survey Research Organization has the responsibility for insuring that Subcontractors (Interviewers, Interviewing Services and Validation, Coding, and Tabulation Organizations) and Consultants are aware of and agree to maintain and respect Respondent confidentiality whenever the identity of Respondents or Respondent-identifiable information is disclosed to such entities.

CASRO
The Voice and Values of Research
COUNCIL OF AMERICAN SURVEY RESEARCH ORGANIZATIONS®    *CODE OF STANDARDS AND ETHICS FOR SURVEY RESEARCH*

6

c. Before permitting Clients or others to have access to completed questionnaires in circumstances other than those described above, Respondent names and other Respondent-identifying information (e.g., telephone numbers) should be deleted.

d. Invisible identifiers on mail questionnaires that connect Respondent answers to particular Respondents should not be used. Visible identification numbers may be used but should be accompanied by an explanation that such identifiers are for control purposes only and that Respondent confidentiality will not be compromised.

e. Any Survey Research Organization that receives from a Client or other entity information that it knows or reasonably believes to be confidential, Respondent-identifiable information should only use such information in accordance with the principles and procedures described in this Code.

f. The use of survey results in a legal proceeding does not relieve the Survey Research Organization of its ethical obligation to maintain in confidence all Respondent-identifiable information or lessen the importance of Respondent anonymity. Consequently, Survey Research firms confronted with a subpoena or other legal process requesting the disclosure of Respondent-identifiable information should take all reasonable steps to oppose such requests, including informing the court or other decision-maker involved of the factors justifying confidentiality and Respondent anonymity and interposing all appropriate defenses to the request for disclosure.

B. Privacy and the Avoidance of Harassment

1. Survey Research Organizations have a responsibility to strike a proper balance between the needs for research in contemporary American life and the privacy of individuals who become the Respondents in the research. To achieve this balance:

   a. Respondents will be protected from unnecessary and unwanted intrusions and/or any form of personal harassment.

   b. The voluntary character of the Interviewer-Respondent contact should be stated explicitly where the Respondent might have reason to believe that cooperation is not voluntary.

2. This principle of privacy includes the following specific applications:

   a. The Research Organization, Subcontractors and Interviewers shall make every reasonable effort to ensure that the Respondent understands the purpose of the Interviewer/Respondent contact.

      (1) The Interviewer/Research Company representative must provide prompt and honest identification of his/her research firm affiliation.

      (2) Respondent questions should be answered in a forthright and non-deceptive manner.

CODE OF STANDARDS AND ETHICS FOR SURVEY RESEARCH    CASRO
The Voice and Values of Research
COUNCIL OF AMERICAN SURVEY RESEARCH ORGANIZATIONS

7

b. Deceptive practices and misrepresentation, such as using research as a guise for sales or solicitation purposes, are expressly prohibited.

c. Survey Research Organizations must respect the right of individuals to refuse to be interviewed or to terminate an interview in progress. Techniques that infringe on these rights should not be employed, but Survey Research Organizations may make reasonable efforts to obtain an interview including: (1) explaining the purpose of the research project; (2) providing a gift or monetary incentive adequate to elicit cooperation; and (3) re-contacting an individual at a different time if the individual is unwilling or unable to participate during the initial contact.

d. Research Organizations are responsible for arranging interviewing times that are convenient for respondents.

e. Lengthy interviews can be a burden. Research Organizations are responsible for weighing the research need against the length of the interview and Respondents must not be enticed into an interview by a misrepresentation of the length of the interview.

f. Research Organizations are responsible for developing techniques to minimize the discomfort or apprehension of Respondents and Interviewers when dealing with sensitive subject matter.

g. Electronic equipment (taping, recording, photographing) and one-way viewing rooms may be used only with the full knowledge of Respondents.

3. Internet Research

The unique characteristics of Internet research require specific notice that the principle of respondent privacy applies to this new technology and data collection methodology. The general principle of this section of the Code is that survey Research Organizations will not use unsolicited emails to recruit survey respondents or engage in surreptitious data collection methods. This section is organized into three parts: a. email solicitations, b. active agent technologies, and c. panel/sample source considerations.

a. Email Solicitation

(1) Research Organizations are required to verify that individuals contacted for research by email have a reasonable expectation that they will receive email contact for research. Such agreement can be assumed when ALL of the following conditions exist:

(a) A substantive pre-existing relationship exists between the individuals contacted and the Research Organization, the Client supplying email addresses, or the Internet Sample Providers supplying the email addresses (the latter being so identified in the email invitation);

(b) Survey email invitees have a reasonable expectation, based on the pre-existing relationship where survey email invitees have specifically opted in for Internet research with the research company or Sample Provider, or in the case of Client-supplied lists that they may be contacted for research and invitees have not opted out of email communications;

The Voice and Values of Research
CASRO®   *CODE OF STANDARDS AND ETHICS FOR SURVEY RESEARCH*
COUNCIL OF AMERICAN SURVEY RESEARCH ORGANIZATIONS®

8

(c) Survey email invitations clearly communicate the name of the sample provider, the relationship of the individual to that provider, and clearly offer the choice to be removed from future email contact.

(d) The email sample list excludes all individuals who have previously requested removal from future email contact in an appropriate and timely manner.

(e) Participants in the email sample were not recruited via unsolicited email invitations.

(2) Research Organizations are prohibited from using any subterfuge in obtaining email addresses of potential respondents, such as collecting email addresses from public domains, using technologies or techniques to collect email addresses without individuals' awareness, and collecting email addresses under the guise of some other activity.

(3) Research Organizations are prohibited from using false or misleading return email addresses or any other false and misleading information when recruiting respondents. As stated later in this Code, Research Organizations must comply with all federal regulations that govern survey research activities. In addition, Research Organizations should use their best efforts to comply with other federal regulations that govern unsolicited email contacts, even though they do not apply to survey research.

(4) When receiving email lists from Clients or Sample Providers, Research Organizations are required to have the Client or Sample Provider verify that individuals listed have a reasonable expectation that they will receive email contact, as defined, in (1) above.

(5) The practice of "blind studies" (for sample sources where the sponsor of the study is not cited in the email solicitation) is permitted if disclosure is offered to the respondent during or after the interview. The respondent must also be offered the opportunity to "opt-out" for future research use of the sample source that was used for the email solicitation.

(6) Information about the CASRO Code of Standards and Ethics for Survey Research should be made available to respondents.

b. Active Agent Technology

(1) Active agent technology is defined as any software or hardware device that captures the behavioral data about data subjects in a background mode, typically running concurrently with other activities. This category includes tracking software that allows Research Organizations to capture a wide array of information about data subjects as they browse the Internet. Such technology needs to be carefully managed by the research industry via the application of research best practices.

Active agent technology also includes direct to desktop software downloaded to a user's computer that is used solely for the purpose of alerting potential survey respondents, downloading survey content or asking survey questions. A direct to desktop tool does not track data subjects as they browse the Internet and all data collected is provided directly from user input.

Data collection typically requires an application to download onto the subjects' desktop, laptop or PDA (including personal wireless devices). Once downloaded, tracking software has the capability of capturing the data subject's actual experiences when using the Internet such as Web page hits, web pages visited, online transactions completed, online forms completed, advertising click-through rates or impressions, and online purchases.

Beyond the collection of information about a user's Internet experience, the software has the ability to capture information from the data subject's email and other documents stored on a computer device such as a hard disk. Some of this technology has been labeled "spyware," especially because the download or installation occurs without the data subject's full knowledge and specific consent. The use of spyware by a member of CASRO is strictly prohibited.

A cookie (defined as a small amount of data that is sent to a computer's browser from a web server and stored on the computer's hard drive) is not an active agent. The use of cookies is permitted if a description of the data collected and its use is fully disclosed in a Research Organizations' privacy policy.

(2) Following is a list of unacceptable practices that Research Organizations should strictly forbid or prevent. A Research Organization is considered to be using spyware when it fails to adopt all of the practices in set forth in Section 3 below or engages in any in the following practices:

(a) Downloading software without obtaining the data subject's informed consent.

(b) Downloading software without providing full notice and disclosure about the types of information that will be collected about the data subject, and how this information may be used. This notice needs to be conspicuous and clearly written.

(c) Collecting information that identifies the data subject without obtaining affirmed consent.

(d) Using keystroke loggers without obtaining the data subject's affirmed consent.

(e) Installing software that modifies the data subject's computer settings beyond that which is necessary to conduct research providing that the software doesn't make other installed software behave erratically or in unexpected ways.

(f) Installing software that turns off anti-spyware, anti-virus, or anti-spam software.

(g) Installing software that seizes control or hijacks the data subject's computer.

(h) Failing to make commercially reasonable efforts to ensure that the software does not cause any conflicts with major operating systems and does not cause other installed software to behave erratically or in unexpected ways.

(i) Installing software that is hidden within other software that may be downloaded.

(j)  Installing software that is difficult to uninstall.

(k)  Installing software that delivers advertising content, with the exception of software for the purpose of ad testing.

(l)  Installing upgrades to software without notifying users.

(m) Changing the nature of the active agent program without notifying user.

(n)  Failing to notify the user of privacy practice changes relating to upgrades to the software.

(3) Following are practices Research Organizations that deploy active agent technologies should adopt. Research Organizations that adopt these practices and do not engage in any of the practices set forth in Section 2 above will not be considered users of spyware.

(a)  Transparency to the data subject is critical. Research companies must disclose information about active agents and other software in a timely and open manner with each data subject. This communication must provide details on how the Research Organization uses and shares the data subject's information.

   i.  Only after receiving an affirmed consent or permission from the data subject or parent's permission for children under the age of 18, should any research software be downloaded onto the individual's computer or PDA.

   ii.  Clearly communicate to the data subject the types of data if any, that is being collected and stored by an active agent technology.

   iii.  Disclosure is also needed to allow the data subject to easily uninstall research software without prejudice or harm to them or their computer systems.

   iv.  Personal information about the subject should not be used for secondary purposes or shared with third parties without the data subject's consent.

   v.  Research Organizations are obligated to ensure that participation is a conscious and voluntary activity. Accordingly, incentives must never be used to hide or obfuscate the acceptance of active agent technologies.

   vi.  Research Organizations that deploy active agent technologies should have a method to receive queries from end-users who have questions or concerns. A redress process is essential for companies if they want to gauge audience reaction to participation on the network.

   vii.  On a routine and ongoing basis, consistent with the stated policies of the Research Organization, data subjects who participate in the research network should receive clear periodic notification that they are actively recorded as participants, so as to insure that their participation is voluntary. This notice should provide a clearly defined method to uninstall the Research Organization's tracking software without causing harm to the data subject.

CODE OF STANDARDS AND ETHICS FOR SURVEY RESEARCH    CASRO
The Voice and Values of Research
COUNCIL OF AMERICAN SURVEY RESEARCH ORGANIZATIONS

11

(b) Stewardship of the data subject is critical. Research companies must take steps to protect information collected from data subjects.

    i. Personal or sensitive data (as described in the Personal Data Classification Appendix) should not be collected. If collection is unavoidable, the data should be destroyed immediately. If destruction is not immediately possible, it: (a) should receive the highest level of data security and (b) should not be accessed or used for any purpose.

    ii. Research Organizations have an obligation to establish safeguards that minimize the risk of data security and privacy threats to the data subject.

    iii. It is important for Research Organizations to understand the impact of their technology on end-users, especially when their software downloads in a bundle with other comparable software products.

    iv. Stewardship also requires the Research Organization to make commercially reasonable efforts to ensure that these "free" products are also safe, secure and do not cause undue privacy or data security risks.

    v. Stewardship also requires a Research Organization that deploys active agent technologies to be proactive in managing its distribution of the software. Accordingly, companies must vigorously monitor their distribution channel and look for signs that suggest unusual events such as high churn rates.

    vi. If unethical practices are revealed, responsible research companies should strictly terminate all future dealings with this distribution partner.

c. Panel/Sample Source Considerations

The following applies to all Research Organizations that utilize the Internet and related technologies to conduct research.

(1) The Research Organization must:

    (a) Disclose to panel members that they are part of panel.

    (b) Obtain panelist's permission to collect and store information about the panelist.

    (c) Collect and keep appropriate records of panel member recruitment, including the source through which the panel member was recruited.

    (d) Collect and maintain records of panel member activity.

(2) Upon Client request, the Research Organization must disclose:

(a) Panel composition information (including panel size, populations covered, and the definition of an active panelist).

(b) Panel recruitment practice information.

(c) Panel member activity.

(d) Panel incentive plans.

(e) Panel validation practices.

(f) Panel quality practices.

(g) Aggregate panel and study sample information (this information could include response rate information, panelist participation in other research by type and timeframe, see Responsibilities in Reporting to Clients and the Public).

(h) Study related information such as email invitation(s), screener wording, dates of email invitations and reminders, and dates of fieldwork.

(3) Stewardship of the data collected from panelists is critical:

(a) Panels must be managed in accordance with applicable data protection laws and regulations.

(b) Personal or sensitive data should be collected and treated as specified in the Personal Data Classification Appendix.

(c) Upon panelist request, the panelist must be informed about all personal data (relating to the panelist that is provided by the panelist, collected by an active agent, or otherwise obtained by an acceptable method specified in a Research Organization's privacy policy) maintained by the Research Organization. Any personal data that is indicated by panel member as not correct or obsolete must be corrected or deleted as soon as practicable.

(4) Panel members must be given a straightforward method for being removed from the panel if they choose. A request for removal must be completed as soon as practicable and the panelist must not be selected for future research studies.

(5) A privacy policy relating to use of data collected from or relating to the panel member must be in place and posted online. The privacy policy must be easy to find and use and must be regularly communicated to panelists. Any changes to the privacy policy must be communicated to panelists as soon as possible.

(6) Research Organizations should take steps to limit the number of survey invitations sent to targeted respondents by email solicitations or other methods over the Internet so as to avoid harassment and response bias caused by the repeated recruitment and participation by a given pool (or panel) of data subjects.

(7) Research Organizations should carefully select sample sources that appropriately fit research objectives and Client requirements. All sample sources must satisfy the requirement that survey participants have either opted-in for research or have a reasonable expectation that they will be contacted for research.

(8) Research Organizations should manage panels to achieve the highest possible research quality. This includes managing panel churn and promptly removing inactive panelists.

(9) Research Organizations must maintain survey identities and email domains that are used exclusively for research activities.

(10) If a Research Organization uses a sample source (including a panel owned by the Research Organization or a subcontractor) that is used for both survey research and direct marketing activities, the Research Organization has an obligation to disclose the nature of the marketing campaigns conducted with that sample source to Clients so that they can assess the potential for bias.

(11) All data collected on behalf of a Client must be kept confidential and not shared or used on behalf of another Client (see also Responsibilities to Clients).

4.  Privacy Laws and Regulations

    a.  Research Organizations must comply with existing state, federal, and international statutes and regula-tions governing privacy, data security, and the disclosure, receipt and use of personally-identifiable information (collectively "Privacy Laws"). Some of the Privacy Laws affecting Survey Research are limited to specific industries (e.g., financial and health care industries), respondent source (e.g., children), and/or international venues.

    b.  In instances in which privacy laws apply to Survey Research operations for specific industries or respondent source, Research Organizations will:

        (1) Always enter into a confidentiality or "chain of trust" agreement when receiving and using legally-protected, personally-identifiable information from a source other than the data subject, insuring that the Research Organization will protect the information and only use it for the purposes specified in the agreement;

        (2) Always require subcontractors and other third parties to whom they disclose personally-identifiable information to enter into confidentiality or "chain of trust" agreements that require such party(ies) to provide the same level of security and limitations of use and disclosure as the Research Organization;

        (3) Always store or maintain personally-identifiable information in a verifiably secure location;

        (4) Always control and limit accessibility to personally-identifiable information;

(5) Always use reasonable efforts to destroy personally-identifiable information once the survey is complete and validation has been conducted, unless the personally-identifiable information relates to Respondents in panels, to ongoing studies, or for some other critical research reason, or the research Client is legally or contractually obligated to require its service providers to maintain such information for a certain period of time and contractually imposes this requirement on the Research Organization;

(6) Never knowingly receive, use or disclose personally-identifiable information in a way that will cause the Research Organization or another party to violate any Privacy Law or agreement.

c. In order to conduct international research that requires either transmitting or receiving personally-identifiable information of Respondents, Research Organizations must comply in all material respects with international privacy laws and regulations, by, in the case of data transfers with a person or entity in the European Union, either (i) certifying their compliance with the privacy provisions described in the United States Safe Harbor Principles of the European Union Directive on Data Protection or (ii) satisfying an alternative method of complying in all material respects with the Directive. The EU Safe Harbor privacy principles are contained in the CASRO Model Privacy Policy and are as follows:

(1) Notice: A description of what information is collected, how it is collected, its purpose, and its disclosure to third parties.

(2) Choice: A statement of and procedures for allowing individuals to choose not to participate in the research and/or to have their personal information used or disclosed to a third party.

(3) Onward Transfer: A statement that personal information will be transferred only to third parties who are also in compliance with the Safe Harbor Principles.

(4) Access: Procedures to provide individuals with access to their personal information in order to correct, amend, or delete that information where it is inaccurate.

(5) Security: A description of the reasonable precautions taken to protect personal information from loss, misuse and unauthorized access, disclosure, alteration, and destruction.

(6) Data Integrity: A statement that information will be used consistent with the purpose for which it was collected.

(7) Enforcement: A description of internal and external mechanisms for assuring compliance, and addressing and resolving disputes and complaints.

d. Research Organizations will, to the extent required by law or as necessary to fully and completely comply with the principles set forth in the section of this Code entitled Responsibilities to Respondents, adopt effective and comprehensive legal and operational policies, such as those set forth in CASRO's Privacy Protection Program, which will be updated as necessary to conform with additions to and changes in Privacy Laws.

## II. RESPONSIBILITIES TO CLIENTS

A. Relationships between a Survey Research Organization and Clients for whom the surveys are conducted should be of such a nature that they foster confidence and mutual respect. They must be characterized by honesty and confidentiality.

B. The following specific approaches describe in more detail the responsibilities of Research Organizations in this relationship:

1. A Survey Research Organization must assist its Clients in the design of effective and efficient studies that are to be carried out by the Research Company. If the Survey Research Organization questions whether a study design will provide the information necessary to serve the Client's purposes, it must make its reservations known.

2. A Research Organization must conduct the study in the manner agreed upon. However, if it becomes apparent in the course of the study that changes in the plans should be made, the Research Organization must make its views known to the Client promptly.

3. A Research Organization has an obligation to allow its Clients to verify that work performed meets all contracted specifications and to examine all operations of the Research Organization that are relevant to the proper execution of the project in the manner set forth. While Clients are encouraged to examine questionnaires or other records to maintain open access to the research process, the Survey Research Organization must continue to protect the confidentiality and privacy of survey Respondents.

4. When more than one Client contributes to the cost of a project specially commissioned with the Research Organization, each Client concerned shall be informed that there are other Participants (but not necessarily their identity).

5. Research Organizations will hold confidential all information that they obtain about a Client's general business operations, and about matters connected with research projects that they conduct for a Client.

6. For research findings obtained by the agency that are the property of the Client, the Research Organization may make no public release or revelation of findings without expressed, prior approval from the Client.

C. Bribery in any form and in any amount is unacceptable and is a violation of a Research Organization's fundamental, ethical obligations. A Research Organization and/or its principals, officers and employees should never give gifts to Clients in the form of cash. To the extent permitted by applicable laws and regulations, a Research Organization may provide nominal gifts to Clients and may entertain Clients, as long as the cost of such entertainment is modest in amount and incidental in nature.

# III. RESPONSIBILITIES IN REPORTING TO CLIENTS AND THE PUBLIC

A. When reports are being prepared for Client confidential or public release purposes, it is the obligation of the Research Organization to insure that the findings they release are an accurate portrayal of the survey data, and careful checks on the accuracy of all figures are mandatory.

B. A Research Organization's report to a Client or the Public should contain, or the Research Organization should be ready to supply to a Client or the Public on short notice, the following information about the survey:

   1. The name of the organization for which the study was conducted and the name of the organization conducting it.

   2. The purpose of the study, including the specific objectives.

   3. The dates on or between which the data collection was done.

   4. A definition of the universe that the survey is intended to represent and a description of the population frame(s) that was actually sampled.

   5. A description of the sample design, including the method of selecting sample elements, method of interview, cluster size, number of callbacks, Respondent eligibility or screening criteria, and other pertinent information.

   6. A description of results of sample implementation including (a) a total number of sample elements contacted, (b) the number not reached, (c) the number of refusals, (d) the number of terminations, (e) the number of non-eligibles, (f) the number of completed interviews.

   7. The basis for any specific "completion rate" percentages should be fully documented and described.

   8. The questionnaire or exact wording of the questions used, including interviewer directions and visual exhibits.

   9. A description of any weighting or estimating procedures used.

   10. A description of any special scoring, data adjustment or indexing procedures used. (Where the Research Organization uses proprietary techniques, these should be described in general and the Research Organization should be prepared to provide technical information on demand from qualified and technically competent persons who have agreed to honor the confidentiality of such information).

   11. Estimates of the sampling error and of data should be shown when appropriate, but when shown they should include reference to other possible sources of error so that a misleading impression of accuracy or precision is not conveyed.

   12. Statistical tables clearly labeled and identified as to questionnaire source, including the number of raw cases forming the base for each cross-tabulation.

13. Copies of Interviewer instructions, validation results, code books, and other important working papers.

C. As a **minimum**, any general public release of survey findings should include the following information:

1. The sponsorship of the study.

2. A description of the purposes.

3. The sample description and size.

4. The dates of data collection.

5. The names of the research company conducting the study.

6. The exact wording of the questions.

7. Any other information that a lay person would need to make a reasonable assessment of the reported findings.

D. A Survey Research Organization will seek agreements from Clients so that citations of survey findings will be presented to the Research Organization for review and clearance as to accuracy and proper interpretation prior to public release. A Research Organization will advise Clients that if the survey findings publicly disclosed are incorrect, distorted, or incomplete, in the Research Organization's opinion, the Research Organization reserves the right to make its own release of any or all survey findings necessary to make clarification.

## IV. RESPONSIBILITIES TO OUTSIDE CONTRACTORS AND INTERVIEWERS

A. Research Organizations will not ask any Outside Contractor or Interviewer to engage in any activity which is not acceptable as defined in other sections of this *Code of Standards and Ethics for Survey Research* or related CASRO® publications.

# APPENDIX: PERSONAL DATA CLASSIFICATION

| Classification Level Name | "Ordinary Personal Data" | "Sensitive Personal Data" | "Hyper-Sensitive Personal Data" |
|---|---|---|---|
| Criteria | Data that is identifiable to an individual person but is not "Sensitive Personal Data." | Data that is (1) identifiable to an individual person and (2) has the potential to be used to harm or embarrass the person. | Individually identifiable data that typically has no legitimate survey research value or purpose and has a very high potential to harm or embarrass the data subject. |
| Examples | Name<br>Telephone # (work & home)<br>Address (work & home)<br>E-mail address (work and home)<br>Internal Company ID numbers<br>Gender<br>Marital status<br># of Children<br>Date of Birth, Age<br>Citizenship<br>Education<br>Income range<br>Veteran status<br>Immigration status<br>Languages spoken<br>Country of residence<br>Non-medical benefits information<br>Purchase history, buying patterns, shopping patterns, hobbies<br>All other personal data not "Sensitive Personal Data"<br>IP address | Criminal arrests or convictions<br>Judgments in civil cases<br>Administrative sanctions<br>Race, ethnicity, national origin<br>Political opinions<br>Religious or philosophical beliefs<br>Union & Trade-union membership<br>Data concerning health or medical treatment<br>Data concerning sexual orientation or activity<br>Financial data (such as credit rating, excluding items listed as Hyper-Sensitive Personal Data)<br>Salary & Compensation<br>Disability status | Social Security Numbers<br>National ID Numbers<br>Driver's License #<br>Financial Information (Credit card #s, Account #s)<br>Passwords |
| Administrative Access Restrictions (e.g., access granted only to employees with a demonstrable need to know) | Access restricted to persons with a need to know for legitimate business purposes, and who have signed a confidentiality agreement. | Access restricted to persons with a need to know for legitimate business purposes, and who have signed a confidentiality agreement, and who have been specifically designated by management. | Do not collect if at all possible; implement processes to eliminate data that's not used or ask client to provide only essential data. If collected and not eliminated do not disclose to third parties and apply the same Administrative Access requirements as Sensitive Personal Data. |
| Physical Labeling (e.g., papers and diskette or tape label) | "Personal Data" label in a conspicuous location on each document. | "Sensitive Personal Data" label in a conspicuous location on each document. | Same as Sensitive Personal Data. |
| Electronic Labeling (e.g., digital file, e-mail, or web page) | "Personal Data" label in a conspicuous location on each digital file, e-mail, or web page, and on subject line of messages. | "Sensitive Personal Data" label in a conspicuous location on each digital file, e-mail, or Web page, and on subject line of messages. | Same as Sensitive Personal Data. |



The Voice and Values of Research
CASRO®
COUNCIL OF AMERICAN SURVEY RESEARCH ORGANIZATIONS®
CODE OF STANDARDS AND ETHICS FOR SURVEY RESEARCH

| Classification Level Name | "Ordinary Personal Data"[1] | "Sensitive Personal Data"[2] | "Hyper-Sensitive Personal Data"[3] |
|---|---|---|---|
| Physical Storage (e.g., secure room, locked drawer) | Storage in a secure office or other location. Room need not be locked if access to the building or floor is restricted to persons who are authorized to see the data. | Storage in a locked drawer, file cabinet, or office required. If stored in an open-file storage area, access to the area must be restricted to persons who are authorized to see the data. | Same as Sensitive Personal Data. |
| Electronic Storage (e.g., password protection, encryption) | Stored in a directory or folder with restricted access, e.g., password protection. | Stored in a directory or folder with restricted access, e.g., password protection. | Same as Sensitive Personal Data. |
| Physical Transmission (e.g., sealed envelope, bonded courier) | Sealed envelope. | Sealed double envelopes with bonded courier, and data encrypted with minimum 128 bit key. | Same as Sensitive Personal Data. |
| Electronic Transmission (e.g., encrypted, authentication of recipient) | Information should be transmitted to a verified account (email address or login ID). | Information should be transmitted to a verified account (email address or login ID) and the data should be transmitted in encrypted form (minimum 128-bit key). | Same as Sensitive Personal Data. |
| Physical Disposal (e.g., shredding of paper or other media) | After applicable Electronic Disposal, secure onsite disposal (including shredding of paper). | After applicable Electronic Disposal, secure onsite disposal (including shredding of paper). Disposal audit trail required. | Same as Sensitive Personal Data. |
| Electronic Disposal (e.g., wiping of disk, degaussing) | Where feasible and possible, removal of directory entry for file, and overwriting of file space with other data. Alternatively, security certification where data becomes embedded in archives and cannot be selectively deleted. | Where feasible and possible, degaussing (wiping) of media or physical destruction of media. Alternatively, security certification where data becomes embedded in archives and cannot be selectively degaussed (wiped). | Same as Sensitive Personal Data. |

[1] Standard demographic data included in surveys are only considered "Ordinary Personal Data" if it is identifiable to an individual person.

[2] Standard demographic data included in surveys are only considered "Sensitive Personal Data" if it is identifiable to an individual person. It may be necessary to create additional classification levels for data that is subject to specific statutory requirements, such as "personal health information" subject to HIPAA.

[3] It may be necessary to create additional classification levels for data that is subject to specific statutory requirements, such as "personal health information" subject to HIPAA.

CODE OF STANDARDS AND ETHICS FOR SURVEY RESEARCH    The Voice and Values of Research CASRO COUNCIL OF AMERICAN SURVEY RESEARCH ORGANIZATIONS

21

For more information about



The Voice and Values of Research

# CASRO®

COUNCIL OF AMERICAN SURVEY RESEARCH ORGANIZATIONS®

## CODE OF STANDARDS AND ETHICS FOR SURVEY RESEARCH

please visit

### www.casro.org

or contact

Council of American Survey Research Organizations® (CASRO®)
170 North Country Road, Suite 4
Port Jefferson, New York 11777 USA
(631) 928-6954 • Fax: (631) 928-6041

email: casro@casro.org



The Voice and Values of Research
CASRO® CODE OF STANDARDS AND ETHICS FOR SURVEY RESEARCH
COUNCIL OF AMERICAN SURVEY RESEARCH ORGANIZATIONS®
22



The Voice and Values of Research

# CASRO®
COUNCIL OF AMERICAN SURVEY RESEARCH ORGANIZATIONS®

© CASRO, 2009

www.casro.org

# EXHIBIT C



# AAPOR Code of Professional Ethics & Practices

Home > About AAPOR> Standards & Ethics > AAPOR Code of Professional Ethics & Practice

We, the members of the American Association for Public Opinion Research, subscribe to the principles expressed in the following code. Our goals are to support sound and ethical practice in the conduct of public opinion research and in the use of such research for policy- and decision-making in the public and private sectors, as well as to improve public understanding of public opinion and survey research methods and the proper use of public opinion and survey research results.

We pledge ourselves to maintain high standards of scientific competence and integrity in conducting, analyzing, and reporting our work; in our relations with survey respondents; with our clients; with those who eventually use the research for decision-making purposes; and with the general public. We further pledge ourselves to reject all tasks or assignments that would require activities inconsistent with the principles of this code.

## THE CODE

### I. Principles of Professional Practice in the Conduct of Our Work

A. We shall exercise due care in developing research designs and survey instruments, and in collecting, processing, and analyzing data, taking all reasonable steps to assure the reliability and validity of results.

1. We shall recommend and employ only those tools and methods of analysis that, in our professional judgment, are well suited to the research problem at hand.

2. We shall not knowingly select research tools and methods of analysis that yield misleading conclusions.

3. We shall not knowingly make interpretations of research results that are inconsistent with the data available, nor shall we tacitly permit such interpretations.

4. We shall not knowingly imply that interpretations should be accorded greater confidence than the data actually warrant.

B. We shall describe our methods and findings accurately and in appropriate detail in all research reports, adhering to the standards for minimal disclosure specified in Section III.

C. If any of our work becomes the subject of a formal investigation of an alleged violation of this Code, undertaken with the approval of the AAPOR Executive Council, we shall provide addition information on the survey in such detail that a fellow survey practitioner would be able to conduc professional evaluation of the survey.

## II. Principles of Professional Responsibility in Our Dealings With People

A. The Public:

1. When preparing a report for public release we shall ensure that the findings are a balanced and accurate portrayal of the survey results.

2. If we become aware of the appearance in public of serious inaccuracies or distortions regarding our research, we shall publicly disclose what is required to correct these inaccuracies or distortior including, as appropriate, a statement to the public media, legislative body, regulatory agency, or other appropriate group, to which the inaccuracies or distortions were presented.

3. We shall inform those for whom we conduct publicly released surveys that AAPOR standards require members to release minimal information about such surveys, and we shall make all reasonable efforts to encourage clients to subscribe to our standards for minimal disclosure in the releases.

B. Clients or Sponsors:

1. When undertaking work for a private client, we shall hold confidential all proprietary informat obtained about the client and about the conduct and findings of the research undertaken for the client, except when the dissemination of the information is expressly authorized by the client, or when disclosure becomes necessary under the terms of Section I-C or II-A of this Code.

2. We shall be mindful of the limitations of our techniques and capabilities and shall accept only those research assignments that we can reasonably expect to accomplish within these limitations.

C. The Profession:

1. We recognize our responsibility to the science of survey research to disseminate as freely as possible the ideas and findings that emerge from our research.

2. We shall not cite our membership in the Association as evidence of professional competence, since the Association does not so certify any persons or organizations.

D. The Respondent:

1. We shall avoid practices or methods that may harm, humiliate, or seriously mislead survey respondents.

2. We shall respect respondents' concerns about their privacy.

3. Aside from the decennial census and a few other surveys, participation in surveys is voluntary. We shall provide all persons selected for inclusion with a description of the survey sufficient to

permit them to make an informed and free decision about their participation.

4. We shall not misrepresent our research or conduct other activities (such as sales, fund raising, political campaigning) under the guise of conducting research.

5. Unless the respondent waives confidentiality for specified uses, we shall hold as privileged and confidential all information that might identify a respondent with his or her responses. We also shall not disclose or use the names of respondents for non-research purposes unless the respondents grant us permission to do so.

6. We understand that the use of our survey results in a legal proceeding does not relieve us of our ethical obligation to keep confidential all respondent identifiable information or lessen the importance of respondent anonymity.

### III. Standards for Minimal Disclosure

Good professional practice imposes the obligation upon all public opinion researchers to include, any report of research results, or to make available when that report is released, certain essential information about how the research was conducted. At a minimum, the following items should be disclosed.

1. Who sponsored the survey, and who conducted it.

2. The exact wording of questions asked, including the text of any preceding instruction or explanation to the interviewer or respondents that might reasonably be expected to affect the response.

3. A definition of the population under study, and a description of the sampling frame used to identify this population.

4. A description of the sample design, giving a clear indication of the method by which the respondents were selected by the researcher, or whether the respondents were entirely self-selected.

5. Sample sizes and, where appropriate, eligibility criteria, screening procedures, and response rates computed according to AAPOR Standard Definitions. At a minimum, a summary of disposition of sample cases should be provided so that response rates could be computed.

6. A discussion of the precision of the findings, including estimates of sampling error, and a description of any weighting or estimating procedures used.

7. Which results are based on parts of the sample, rather than on the total sample, and the size of such parts.

8. Method, location, and dates of data collection.

From time to time, AAPOR Council may issue guidelines and recommendations on best practices with regard to the release, design and conduct of surveys.

*As revised in 200*

Back to top

###

## READ MORE

Disclosure standards | Ethics

American Association for Public Opinion Research
P.O. Box 14263 | Lenexa, KS 66285-4263
(913) 895-4601 | FAX: (913) 895-4652
Email: info@aapor.org



AMERICAN ASSOCIATION FOR PUBLIC OPINION RESEARCH

---

# Best Practices for Survey and Public Opinion Research

Home > Resources For Researchers > Best Practices

"The quality of a survey is best judged not by its size, scope, or prominence, but by how much attention is given to [preventing, measuring, and] dealing with the many important problems that can arise."

*—"What is a Survey?", American Statistical Association, 1996*

How to produce a quality survey:

1. Have specific goals.
2. Consider alternatives.
3. Select samples that well represent the population to be studied.
4. Use designs that balance costs with errors.
5. Take great care in matching question wording to the concepts being measured and the population studied.
6. Pretest questionnaires and procedures.
7. Train interviewers carefully on interviewing techniques and the subject matter of the survey.
8. Check quality at each stage.
9. Maximize cooperation or response rates within the limits of ethical treatment of human subjects.
10. Use appropriate statistical analytic and reporting techniques.
11. Develop and fulfill pledges of confidentiality given to respondents.
12. Disclose all methods of the survey to allow for evaluation and replication.

Have specific goals for the survey.

The objectives of a high quality survey or poll should be specific, clear-cut and unambiguous. Such surveys are carried out solely to develop statistical information about the subject, not to produce predetermined results, nor as a ruse for marketing, fund-raising, changing voters' minds, or similar activities. Go to the Top of the Page

Consider alternatives to using a survey to collect information.

In its initial conceptualization, the ideal survey takes seriously the important question of whether or not the information needed would best be acquired by conducting a survey or poll. A survey generally originates when an individual or institution is confronted with a need for information for

which existing data appear to be insufficient. At this point, it is important to consider if the requir
information can even be collected by a survey or whether a survey would actually be the best way
to acquire the information needed. If a survey is indeed appropriate, then careful attention must b
given as to who is to be sampled and what is to be learned about those sampled.

Select samples that well represent the population to be studied.

A replicable or *repeatable* plan is developed to randomly choose a sample capable of meeting the
survey's goals. Sampling should be designed to guard against unplanned selectiveness. A survey's
intent is not to describe the particular individuals who, by chance, are part of the sample, but rath
to obtain a composite profile of the population. In a bona fide survey, the sample is not selected
haphazardly or only from persons who volunteer to participate. It is scientifically chosen so that
each person in the population will have a measurable chance of selection. This way, the results ca
be reliably projected from the sample to the larger population with known levels of
certainty/precision.

Critical elements in an exemplary survey are: (a) to ensure that the right population is indeed bein
sampled (to address the questions of interest); and (b) to locate (or "cover") all members of the
population being studied so they have a chance to be sampled. The quality of the list of such
members (the "sampling frame")whether it is up-to-date and complete is probably the dominant
feature for ensuring adequate coverage of the desired population to be surveyed. Where a particul
sample frame is suspected to provide incomplete or inadequate coverage of the population of
interest, multiple frames should be used.

Virtually all surveys taken seriously by social scientists, policy makers, and the informed media u
some form of *random or probability sampling*, the methods of which are well grounded in
statistical theory and the theory of probability. Reliable and efficient estimates of needed statistic:
can be made by surveying a carefully constructed sample of a population, provided that a large
proportion of the sample members give the requested information. The latter requires that careful
and explicit estimates of potential non response bias and sample representativeness be developed.

Use designs that balance costs with errors.

For example, allocating a survey budget to support a very large sample size, but with insufficient
attention to follow-up of non respondents to produce a good response rate (cf. *item 9*, below)
generally yields results that are less accurate than surveying a smaller sample with a higher
response rate. Similarly, allocating most of one's funds to provide a large sample size but with litt
or no resources devoted to interviewer training would not be prudent. Although sampling errors c
be readily estimated using probability sampling methods, they do not reflect the total error of a
survey statistic or estimate, which is a function of many different features of a given survey. Surv
professionals practicing at their best carefully seek to balance these various types of error in the
design and conduct of a particular survey, in order to minimize the total error given the budget or
resources available.

Take great care in matching question wording to the concepts being measured and the population
studied.

Based on the goals of a survey, questions for respondents are designed and arranged in a logical
format and order to create a survey questionnaire. The ideal survey or poll recognizes that plannii

the questionnaire is one of the most critical stages in the survey development process, and gives careful attention to all phases of questionnaire development and design, including: definition of topics, concepts and content; question wording and order; and questionnaire length and format. O must first ensure that the questionnaire domains and elements established for the survey or poll fully and adequately cover the topics of interest. Ideally, multiple rather than single indicators or questions should be included for all key constructs.

Beyond their specific content, however, the manner in which questions are asked, as well as the specific response categories provided, can greatly affect the results of a survey. Concepts should clearly defined and questions unambiguously phrased. Question wording should be carefully examined for special sensitivity or bias. Techniques should be developed to minimize the discomfort or apprehension of both respondents and interviewers when dealing with sensitive subject matter. Ways should be devised to keep respondent mistakes and biases (e.g., memory of past events) to a minimum, and to measure those that cannot be eliminated. To accomplish these objectives, well- established cognitive research methods (e.g., paraphrasing and "think aloud" interviews) and similar methods (e.g., behavioral coding of interviewer-respondent interactions) should be employed with persons similar to those to be surveyed to assess and improve all key questions along these various dimensions.

Pretest questionnaires and procedures to identify problems prior to the survey.

High quality surveys and polls always provide adequate budget and time for pretesting questionnaire(s) and field procedures. A pretest of the questionnaire and field procedures is the o1 way of finding out if everything "works"especially if a survey employs new techniques or a new : of questions. Because it is rarely possible to foresee all the potential misunderstandings or biasing effects of different questions or procedures, it is vital for a well-designed survey operation to include provision for a pretest. All questions should be pretested to ensure that questions are understood by respondents, can be properly administered by interviewers, and do not adversely affect survey cooperation. In circumstances where one is uncertain about the best design or any critical component of such a design, split sample experiments, which systematically compare the effects of two or more alternatives, should be included either prior to or as part of the pretesting process to select the most appropriate or effective design(s) or component(s).

Train interviewers carefully on interviewing techniques and the subject matter of the survey.

Insisting on high standards in the recruiting and training of interviewers is also crucial to conducting a quality survey or poll. For high quality data to be collected, interviewers in telephor or in person surveys must be carefully trained to do their work properly through face-to-face ("classroom") or telephone training, self-study, or some combination of these. Good interviewer techniques should be stressed, such as how to make initial contacts, how to deal with reluctant respondents, how to conduct interviews in a professional manner, and how to avoid influencing o biasing responses. Training should also involve practice interviews to familiarize the interviewers with the variety of situations they are likely to encounter. Time should be spent going over survey concepts, definitions, and procedures, including a question-by- question approach to be sure that interviewers can deal with any misunderstandings that may arise.

Construct quality checks for each stage of the survey.

Excellent surveys and polls are those that collect information carefully, and check and verify eacl

step of the research process. To assure that the proper execution of a survey corresponds to its
design, every facet of a survey must be looked at during implementation. Checks must be made a
every step to ensure that the sample is selected according to specifications; that the interviewers c
their work properly; that the information from questionnaires is edited and coded accurately; that
computer data entry is done correctly; and that the computer programs used for data analysis wor
properly.

Sloppy execution in the field, in particular, can seriously undermine results. Controlling the quali
of fieldwork is done by observing/monitoring, verifying and/or redoing a small sample of the
interviews. At least some questionnaire-by-questionnaire checking (including interviewer "edits"
and a review of frequencies to monitor questionnaire performance while in the field are also
essential to detect omissions (e.g., skip errors) or other obvious mistakes in the data before it is to
late to fix them.

Maximize cooperation or response rates within the limits of ethical treatment of human subjects.

Nonresponse occurs when members of the sample cannot or will not participate in a survey. Care
sample management and control to ensure that a large proportion of sample members provide the
information requested is essential to good survey practice. A low cooperation or response rate do
more damage in rendering a survey's results questionable than a small sample, because there may
no valid way scientifically of inferring the characteristics of the population represented by the no
respondents. Proper sample management and control entails such things as adding sample in
correctly formulated replicates, tracking the disposition of all cases, monitoring the sample while
the field for potential problems, and "metering" or rationing resources to ensure the collection of
data from harder-to-reach respondents. Interviewers must also be carefully equipped through
training with effective responses to deal with concerns that reluctant respondents might express.
Specific procedures designed explicitly to stimulate survey cooperation or participation should al
be considered, such as (where possible) sending advance letters to sample households or individu
to inform them of the pending survey, offering monetary (i.e., cash) or non-monetary (some other
valued reward) incentives to encourage participation, and sending reminders or making follow-up
calls to those who do not respond initially. Failure to follow up non respondents and refusals, in
particular, can severely undermine an otherwise well-designed survey. To deal with this possibili
(a) visits or calls to sample households are scheduled with careful attention to such consideration:
as the best time of day to call or visit; (b) allowance is made for repeated attempts (e.g., callbacks
different times and days) to thoroughly work the selected sample in not-at home and related
situations; and (c) special efforts (i.e, reworking refusals with an experienced interviewer) are ma
to persuade persons who are inclined not to participate to respond. In mail surveys, it is usually
necessary to send reminders and conduct several follow- up mailings, and at times to contact at le
a subsample of the remaining non respondents by telephone or personal visit. Where possible,
specific efforts to directly observe or measure the characteristics of non respondents should also
included in the overall survey design.

Use statistical analytic and reporting techniques appropriate to the data collected.

Excellence in the practice of survey and public opinion research requires that data analysis and
interpretation be competent and clear, and that findings or results be presented fully,
understandably, and fairly. The information collected should be critically examined in a search fo
meaning processed, refined, and thoroughly analyzed. Routine reliability studies should be
conducted for all key measurements.

Special codes should be provided for missing items, indicating why the data are not included. An
ideally, the "filling in" or imputation of these missing data items (based on rigorous and well
validated statistical methods) should be undertaken to reduce any biases arising from their absenc
Statistical tables should be clearly labeled, including identification of questionnaire source, and tl
(unweighted) number of cases forming the base for each cross-tabulation. Sampling errors should
be included for all statistics presented, rather than only the statistics themselves.

Findings and interpretations should be presented honestly and objectively, with full reporting of ε
relevant findings, including any that may seem contradictory or unfavorable. Sampling and
nonsampling errors including coverage, measurement and reporting errors, response variance,
interviewer and respondent bias, non response, imputation error and errors in processing the data
should explicitly be taken into account in the analysis of survey data and interpretation of survey
results, in a comprehensive effort to assess error from each perspective. Conclusions should be
carefully distinguished from the factual findings, and great care should be taken to be sure that th
conclusions and the findings presented are consistent.

Carefully develop and fulfill pledges of confidentiality given to respondents.

Establish clear intentions and meticulous procedures to assure the privacy of respondents and the
confidentiality of the information they provide. Unless the respondent explicitly requests
otherwise,or waives confidentiality for specified uses, one should hold as privileged and
confidential the identity of individual respondents and all information that might identify a
respondent with his or her responses.

*Exemplary* survey research practice requires that one literally do "whatever is possible" to protect
the privacy of research participants and to keep collected information they provide confidential or
anonymous. One must establish clear intentions to protect the confidentiality of information
collected from respondents, strive to ensure that these intentions realistically reflect one's ability t
do so, and clearly state pledges of confidentiality and their realistic limitations to respondents. Th
is, one must ensure that the means are adequate to protect confidentiality to the extent pledged or
intended, that procedures for processing and use of data conform to the pledges made, and that
appropriate care is taken in dealing with directly identifying information (i.e., using such steps as
destroying this type of information or removing it from the file when it is no longer needed for
inquiry).

Interviewers and other research staff must be carefully trained and indoctrinated to uphold and
maintain the confidentiality of respondents' identities and the information they provide and
take/sign an explicit oath or pledge of confidentiality to do so before beginning work. In the
verification of information, one must protect the identity of respondents from outside disclosure.

One should also assure that appropriate techniques are applied to control for potential statistical
disclosure of respondent data. Individual respondents should never be identified or identifiable in
reporting survey findings: all survey results should be presented in completely anonymous
summaries, such as statistical tables and charts, and statistical tabulations presented by broad
enough categories so that individual respondents cannot be singled out.

Disclose all methods of the survey to permit evaluation and replication.

Excellence in survey practice requires that survey methods be fully ddisclosed and reportedin

sufficient detail to permit replication by another rreasearcher andthat all data (subject to appropriat safeguards to maintain privacy and confidentiality) be fully documented and made available for independent examination. Good professional practice imposes an obligation upon all survey and public opinion researchers to include, in any report of research results, or to make available when that report is released, certain minimal essential information about how the research was conducto to ensure that consumers of survey results have an adequate basis for judging the reliability and validity of the results reported. Exemplary practice in survey research goes beyond such standard for "mminimaldisclosure," promulgated by AAPOR and several other pprofessionalassociations (e.g., CASRO and NCPP) by (a) describing how the research was done in sufficient detail that a skilled researcher could repeat the study, and (b) making data available for independent examination and analysis by other responsible parties (with appropriate safeguards for privacy concerns).

A comprehensive list of the elements proposed for disclosure by one or more ssources which in combination, exceed the "standards for mminimumdisclosure" proposed by any one of the professional organizations includes:

- who sponsored the survey, and who conducted it;
- the purpose of the study, including specific objectives;
- the questionnaire and/or the exact, full wording of all questions asked, including any visua exhibits and the text of any preceding instruction or explanation to the interviewer or respondents that might reasonably be expected to affect the response;
- a definition of the universe the population under study which the survey is intended to represent, and a description of the sampling frame used to identify this population (includi its source and likely bias);
- a description of the sample design, including cluster size, number of callbacks, informatio on eligibility criteria and screening procedures, method of selecting sample elements, mod of data collection, and other pertinent information;
- a description of the sample selection procedure, giving a clear indication of the methods b; which respondents were selected by the researcher, or whether the respondents were entire self-selected, and other details of how the sample was drawn in sufficient detail to permit fairly exact replication;
- size of samples and sample ddisposition theresults of sample implementation, including a full accounting of the final outcome of all sample cases: e.g., total number of sample elements contacted, those not assigned or reached, refusals, terminations, non-eligibles, ar completed interviews or questionnaires;
- documentation and a full description, if applicable, of any response or completion rates cit (for quota designs, the number of refusals), and (whenever available) information on how non respondents differ from respondents;
- a description of any special scoring, editing, data adjustment or indexing procedures used;
- a discussion of the precision of findings, including, if appropriate, estimates of sampling eerror withreferences to other possible sources of error so that a misleading impression of accuracy or precision is not cconveyed and a description of any weighting or estimating procedures used;
- a description of all percentages on which conclusions are based;
- a clear delineation of which results are based on parts of the sample, rather than on the tot; sample;
- method(s), location(s), and dates of interviews, fieldwork or data collection;
- interviewer characteristics;

- copies of interviewer instructions or manuals, validation results, codebooks, and other important working papers; and
- any other information that a layperson would need to make a reasonable assessment of the reported findings.

Sources

Back to top

### 

## READ MORE

Disclosure standards | Sampling

American Association for Public Opinion Research
P.O. Box 14263 | Lenexa, KS 66285-4263
(913) 895-4601 | FAX: (913) 895-4652
Email: info@aapor.org

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Appendix C

Court Order Vis a Vis Respondent Identities

GRAHAM**HOLLIS** APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103

**DECLARATION OF JON KROSNICK ISO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **STATE OF OKLAHOMA, et al.** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 05-CV-329-GKF-PJC** |
| | ) | |
| **TYSON FOODS, INC., et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

Before the Court are the Motion for Protective Order filed by Plaintiffs State of

Oklahoma, ex rel. W.A. Drew Edmonson, in his capacity as Attorney General of the State of

Oklahoma and Oklahoma Secretary of the Environment C. Miles Tolbert, in his capacity as the

Trustee for Natural Resources for the State of Oklahoma (hereafter, the "State") (Dkt. #1853),

and the Motion to Compel Production of Expert Materials filed by Defendants Tyson Foods,

Inc., Tyson Poultry, Inc., Tyson Chicken, Inc., (the "Tyson Defendants"), Cobb-Vantress, Inc.,

Cal-Maine Foods, Inc., Cal-Maine Farms, Inc., Cargill, Inc., Cargill Turkey Production, LLC,

George's, Inc., George's Farms, Inc., Peterson Farms, Inc., Simmons Foods, Inc., and Willow

Brook Foods, Inc. (hereafter "Defendants") (Dkt. #1854).

At the February 26, 2009 hearing, the State represented it had produced all the materials

sought by the Defendants except for the personal identification information of the survey

respondents for which it seeks a protective order.  Defendants have sought this information from

the State and the Tyson Defendants have also subpoenaed the three independent contractors

hired by the State's experts, Stratus Consulting ("Stratus"), for their materials: Wilson Research

Strategies ("WRS"), Consumer Logic, Inc. ("Consumer Logic") and Westat, Inc.("Westat").

The remaining issue in both motions, therefore, is whether the identifying information of respondents to the survey conducted by the State's experts and their polling firms should be produced.

Defendants also filed a Motion for Extension of Time to File their Expert Reports on Damages (Dkt. #1857).  They contend that they need three additional months (March 2 until June 2, 2009) from the disclosure of the requested identifying information of all the survey respondents in which to interview these respondents, depose the State's experts and have their damages expert evaluate the volume of materials that have already been produced.  At the hearing, the Court granted an extension until March 31, 2009, subject to further extension of time should the Court determine that Defendants are entitled to the respondent information they seek.

### Background

The expert report at the heart of this discovery dispute is the *Natural Resource Damages Associated with Aesthetic and Ecosystem Injuries to Oklahoma's Illinois River System and Tenkiller Lake* (hereafter, the "CV Report")*,* a study undertaken by the State's damages experts at Stratus Consulting, Inc. - David J. Chapman, Richard C. Bishop, W. Michael Hanemann, Barbara J. Kanninen, Jon A. Krosnick, Edward R. Morey and Roger Tourangeau (the "Stratus experts") - to measure the natural resource damages  "associated with excess phosphorus from poultry waste and other sources entering the Illinois River system and Tenkiller Lake."  *See Exhibit D to* State's Motion for Protective Order (Dkt. #1853).  To estimate the amount of money damages for future injuries resulting from past and current land applications of poultry waste to the Illinois River Watershed ("IRW"), the Stratus experts conducted a contingent

valuation survey (the "CV survey").

> [A contingent valuation] is a survey-based approach to the valuation of nonmarket
> goods and services that relies on a questionnaire for the direct elicitation of
> information about the value of the good or service in question. The value obtained
> for the good or service is said to be contingent upon the nature of the constructed
> (hypothetical or simulated) market and the good or service described in the survey
> scenario. In the natural resource damage assessment context, CV studies generally
> derive values through elicitation of respondents' willingness to pay (WTP)[1] to
> prevent injuries to natural resources or to restore injured natural resources.

Dept. of Interior ("DOI"), *Natural Resource Damage Assessments*, 59 Fed.Reg. 23098, 23100,

1994 WL 163004 (May 4, 1994); *see also* Dept. of Commerce, National Oceanic and

Atmospheric Admin. ("NOAA"), *Natural Resource Damage Assessments under the Oil*

*Pollution Act of 1990*, 58 Fed.Reg 4601-4602, 1993 WL 6073 (Jan. 15, 1993).

The CV methodology determines a use/nonuse valuation rather than a restoration

assessment of damages and has been employed when there is injury to a nonmarketable

resource.[2] The Stratus experts used a total valuation framework including a use value, *e.g.*, "if

---

[1] The CV Report explains the difference between willingness to pay ("WTP") and willingness-to-accept ("WTA") as a measure of value of natural resource injury:

> There are two alternative ways to frame an exchange: WTP and willingness-to-accept
> (WTA). WTP is the *maximum* amount those affected by natural resource injuries would
> be willing to pay to be rid of them. The WTA measure of damages is the *minimum*
> compensation those affected by the natural resource injuries would require to be as well
> off as they would have been had the injuries not occurred.

*CV Report*, p. 2-5. The CV Report points out that the WTA is generally much greater than the WTP and although the NOAA Panel in its report on CV methodology acknowledged that WTA is the "conceptually correct measure of lost passive-use value for environmental damage that has already occurred," it nonetheless recommended the use of WTP as the "conservative choice." *Id.* The Stratus experts, therefore, adopted WTP for the CV survey, in accordance with the 1993 NOAA guidelines.

[2] There are a variety of economic methods to value natural resources, including market valuation which calculates damages based on market value of the resources and nonmarket valuation that often employs surveys to ascertain the total value one may derive from a resource.

> A natural resource has both use values and nonuse values. Use values derive from the
> actual use of the resource. Only someone who actually uses the resource receives use
> value benefits from that resource. In contrast, anyone - whether they use the resource or
> not - can receive nonuse value benefits from a resource. Nonuse values include both an

excess algae in Tenkiller Lake reduces the aesthetics of the lake, or reduces catch of favored fish

in the lake, enjoyment of the lake by anglers may decline, which would reduce the angler's use

and/or enjoyment of the lake," and nonuse values, *e.g.*,

> people may value natural resources of the Illinois River System and Tenkiller
> Lake in an uninjured state (e.g., without compromised aesthetics or ecosystem)
> because they want to bequeath them to future generations.  This component of
> nonuse value is referred to as "bequest value."  Or, they may place a value on
> simply knowing that a resource exists in an uninjured state, or for other reasons.
> This is referred to as "existence value."

*CV Report,* pp. 1-4.  In determining the total valuation, the CV survey first described the injury

to the IRW and then ultimately asked the respondent whether he/she would be willing to pay a

one-time tax for alum treatments to the river and lake after the court bans the spreading of

poultry litter to decrease the time it would take to return Tenkiller Lake to its 1960 state 40 years

sooner than without the treatments.  Using the CV method, the Stratus experts estimated

damages per household to be $184.55 and with 1,352,878 households in the study area, the

estimate of future natural resource damages is $249,673,635.[3]

The Stratus experts used focus groups, one-on-one interviews, pre-testing and pilot tests

to develop and refine the questionnaire that was used in the final survey.  WRS was retained for

logistical support for one night of focus groups.  Consumer Logic was used for all remaining

---

> *existence* value, the value someone derives from knowing that a resource exists, and an
> *option* value, the value someone derives from having the opportunity to use the resource
> in the future.  Nonuse value is sometimes referred to as "passive use" value.

Dale B. Thompson, *Valuing the Environment: Courts' Struggles with Natural Resource Damages*, 32
Envtl. L. 57, 89 n.3 (Winter 2002) (emphasis added). Typically, a CV survey asks whether the respondent
would vote to support a project that would protect a natural resource and cost the respondent a certain
amount of money.

[3]These damages do not include additional damages for injuries to groundwater or human health or
any damages for the years prior to the study.

focus groups, one-on-one interviews, pretesting and a telephone survey.  And Westat was

retained to implement two pilot field studies as well as the final in-person door-to-door survey of

Oklahoma residents.

As "precursor" studies to the main CV survey, the Stratus experts conducted an intercept

recreation study in 2006 "to gain an understanding of the levels of use of the natural resources at

issue and the public thoughts about those resources."  *State's Response to Defendants' Motion to

Compel*,  p.2 (Dkt. #1885).  Also in 2006, a "telephone study to gain (1) an understanding of

people's knowledge of and use of Oklahoma rivers; (2) an understanding of people's knowledge

of the Illinois River Watershed and (3) to gain un understanding of the impacts of the

Defendants' media campaign" was undertaken.  *Id*.

The State states that it timely produced (1) all the materials that exist pertaining to the

intercept recreation study, (2) a copy of the script, phone numbers of individual contacted and

results for the telephone survey, (3) all the scripts and other materials the Stratus experts created

for the focus groups and one-on-one interviews, (4) all the materials used by and the results

gathered by Stratus experts during the pretests, (5) Westat's two reports on the pilot tests and all

the information the Stratus experts reviewed regarding the pilot tests, and (6) the Stratus experts'

interviewer training materials, the script and the show cards for the main survey.  And at the

February 26, 2009 hearing, the State represented that the only materials  not produced are the

identifying information about the survey respondents.

## Analysis

Defendants move to compel this identifying information which the State seeks to protect.

The State seeks a protective order pursuant to Rule 26© of the Federal Rules of Civil Procedure

which states in pertinent part:

> (1) *In General*. A party or any person from whom discovery is sought may move for a protective order in the court where the action is pending . . . . The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following:
>> (G) requiring that a trade secret or *other confidential research , development, or commercial information* not be revealed or be revealed only in a specified way . . .

Fed.R.Civ.P. 26(c)(1)(G)(emphasis added). To resist disclosure of confidential information, a party must first establish that the information is confidential and that its disclosure might be harmful. *Centurion Indus., Inc. v. Warren Steurer and Associates*, 665 F.2d 323, 325 (10th Cir. 1981). If this is demonstrated, then the burden shifts to the party seeking disclosure to show that the requested information is relevant and necessary. *Id.* Finally, the Court must balance the need for discovery of the confidential material against the claims of injury resulting from disclosure. *Id.*; 8 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure §2043, p. 559 (2d ed. 1994) ("If it is established that confidential information is being sought, the burden is on the party seeking discovery to establish that the information is sufficiently relevant and necessary to his case to outweigh the harm disclosure would cause to the person from whom he is seeking the information").

The State contends that the code of professional ethics governing the conduct of surveys mandates that identifying information of survey respondents be kept confidential. *See* Council of American Survey Research Organizations Code of Standards and Ethics for Survey Research (Rev.2008) ("CASRO Code"), *Exhibit H to Plaintiff's Motion for Protective Order* (Dkt.

#1853)[4] and American Association for Public Opinion Research Code of Professional Ethics &

Practices ("AAPOR Code"),[5] *Exhibit I to Plaintiff's Motion for Protective Order* (Dkt. #1853).

CASRO and AAPOR have filed a joint amicus brief further emphasizing the importance of

confidentiality of the identities of survey respondents.  They explain that preservation of this

confidentiality is warranted (1) to protect research results against inaccuracies or bias as the

candor of the respondents' answers may be inhibited by public disclosure and (2) "to ensure the

free flow of information and to provide the foundation for unbiased survey data."[6] *Amici Curiae

Brief*, pp. 6-9 (Dkt. #1890) (citing *Upjohn Co. v. United States*, 449 U.S. 383 (1981)).

The Federal Judicial Center's Reference Manual on Scientific Evidence (2d ed. 2000)

("FJC Reference Manual") recognizes the ethical obligation on the part of survey researchers to

maintain the confidentiality of respondents' identities.

The respondents questioned in a survey generally do not testify in legal

---

[4] The CASRO Code provides:
The use of survey results in a legal proceeding does not relieve the Survey Research Organization of its ethical obligation to maintain in confidence all Respondent-identifiable information or lessen the importance of Respondent Anonymity. Consequently, Survey Research firms confronted with a subpoena or other legal process requesting the disclosure of Respondent-identifiable information should take all reasonable steps to oppose such requests, including informing the court or other decision-maker involved of the factors justifying confidentiality and Respondent anonymity and interposing all appropriate defenses to the request for disclosure.
CASRO Code §I.3.f., *Exhibit H to Plaintiff's Motion for Protective Order* (Dkt. #1853)

[5] The AAPOR Code contains a similar provision:
We understand that the use of our survey results in a legal proceeding does not relieve us of our ethical obligation to keep confidential all respondent identifiable information or lessen the importance of respondent anonymity.
AAPOR Code §II.D.6, *Exhibit I to Plaintiff's Motion for Protective Order* (Dkt. #1853).

[6] Defendants state that the amicus position is not pertinent here because the State's attorneys specifically removed the boilerplate confidentiality provisions in the draft documents of the survey instruments.  At the hearing, the State explained that the provisions were removed because it could not guarantee that the Court would not allow the respondents' identities to be disclosed.

proceedings and are unavailable for cross-examination. Indeed, one of the advantages of a survey is that it avoids a repetitious and unrepresentative parade of witnesses. To verify that interviews occurred with qualified respondents, standard survey practice includes validation procedures, the results of which should be included in the survey report.

Conflicts may arise when an opposing party asks for survey respondents' names and addresses in order to reinterview some respondents. The party introducing the survey or the survey organization that conducted the research generally resists supplying such information. Professional surveyors as a rule guarantee confidentiality in an effort to increase participation rates and to encourage candid responses. Because failure to extend confidentiality may bias both the willingness of potential respondents to participate in a survey and their responses, the professional standards for survey researchers generally prohibit the disclosure of respondents' identities.

*Id*. at 271-72.

A number of courts have similarly recognized the need to preserve the confidentiality of survey participants. *See, e.g., Applera Corp. v. MJ Research, Inc.*, 389 F.Supp.2d 344, 350 (D.Conn. 2005) ("researchers are prohibited by ethical rules from disclosing the actual individual identities of the survey respondents and instructed to defend against Court orders compelling disclosure")*; Farnsworth v. Proctor & Gamble Co.*, 758 F.2d 1545 (11th Cir. 1985)(prohibiting disclosure of respondent identities because of potential harm to social research surveying); *Lampshire v. Proctor & Gamble Co.*, 94 F.R.D. 58, 60 (N.D. Ga. 1982) (finding good cause to redact the personal identifying information of survey respondents and rejecting defendant's claim that this information was necessary to adequately test the validity of the survey); *but see Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 2007 WL 102088 (E.D.Ky 2007) (affirming the Magistrate Judge's ruling that identifying information of the participants of a survey conducted by a party in litigation should be disclosed); *United States Surgical Corp. v. Orris, Inc.*, 983 F.Supp 963, 969 (D.Kan.1997) (affirming Magistrate Judge's order to disclose

the identities of the survey participants).

The State has established that the identifying information of the respondents is confidential material under Rule 26© and that its disclosure would be harmful.  The burden thus shifts to Defendants to show that the confidential information is sufficiently relevant and necessary to their case to outweigh the harm resulting from disclosure.  *Centurion Indus.*, 665 F.2d at 325-26.

Defendants submit the affidavit of their expert in the preparation and evaluation of NRD assessments, William H. Desvousges,  ("Desvousges").  Desvousges attests that the identity of the individuals surveyed or questioned during the course of the State's damage evaluation is necessary to fully critique the State's NRD assessment.  *Desvousges Affidavit*, ¶25, *Exhibit 4 to Defendants' Motion to Compel* (Dkt. #1854) (hereafter "*Desvousges Affidavit*").  Specifically, Desvousges cites the need for the identifying information for evaluation of the following:

(1)    how interviewers actually administered the survey,

(2)    how accurately interviewers recorded respondent answers,

(3)    how Plaintiffs went about "educat[ing]" survey participants about the phosphorous "problem" in the wake of the 2006 telephone survey,

(4)    how much uncertainty interviewers injected into the damages calculation based on the nonuse values collected after that "educat[ion]" process, and

(5)    bias resulting from the actual (versus ideal or scripted) interviews, including interviewers' narrative descriptions of the injury, the way interviewers identified and presented the cause of the "problem" and the proposed solution, the manner in which interviewers asked questions, what interviewers told respondents during the survey, and how the respondents' answers were processed.

*Defendants' Response to Plaintiff's Motion for Protective Order,* pp. 2-3 (citations to *Desvousges' Affidavit* omitted) (Dkt. #1883).  Defendants note that what the State has provided are the materials that state what the interviewers *were supposed to say* to the respondents and not what was *actually conveyed* or the *actual response*s which are needed to determine whether the

survey is free of bias.

The State submits the affidavits of two of their Stratus experts, Jon A. Krosnick

("Krosnick")and Roger Tourangeau ("Tourangeau") to refute Desvousges' testimony.  Both

experts attest that (1) they did not personally administer the CV survey to any respondents or

potential respondents; and (2) they are unaware of any standard procedures in survey research

that require using respondents' personal identifying information to evaluate any of the following:

a.    bias and non-response bias;
b.    the effect of survey questionnaire design on the interviewees' responses
      and the State's damages calculation;
c.    the rationale behind selecting a CV methodology after completing the
      telephone survey and recreational study;
d.    the totality of information provided to respondents during the interviews.

*Krosnick Affidavit*, ¶¶8 and 9, *Exhibit G to the State's Response* (Dkt. #1885); *Tourangeau*

*Affidavit*, ¶¶8 and 9, *Exhibit H to the State's Response* (Dkt. #1885).  The State explains that the

participant identifying information was never in the possession of the Stratus experts and thus

does not constitute testifying experts' "considered materials." [7]  And, in any case, personal

identifying information of participants in the survey development and administration is not

subject to disclosure because it constitutes "confidential research."

Although the identity of the survey participants is relevant, Defendants have failed to

---

[7] Defendants point out that the Stratus experts had the personal identifying information for at least 189 of the CV survey participants. The produced materials show at least four of the Stratus experts were provided with this identifying information by Westat on December 1, 2008 in a file containing the contact information of people who initially declined to complete the CV survey and Krosnick and Tourangeau actually contacted some of these participants in making their "conversion" calls.  Krosnick and Tourangeau attest that they were the only Stratus experts who attempted conversion of a *subset* of the 189 and they were unaware of any specific individual of those they were able to reach who ultimately participated in the survey.  "Conversion," they explain, "is a standard survey practice whereby individuals who initially decline participating in a survey are contacted following their initial decline for the purpose of encouraging participation."  *Krosnick Affidavit* ¶¶6 and 7, *Exhibit G to the State's Response* (Dkt. #1885); *Tourangeau Affidavit*, ¶¶6 and 7, *Exhibit H to the State's Response* (Dkt. #1885).

persuade the Court that such is "sufficiently relevant and necessary to their case" to outweigh the

harm of undermining the public interest in insuring the ability of surveys to elicit accurate

information from respondents.   Not surprisingly, the affidavits of the State's experts dispute the

necessity of the identifying information claimed by Defendants' expert, Desvousges, to test the

reliability of the CV survey.  Defendants do not adequately explain how re-contacting all or any

of the ~2000 CV survey respondents would "forensically test this more than two-year shaping

process to evaluate the CV method" the State employed.  The survey was conducted in

compliance with the NOAA Panel Guidelines and takes into account the interviewer effect and

the understanding and acceptance of the respondents.  The CV Report details the training and

supervision of the interviewers as well as the validation procedures and their results.  In addition,

the State produced three reports from Westat explaining its work as well as its prior drafts of

reports it provided to the Stratus experts.  Defendants have not articulated what they would ask

these respondents to test the reliability of the survey or what would result from their "re-survey"

of respondents, other than the possibility of up to ~2000 " mini-trials" to determine whether the

polling firms' interviewers significantly deviated from the detailed survey instructions and

materials in sufficient numbers to skew the results.  Yet, they offer no basis for this unlikely

scenario.

Defendants cite their Exhibit 19, the zip file of the names, addresses and phone numbers

of 189 respondents in the possession of the Stratus experts as evidence that the State's "CV

survey workers often had multiple contacts with many of the survey respondents (including one

respondent who was contacted at least 13 times) and these workers (sometimes multiple

workers) contacted members of the survey sample households by telephone and in-person."   The

Court sees little if any additional value Defendants could extract from yet another contact of a "multiple-contact" respondent over cross-examination of the Stratus experts as to possible bias resulting from those contacts.

Finally, as is clear from the briefing, Defendants have ample material to prepare a defense against the CV study.  Defendants can attack the CV survey by challenging the sample size, survey questions and design, sampling techniques and other scientific challenges to the adequacy of the survey and its CV methodology.

For the reasons set forth above, the Court **GRANTS** the State's Motion for Protective Order (Dkt. #1853), and **DENIES** Defendants' Motion to Compel (Dkt. #1854).  Because the Court finds that Defendants are not entitled to the identifying information of the survey respondents, the Court sees no justification for any further extension of time for the Defendants' expert report(s) on damages.  The report(s), accordingly, will be due on March 31, 2009.

IT IS SO ORDERED, this 11th day of March, 2009.

Paul J. Cleary
United States Magistrate Judge

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Graham**Hollis** APC
3555 Fifth Avenue Suite 200
San Diego, California 92103

Appendix D


Review of Past Studies of the Accuracy of Recollections of Work Experiences

**DECLARATION OF JON KROSNICK ISO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

### The Accuracy of Survey Measurements of Time Spent Working:

### An Inconclusive Literature

**Introduction**

A great deal of empirical research in the social sciences, especially that involving surveys, has often required people to report events they have witnessed or behaviors they have performed.  So the findings of that research depends importantly on the accuracy of people's self-reports.  Everyone's daily life experiences illustrate that we remember many facts accurately, such as where we parked our car this morning, where we ate breakfast last Monday, and in what city we were born.  Thus, the question of interest for researchers is not whether memories are accurate but rather how likely certain types of recollections are to be accurate, what magnitude of errors appear in certain recollections, and what biases, if any, appear.

The accuracy of people's reports of the number of hours they worked has received a substantial amount of research attention, partly because governments often use answers to this type of question when compiling labor statistics and reports of economic productivity (Elridge, Manser, & Otto, 2004; Fleck, 200; Frazis & Stewart, 20049). In a typical study, researchers have asked a respondent how many hours he or she works or worked each week and then compared those reports to an independent record of the respondent's work hours, such as company payroll records, to validate the recollections.  A number of studies have found discrepancies, documented especially visibly in a highly cited review by Bound, Brown, and Mathiowetz (2001), raising the possibility that some or many people's reports are inaccurate.

But is that conclusion justified?  To be so, the methodology of the studies upon which the conclusion is based must meet a set of criteria.  First, the wording of the recall questions asked of

respondents and their administration must conform to best practices and must avoid creating bias in answers. Second, the wordings of those questions must match exactly the quantities being documented by the benchmarks. Third, the recollections must be collected from the same individuals whose work histories are described by the benchmarks. Fourth, there must be strong reason to believe that the benchmarks are accurate and not themselves subject to error or bias. And more criteria must be met as well, as I outline below.

In this appendix, I outline the necessary criteria in detail and then review not only the papers considered by Brown et al. (2001) but also additional papers reporting comparable tests in subsequent publications. I review the methodology of each paper carefully and illustrate how none of the papers meet the standards necessary to justify strong conclusions about the validity of survey respondent reports. Therefore, given the substantial interest in this topic documented in the published literature, future studies should employ improved methods to allow for reaching more solid conclusions.

*Criteria for a Good Validation Study*

Recall question wording. In order to gauge the accuracy of people's recollections of work hours, the self-report questions must be designed and administered in a way that maximizes accuracy of reporting and avoids inducing bias. Maximizing reporting accuracy can be done by wording questions in keeping with best practices in questionnaire design generally. For example, because acquiescence response bias inclines people to agree with assertions presented in a question (for a review, see Krosnick, J. A. (1991). Response strategies for coping with the cognitive demands of attitude measures in surveys. Applied Cognitive Psychology, 5, 213-236), it would be a mistake to ask respondents whether they agree or disagree with an assertion such as, "I worked more than 40 hours per week on average." And because asking respondents to

choose among a set of offered ranges induces bias toward the middle of the set (Schwarz, N.,

Hippler, H.-J., Deutsch, B., & Strack, F.  (1985).  Response scales: Effects of category range on

reported behavior and comparative judgments.  Public Opinion Quarterly, 49, 388-395), it would

be a mistake to ask respondents to indicate how many hours they worked per week on average

and offering a set of response options such as: 0-10 hours, 11-20 hours, 21-30 hours, 31-40

hours, 41-50 hours, 51 or more hours.  Because offering a "don't know" or "not sure" response

option causes respondents to abstain from answering when they actually possess the ability to

provide a valid report (see Krosnick, J. A.  (2002).  The causes of no-opinion responses to

attitude measures in surveys: They are rarely what they appear to be.  In R. M. Groves, D. A.

Dillman, J. L. Eltinge, & R. J. A. Little (Eds.), Survey nonresponse.  New York: Wiley;

Krosnick, J. A., Holbrook, A. L., Berent, M. K., Carson, R. T., Hanemann, W. M., Kopp, R. J.,

Mitchell, R. C., Presser, S., Ruud, P. A., Smith, V. K., Moody, W. R., Green, M. C., & Conaway,

M.  (2002).  The impact of "no opinion" response options on data quality: Non-attitude reduction

or an invitation to satisfice?  Public Opinion Quarterly, 66, 371-403), it would be a mistake to

offer such response options.  Instead, it is preferable to ask a simple open-ended question

requesting a numeric response.

It is also important that the self-report questions ask about exactly the time period

documented by the benchmark.  For example, it would be a mistake to ask survey respondents

"How many hours per week do you work?" in the present tense.  The only way for a person to

report hours worked is to describe events that have occurred in the past, and asking in the present

tense leaves unspecified the time period in the past of interest to the researcher.  Respondents

faced with this dilemma must decide whether they should choose either to describe some time

period in the past of their (arbitrary) choosing or whether to describe their guesses of their future

work hours or some combination.  If a person's work hours have changed or will change, this introduces the potential for different answers depending upon how the respondent chooses to interpret his or her assignment.  Even using the past tense without specifying a time period to be described leaves answers open to this source of error.  So an ideal question must use the past tense and describe a specific time period.

Similarly important is that the wording of a recall question must specify what types of work hours a person should count.  For example, if a respondent occasionally works overtime, he or she may overlook the overtime hours unless instructed to include them in the report.  And if a respondent chooses to work off the clock in order to meet the expectations of his or her employer, then the survey question should instruct inclusion of all hours spent performing tasks for the employer, regardless of whether they were paid work hours recorded on a time clock or not.

Also important is providing a clear definition of what counts as work time.  For example, a person whose sales job entails driving from client to client may not think of the driving time as time spent working unless instructed to do so.  Similarly, a respondent may be legitimately uncertain about whether to include in work hours the time it takes him or her to check work-related voice mails from home over the weekend or the time it takes to put on a uniform and prepare a set of tools before going onto the shop floor to begin work tasks.  Question wordings must specify what Schuman and Presser (1981) called the "frame of reference" for a question, so that that frame of reference is clear to all respondents, uniform across respondents, and matches that of the benchmarks to which the self-reports will be compared.

Likewise, if a survey question asks respondents to report how many hours they <u>usually</u> work per week, it would not make sense to compare those reports to the work hours listed on his

or her pay stub for the most recent past two weeks, because discrepancies may be driven by fluctuations in people's work schedules over time, such as seasonal changes in assigned hours, reductions in work due to flu season, etc. Furthermore, the word "usually" introduces ambiguity, because some respondents presume it is requesting the mean, whereas other respondents presume it requests the mode (Lin, 2012). Different respondents interpreting the question differently and in ways that do not match the benchmark will yield discrepancies that are not indications of inaccuracy.

Sample matching. Further complications come about because a comparison of self-reports to benchmarks can be done at two levels of aggregation: (1) for each individual person, and (2) for a group of people. Taking the first approach, a single person's report of his or her work hours can be compared to a benchmark independently documenting the number of hours he or she worked. The second approach involves calculating the average or total number of hours worked by a group of people and comparing them to the average or total derived from benchmarks on the same people. Both approaches can be legitimate if carried out optimally, though the former can document either over-reporting or under-reporting by specific individuals, whereas the latter can only document a general tendency across people to over-report or under-report and cannot assess individual-level error. If individual respondents' reports are distorted at least partly by random measurement error, then such error will cancel out in aggregated statistics.

If an investigator adopts the aggregate comparison approach, it is necessary that the same respondents provide self-reports as generated the benchmark statistics. In other words, it would not be optimal to obtain recollections from one group of people and compare those reports to benchmarks documenting the work hours of a different group of people. If one were to collect work hour recollections from a random sample of employees with a response rate less than 100%

and then compare those reports with employer records of hours worked by the entire population of workers from which the sample was drawn, discrepancies may be due to unrepresentativeness of the participating respondents rather than inaccuracy in their recollections.

Benchmark validity.  Another requirement of a useful validity assessment is that the benchmarks must be accurate.  It is tempting to think that "official records" maintained by a company or government agency are complete and correct.  But the process of extracting data from a database of employment history or other events always requires a method for matching individuals to the records, and that process may be imprecise.  For example, if matching survey respondents to employment records using their names, two people with the same name in either database introduce uncertainty, as does misspelling of names, the presence of a middle initial in one database vs. its absence in the other, and so on.  Berent, Krosnick, and Lupia (2016; Berent, M. K., Krosnick, J. A., & Lupia, A.  (2016).  Measuring voter registration and turnout in surveys: Do official government records yield more accurate assessments?  Public Opinion Quarterly, 80, 597-621) showed that the process of matching survey respondents to government records could not be done in a way that led to plausible results.  So caution is appropriate regarding any official records.

Likewise, contemporaneous documenting of events via diaries is appealing because of the minimal time lag between the event and the recording.  But, as noted above, people do not always complete diaries quickly, and they sometimes do so through reconstruction that may not be done with care and can therefore be error-prone (e.g., Crosbie, T.  (2006).  Using activity diaries: Some methodological lessons.  Journal of Research Practice, 2, 1-13; Higgins, C. A., McClean, R. J., & Conrath, D. W.  (1985).  The accuracy and biases of diary communication data.  Social Networks, 7, 173-187; Hyland, M. E., Kenyon, C. A., Allen, R., & Howarth, P.

(1993)  Diary keeping in asthma: Comparison of written and electronic methods.  <u>BMJ</u>, <u>306</u>, 487-489).  As a result, any discrepancy between a later recollection and a diary is not unambiguously evidence of inaccuracy of the recollection.

Another source of benchmark data has sometimes been reports of other people.  For example, a supervisor might be asked to report the number of hours worked by each of the employees who directly report to him or her.  But in most employment situations, there is no reason to believe that a manager or supervisor would be aware of the exact work times of their employees.  Therefore, discrepancies between supervisors' assessments of an employee's work hours and the employee's own assessments could be due to errors in the former, not the latter.

<u>Conclusion</u>.  In light of all of the above, I next offer a review of the existing literature composted of studies assessing people's ability to report the number of hours they worked per week. And as I will explain, observed discrepancies between respondents' reports and benchmarks can routinely be explained in ways other than misreporting.

**Procedure**

To review the existing literature, I sought out studies that were designed to compare respondent reports of the number of hours they worked per week with a benchmark that could be matched to each respondent. [1] The starting point for this literature search was Bound et al.'s (2001) meta-analysis of validation studies. I included all studies cited by them and newer studies,

---

[1] I did *not* include in this review studies that compared two different data sources from different respondents at the aggregate level. For instance, Williams (2004) compared people's reports of their usual weekly work hours in two national surveys (the Labor Force Survey and the New Earnings Survey) to time diary estimates of work hours from the UK Time Use Survey. Although this type of study may seem similar to the validation studies covered in this review, studies using methodology that relies on aggregate-level comparisons across different groups of respondents are not appropriate for our focus. In aggregate-level comparisons like these, we cannot know whether the groups of respondents vary in their actual work hours. Thus, even if both groups' estimates were perfectly accurate, they could be discrepant. The inverse is also true: even if there is no discrepancy between the two groups on the aggregate level, each individual could be inaccurate. Therefore, I focused this review strictly on validation studies in which there was a validation measure of each individual respondent's work hours that could be compared to reports.

the reports of which cited the meta-analysis.  I then searched for other articles cited in reports of these studies, as well as other articles citing these studies. I continued this process until I no longer found new validation studies seeking to gauge the accuracy of people's reports of the hours they worked. Multiple iterations of this process yielded reports of forty-eight analyses.

In my review of these analyses, I evaluated (1) whether each study's validation measure could reasonably be assumed to reflect the truth of hours worked, (2) if each study appropriately matched the validation measure and the question asked to respondents, and (3) if each study used a clear, unambiguous question about work hours for respondents to answer. In all three of these categories, methodological flaws appeared numerous times throughout the literature.

**Results**

***Validation Accuracy Concerns***

*Self-Report Benchmarks.* Older studies assessing the accuracy of work hour reports compared them to employer records, which can be difficult to obtain and have questionable completeness and accuracy.  More recently, many studies asked respondents to spend a day (or more) filling out a time diary of their activities in real-time. Other studies asked respondents to complete a retrospective diary about their activities during the day before their interview. Then, researchers coded the activities in the diaries to determine the amount of time respondents spent working.

However, this method falls far from the mark of the gold standard for a validation study. First, real-time diaries rely on respondents to faithfully keep track of their time, posing threats to accuracy when respondents fill out the entire diary just before turning it in rather than filling it out daily as intended. Alternatively, a diary about the previous day relies on recall, potentially opening it to memory errors it is supposed to be validating against. Second, given that both types

of time diaries are self-reports, any motivation-driven distortion of reports might appear in the diaries and in the later retrospective recollection, thus yielding matching that constitutes the illusion of accuracy.  Therefore, this is a suboptimal method of benchmarking.

*Employer Report (vs. Record).* A number of prominent studies in this literature involved a surprisingly ambiguous benchmark: a survey of employers.  In the Current Population Survey, for example, respondents were asked to report on their work hours, and interviewers sometimes mailed packets to each respondent's employer asking if the respondent worked for the company, and, if so, how many hours per week the respondent worked. The employer was asked to return the packet by mail after filling it out.

I am not aware of any available documentation from the survey of employers showing how the inquiries were phrased, how the reports were provided, and how those data were analyzed.  I do not know which staff member(s) at the employer responded to the inquiry, how knowledgeable those individuals were about the exact hours worked by the employee, what records of work hours could have been consulted by the staff member(s), how accurate those records were, and whether the staff member(s) consulted those records or not when responding to the questionnaire.  It is possible that staff members provided their guesses about hours worked, or reported the employers' expectations of hours worked, rather than having a record of actual hours worked.  And if employees worked off the clock or occupied jobs whereby their work hours were not tracked by the employer during the period of employment, it should be no surprise if respondents' reports disagree with those of their employer.  Thus, there is not a strong basis for confidence in the use of this sort of benchmark.

***Proxy Respondents***

Some studies were flawed because they sought data from proxies instead of from the actual worker. For example, the Current Population Survey allows a household member to answer all questions about all other household members. Thus, a person's spouse may report how many hours another household member worked. Any discrepancies between such proxy reports and benchmarks may be due to inaccurate guesses by the proxies rather than inaccurate knowledge held by the employee.

***Benchmark Problems***

*Different Time Frames.* For a validation effort to be informative, the time frames of the self-report question and the benchmark must match. For instance, if respondents reported how much they worked *on average* over a period of months or years, but the benchmark documented only the last payroll period, discrepancies may arise due to irregularities in the last pay cycle. Indeed, Frazis and Stewart (2004, 2007, 2009) demonstrated how mismatching time frames increased the discrepancy between respondents' reports and a benchmark. Respondents completed time diaries and also reported the number of hours they worked during the last week. The discrepancy between these two was shrank when using only time diaries that were completed during the week that respondents reported on. That is, the closer the match between the time frames of the recollection and the benchmark, the smaller the discrepancy.

*Extrapolation from Days to Weeks.* In some studies, participants completed a time diary for one or two days, and then researchers used those responses to create a "synthetic validation week" by multiplying a weekday by 5 and a weekend day by 2. This synthesized quantity was then compared to respondents' reports of the number of hours they worked in a real week. As a

result, any discrepancies between the self-reports and the synthesized weeks may be due to errors in the synthesizing.

### Question Wording Issues

Small differences in question wording can produce large differences in answers, so it's critical that questions be formulated precisely so that respondents provide exactly the quantity sought by the researcher (Schwarz, 1999). Any ambiguity that leaves room for alternative interpretations may introduce error that attenuates correspondence of recollections with benchmarks.

*"Usually"*. Even the seemingly simple question asking, "How many hours do you usually work per week?" can introduce error due to the number of ways it can be interpreted (e.g., Fleck, 2009; Tijdens & Dragstra, 2007). Specifically, it would be a mistake for researchers to assume that respondents answer this sort of question by reporting their *average* weekly work hours, because respondents typically answer this question by reporting their *modal* weekly work hours (Lin, 2012).

*Unspecified Time Frame*. In order to ensure a match between the time frame of the self-report and benchmark, it is critical that the question refers to a discrete, specific time frame. For instance, consider an employee who earned a promotion a few months ago, and with it, has had to work about five extra hours per week.  If the benchmark assesses the employee's average hours worked per week over the past year, but the employee only used the past month or two as a reference when answering the question, his or her answer will appear inflated. In this case, the mismatch between the two is not driven by the employee's inability to report the hours he or she worked per week, but rather is an issue of question ambiguity that caused the employee to (correctly) answer a slightly different question than is appropriate for the benchmark. In

numerous past studies, researchers did not specify a reference period for respondents to describe, thereby undercutting the comparisons with benchmarks.

A similar issue is that "work hours" can be defined in numerous ways (e.g., as time performing work activities, not counting breaks, vs. time spent at an employer's location). Indeed, one study found that discrepancies between respondents' reports and their time diaries were reduced when breaks less than 30 minutes spent at the workplace were counted as work time (Lin, 2012). As such, it is critical that respondents be told specifically what activities to include in and exclude from their estimates of work time.

Finally, rather than asking a simple, direct question seeking the average number of hours worked per week, some studies asked respondents multiple different questions in order to calculate their "answer." For example, respondents were asked how many weeks they worked during a particular year, how many times they called in sick, and more. Answers to these questions were then combined by the researcher to yield an estimate of number of hours worked. The drawback of this approach is that any discrepancies between the mathematical result and a benchmark may be due to inaccuracy of judgments of hours worked or inaccuracy in terms of other judgments used in the calculation (e.g., number of days taken as vacation).

***The Frequency of Sources of Discrepancies***

I evaluated each past study in this literature by identifying any shortcomings of the methodology involved rendering results ambiguous about whether they should be viewed as evidence of recall inaccuracy. Table 1 depicts the result, with each column representing one of the alternative sources discussed above and an "X" indicating when the possible alternative source of discrepancy was present in the study methodology used for each analysis.[2] As shown

---

[2] When a study's description was too superficial to allow assessment of a feature, the call contains a "?".

there, alternative sources of discrepancy were consistently present in these studies. Indeed, most of the analyses I evaluated contain multiple possible alternative sources of discrepancy between the validation measure and respondents' reports of their hours worked. [3] Unfortunately, this makes it impossible to discern the source of the discrepancies found in these studies, thereby undermining the ability of these studies to assess the accuracy of people's recollections of hours worked.

**Discussion**

This review of studies attempting to assess the accuracy of people's reports of the hours they worked identified a wide array of alternative sources of discrepancies between those reports and benchmarks to which they were compared.  Because of the pervasive presence of these alternative explanations, the literature does not provide a basis for a strong conclusion about how people accurately report the hours they have worked.  Although various authors have used such evidence to reach conclusions on this matter, this review suggests that such conclusions cannot be reached with confidence.  Alternative study designs are required in order to yield solid evidence on this point, and no such studies have yet been conducted.

Unfortunately, researchers (e.g., Robinson et al. 2011) and journalists (Kellaway, 2014) have interpreted the results of studies like these as suggesting that respondents are unable to accurately report their work hours.  But as shown here, this literature does not justify such a conclusion.

---

[3] See the technical appendix for a more detailed description of each study, its methodology, and the reason it received an "X" in the table.

**Table 1.**

| | Validation Accuracy Concerns | | Validation Mismatch | | Question Clarity | |
|---|---|---|---|---|---|---|
| | Employer Report (vs. Record) | Self-Report (e.g., Time Series) | Included Proxy Respondents | Different Time Frames | Unspecified Time Frame | Vague Wording/ Indirect Question |
| Cartensen & Woltman (1979) Analysis 1 | X | | X | | X | X |
| Analysis 2 | X | | X | | X | X |
| Analysis 3 | X | | | | X | X |
| Stafford & Duncan (1980) | | X | | X | X | X |
| Mellow & Sider (1983) Analysis 1 | X | | X | | X | X |
| Analysis 2 | X | | X | | X | X |
| Analysis 3 | X | | | | X | X |
| Duncan & Mathiowetz (1985); Duncan & Hill (1985, 1989) | | | | | | X |
| Robinson (1985) | | X | | X | | |
| Bound, Brown, Duncan, & Rodgers (1989) Analysis 1 | | | | | | X |
| Analysis 2 | | | | | | |
| Analysis 3 | | | | ? | X | X |
| Rodgers, Brown, & Duncan (1993) Analysis 1 | | | | | | X |
| Analysis 2 | | | | | | |
| Analysis 3 | | | | ? | X | X |
| Edwards, Levine, & Cohany (1989) Analysis 1 | | X | | X | X | X |

| | | | | | |
|---|---|---|---|---|---|
| Analysis 2 | | X | | | | ? |
| Analysis 3 | | X | | X | X | X |
| Analysis 4 | | X | | X | X | X |
| Hamermesh (1990) Analysis 1 | | X | | X | X | ? |
| Analysis 2 | | X | | X | | X |
| Niemi (1993) | | X | | X | | |
| Robinson & Bostrom (1994) Analysis 1 | | X | | X | | |
| Analysis 2 | | X | | X | X | |
| Analysis 3 | | X | | X | ? | ? |
| Barron, Berger, & Black (1997) | ? | | | ? | ? | ? |
| Jacobs (1998) | | X | | ? | ? | ? |
| Angrist & Krueger (1999) | X | | X | ? | X | X |
| Robinson, Chenu, & Alvarez (2002) Analysis 1 | | X | | X | ? | ? |
| Analysis 2 | | X | | ? | ? | ? |
| Juster, Ono, & Stafford (2003) Analysis 1 | | X | | X | X | |
| Analysis 2 | | X | | X | ? | ? |
| Frazis & Stewart (2004) Analysis 1 | | X | | X | X | X |
| Analysis 2 | | X | X | X | | ? |
| Analysis 3 | | X | X | X | X | X |
| Frazis & Stewart (2007) | | X | X | X | | ? |
| Frazis & Stewart (2009) | | X | X | X | | ? |
| Bonke | | X | | X | ? | ? |

| | | | | | |
|---|---|---|---|---|---|
| (2005) | | | | | |
| Klevmarken (2005) | X | | X | | ? |
| Otterbach & Sousa-Poza (2010) | X | | X | X | X |
| Robinson, Martin, Glorieux, & Minnen (2011) Analysis 1 | X | | X | X | X |
| Analysis 2 | X | X | X | | ? |
| Analysis 3 | X | X | X | X | X |
| Analysis 4 | X | | X | X | X |
| Lin (2012) | X | | X | X | X |
| Sonnenberg et al (2012) | X | | X | X | X |
| Gershuny & Robinson (2013) Analysis 1 | X | | X | X | X |
| Analysis 2 | X | | X | X | X |

# References

Angrist, J., & Krueger, A. (1999). Empirical strategies in labor economics. In O. Ashenfelter & D. Card (Eds.), *Handbook of labor economics*, *Vol. 3 A* (1277-1366). North-Holland, Amsterdam): Elsevier.

Barron, J. M., Berger, M. C., & Black, D. A. (1997). *On the job training*. Kalamazoo, MI: W. E. Upjohn Institute for Employment Research.

Bartlett, F. C. (1932). *Remembering: A study in experimental and social psychology.* Cambridge, UK: Cambridge University Press.

Belezza, F. S., & Bower, G. H. (1981). Person stereotypes and memory for people. *Journal of Personality and Social Psychology, 41,* 956-865.

Bonke, J. (2005). Paid work and unpaid work: Diary information versus questionnaire information. *Social Indicators Research*, *70*, 349-368.

Bound, J., Brown, C., Duncan, G. J., & Rodgers, W. L. (1989). Measurement error in cross-sectional and longitudinal labor market surveys: Results from two validation studies, *NBER Working Paper Series: 2884*. Cambridge, MA: National Bureau of Economic Research.

Bound, J., Brown, C., & Mathiowetz, N. (2001). Measurement error in survey data. In *Handbook of Econometrics, vol. 5,* Eds. J. J. Heckman and E. Learner. New York: Springer-Verlag.

Carstensen, L., & Woltman, H. (1979). Comparing earning data from the CPS and employer's records. *Proceedings of the Social Statistics Section* (p. 168-173). Alexandria, VA: American Statistical Association.

Duncan, G. J., & Hill, D. H. (1985). An investigation of the extent and consequences of measurement error in labor economic survey data. *Journal of Labor Economics, 3*, 508-522.

Duncan, G. J., & Hill, D. H. (1989). Assessing the quality of household panel data: The case of the panel study of income dynamics. *Journal of Business & Economic Statistics, 7(4),* 441-452.

Duncan, G. J., & Mathiowetz, N. A. (1985). *A validation study of economic survey data.* Ann Arbor, Michigan: University of Michigan Survey Research.

Edwards, W. S., Levine, R., & Cohany, S. (1989). Procedures for validating reports of hours worked and for classifying discrepancies between questionnaire reports and validation totals. In *Proceedings of the American Statistical Association.*

Eldridge, L. P., Manser, M. E., & Otto, P. F. (2004). Alternative measures of supervisory employee hours and productivity growth. *Monthly Labor Review,* 127, 9.

Fleck, S. E. (2009). International comparison of hours worked: An assessment of the statistics. *Monthly Labor Review, 132,* 3-31.

Frazis, H., & Stewart, J. (2004). What can time-use data tell us about hours of work? *Monthly Labor Review, 127.*

Frazis, H., & Stewart, J. (2007). Where does the time go? Concepts and measurement in the American time use survey. In E. R. Berndt & C. R. Hulten (Eds.), *Hard-to-measure goods and services: Essays in honor of Zvi Griliches* (73-97). University of Chicago Press.

Frazis, H., & Stewart, J. (2009). Comparing hours per job in the CPS and the ATUS. *Social indicators research*, *93*(1), 191-195.

Gershuny, J., Robinson, J. P., Fisher, K., & Martin, S. (2007). Workweek estimate—diary differences and regression to the mean. *Unpublished manuscript*.

Hamermesh, D. S. (1990). Shirking or productive schmoozing: Wages and the allocation of time at work. *Industrial and Labor Relations Review*, *43*, 1215-1335.

Jacobs, J. (1998). Measuring time at work: Are self-reports accurate? *Monthly Labor Review*, *121*, 42-53.

Jones, E. E., & Sigall, H. (1971). The bogus pipeline: a new paradigm for measuring affect and attitude. *Psychological Bulletin, 76(5),* 349.

Juster, F. T., Ono, H., & Stafford, F. P. (2003). An assessment of alternative measures of time use. *Sociological Methodology*, *33*, 19-54.

Kellaway, L. (2014, March 30). Think you work hard? Bet you don't. *Financial Times, ft.com/work&careers*.

Klevmarken, N. A. (2005). Estimates of a labour supply function using alternative measures of hours of work. *European Economic Review*, *49*, 55-73.

Kunda, Z. (1990). The case for motivated reasoning. *Psychological Bulletin, 108,* 480-498.

Lin, K-H. (2012). Revisiting the gap between stylized and diary estimates of market work time. *Social Science Research, 41,* 380-391.

Loftus, E. F., & Palmer, J. C. (1974). Reconstruction of automobile destruction: An example of the interaction between language and memory. *Journal of Verbal Learning and Verbal Behavior*, 13(5), 585-589.

Loftus, E. F., & Pickrell, J. E. (1995). The formation of false memories. *Psychiatric Annals,
25:12,* 720-725.

Mellow, W., & Sider, H. (1983). Accuracy of response in labor market surveys: Evidence and
implications. *Journal of Labor Economics*, *1*, 331-344.

Nelson, K. (1993). The psychological and social origins of autobiographical memory.
*Psychological Science, 4,* 7-14.

Niemi, I. (1993) Systematic error in behavioral measurement: Comparing results from interview
and time budget studies. *Social Indicators Research*, *30*, 229-244.

Otterbach, S., & Sousa-Poza, A. (2010). How accurate are German work-time data? A
comparison of time-diary reports and stylized estimates. *Social Indicators Research*, *97*,
325-339.

Robinson, J. P. (1985). The validity and reliability of diaries versus alternative time use
measures. In F. T. Juster & F. P. Stafford (Eds.), *Time, goods, and well-being* (33-62).
Ann Arbor, MI: University of Michigan Survey Research Center.

Robinson, J. P., Chenu, A., & Alvarez, A. S. (2002). Measuring the complexity of hours at work:
The weekly work grid. *Monthly Labor Review*, *125*, 44-54.

Robinson, J. P., Martin, S., Glorieux, I., & Minnen, J. (2011). The overestimated workweek
revisited. *Monthly Labor Review, 134*, 43-53.

Rodgers, W. L., Brown, C., & Duncan, G. J. (1993). Errors in survey reports of earnings, hours
worked, and hourly wages. *Journal of the American Statistical Association*, *88*, 1208-
1218.

Ross, M. (1997). Validating memories. In *Memory for Everyday and Emotional Events,* Eds.
N.L. Stein, P.A. Ornstein, B. Tversky, & C. Brainerd. Mahwah, NJ: Laurence Erlbaum
Associates, Inc.

Schwarz, N. (1999). Self-reports: How the questions shape the answers. *American Psychologist,
54(2).*

Schuman, H., & Presser, S.  (1981).  *Questions and answers in attitude surveys: Experiments on
question form, wording, and context*.  New York: Academic Press.

Sonnenberg, B., Riediger, M., Wrzus, C., & Wagner, G. C. (2012). Measuring time use in
surveys – Concordance of survey and experience sampling measures. *Social Science
Research*, *41*, 1037–1052.

Stafford, F., & Duncan, G. J. (1980). The use of time and technology by households in the
United States. In R. G. Ehrenberg (Ed.), *Research in Labor Economics*, *Vol 3*.

Greenwich, CT: JAI Press.

Thompson, C. P., Skowronski, J. P., Larsen, S. F., Betz, A. L. (1996). *Autobiographical memory: Remember what and remembering when.* Mahwah, NJ: Laurence Erlbaum Associates, Inc.

Tijdens, K., & Dragstra, A. (2007). How many hours do you usually work?: An analysis of the working hours questions in 26 large-scale surveys in six countries and the European Union. *Time & Society, 16 (1),* 199-130.

Tulving, E. (1995). Organization of memory: Quo vadis. In *The Cognitive Neurosciences*, Ed. M.S. Gazzaniga, pp. 839–47. Cambridge, MA: MIT Press.

Williams, R. D. (2004). Investigating hours worked measurements. *Labor Market Trends, 112(2),* 71-79.

**Critique of Individual Studies**

## Carstensen and Woltman (1979)

This paper analyzed data from the 1977 Current Population Survey (CPS). In the CPS, interviewers asked respondents to report, "How many hours per week do you usually work at your job?" However, if the respondent was not available to complete the survey, a proxy respondent was asked, "How many hours per week does (respondent's name) usually work at his/her job?" Then, respondents were asked to provide the names and addresses of their employers. These identified employers were mailed a packet asking, "How many hours per week does (respondent's name) usually work at this job?" The researchers used these employers' reports as their validation measure to compare against respondents' reports of their hours worked. Analyzing both actual and proxy respondents' reports (Analysis 1), the researchers found that respondents' reports were approximately 1.33 hours per week higher than employers' reports (38.43 vs. 37.10). However, analyzing only proxy respondents (Analysis 2) showed that their reports were approximately 1.40 hours higher per week than employers' reports (39.20 vs. 37.80), whereas analyzing only actual respondents showed their reports were approximately 1.26 hours per week higher than employers' reports (37.76 vs. 36.50).

**Validation Accuracy (X Analyses 1, 2, & 3):** The methods used in the CPS call the validation measure's accuracy into question by relying on an employer's report rather than a detailed record or log.

*Employer Report (vs. Record):* This study sent a packet to employers asking them to answer questions about how many hours per week the respondent usually works and assumed the employers' reports captured the objective truth. However, we have no way of knowing if the employers kept detailed records of their employees' time. Indeed, given that the study included salaried workers, we can safely assume that at least some of the respondents' employers did not

have a record of their hours. Even for those who did keep a record, we still do not know if the employers used the records to fill out the packet. As such, while this study finds a significant discrepancy between respondent and employer reports of hours worked per week, we cannot be sure which of the two measures more accurately reflects the objective truth.

**Validation Matching (X Analyses 1 & 2):** The study asked nearly identical questions of respondents and their employers. However, because all three analyses relied on employer' reports (rather than a record), any issues with question clarity are particularly problematic, because they introduce the possibility that each respondent and his/her employer interpreted the question differently, creating a mismatch between respondents' reports and the validation measure (i.e., employers' reports). Additionally, Analyses 1 & 2 included proxy respondents, meaning that the analyses did not compare respondents' self-reports about their own work hours to their employers' reports.

*Included Proxy Respondents:* When the primary respondent was unable to complete the interview, proxy respondents were asked to do so. This is problematic, because the analyses included discrepancies between a proxy's report of the respondent's work hours and the employers' report. As such, this does not address the question of whether people accurately report the number of hours they work per week.

**Question Clarity (X Analyses 1, 2, & 3):** Although this study ensured that the questions asked of respondents and employers were nearly identical, the questions lacked specificity, which could create discrepancies in responses if the respondents and their employers interpreted the question differently.

*Unspecified Time Frame:* The question did not provide a specific time frame for the respondent (or employer) to describe when answering the question. Therefore, perhaps the

respondent and the employer accurately reported the respondent's usual work hours, but within different time frames (e.g., across the whole year vs. across the past month).

*Vague Wording:* Another issue with the question is that it asked about the hours "usually" worked, as opposed to directly specifying whether respondents should report the mean or mode number of hours worked. For any instances when a respondent interpreted the question about the mean and his/her employer interpreted it to be about the mode (or vice versa), there are likely to be discrepancies.

**Stafford and Duncan (1980)**

This paper analyzed data from the 1975-1976 University of Michigan Time Use Surveys (UMTUS). In it, respondents answered, "About how many hours do you work on your main job in an average week, including any paid or unpaid overtime?" Interviewers contacted each respondent four times over the course of the year to complete a "yesterday" diary, in which they recounted all of their activities (and time spent doing each one) during the previous day. Researchers then coded the diaries to determine the amount of time each respondent worked. Then, the researchers used this information to create a synthetic week for each participant that captures their predicted average hours worked per week based on the four time diaries. Using this synthetic week to compare against respondents' reports, the researchers found that respondents' reports were higher (41.8 hours per week) than the time diaries (36.8 hours per week).

**Validation Accuracy (X):** The methods used in the UMTUS call the validation measure's accuracy into question for relying on self-reported time use diaries, as outlined next.

*Self-Report:* In order to validate respondents' work hours, this study asked them to complete four time diaries over the course of a year. Thus, self-reports were validated by comparisons to self-reports. Furthermore, any irregularities in respondents' work hours on the day the diary happened to be collected will create illusory appearances of inaccuracies in the synthetic estimate of that individual's weekly work hours.

**Validation Match (X):** The study did not ask respondents to recall their work hours specifically for the days captured by the validation measure (i.e., the days when they completed the diaries), thereby creating a mismatch between the time frames assessed by each measure.

*Different Time Frames:* The validation measure used four time diaries completed over the year, and the self-report question did not specify an exact time frame. This creates room for discrepancies between respondents' reports and the validation measure that are not due to respondents' ability to accurately report their work hours. For instance, if a retail worker was interviewed during the holiday rush and only referred to the past few weeks when reporting his or her average work hours, but the time diaries included slower spring, summer, and fall days, his or her self-report will appear to be inflated.

**Questions Clarity (X):** Although the question clarified what time respondents should include (i.e., "paid and unpaid overtime"), it did not give them a specific time frame to describe.

*Unspecified Time Frame:* Rather than provide a specific time frame, the question asked respondents about the hours they work in an average week at their main job, leaving open to interpretation how many weeks in the past the respondent should average across.

## Mellow and Sider (1983)

This paper analyzed data from the 1977 Current Population Survey (CPS). In the CPS, interviewers asked respondents, "How many hours per week do you usually work at your job?" If the respondent was not available to complete the survey, a proxy respondent was asked, "How many hours per week does (respondent's name) usually work at his/her job?"

Respondents were asked to provide the names and addresses of their employers. These identified employers were mailed a packet asking, "How many hours per week does (respondent's name) usually work at this job?" The researchers used these employers' reports as the validation measure to compare against respondents' reports of their hours worked. Analyzing both actual and proxy respondents' reports (Analysis 1), the researchers found that respondents reported about working about 3.9% hours (in natural logs) more than the employer reports.

**Validation Matching ($X_{\text{Analyses 1 \& 2}}$):** The study used nearly identical questions for the respondents and their employers to answer. However, because all three analyses relied on employer' reports (rather than a record), any issues with question clarity are particularly problematic, because they introduce the possibility that each respondent and his/her employer interpreted the question differently, creating a mismatch between respondents' reports and the validation measure (i.e., employers' reports). Additionally, Analyses 1 & 2 included proxy respondents, meaning they did not match respondents' reports about their own work hours to their employers' reports.

*Included Proxy Respondents:* When the primary respondent was unable to complete the interview, proxy respondents were asked to do so. This is problematic, because the analyses

included discrepancies between a proxy's report of the respondent's work hours and the
employers' report.

**Question Clarity (X** <sub>Analyses 1, 2, & 3</sub>**):** Although this study ensured that the question asked of
respondents and employers were nearly identical, the question lacked specificity, and this
deficiency could create discrepancies if the respondents and their employers interpreted the
question differently, as outlined next.

*Unspecified Time Frame:* The question did not provide a specific time frame for the
respondent (or employer) to refer to when answering the question. This introduced the possibility
that the respondent and employer accurately reported the respondent's usual work hours but
within different time frames (e.g., across the whole year vs. across the past month).

*Vague Wording:* Another issue with the question is that it asked about the hours "usually"
worked, as opposed to directly specifying whether respondents should report the mean or mode
number of hours worked. If a respondent interpreted the question to be requesting the mean, and
his/her employer interpreted the question to be requesting the mode (or vice versa), discrepancies
in reports can result that are not indications of inaccuracy.

**Duncan and Hill 1985; Duncan and Mathiowetz (1985)**

These papers reported analyses using data from the 1983 Panel Study of Income Dynamics (PSID).  Respondents were recruited from a single manufacturing company that employed thousands of workers. The researchers were given access to two years of the company's records of their employees' daily work hours. Thus, this design ensured that for every respondent in the sample, the researchers had a validation measure.  Respondents were asked to report the number of days for each year (1981 & 1982) that they did not work due to illness, vacation, strikes, or being laid off. Then, respondents were asked to report the number of weeks they worked at the job during each year and the average hours they worked per week. From these reports, the researchers calculated an annual number of hours each respondent claimed to have worked. Respondents' reports of their annual work hours were 90 hours higher than the company records for the prior year (1982) and 115 hours higher than the company records for the year before that (1981).

**Validation Accuracy (✔):** This study used a validation measure that should capture respondents' actual work hours. The record was kept by the company over two years and provided logs of each employee's daily work hours.  The researchers were given access to this record.

**Validation Matching (✔):**  The validation measure and the question respondents answered matched in terms of reference period. Respondents answered questions about their work hours over a specific year (1981 or 1982), and the annual hours recorded by the company for that year were used to validate the responses.

**Question Clarity (X):**  Rather than asking respondents the total number of hours they worked

during the reference year, this study calculated annual work hours based on responses to multiple

different questions.  This is problematic because even small inaccuracies compound with each

additional question used to calculate a respondents' final "report."  More importantly, if the

respondents worked "off the clock", the employer could not know those hours and include them

in the benchmark totals.

## Robinson (1985)

This paper used data from the 1965-1966 University of Michigan Time Use Survey. In it, respondents completed a "yesterday" diary, recounting all of their activities (and time spent doing each one) for the previous day. Additionally, respondents reported, "Thinking of all the work you did for pay, how many hours did you put in during your last complete week of work?" The researchers then coded the activities in each diary to determine the hours spent at work and, from this, generate a synthetic estimate of how many hours each respondent works per week. Comparing this estimate with respondents' reports of their last full week found that on average respondents reported working 3.8 hours more per week than would be expected from their diaries (43.4 vs. 39.6).

**Validation Accuracy (X):** The methods used in the UMTUS called the validation measure's accuracy into question by relying on self-reported time use diaries.

*Self-Report:* In order to validate respondents' work hours, this study asked them to complete yesterday diaries. However, we cannot be sure that this method actually captured the objective truth. First, it is based on self-report, so the study essentially compared self-reports to self-reports. Second, the diary method relies on respondent recall, leaving it open to error from lapses in memory, but in the diaries rather than the more global self-reports. Finally, any irregularities in respondents' work hours on the day the diary happened to be collected will create inaccuracies in the synthetic estimate of that individual's weekly work hours.

**Validation Matching (X):** This study failed to match its validation measure to the question it asked respondents, because they used different time frames.

*Different Time Frames:* The validation method directly measured work hours for only a single day, which was then used to generate a synthetic estimate of how many hours each respondent likely worked that week. In contrast, the question respondents answered asked about a specific full week. Furthermore, for any respondents who did not complete a time diary for Friday, their time diary did not describe the same calendar week as did their "last full week of work" (i.e., the prior week).

**Question Clarity (✔):** This study asked respondents to answer a clear question that provided a specific time frame to participants (last full week), asked about total hours week (rather than an ambiguous "usual" hours per week), and clarified what types of work hours should count (i.e., "work you did for pay").

**Bound, Brown, Rogers, and Duncan (1989)**

This paper used data from the 1987 Panel Study of Income Dynamics (PSID).
Respondents were recruited from a single manufacturing company that employed thousands of
workers. The researchers were given direct access to two years of the company's meticulously-
kept records of their employees' daily work hours. Thus, this design ensured that for every
respondent in the sample, the researchers had a validation measure that can be expected to be
objective and free of bias.  During the interview, respondents answered a series of questions
asking about the total number of days they missed because a family member was sick, they were
sick, they took vacation or time off, they were on strike, or they were unemployed or laid off.
They also reported the number of weeks they worked on the main job, hours worked per week,
and any overtime hours. The researchers used this information to compute each respondent's
reported number of hours worked over the past year and compared it with the employers'
records. Using these data in Analysis 1, the researchers found correlation of $r = 0.64$ between the
logarithm of respondents' work hour reports and the company record.

Respondents also reported, "How many hours per week did you work at this job
including paid overtime, sick time, and other paid time off" for the previous (two-week) pay
period. The researchers compared each respondent's report to the hourly payroll record for the
past two weeks. Using these data in Analysis 2, the researchers found a correlation of $r = 0.64$ (r
= 0.69 with outliers removed) between the logarithm of respondents' work hour reports and the
company record.

Respondents also reported, "How many hours per week do you usually get paid for,
including any usual overtime?" Then, the researchers compared each respondent's report to the
average hours worked in the previous twelve normal weeks in the payroll records. Using these

data in Analysis 3, the researchers found correlation of r = 0.61 between the logarithm of respondents' work hour reports and the company record.

**Validation Accuracy (✔):** All three analyses in this study used an appropriate validation measure that should capture respondents' actual work hours. The record was kept by the company over two years and provided logs of each employee's daily work hours.  The researchers were given direct access to this record.

**Validation Matching (? Analysis 3):** The researchers matched the validation measure and the question respondents answered in each analysis in terms of the reference period. In Analysis 1, respondents reported their total hours for the previous year and the researchers compared this to the total hours in the payroll for that year. In Analysis 2, respondents answered questions about their work hours for the last pay period, and the company's payroll for the last pay period were used to validate the responses. However, it is unclear if the question and validation in Analysis 3 match. In it, respondents reported their usual weekly work hours and the researchers attempted to match this by validating their reports with the twelve most recent normal work weeks for each respondent. Because the question did not specify a specific time frame though, we cannot be sure that the previous twelve normal weeks accurately captures the time frame most respondents referenced when answering the question.

**Question Clarity (X Analyses 1 & 3):** Analysis 2 asked respondents to answer a clear question that provided a specific time frame to participants (past two weeks), asked about total hours per week (rather than an ambiguous "usual" hours per week) and made sure to clarify what types of ambiguous work hours should count (e.g., paid sick time). In contrast, Analysis 1 is indirect. Additionally, Analysis 3 included a question that was open to interpretation because it did not specify a time frame and used vague wording.

*Unspecified Time-Frame* (Analysis 3): The question did not clarify a time frame for respondents, forcing them to interpret how many weeks back they were expected to describe.

*Indirect Question* (Analyses 1 & 3)*:* Rather than asking respondents the total number of hours they worked during the reference year, Analysis 1 calculated annual work hours based on responses to multiple different questions.  This is problematic because even small inaccuracies compound with each additional question used to calculate a respondents' final "report." For instance, even if a respondent accurately reports the average hours she worked per week, if she forgot about a few vacation or sick days, her final "report" of her annual work hours will appear inflated. In Analysis 3, the question asked respondents about the number of hours they "usually" work per week, leaving it unclear if they should report on the mean or mode number of hours.

**Rodgers, Brown, and Duncan (1993)**

This paper used data from the 1983 and 1987 Panel Study of Income Dynamics (PSID). The PSID recruited respondents from a single manufacturing company that employed thousands of workers. The researchers were given access to two years of the company's records of their employees' daily work hours. Thus, this design ensured that for every respondent in the sample, the researchers had a validation measure.  During the interview, respondents answered a series of questions asking about the total number of days they missed because a family member was sick, they were sick, they took vacation or time off, they were on strike, or they were unemployed or laid off. They also reported the number off weeks they worked on the main job, hours worked per week, and any overtime hours. The researchers used this information to compute each respondent's reported number of hours worked over the past year and compared it with the employers' records. Using these data in Analysis 1, the researchers found correlation of $r = 0.719$ ($r = 0.664$ with outliers removed) between the logarithm of respondents' work hour reports and the company record.

Respondents also reported, "How many hours per week did you work at this job including paid overtime, sick time, and other paid time off" for the previous (two-week) pay period. The researchers compared each respondent's report to the hourly payroll record for the past two weeks. Using these data in Analysis 2, the researchers found a correlation of $r = 0.61$ ($r = 0.69$ with outliers removed) between the logarithm of respondents' work hour reports and the company record.

Respondents also reported, "How many hours per week do you usually get paid for, including any usual overtime?" The researchers compared each respondent's report to the average hours worked in the previous twelve normal weeks in the payroll records. Using these

data in Analysis 3, the researchers found correlation of $r = 0.62$ ($r = 0.61$ with outliers removed)
between the logarithm of respondents' work hour reports and the company record.

**Validation Accuracy (✔):** All three analyses in this study used an appropriate validation
measure that should objectively capture respondents' actual work hours. The record was kept by
the company over two years and provided logs of each employee's daily work hours. Further, the
researchers were given access to this record.

**Validation Matching (? Analysis 3):** The researchers matched the validation measure and the
question respondents answered in each analysis. In Analysis 1, respondents reported their total
hours for the previous year, and the researchers compared this to the total hours in the payroll for
that year. In Analysis 2, respondents answered questions about their work hours specifically for
the last pay period, and the company's payroll for the last pay period were used to validate the
responses. However, it is unclear if the question and validation in Analysis 3 match. Respondents
reported their usual weekly work hours, and the researchers attempted to match this to the twelve
most recent normal work weeks for each respondent. Because the question did not specify a
specific time frame, we cannot be sure that the previous twelve normal weeks accurately
captures the time frame that most respondents referenced when answering the question.

**Question Clarity (X Analyses 1 & 3):** Analysis 2 asked respondents to answer a clear question that
provided a specific time frame to participants (past two weeks), asked about total hours per week
(rather than an ambiguous "usual" hours per week), and made sure to clarify what types of
ambiguous work hours should count (e.g., paid sick time). In contrast, Analysis 1 it is indirect.
Additionally, Analysis 3 included a question that was open to interpretation because it did not
specify a time frame and used vague wording.

*Unspecified Time-Frame* (Analysis 3): The question did not clarify a time frame for respondents, forcing them to choose how many weeks back to reference in order to arrive at their answer.

*Indirect Question* (Analyses 1 & 3)*:* Rather than asking respondents the total number of hours they worked in the reference year, Analysis 1 calculated annual work hours based on responses to multiple different questions.  This is problematic because even small inaccuracies compound with each additional question used to calculate a respondents' final "report." For instance, even if a respondent accurately reports the average hours she worked per week, if she forgot about a few vacation or sick days, her final "report" of her annual work hours will appear inflated. In Analysis 3, the question asked respondents about the number of hours they "usually" work per week, leaving it unclear if they should report on the mean or mode number of hours.

**Edwards, Levine, and Cohany (1989)**

This paper collected original data to validate respondents' reports of their hours worked. Respondents first answered one of four variants of a CPS-like question about their hours worked: Analysis (1) a question about the hours they usually work at their main and other jobs, Analysis (2) a question about their actual hours worked during the reference week, Analysis (3) a question that included a motivational introduction and provided a calendar to aid recall before asking about usual work hours, or Analysis (4) a question about usual work hours after being read detailed definitions of all the key terms. Afterwards, respondents were asked to validate their responses by engaging in a more laborious recall procedure. More specifically, respondents thought through each day of their previous week to report the hours they worked. To aid recall, the interviewers gave respondents multiple recall queues (e.g., examples of reasons they may have deviated from their usual schedules), gave them plenty of time to answer, and made clear that the respondent should put a lot of effort into answering as accurately as possible. Thus, the researchers used this recalled estimate to validate respondents' stylized reports of their usual work hours. Averaging across all four variants of the question, respondents reported working about 2.78 hours more than indicated by the validation procedure (Analysis 1: 3.82 hours; Analysis 2: 2.57 hours; Analysis 3: 1.85 hours; Analysis 4: 3.04 hours).

**Validation Accuracy (X** Analyses 1, 2, 3, & 4**):** The methods used in this study across all four analyses rely on a validation measure that is a self-report.

*Self-Report:* In order to validate respondents' answers, this study used an intensive recall procedure that asked respondents to determine the hours they worked for each day during the previous week. Thus, the validation criterion is composed of self-reports and respondent recall,

leaving it open to the potential inaccuracies in respondents' stylized reports that were used for validation.

**Validation Match (X** Analyses 1, 3, & 4**):** Respondents in this study answered one of four different questions about their work hours. Analysis 2 asked about work hours during the reference week that respondents later validated, and the other three analyses did not, creating a mismatch between the question and the validation measure.

*Different Time Frames:* All three of these analyses asked about "usual" weekly work hours as opposed to the previous week assessed in the validation measure. As such, even if respondents were perfectly accurate, irregularities in the last week would be captured in the validation measure but averaged out in reports of "usual" hours, creating discrepancies.

**Question Clarity (X** Analyses 1, 3, & 4**; ?** Analysis 2**):** By asking about "usual" work hours, three of the analyses failed to specify a time frame that respondents ought to average across and made it unclear whether respondents should answer based on their mean or mode number of hours worked.

*Unspecified Time Frame:* Rather than provide a discrete time frame, the question asked respondents about the hours their typical day, leaving open to interpretation how many days, weeks, or years back the respondent ought to average across.

*Vague Wording:* Another issue with the question is that it asks about "usual" weekly work hours, as opposed to directly specifying whether respondents should answer based on the mean or mode. Analysis 2 avoided this problem, but it is unclear whether respondents were given a basic definition of what should and should not count as work time in their estimates.

**Hamermesh (1990)**

Analysis 1 in this paper used data from the 1975 University of Michigan Time Use Survey. In it, respondents completed four "yesterday" diaries, recounting all of their activities (and time spent doing each one) for the previous day. Additionally, respondent answered, "How many hours do you work in your main job in an average week?" The researchers coded the activities in each diary to determine the hours spent at work and, from this, generate a synthetic estimate of how many hours each respondent works per week. The researchers found that respondents reported working about 1.5 hours more per week than would be expected based on their diaries (44 vs. 42.5).

Analysis 2 in this paper used data from the 1981 University of Michigan Time Use Survey. In it, respondents completed four "yesterday" diaries, recounting all of their activities (and time spent doing each one) for the previous day. Additionally, as a follow up to a question about their weekly work hours, respondents were asked, "How many hours did you work in 1980 when you were working?" The researchers coded the activities in each diary to determine the hours spent at work and, from this, generate a synthetic estimate of how many hours each respondent works per week. The researchers found that respondents reported working about 3.6 hours more per week than would be expected based on their diaries (43.3 vs. 39.7).

**Validation Accuracy (X $_{\text{Analyses 1 \& 2}}$):** The methods used in the UMTUS call the validation measure's accuracy into question for relying on self-reported time use diaries.

*Self-Report:* In order to validate respondents' work hours, this study asked them to complete yesterday diaries. However, we cannot be sure that this method captured objective truth. First, it is based on self-report, making the evaluation tautological. Second, this method

relies on respondent recall, leaving it open to error from lapses in memory. Finally, any irregularities in respondents' work hours on the day the diary was completed created inaccuracies in the synthetic estimate of that individual's weekly work hours.

**Validation Matching (X** <sub>Analyses 1 & 2</sub>**):** This study failed to match its validation measure to the question it asked respondents, because the two methods used different time frames.

*Different Time Frames:* The validation method measured work hours for four specific days, which were then used to generate a synthetic estimate of how many hours each respondent likely worked that week. In contrast, respondents reported their weekly work hours across all of 1980, rather than focusing on the weeks when the diaries were collected, potentially creating discrepancies between the two. For instance, if respondents completed diaries on less busy weeks (e.g., by rescheduling a time diary if they were contacted during a busy week), the diary estimates of their work hours would be lower than average.

**Question Clarity (X** <sub>Analyses 1 & 2</sub>**):** Both analyses had issues with the question they asked respondents to respond to, as, described next.

*Unspecified Time Frame* (Analysis 1): The question in Analysis 1 asked respondents about the hours they work in an average week but did not provide respondents with a clear time frame to reference, leaving it unclear how many weeks back respondents ought to average across.

*Vague Wording/Indirect Question:* It is unclear if the questions in these analyses gave respondents a definition of what should and should not count as work time in their reports. Additionally, the question in Analysis 2 did not clearly indicate that respondents should report

their average weekly work hours, leaving it unclear that they should report their mean, rather than their mode, number of work hours per week.

## Niemi (1993)

This paper used data from the 1987 Finnish Time Use Survey (FTUS). The FTUS recruited Finnish residents to complete interviews for labor statistics. The interviewers asked respondents, "How many hours did you work at your main job last week, possible overtime included?" clarifying that domestic work should not be included and any temporary absences from work should be subtracted. Each respondent was also asked to keep a time diary for two consecutive days. The researchers coded every ten-minute interval of activity in the diaries and used the aggregate work hours from the diaries to validate the aggregate reports from respondents. The researchers found that people reported about 0.9 hours more of work per week (38.0 hours vs. 37.1 hours) than the diaries showed.

**Validation Accuracy Concerns (X):** The methods used in this study call the validation measure's accuracy into question by relying on self-reported time use diaries.

*Self-Report:* In order to validate respondents' work hours, this study asked them to keep time diaries of their activities. However, we cannot be sure that this method captured the objective truth. First, it is tautologically based on self-report. Second, even if the method was able to capture the objective truth, the way it was administered leaves us uncertain about whether respondents adhered to it. For instance, if respondents did not use the diary throughout the day and instead filled it out afterward, it is essentially another recall measure. As such, any one of these potential sources for error could interfere with the measure.

**Validation Match (X):** This study did not adequately match its validation measure to respondents' reports. First, the researchers did not match each individual respondents' report

with his or her diary and instead compared aggregates. However, even if the researchers had done this, the study failed to match the time frames evaluated by the diaries and the question.

*Different Time Frames:* The interviewers asked respondents about the past week but collected time use diaries to validate these responses during a consecutive week. Thus, the weeks that the question and validation measure each assessed were different, and the time use diaries addressed only two days rather than a full week.  Given that the interviews were completed between September and November, it is possible that people worked a little less on average as the holidays approached. If this were the case, people's reports of their work hours last week would, on average, be higher than what the time diaries show, even if both were perfectly accurate.

**Question Clarity (✔):** The study asked respondents to answer a clear question that provided a specific time frame (last week), asked about total hours per week (rather than "usual" hours per week), and made sure to clarify what types of ambiguous work hours should not count (e.g., domestic work).

**Robinson and Bostrom (1994)**

This paper used data from the 1965, 1975, and 1985 Time Use Surveys at the University of Michigan and University of Maryland. In these surveys, respondents were asked to complete time use diaries over a 24-hour period. In Analysis 1, from the 1965 Michigan study, respondents answered, "Thinking of all the work you did for pay, how many hours did you put in during your last complete week of work?" Using the diaries to create synthetic week estimates as a validation measure, the researchers found that respondents reports of their hours worked were 1 hour higher than would be expected based on their time diaries.

In Analysis 2, from the 1975 Michigan study, respondents answered "About how many hours do you work on your main job in an average week, including both paid and unpaid overtime?" Using the diaries to create synthetic week estimates as a validation measure, the researchers found that respondents reports of their hours worked were 4 hours higher than would be expected based on their time diaries.

Analysis 3 was from the 1985 University of Maryland study. Respondents were asked to report their weekly work hours, but the exact question wording was not reported. Using the diaries to create synthetic week estimates as a validation measure, the researchers found that respondents reports of their hours worked were 7 hours higher than would be expected based on their time diaries.

**Validation Accuracy (X** $_{Analyses\ 1,\ 2,\ \&\ 3}$**):** The methods used in these studies called the validation measures' accuracy into question by relying on self-reported time use diaries.

*Self-Report:* In order to validate respondents' work hours, this study asked them to complete yesterday diaries. However, we cannot be sure that this method actually captured the

objective truth. First, it is tautologically based on self-reports.  Second, this method relies on respondent recall. Finally, any irregularities in respondents' work hours on the day the diary happened to be collected will create inaccuracies in the synthetic estimate of that individual's weekly work hours.

**Validation Matching (X Analyses 1, 2, & 3):** These studies failed to match their validation measures to the questions they asked respondents by using different time frames for each method.

*Different Time Frames:* The validation method assessed only a single day (the day of the diary) and then used this to estimate a typical week for each respondent. In contrast, the self-report question asked respondents about their last full week of work (Analysis 1), usual weekly work hours (Analysis 2), or a similar variant (Analysis 3). Further, in Analysis 1, not only did the validation measure not capture a full week, but it is likely that the day itself was not part of respondents' last full week –which, except for respondents who completed the diary on a Friday, would almost always be at least one week prior.

**Question Clarity (X Analysis 2, ? Analysis 3):** The question in Analysis 2 was ambiguous because it did not specify a time frame. We do not know the exact wording to the question in Analysis 3, meaning we do not know if it specified a time frame for respondents and made clear they should report their average number of work hours.

*Unspecified Time Frame:* The question in Analysis 2 did not clarify a time frame for respondents, forcing them to guess how many weeks back they were expected to average across in order to arrive at their answer.

## Barron, Berger, and Black (1997)

This paper used data from the 1993 Upjohn Institute Survey. The survey was particularly interested in on-the-job training methods, so they interviewed the most recently hired person from a random sample of 5,000 firms. In addition to questions about on-the-job training, the interviewers asked respondents about their work hours.  The researchers then compared these reports with a measure from each respondent's firm. Unfortunately, this paper does not include information about the exact work hours question, nor does it detail how the validation measure was collected from each firm.  The paper said that respondents reported working about 1.5 hours per week more than the validation measure (38.5 vs. 36.98), though the correlation between respondents' and their employers was high ($r = 0.77$).

**Validation Accuracy (?):** Given that the paper did not report how work hours were validated, we cannot know for certain whether the researchers had access to an accurate log of work hours, relied on employers' reports, or had some other means for obtaining an outside measure of work hours to compare with each respondent.

**Validation Matching (?):** Given that the paper did not provide the methods for obtaining the validation measure nor the question asked to respondents, we cannot be certain that both were assessing the same time frame.

**Question Clarity (?):**  Given that the paper did not provide the exact work hours question, we cannot know if it referenced a specific time period, used vague words like usual (vs. average), or was ambiguous in other ways that opened it up to interpretation.

**Jacobs (1998)**

This paper used data from the National Survey of the Changing Workforce. The study asked respondents about their average work hours per week (unfortunately, the exact wording of this question was not reported). Then, to validate these reports, the researchers created a calculated work week by subtracting respondents' reports of how long their commute usually is from their reports of when they usually leave and return for work each day. The logic for using this as a validation measure is that people are typically very aware of routine features of their days (like when they leave for and get back from work each day and how long it typically takes). Comparing people's reports to this validation measure, the researchers found a strong correlation ($r = 0.66$; $r = 0.77$ after correcting coding errors) between the two and found that people reported working about two and a half hours fewer per week than the validation measure showed (42.2 vs. 44.8).

**Validation Accuracy (X):** This study used a unique validation measure that relied on respondents' own reports rather than objective record kept by employers. However, by relying on self-report, the accuracy of the validation measure comes into question.

*Self-Report (e.g., Time Series):* Although the study attempted to obtain a valid measure from respondents to compare to their overall reports, we have little reason to believe this method captured the objective truth. The employed method did not adequately capture complications such as sick days or vacation days that deviate from the routine. To the extent that the validation measure is less sensitive to these fluctuations, it is entirely plausible that it is less accurate than respondents' reports. Furthermore, the validation measure is based on self-report.

**Validation Matching (?):** Given that the paper did not provide the question asked to respondents, we cannot be certain that it assessed the same time frame as the validation measure.

**Question Clarity (?):** Given that the paper did not provide the exact work hours question, we cannot know if it referenced a specific time period, used vague words like usual (vs. average), or was ambiguous in other ways that opened it up to interpretation.

## Angrist and Krueger (1999)

This paper re-analyzed the data presented by Mellow and Sider (1983) that were collected in a special supplement to the January 1977 Current Population Survey (CPS). In it, interviewers asked respondents, "How many hours per week do you usually work at your job?" If the respondent was not available to complete the survey, a proxy respondent was asked, "How many hours per week does (respondent's name) usually work at his/her job?" Respondents were also asked to provide the names and addresses of their employers. Then, the identified employers were mailed a packet asking for information about the respondents' labor status and hours worked ("How many hours per week does (respondent's name) usually work at this job?"). The researchers used these employers' reports as their validation measure to compare against respondents' reports of their hours worked.  Respondents reported working about 0.04 natural log hours more than the employer reports, consistent with Mellow and Sider's original analyses. However, removing respondent and employer outliers reduced this discrepancy (10% windzorized: 0.02 natural log hours; truncated: 0.01 natural log hours).

**Validation Accuracy (X):** The methods used in the CPS call the validation measure's accuracy into question by relying on an employer's report rather than a detailed record or log.

*Employer Report (vs. Record):* In this study, a packet was mailed to employers asking them to answer questions about how many hours per week the respondent usually works and assumed the employers' reports captured the objective truth.  However, we have no way of knowing if the employers kept detailed records of their employees' time. Indeed, given that the study included salaried workers, we can safely assume that at least some of the respondents' employers did not have a record of their hours. Even for those who did keep a record, we do not know if the employers actually used the records to fill out the packet. As such, while this study

found a significant discrepancy between respondent and employer reports of hours worked per week, we cannot be sure which of the two measures more accurately reflects the objective truth.

**Validation Matching (X):** The study used nearly identical questions for the respondents and their employers to answer. However, because this study relied on employer' reports (rather than a record), any issues with question clarity are particularly problematic because they introduce the possibility that a respondent and his/her employer may have interpreted the question differently, creating a mismatch between respondents' reports and the validation measure (i.e., employers' reports). Furthermore, the study included proxy respondents in its analysis, meaning its analyses did not only match respondents' reports about their own work hours to their employers' reports.

*Included Proxy Respondents:* When the primary respondent was unable to complete the interview, proxy respondents were asked to do so. This is highly problematic, because the analyses included discrepancies between a proxy's report of the respondent's work hours and the employers' report. As such, this study did not address whether people accurately report the number of hours they work per week.

**Question Clarity (X):** Although this study ensured that the question asked of respondents and employers were nearly identical, the question lacked specificity, which could create discrepancies if the respondents and their employers interpreted it differently.

*Unspecified Time Frame:* The question did not provide a specific time frame for the respondent (or employer) to refer to when answering the question. This introduces the possibility that the respondent and employer might have accurately reported the respondent's usual work hours but during different time frames (e.g., across the whole year vs. across the past month).

*Vague Wording:* Another issue with the question is that it asks about the hours "usually" worked, as opposed to directly specifying whether they should report the mean or mode number of hours worked. If a respondent interpreted the question to be asking for the mean and his/her employer interpreted the question as asking for the mode (or vice versa), there are likely to be discrepancies.

**Robinson, Chenu, and Alvarez (2002)**

This paper used data from the 1989-1999 French Time Use Survey. This study collected three different estimates of each respondent's weekly work hours: 1) respondents answered a question to estimate their weekly work hour, 2) respondents completed a yesterday time diary in which they reported all the activities they completed in the previous 24 hours, and 3) respondents completed a last-week work grid. For the work grid, the researchers were presented a grid that split all the hours of the past seven days into 15-minute intervals. Respondents used the grid to indicate the intervals over the past seven days when they were working. As such, the researchers were able to compare respondents' reports of their weekly work hours to two different validation measures (Analysis 1: the yesterday diary; Analysis 2: the seven-day work grid), as well as compare the validation measures to each other. They found that respondents' reports of their weekly work hours were highest (39.4), then the work-week grid (37.1), and finally the diary (35.8).

**Validation Measure (X $_{\text{Analysis 1 \& 2}}$):** Although this study included two possible methods for validating respondent reports, it is unclear if either of them captured the objective truth given the fact that there is a discrepancy of 1.3 hours between them, as explained next.

*Self-Report:* Both of the validation measures fall prey to the same general concern –they rely on respondents to self-report their hours worked.

**Validation Match (X $_{\text{Analysis 1}}$, ? $_{\text{Analysis 2}}$):** Without the exact question wording, it is difficult to determine if the validation measures and the question respondents answered match. However, we do know there is a mismatch in the time frame between the question (which was about weekly

hours) and the yesterday diary in Analysis 1, which only assessed a specific, single day (and was then used to create a synthetic week).

**Question Clarity (?$_{Analysis\ 1\ \&\ 2}$):** Again, given that the paper did not provide the exact work hours question, we cannot know if it referenced a specific time period, used vague words such as usual (vs. average), or was ambiguous in other ways that opened it up to interpretation.

## Juster, Ono, and Stafford (2003)

This paper used data from the 1984 and 1993 Swedish HUS Surveys and the 1998/1999 University of Maryland Time Use Study. In these studies, interviewers called respondents and asked them to complete time diaries by indicating the start and stop times of all the activities they completed over the past 24 hours. These studies also asked respondents about their weekly work hours. In the Swedish HUS surveys (Analysis 1), respondents reported, "On average, how many hours per week are you currently working at your main job, including both paid and unpaid overtime?" The exact wording for the University of Maryland Study (Analysis 2) was not reported. The researchers computed synthetic weeks from the time diaries to compare with each respondent's report. The results are reported in table format below, broken down by country, year the survey was completed, and respondent sex.

TABLE 2
Mean Weekly Hours of Market Work in Sweden and United States: Same
Respondent Reports

|  | Sweden | | | | United States | |
|  | 1984 | | 1993 | | 1998/1999 | |
|  | Male | Female | Male | Female | Male | Female |
|---|---|---|---|---|---|---|
| Stylized | 38.1 | 37.9 | 42.6 | 34.5 | 48.1 | 42.1 |
|  | (10.6) | (10.6) | (9.2) | (9.9) | (11.4) | (12.8) |
| Diary | 38.7 | 38.1 | 40.5 | 35.8 | 47.3 | 41.6 |
|  | (14.1) | (13.6) | (15.6) | (13.5) | (15.9) | (13.7) |
| N | 744 | 672 | 525 | 428 | 205 | 222 |

*Note*: Parentheses contain standard errors.

**Validation Accuracy (X Analyses 1 & 2):** The methods used in these studies call the validation measures' accuracy into question by relying on time use diaries.

*Self-Report:* In order to validate respondents' work hours, this study asked them to complete yesterday diaries. However, we cannot be sure that this method captured the objective truth. First, it is still based on self-report, leaving it open to a number of potential biases (e.g.,

many of the same biases present in the self-report question that it is attempting to (in)validate). Second, this method relies on respondent recall. Finally, any irregularities in respondents' work hours on the day the diary happened to be collected will create inaccuracies in the synthetic estimate of that individual's weekly work hours.

**Validation Matching (X $_{Analyses\ 1\ \&\ 2}$):** These studies failed to match their validation measures to the questions they asked respondents by using different time frames for each method.

*Different Time Frames:* The yesterday diary method only assessed a single day (or two single days in Analysis 1) and then used this to estimate a typical week for each respondent. In contrast, the self-report question asked respondents about weekly hours, rather than addressing if respondents were able to accurately recall their work hours on the specific days that had been validated.

**Question Clarity (X $_{Analysis\ 1,\ ?\ Analysis\ 2}$):** Although the question in Analysis 1 specified that respondents should report based on the average (e.g., rather than "usual" work hours, it did not provide a discrete time period for respondents to reference. Given that the paper did not provide the exact question for the University of Maryland study, we cannot know if Analysis 2 was based on a question that referenced a specific time period, used vague words like usual (vs. average), or was ambiguous in other ways that opened it up to interpretation.

*Unspecified Time Frame:* Rather than provide a discrete time frame, the question in Analysis 1 asked respondents about the hours they are "currently" working at their job, leaving open to interpretation how many weeks back the respondent ought to average across.

## Frazis and Stewart (2004)

This paper analyzed data from respondents who completed both the 2003 American Time Use Survey (ATUS) and the 2003 Current Population Survey (CPS). As part of the ATUS, all respondents completed a "yesterday" time diary as part of the ATUS, recounting all the activities they completed over the previous 24-hour period. The researchers used these time diaries to create synthetic weeks for each respondent and validate their reports of hours worked. In the ATUS (Analysis 1), respondents reported "How many hours do you usually work at your main job?" as well as "How many hours do you usually work at any other jobs?" Using the traditional "work time" definition in the ATUS to code the diaries, the researchers found that respondents reported working about 2.7 hours more than would be expected from their time diaries (40.3 vs. 37.6).

These same respondents also completed the CPS. In it, interviewers asked respondents, "How many hours did you work last week?" (Analysis 2). Analyzing only respondents who actually worked during the CPS reference week and using the traditional "work time" definition in the ATUS to code the diaries, the researchers found that respondents reported working about 0.7 hours more than would be expected from their time diaries (39.4 vs. 38.7).

As part of the CPS, respondents also reported, "How many hours per week do you usually work at your job?"  (Analysis 3). Again, analyzing only respondents who actually worked during the CPS reference week and using the traditional "work time" definition in the ATUS to code the diaries, the researchers found that respondents reported working about 1.3 hours more than would be expected from their time diaries (40.0 vs. 38.7).

the researchers split the CPS data from Analysis 2 into respondents whose time diaries overlapped with the CPS reference week and those whose time diaries did not overlap with the CPS reference week. While there was a difference of 1.5 hours between the time diary (36.8) and report of hours worked last week (38.3) when the two did not overlap, this difference dropped to 0.5 hours when they did overlap (time diary: 38.8, hours last week: 39.3). This lends credence to the notion that a mismatch between the time frames of the question and validation measure can increase discrepancies between the two – although it is worth noting that even this analysis does not perfectly match the two, because the ATUS time diary measured only a single day rather than the full week reported on in the CPS.

The researchers also considered different definitions for how to code work time in the diaries. If they included 15-minute breaks and time spent on work-related travel, the estimate of weekly work hours from the time diaries increased to 39.2 hours. Using this estimate, there is a difference of only 1.1 hours from reports of usual work hours and 0.2 from the reports of hours worked last week. Furthermore, when only looking at cases when the time diary day was in the same week as the CPS reference week (i.e., looking at respondents with an overlap while also using the modified coding of work hours), there was no difference between the two (39.3 for both).

**Validation Accuracy (X Analyses 1, 2, & 3):** All of the questions that were validated in this paper did so by comparing respondents' reports to synthetic weeks generated from time-diaries in the ATUS. However, because time-diaries rely on self-reports, this creates a tautology.

*Self-Report:* In order to validate respondents' reports of work hours, this study asked them to recall all of their activities over the 24-hour period prior to the interview. However, we

cannot be sure that this method captured the objective truth. First, it is based tautologically on

self-reports.

**Validation Matching (X** Analyses 1, 2, & 3**):** All of the analyses in this paper also have an issue with

the match between the questions they asked respondents and the validation measure they used.

*Included Proxy Respondents* (Analyses 2 & 3): When the primary respondent in the CPS

was unable to complete the interview, proxy respondents were asked to do so. This is

problematic, because the analysis include discrepancies between a proxy's report of the

respondent's work hours the validation measure.

*Different Time Frames:* Each respondent completed a yesterday time diary for a single

day. However, respondents reported how many hours they usually worked (in Analyses 1 & 3)

and how many hours they worked last week (in Analysis 2).

**Question Clarity (X** Analysis 1, 2, & 3**):** The question used in Analyses 1 & 2 asked respondents

about the hours they usually work at their jobs, requiring respondents to interpret ambiguities in

the question in order to answer it.

*Unspecified Time Frame:* Rather than provide a discrete time frame (like the question in

Analysis 2), the questions used in Analysis 1 & 3 asked respondents about the hours they usually

work at their main and secondary jobs, leaving open to interpretation how many weeks back the

respondent ought to average across.

*Vague Wording:* Another issue with the questions in Analyses 1 & 3 is that they asked

how many hours respondents "usually" work per week, as opposed to directly specifying

whether they should report the mean or mode number of hours worked. As such, this opens the

question up to some interpretation that could create discrepancies between reports and a

validation measure. Analysis 2 avoided this issue by asking about total hours over a specific time frame, but it is still unclear if this question included a definition of what respondents should and should not include as "work time" in their reports.

**Frazis and Stewart (2007)**

This paper also reported on data from the 2003 ATUS & CPS. Respondents completed a "yesterday" time diary as part of the ATUS, recounting all the activities they completed over the previous 24-hour period.  Additionally, in the CPS, they reported, "How many hours did you work last week?" Using the time diaries to create synthetic weeks, the researchers found that respondents reported working about 1.7 hours more last week (39.0) than would be expected from the time diaries (37.3).  When the researchers only analyzed cases when the time diary occurred during the CPS reference week, the difference was reduced to 0.4 hours (time diary: 38.6, hours last week: 39.0).

**Validation Accuracy (X):** This paper used time diaries to validate respondents' reports of their work hours. However, time-diaries tautologically rely on self-report.

*Self-Report:* In order to validate respondents' work hours, this study asked them to recall all of their activities over the 24-hour period prior to the interview.  This reliance on recall creates a tautology.

**Validation Matching (X):** The methods used in these two surveys do not ensure a match between the work hours assessed in the validation measure ant the question respondents answered.

*Included Proxy Respondents:* When the primary respondent in the CPS was unable to complete the interview, proxy respondents were asked to do so. This is highly problematic as the analysis now also include discrepancies between a proxy's report of the respondent's work hours the validation measure.

*Different Time Frames:* Each respondent completed a yesterday time diary for a single day. However, respondents reported how many hours they worked last week.

**Question Clarity (?):** This study asked respondents to answer a clear question that provided a specific time frame to participants (last week) and asked about total hours week (rather than an ambiguous "usual" hours per week). However, it is unclear if this question included a definition of what respondents should and should not include as "work time" in their reports.

**Frazis and Stewart (2009)**

This paper reported data from the ATUS & CPS from 2003-2006. Respondents completed a "yesterday" time diary as part of the ATUS, recounting all the activities they completed over the previous 24-hour period.  Additionally, in the CPS, they reported "How many hours did you work last week?" Using the time diaries to create synthetic weeks, the researchers found that respondents reported working about 3.4 hours more last week in the CPS (37.3) than would be expected from their time diaries (33.9). However, if the researchers only included cases when the time diaries occurred during the CPS reference weeks and also coded 15-minute breaks and work-related travel as work time in the diaries, the discrepancy reduces to 2.3 hours (time diary: 35.0; hours last week: 37.3). Further, the researchers noted that the estimated synthetic weeks from the ATUS time diaries might be biased because the multiple jobholding rate in the ATUS was significantly higher than in the CPS. If they also adjusted for CPS multiple jobholding rates, the discrepancy reduced to 0.2 hours.

**Validation Accuracy (X)**: This paper used time diaries to validate respondents' reports of their work hours. However, because time-diaries themselves rely on self-report, there are concerns about their validity.

*Self-Report:* In order to validate respondents' work hours, this study asked them to recall all of their activities over the 24-hour period prior to the interview. However, we cannot be sure that this method actually captures the objective truth. First, it is still based on self-report, leaving it open to potential motivational biases.

**Validation Matching (X):** The methods across these two surveys do not ensure a match between the work hours assessed in the validation measure ant the question respondents answered.

*Included Proxy Respondents:* When the primary respondent in the CPS was unable to complete the interview, proxy respondents were asked to do so. This is highly problematic as the analysis now also include discrepancies between a proxy's report of the respondent's work hours the validation measure.

*Different Time Frames:* Each respondent completed a yesterday time diary for a single day. However, respondents' reported how many hours they worked last week.

**Question Clarity (?):** This study asked respondents to answer a clear question that provided a specific time frame to participants (last week) and asked about total hours week (rather than an ambiguous "usual" hours per week). However, it is unclear if this question included a definition of what respondents should and should not include as "work time" in their reports.

## Bonke (2005)

This paper used data from the 2001 Danish Time Use Survey that interviewed Danish respondents about their labor practices. In this study, interviewers asked respondents about their usual work hours (exact wording not available) and then trained respondents how to complete time diaries for two future dates (a weekday and a weekend day). Based on the time diaries, the researchers were able to calculate a synthetic week for each respondent to validate their reports against. The study found that people reported about 0.55 fewer hours of work than their diaries showed.

### Validation Accuracy Concerns (X)

Unfortunately, the methods used in this study call the validation measure's accuracy into question for relying on self-reported time use diaries.

*Self-Report:* In order to validate respondents' work hours, this study asked them to keep time diaries of their activities. However, we cannot be sure that this method actually captures the objective truth. First, it is still based on self-report, leaving it open to a number of potential biases. Second, even if the method was able to capture the objective truth, the way it is administered leaves us uncertain if respondents actually adhered to it. For instance, if respondents did not actually use the diary throughout the day and instead just filled it out afterward, it essentially becomes another recall measure. As such, any one of these potential sources for error could interfere with the measure, making us less certain of its validity.

**Validation Matching (X):** Although the paper did not report the exact question wording, the methods used in the study do indicate that there was a mismatch between the time frames assessed by the two measures.

*Different Time Frames:* In the study, respondents answered a question about their weekly work hours in an interview and were then trained on how to complete time diaries for two future days. Thus, not only do the time diaries only capture a couple specific days and then generate a synthetic, but we can be sure that the days of the diaries were not a part of the respondents'' estimations because they came *after* the interview.

**Question Clarity (?):** Given that the paper did not provide the exact work hours question, we cannot know if it referenced a specific time period, used vague words like usual (vs. average), or was ambiguous in other ways that opened it up to interpretation.

## Klevmarken (2005)

This paper used data from the 1993 Swedish HUS Survey.  In it, respondents were interviewed twice (once the day after a weekday and once the day after a weekend). Each time, respondents completed a yesterday time diary, detailing the start and stop times of all the activities they did over the previous day.  Additionally, respondents reported how many hours they worked in the week preceding the interview by responding to the question, "The question which follows applies to a certain week, Monday the … to Sunday the …, that is week no… How many hours did you work that week in your main job? How many hours in any secondary job?" The researchers found that respondents reports of their hours worked last week correlated with their weekday time diaries at about $r = 0.48$ (males interview one report $r = 0.498$, males interview two report $r = 0.480$, females interview one report $r = 0.497$, females interview two report $r = 0.479$). However, if the researchers excluded respondents who reported not working in the previous week, the correlations dipped (males interview one report $r = 0.214$, males interview two report $r = 0.194$, females interview one report $r = 0.389$, females interview two report $r = 0.370$).

**Validation Accuracy (X):** The methods used in this study put its validation measure's accuracy in question for relying on self-reported time use diaries.

*Self-Report:* In order to validate respondents' work hours, this study asked them to complete yesterday diaries. However, we cannot be sure that this method actually captures the objective truth. First, it is still based on self-report, leaving it open to a number of potential biases (e.g., many of the same biases present in the self-report question that it is attempting to (in)validate). Second, this method still relies on respondent recall, leaving it open to error from lapses in memory. Finally, any irregularities in respondents' work hours on the day the diary

happened to be collected will create inaccuracies in the synthetic estimate of that individual's weekly work hours.

**Validation Matching (X):** The questions respondents answered and the validation measure used in this study fail to match because they assessed different time frames.

*Different Time Frames:* The validation measure used a time diary of a single day and compared those work hours with two different respondent reports of hours worked during the last week. Thus, the time frames assessed by each measure are different. Furthermore, because the time diary only assessed a single day, it may be biased by unusual features of that day (e.g., sick days) than a question about all the hours a person worked last week.

**Question Clarity (?):** This study asked respondents a clear question that provided a specific time frame to participants (last week) and asked about total hours week (rather than an ambiguous "usual" hours per week). However, it is unclear if this question included a definition of what respondents should and should not include as "work time" in their reports.

**Otterbach and Sousa-Poza (2010)**

This paper used data from the 2001-2002 German Time Use Survey. In it, respondents answered a series of questions about their work hours to determine time spent working at their primary job ("How many weekly hours do you normally work in your contemporary main employment (without occasional extra hours and unpaid lunch breaks)?"), weekend hours ("Does it happen that you work on weekends? If yes, how often?"), and potential side-jobs ("How many hours per week do you normally work for all these side-jobs (without occasional extra hours and unpaid lunch breaks)?"). Respondents also completed time diaries for three days (two weekdays and one weekend day), writing down their activities for the entire day in 10 minute intervals. Interviewers coded the activities in the diaries to determine the hours each respondent spent working for each of the diary days. Respondents also reported whether each day was normal or unusual (e.g., a sick day). Excluding unusual days, the researchers used the time diaries to compute a synthetic week estimate of each respondent's work hours. The researchers found that overall, respondents reported working about 1 hour per week more than would be expected from the diaries. However, this difference was larger for individuals working more than 35 hours per week (who reported working 2.1 hours more per week than would be expected from the diaries), it reversed for individuals working fewer than 35 hours per week (who reported working 3.4 hours less per week than would be expected from the diaries).

**Validation Accuracy (X):** The methods used in this study call its validation measure's accuracy into question due to reliance on time diaries.

*Self-Report:* In order to validate respondents' work hours, this study asked them to complete yesterday diaries. Thus, self-reports were validated against self-reports.

**Validation Matching (X):** The questions respondents answered and the validation measure used in this study fail to match, because they addressed different time frames.

*Different Time Frames:* The validation measure used time diaries from three days to create synthetic weeks, but respondents were asked about hours they normally work per week at their main job, on the weekends, and at any side jobs. Thus, this study compared a validation measure based on three specific days' work hours with respondents' reports of how many hours they "normally" work in a week.

**Question Clarity (X):** Although the question(s) clarified what respondents should and should not include in their reports of work hours (i.e., specifically asking about weekend hours and side jobs while noting to exclude breaks), the interviewers did not specify a time frame for respondents to refer to and used vague wording that respondents were required to disambiguate.

*Unspecified Time Frame:* The question did not provide a specific time frame, leaving open to interpretation how many weeks in the past that the respondents ought to consider when providing their responses.

*Vague Wording:* The question asked respondents to report how many weekly hours they "normally" work, leaving it unclear whether respondents should provide a report based on their mean or mode number of weekly work hours.

**Robinson, Martin, Glorieux, and Minnen (2011)**

Analyses 1-3

This paper analyzed data from respondents who completed both the 2003 American Time Use Survey (ATUS) and the 2003 Current Population Survey (CPS). As part of the ATUS, all respondents completed a "yesterday" time diary, recounting all the activities they completed over the previous 24-hour period. The researchers used these time diaries to create synthetic weeks for each respondent and validate their reports of hours worked. In the ATUS (Analysis 1), respondents reported "How many hours do you usually work at your main job?" as well as "How many hours do you usually work at any other jobs?" Analyzing all respondents who reported 1 or more hours, the researchers found that respondents reported working about 3.2 hours more than would be expected from their time diaries (39.5 vs. 36.3).

These same respondents also completed the CPS. In it, interviewers asked respondents, "How many hours did you work last week?" (Analysis 2). Analyzing all respondents who reported 1 or more hours, the researchers found that respondents reported working about 2.8 hours more than would be expected from their time diaries (38.7 vs. 35.9).

As part of the CPS, respondents also reported, "How many hours per week do you usually work at your job?"  (Analysis 3). Analyzing all respondents who reported 1 or more hours, the researchers found that respondents reported working about 3.6 hours more than would be expected from their time diaries (39.5 vs. 35.9).

**Validation Accuracy ($X_{Analyses\ 1,\ 2,\ \&\ 3}$)**: All of the questions that were validated in this paper did so by comparing respondents' reports to synthetic weeks generated from time-diaries in the ATUS. However, time-diaries are self-reports.

*Self-Report:* In order to validate respondents' work hours, this study asked them to recall all of their activities over the 24-hour period prior to the interview. Thus, self-reports were compared to self-reports.

**Validation Matching (X $_{\text{Analyses 1, 2, & 3}}$):** All of the analyses in this paper also have an issue with the match between the questions they asked respondents and the validation measure they used.

*Included Proxy Respondents* (Analyses 2 & 3): When the primary respondent in the CPS was unable to complete the interview, proxy respondents were asked to do so. This is highly problematic as the analysis now also include discrepancies between a proxy's report of the respondent's work hours the validation measure.

*Different Time Frames:* Each respondent completed a yesterday time diary for a single day. However, respondents reported how many hours they usually worked (in Analyses 1 & 3) and how many hours they worked last week (in Analysis 2).

**Question Clarity (X $_{\text{Analysis 1, 2, & 3}}$):** The question used in Analyses 1 & 2 asked respondents about the hours they usually work at their jobs, requiring respondents to interpret ambiguities in the question in order to answer it.

*Unspecified Time Frame:* Rather than provide a discrete time frame (like the question in Analysis 2), the questions used in Analysis 1 & 3 asked respondents about the hours they usually work at their main and secondary jobs, leaving open to interpretation how many weeks back the respondent ought to average across.

*Vague Wording:* Another issue with the questions used in Analyses 1 & 3 is that they asked how many hours respondents "usually" work per week, as opposed to directly specifying whether they should report the mean or mode number of hours worked (or asking about actual

total hours over a time frame like the question in Analysis 2). As such, this opens the question up to some interpretation that could create discrepancies between reports and a validation measure. Analysis 2 avoided this issue by asking about total hours over a specific time frame, but it is unclear whether this question included a definition of what respondents should and should not include as "work time" in their reports.

Analysis 4

In a second study, this paper analyzed data from the 1999 and 2004 Belgium weekly time-diary studies. In these studies, interviewers asked respondents, "How many hours do you generally spend per week (weekend included) on paid work? By work we mean all the work you do for your main job, including paid and unpaid overtime. Thus, it is the real time you work on your main job. Please do not include the time you travel between home and work." Respondents were also asked about secondary jobs. Then, the interviewer trained respondents on how to keep a time diary for the next 7 days, asking respondents to record the start and stop times of all their activities throughout each day. The researchers noted that there was a tendency overall for respondents to report working more hours than were captured by their diaries. Furthermore, the researchers found that the more hours respondents reported working, the larger the gap between their reports and the work hours captured in their time diaries.

**Validation Accuracy (X):** The methods used in this study call its validation measure's accuracy into question for relying on self-reported time use diaries.

*Self-Report:* In order to validate respondents' work hours, this study asked them to keep time diaries of their activities for seven days. However, we cannot be sure that this method accurately captured the objective truth due to reliance on self-reports.

**Validation Match (X):** The study did not ask respondents to recall their work hours specifically for the week captured by the validation measure (i.e., the days when they completed the diaries). As such, this methodology creates a mismatch between the time frames assessed by each measure.

*Different Time Frames:* In this study, respondents first reported their usual work hours before being trained on how to keep the time diary for the next seven days. Although the question did not include a specific time frame for respondents to reference, we can be certain that their answers did not include the days assessed by the time diaries given that the time diaries were completed *after* the interview.

**Question Clarity (X):** Although the question(s) clarified what respondents should and should not include in their reports of work hours (e.g., specifically instructing participants to include paid and unpaid overtime but exclude driving time), the interviewers did not specify a time frame for respondents to refer to and used vague wording that respondents were required to disambiguate.

*Unspecified Time Frame:* The question did not provide a specific time frame, leaving open to interpretation how many weeks back the respondents ought to consider when providing their responses.

*Vague Wording:* The question asked respondents to report how many weekly hours they "generally" work, leaving it unclear whether respondents should provide a report based on their mean or mode number of weekly work hours.

**Lin (2012)**

This paper analyzed data from the 2003-2007 American Time Use Survey (ATUS). In it, respondents reported "How many hours do you usually work at your main job?", as well as "How many hours do you usually work at any other jobs?" They also completed a "yesterday" time diary, recounting all their activities over the previous 24-hour period. Rather than only using the typical ATUS diary coding that measures the exact time respondents reported working, Lin also validated responses by looking at committed time (when workers are paid and prepared to do work even if they are not actively at that moment, e.g., being "on call") and constrained time (breaks when a worker is not expected to do work but is not realistically free to do whatever he/she chooses, e.g., a construction worker taking a 10-minute break on a construction site).

Lin also noted that the questions respondents answered focused on how many hours they "usually" work without a temporal reference, introducing ambiguity as to whether respondents should answer based on the mean or mode. This can be particularly problematic, because workers with long regular work weeks tend to have highly skewed distributions of work hours, making their mean work hours are significantly lower than their mode work hours. To address this, Lin used data from the CPS on respondents' reports of their usual work hours and hours worked last week to create an adjusted estimate for each respondent. The workers in this study reported working 3.2 hours more per week than would be expected by their diaries. However, after instead coding the diaries to include breaks shorter than 30 minutes as work time and using adjusted estimates for each respondent, this discrepancy reduced to 0.52 hours.

**Validation Accuracy (X):** This paper compared respondents' reports to synthetic weeks generated from time-diaries in the ATUS.

*Self-Report:* In order to validate respondents' work hours, this study asked them to recall all of their activities over the 24-hour period prior to the interview.

**Validation Match (X):** The time frames between the validation measure and respondents' reports do not match in this study.

*Different Time Frames:* In this study, respondents completed a single diary of all their activities yesterday. However, they reported on their work hours for a usual week, rather than later being asked to recall their work hours for the day captured in the diary.

**Question Clarity (X):** The question respondents answered in the ATUS was ambiguous and open to different interpretations that could affect respondents reports. The researcher explicitly noted these issues and worked to resolve them by coding the diaries to reflect the definitions respondents might have for what counts as work and by adjusting for how asking about usual hours without a temporal reference can cause people to report their mode (rather than mean) work hours.  Making these adjustments significantly reduced the discrepancy between respondents' reports and their time diaries.

*Unspecified Time Frame:* Rather than provide a discrete time frame, the self-report question asked respondents about the hours they usually work at their main and secondary jobs, leaving open to interpretation how many weeks back the respondent ought to average across.

*Vague Wording:* Another issue with the question is that it asked how many hours respondents "usually" work per week, as opposed to directly specifying whether they should report the mean or mode number of hours worked. As such, this opens the question up to some interpretation that could create discrepancies between reports and a validation measure.

## Sonnenberg et al. (2012)

This study analyzed data from the 2006-2009 German ESM study. In the study, respondents answered questions about how they typically spend their time. In particular, they were asked, "What is a typical day like for you? How many hours do you spend on the following activities on a typical weekday, Saturday, and Sunday?'' and then reported their typical hours spent on the following: (1) job, apprenticeship, second job, (2) errands, (3) housework, (4) childcare, (5) care and support for persons in need of care, (6) education or further training, (7) repairs on and around the house, car repairs, gardening and (8) hobbies and other free-time activities. Then, respondents wore an experience sampling device for 21 days that pinged them at random times throughout the day asking where they were, who they were with, and what they were doing (with the following options among which to choose: (a) working, studying, training, (b) doing housework, errands, (c) doing leisure activities, (d) nothing, sleeping, or watching TV, (e) in a consultation, using governmental services, (f) chatting, visiting, being visited, and/or (g) other activities).  Because experience sampling methods do not allow the researchers to calculate the duration each respondent spent doing an activity, they focused their analyses on comparing the frequencies of respondents' reported activities to the frequencies of the activities captured by the experience sampling.  The researchers found strong correspondence between respondents' reports and the experience sampling frequencies of paid work activities.

**Validation Accuracy (X):** This study used a unique method of validating respondents' reports of their work hours. Unfortunately, this method has a few problems that call its accuracy into question. First and foremost, the method is unable to capture the duration people spend on each activity, making it technically unable to even validate the question respondents answered. Furthermore, self-reports were validated against self-reports.

*Self-Report:* Although experience sampling is presumed to be less biased than respondents' generalized answers to questions about how they typically spend their time, it leaves room for inaccuracy. Specifically, the experience sampling method allowed respondents to set 12 hour periods each day when the device was allowed to ping them. The drawback to this feature is that respondents could adjust the settings in ways that distort their reports (e.g., setting the device so it is primarily on during the evenings and is therefore less of a distraction during work).

**Validation Match (X):** Respondent reports do not describe the same time frame as when the experience sampling was taken, creating a mismatch between the two that may enhance discrepancies.

*Different Time Frames:* In this survey, respondents first answered questions about how they spend their typical day and then completed a 21-day experience sampling procedure. Although the question did not mention a specific time frame for respondents, we can be certain that their answers did not include the days assessed by the experience sampling measure given that it was collected *after* the interview.

**Question Clarity (X):** Although respondents answered multiple specific questions (thereby disambiguating what counts as "work"), it included vague language that was open to interpretation.

*Unspecified Time Frame:* Rather than providing a specific time frame, the question asked respondents about the hours in their typical day, leaving open to interpretation how many days, weeks, or years back the respondent ought to describe.

*Vague Wording:* Another issue with the question is that it asked about a "typical" day, as opposed to directly specifying whether respondents should answer based on the mean or mode across days.

### Gershuny and Robinson (2013)

This paper used data from British Telecom's 1998-2002 Home-On-Line survey. As part of a three-year panel study, respondents kept a diary of all the activities they completed for seven days. Respondents also reported their "usual" work hours (the exact question wording was not reported). In Analysis 1, the researchers used regression to predict participants' diary hours from their reported usual hours and found a regression coefficient of 0.53. Furthermore, based on additional analyses on the variability of respondent's reports to their usual hours and time diary hours across the years in the panel study, the researchers concluded that the mismatches were due to respondents systematically over reporting work weeks above 40 hours.

In Analysis 2, this paper used data from the European Time Use Surveys, in which respondents reported their "usual" work hours and also completed a seven-day work grid of their last week. From the diaries, the work week length, the number of days the respondent worked, the mean length of work time during days worked, the variability of work hours across days worked, the variation of length of the working day, and the product of work week length and variation of the length in the working day were computed. The researchers used these estimates in an OLS regression to predict respondents' reports of their usual work hours as a way of testing the impact of irregularity in the working day (as captured by the various derivable estimates from the work week grid) while controlling for the total work hours captured in the grid. The regression coefficients for all but one of these predictors was highly significant. Furthermore, when the researchers used the equation to adjust respondents' reports to what their estimates would have been if the variability in the length of work days were zero, the gap between respondents' reports and the work week grid all but disappeared. Therefore, the researchers

concluded that the gap between respondents' reports and the work week grid were due to respondents' knowledge (or lack thereof) of their work time.

**Validation Accuracy (X Analyses 1 & 2):** Both of the studies used in this paper rely on self-report data to validate respondents' reports.

*Self-Reports*: Both of the surveys in this paper use a self-report measure to validate respondents' reports of their weekly work hours. In the HoL, people kept time diaries for seven days, so self-reports were validated against self-reports. The seven-day work grid asked respondents to fill out a sheet describing the previous seven days, broken up into 15-minute intervals. For each time interval, respondents indicated whether they were working or not.

**Validation Match (X Analyses 1 & 2):** Although the exact question wording was not reported for either study, the authors describe it as capturing usual weekly work hours, explicitly contrasting it with alternative questions that ask about respondents' last week. As such, we can feel confident that a "usual" weekly report did not examine the same seven days documented by the validation benchmark.

*Different Time Frames:* Both studies' validation measures captured work hours for a specific week, but respondents reported their usual weekly work hours, creating a mismatch between the time frames assessed by each question.

**Question Clarity (X Analyses 1 & 2):** The exact question wording for each survey was not reported. However, the description of the question as being about "usual" weekly work hours does suggest a problem with vague wording.

*Unspecified Time Frame (?):* Again, given that the paper did not provide the exact work hours question, we cannot know if it referenced a specific time period.

*Vague Wording:* Based on the description, it appears that these questions asked about usual weekly work hours, leaving it unclear whether respondents should report the mean or mode number of hours worked.