# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAMELA STEWART and ZULEKHA ABDUL, individually and on behalf of all similarly situated employees of Defendants in the State of California,<br><br>                       Plaintiffs,<br><br>v.<br><br>QUEST DIAGNOSTICS CLINICAL LABORATORIES, INC. and DOES 1 THROUGH 50, inclusive,<br><br>                       Defendants. | Case No.:  3:19-cv-02043-RBM-KSC<br><br>**ORDER ON:**<br><br>**(1) PLAINTIFF'S MOTION FOR CLASS CERTIFICATION [Doc. 56];**<br><br>**(2) DEFENDANT'S REQUEST FOR JUDICIAL NOTICE [Doc. 65];**<br><br>**(3) DEFENDANT'S MOTION TO STRIKE EXPERT DECLARATIONS OF DAVID NEUMARK AND JON KROSNICK FILED IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION [Doc. 66]; and**<br><br>**(4) DEFENDANT'S MOTION TO STRIKE PLAINTIFFS' PAGA ALLEGATIONS [Doc. 86].** |

On December 1, 2020, Plaintiff Pamela Stewart ("Stewart") filed a motion for class certification.  (Doc. 56.)  Defendant Quest Diagnostics Clinical Laboratories, Inc. ("Quest," or the "Company") filed a response in opposition to Stewart's motion for class certification

on January 28, 2021.  (Doc. 64.)  Stewart filed her reply on March 4, 2021.  (Doc. 74.)  Also pending before the Court in connection with the class certification motion are: (1) Quest's request for judicial notice (Doc. 65); and (2) Quest's motion to strike the expert declarations of David Neumark and Jon Krosnick (Doc. 66).  Stewart filed an opposition to Quest's motion to strike (Doc. 73), and Quest filed a reply (Doc. 84).

Following the parties' class certification briefing, Quest filed a motion to strike the representative allegations filed by Stewart and Plaintiff Zulekha Abdul ("Abdul") (collectively, "Plaintiffs") pursuant to the Private Attorneys General Act ("PAGA") (the "PAGA Motion").  (Doc. 86.)  Plaintiffs filed an opposition to Quest's PAGA Motion (Doc. 103), and Quest filed a reply (Doc. 121).  Plaintiffs later filed a notice of supplemental authority in support of their opposition to Quest's PAGA Motion.  (Doc. 125.)  On February 11, 2022, the Honorable Linda Lopez took all pending motions under submission pursuant to Civil Local Rule 7.1(d)(1).  (Doc. 122.)  This action was transferred to the undersigned on April 6, 2022.  (Doc. 127.)

For the reasons discussed below, Quest's request for judicial notice (Doc. 65) is **GRANTED**.  Quest's motion to strike the expert declarations of David Neumark and Jon Krosnick (Doc. 66) is **DENIED**.  Plaintiff's motion for class certification (Doc. 56) is **GRANTED IN PART AND DENIED IN PART**.  Quest's PAGA Motion (Doc. 86) is **DENIED**.

## I.     BACKGROUND

### A. Quest's Business

"Quest is a clinical laboratory company and the world's leading provider of diagnostic information services."  (Doc. 64 (hereinafter "Opp.") at 8.)  Quest employs phlebotomists in "thousands of patient access points" across the country, both in physician offices operated by Quest's clients, and in Patient Service Centers ("PSC") owned and operated by Quest.  (*Id*.)  At its PSCs, Quest offers phlebotomy services, drug testing, and specialized testing, such as for the COVID-19 virus.  (*Id*.)

Quest employs Patient Services Representatives ("PSR" or "PSRs") at each of its

2

PSCs.  PSRs are responsible for drawing blood samples from patients and preparing the specimens for lab testing, among other things.  (*Id.*)  PSRs work in one of four levels.  Most PSRs join Quest as PSR Level 1, "unless they have unique experience, or were working at a different level at a predecessor company or one of Quest's competitors."  (*Id.* at 9.)  While PSR Level 1 "have no leadership responsibilities," PSR Level 4, which are also called "Group Leads," "are at the top of the nonexempt PSR spectrum and assist the supervisors to run multiple locations at a time while still performing phlebotomy services."  (*Id.*)  PSR Levels 2 and 3 have varying degrees of leadership responsibilities.  (*Id.*)  "There are more than 2,400 current and former non-exempt PSRs who worked in various positions and at more than 430 locations throughout California during the limitations periods."  (*Id.*)

**B. Stewart's Claims and Proposed Classes**

Stewart has worked for Quest in San Diego, California as a part-time PSR Level 1 since 2011.  (Doc. 56-1 (hereinafter "Mot.") at 10.)  Stewart had 25 years of phlebotomy experience at the time she was hired, but did not have a college degree.  (*Id.*)  Stewart has remained a PSR Level 1 since the time she was hired.  (Opp. at 10.)

Quest removed this putative class action from San Diego County Superior Court on October 23, 2019.  (Doc. 1.)  Plaintiffs filed their first amended complaint on February 12, 2020.  (Doc. 15.)

In her motion for class certification, Stewart's claims against Quest are two-fold. First, Stewart alleges "Defendant's staffing policies and patient service goals impede its Patient Service Representatives from taking rest periods" in violation of the California Labor Code and applicable Industrial Welfare Commission ("IWC") Wage Orders.  (*See* Mot. at 7.)  In addition to her rest period claims, Stewart also alleges race-based claims against Quest.  She alleges "Black Patient Service Representatives are underpaid and/under-promoted" compared to white PSRs in violation of the Fair Employment and Housing Act ("FEHA").  (*Id.* at 9.)  Stewart also alleges Quest has a "policy and practice of compensating its Class Members at a higher hourly rate if they have college degrees" which has a "discriminatory impact on its Black Patient Service Representatives," such as

3

Stewart herself.  (*Id*. at 8–9.)

Stewart seeks to certify two classes as follows: (1) "[a]ll of Defendant's non-exempt California Patient Service Representatives who were not compensated with one hour of pay for all instances where they did not receive a duty-free and uninterrupted 10 minute rest period consistent with California law, any time between September 13, 2015, and the date of judgment" (the "Rest Period Class"); and (2) "[a]ll current and former Black Patient Service Representatives of Defendant who were employed at any time in the State of California September 12, 2016, through the date of judgment" (the "Black PSR Class"). (*Id*. at 10.)

**C. Quest's Rest Period Policies and Productivity Goals**

Throughout the entirety of the class period, Quest maintained a written rest break policy which applied to all PSRs working in California. (Mot. at 13; Opp. at 10.)  Quest's rest break policy states that "[a]ll non-exempt employees are provided a ten minute paid break for every 4 hours worked or major fraction thereof.  The rest break should be scheduled during the middle of each work period and must be for a minimum of 10 consecutive minutes and not more than 15 minutes." (Doc. 79-1 at 404.)  The rest period policy further states that "[a]ny non-exempt employee who is not provided with one or more rest periods in a workday required under this policy or applicable law shall be paid a rest period premium of one hour at the employee's regular rate of pay." (*Id*.)

Quest maintains productivity requirements for its PSRs. (*Id*. at 13.)  Some locations require PSRs to see a minimum of 24 patients a day during a full-time shift, while other locations require PSRs to see between 25 and 30 patients during a shift. (*Id*.)  Productivity is also measured by the amount of time a patient must wait to be seen at a Quest location. (*Id*. at 14.)  PSRs are expected to see walk-in patients within 20 minutes of arrival, and patients with appointments are expected to be seen within 10 minutes of arrival. (Mot. at 7.)

In addition to alleging Quest's written rest period policy fails to comply with the applicable IWC Wage Order (*see id*. at 2–3), Stewart also alleges Quest's unwritten rest

4

period policies and practices present common questions suitable for certification, such as: (1) whether Quest's staffing practices and its productivity and urgency goals impeded or discouraged its PSRs from taking rest periods; (2) whether Quest violated California law by failing to inform its employees that they are entitled to duty-free rest periods; (3) whether Quest violated California law by failing to inform its employees that they are entitled to penalty payments for any missed rest periods; (4) whether Quest violated California law by failing to inform its employees how to request a rest break penalty payment; and (5) whether Quest violated California law by failing to pay rest break penalties for any missed rest periods.  (*Id.*)

**D. Quest's Progression Policies**

Relevant to Stewart's motion for class certification are the related, but distinct, concepts of progression and promotion at Quest.  Progression occurs when a PSR moves "up" a level, such as from PSR Level 1 to PSR Level 2.  (Opp. at 9.)  "Supervisors and Managers select PSRs who have demonstrated excellent customer-facing skills, leadership, desire and ability to coach and train others, ability to work independently as well as on a team, [and] willingness to take on additional responsibilities" when deciding to progress a PSR.  (*Id.*)  Progressions are "highly discretionary" and are "dependent upon a supervisor's subjective view of the PSR's qualifications."  (*Id.* at 10.)

A promotion, on the other hand, occurs when a PSR elevates in position, such as to a supervisor.  (*Id.*)  Earning a promotion requires a more formal procedure: a PSR must apply for an open position and go through an interview process.  (*Id.*)  Promotions are "dependent on vacancies, the applicant pool, and whether a PSR actually applied for a position." (*Id.* at 10.)  Part-time employees (such as Stewart) are ineligible for promotions. (*Id.* at 9–10.)

Stewart alleges two of Quest's policies have a discriminatory impact on Black PSRs such as Stewart and Plaintiff Abdul.  Specifically, she argues that Black PSR Level 1s are progressed to PSR Level 2 at a slower rate than White PSRs.  (Mot. at 16.)  Stewart also alleges Quest "maintains a policy and practice of compensating its Class Members at a

higher hourly rate if they have college degrees" which has a discriminatory impact on Black PSRs. (*Id.* at 8–9.)

## II.    REQUEST FOR JUDICIAL NOTICE

Quest requests the Court take judicial notice of documents filed in support of Quest's motion to strike the expert declarations of David Neumark and Jon Krosnick. (Doc. 65.) Specifically, Quest asks the Court to take judicial notice of:

(1) the Declaration of David Neumark in Support of Plaintiffs' Motion for Class Certification, dated July 23, 2020, of the Superior Court of the State of California, County of San Francisco in the matter entitled *Kelly Ellis et al v. Google, Inc.*, Super Ct. Case No. CGC-17- 561299;

(2) the Declaration of David Neumark in Support of Plaintiffs' Reply in Support of Motion for Class Certification, dated June 7, 2019, of the Superior Court of the State of California, County of San Mateo in the matter entitled *Jewett et al. v. Oracle America, Inc.*, Super Ct. Case No. 17CIV02669;

(3) the Expert Report of David Neumark, dated December 21, 2017, of the U.S. District Court for the Northern District of California in the matter entitled *Rabin et al. v. PricewaterhouseCoopers, LLP.*, N.D. Cal. Case No. 4:16-cv-02276;

(4) the Expert Report of David Neumark, dated August 2, 2017, of the U.S. District Court for the Southern District of Florida Miami Division in the matter entitled *Equal Employment Opportunity Commission v. Darden Restaurants, Inc. et al.*, Case No. 15-cv-20561;

(5) the Expert Report of David Neumark, dated February 21, 2017, of the U.S. District Court for the Northern District of California in the matter entitled *Heldt et al. v. Tata Consultancy Services, Ltd.*, N.D. Cal. Case No. 4:15-cv-01696-YGR;

(6) the Report of Dr. Jon A. Krosnick, dated June 22, 2020, of the U.S. District Court of Appeals for the Ninth Circuit in the matter entitled *Le et al. v. Walgreen Co. et al.*, D.C. Case No. 8:18-cv-01548- DOC-ADS;

(7) the Report of Dr. Jon A Krosnick, dated August 2, 2019, of the U.S. District Court for the Northern District of Illinois, Eastern Division in the matter of *Smith-Brown et al. v. Ulta Beauty, Inc., et al.*, Case No. 1:18-cv-610;

(8) the Sixth Report of Dr. Jon A. Krosnick, dated June 9, 2017, of the U.S. District

Court for the Central District of California in the matter entitled *Jimenez v. Allstate Insurance Company*, C.D. Cal. Case No. CIV10-8486 JAK (FFMx);

(9) the Expert Reports and Declarations in Support of Plaintiff's Motion for Class Certification: Report of Dr. Jon A. Krosnick, dated August 8, 2011, of the U.S. District Court for the Central District of California in the matter entitled *Jimenez v. Allstate Insurance Company*, C.D. Cal. Case No. CIV10-8486 JAK (FFMx);

(10) the First Report of Dr. Jon A. Krosnick, dated December 18, 2015, of the U.S. District Court for the Southern District of California in the matter entitled *Lucas et al. v. Breg, Inc. et al.*, S.D. Cal. Case No. 3:15-cv-00258-BAS-KSC;

(11) the Declaration and Report of Jon A. Krosnick Ph.D., in Support of Plaintiffs' Opposition to CVS' Motion for Decertification of the Class, dated March 11, 2015, of the Superior Court of the State of California, County of Los Angeles in the matter entitled *Murphy v. CVS Caremark Corp.*, Super Ct. Case No. BC464785;

(12) the Declaration and Expert Report of Dr. Jon A. Krosnick in Support of Plaintiff Trinidad Lopez' Motion for Class Certification, dated October 10, 2014, of the Superior Court of the U.S. District Court for the Central District of California in the matter entitled *Lopez v. Liberty Mutual Insurance Company*, C.D. Cal. Case No. BC 2:14- cv-05576;

(13) the Declaration of Plaintiffs' Expert Dr. Jon A. Krosnick, in Support of Plaintiffs' Reply in Support of Motions for Class Certification, dated January 28, 2014, of the Superior Court of the State of California, County of Los Angeles in the matter entitled *McCleery et al. v. Allstate Insurance Company, et al.*, Super Ct. Case No. BC 410865; and

(14) an Order Affirming Denial of Class Certification, dated May 17, 2017, of the Superior Court of the State of California, County of Los Angeles in the matter of *Espinoza v. East West Bank*, Super Ct. Case No. BC502166.

(*See id.* at 2–4; *see also* Docs. 65-1–65-14.)

Federal Rule of Evidence Rule 201 provides that a court may take judicial notice of adjudicative facts that are "not subject to reasonable dispute" because they are either (1) "generally known within the trial court's territorial jurisdiction" or (2) "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(a), (b).  A court may take judicial notice of "matters of public record."

*Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (quoting *Mack v. South Bay Beer Distrib.*, 798 F.2d 1279, 1282 (9th Cir. 1986)).  A court may also "take judicial notice of the existence of another court's opinion or of the filing of pleadings in related proceedings."  *Peel v. BrooksAmerica Mortg. Corp.*, 788 F.Supp.2d 1149, 1158 (C.D. Cal. 2011) (quoting *Wyatt v. Terhune*, 315 F.3d 1108, 1114 (9th Cir. 2003)); *see also Burbank–Glendale–Pasadena Airport Auth. v. City of Burbank*, 136 F.3d 1360, 1364 (9th Cir. 1998); *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) (taking judicial notice of "several other pleadings, memoranda, expert reports, etc." in related court proceeding).  Here, Quest's request is limited to (1) expert reports or declarations filed by David Neumark and Jon Krosnick in other court proceedings; and (2) an order of the Superior Court of the State of California, County of Los Angeles.  Because these documents are matters of public record and are readily verifiable, Quest's request for judicial notice (Doc. 65) is **GRANTED**.

## III.    MOTION TO STRIKE EXPERT DECLARATIONS

Before addressing the merits of Stewart's motion for class certification, the Court will first consider Quest's challenges to the declarations filed by Stewart's experts, David Neumark and Dr. Jon Krosnick.  (*See* Doc. 66 (hereinafter "Mot. to Strike").)  Quest argues both declarations should be stricken because each "lack[s] sufficient probative value to be useful in evaluating whether class certification requirements have been met, are improperly based on assumptions and guesswork, and lack foundation and requisite expert qualifications."  (*Id*. at 2.)  Stewart argues both expert declarations contain admissible expert testimony and that Quest's motion to strike is improper at the class certification stage.  (*See* Doc. 73 (hereinafter "Mot. to Strike Opp.").)

### A. Legal Standard

The Ninth Circuit has held that expert testimony offered at the class certification stage must meet the standards of relevance and reliability articulated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011) (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338,

8

354 (2011)); *see also P.P. v. Compton Unified Sch. Dist.*, No. CV153726MWFPLAX, 2015 WL 5752770, at *6 (C.D. Cal. Sept. 29, 2015) ("In evaluating expert testimony provided in connection with a class certification motion, this Court applies the evidentiary standard set forth in *Daubert*."). "On a motion for class certification, it is not necessary that expert testimony resolve factual disputes going to the merits of plaintiff's claims; instead, the testimony must be relevant in assessing 'whether there was a common pattern and practice that could affect the class as a whole.'" *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 943 (C.D. Cal. 2015) (subsequent history omitted) (quoting *Ellis*, 657 F.3d at 983).

Expert testimony is admissible if it satisfies the requirements of Federal Rule of Evidence ("Rule") 702.  *See Daubert*, 509 U.S. 579 at 589.  Under Rule 702,

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.  "The party offering expert testimony has the burden of establishing its admissibility." *Bldg. Indus. Ass'n of Washington v. Washington State Bldg. Code Council*, 683 F.3d 1144, 1154 (9th Cir. 2012).

The inquiry required by Rule 702 "is a flexible one." *Daubert*, 509 U.S. at 594; *see also City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1043 (9th Cir. 2014) (citing *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013)) ("Under *Daubert* and its progeny, including *Daubert II*, a district court's inquiry into admissibility is a flexible one."). "In evaluating proffered expert testimony, the trial court is 'a gatekeeper, not a fact finder.'" *City of Pomona*, 750 F.3d at 1043 (quoting *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010), *as amended* (Apr. 27, 2010) (citation and quotation marks omitted)).  "Challenges that go to the weight of the evidence are within

the province of a fact finder, not a trial court judge.  A district court should not make credibility determinations that are reserved for the jury." *City of Pomona*, 750 F.3d at 1044.

Before admitting expert testimony, the trial court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93; *see also Ellis*, 657 F.3d at 982 ("Under *Daubert*, the trial court must act as a 'gatekeeper' to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards by making a preliminary determination that the expert's testimony is reliable") (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 145, 147–49 (1999)).

The Court must find "that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 590.  "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry.  And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Primiano*, 598 F.3d at 565.  "[T]he court must assess [an expert's] reasoning or methodology, using as appropriate such criteria as testability, publication in peer reviewed literature, and general acceptance." *Alaska Rent-A-Car*, 738 F.3d at 969 (quoting *Primiano*, 598 F.3d at 564).  "Reliable expert testimony need only be relevant, and need not establish every element that the plaintiff must prove, in order to be admissible." *Id*. (citing *Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1192 (9th Cir. 2007)).

## B. Discussion

### 1. Motion to Strike Declaration of David Neumark

Stewart submitted the declaration of David Neumark in support of her motion for class certification.  (*See* Doc. 56-9, Declaration of David Neumark ("Neumark Decl."); Doc. 74-2, Rebuttal Declaration of David Neumark.)  Neumark, a professor of economics at the University of California, Irvine, was "retained by the Plaintiffs as a statistical expert

10

to analyze data." (Neumark Decl. ¶¶ 1, 4.)  Specifically, Neumark's declaration states that he considered two questions: (1) Do black/African American employees at Quest remain in PS 1 (the lowest phlebotomy services position) longer than white employees? and (2) How does education of black/African American phlebotomists in California compare to education of white phlebotomists in California?  (*Id*. ¶¶ 8–9.)  Regarding question 1, Neumark concludes "black/African American employees spend more time in PS 1 than do white employees." (*Id*. ¶¶ 10–13.)  Regarding question 2, Neumark "used data from the American Community Survey (ACS) from 2012-2018, on California residents" which "indicate[s] that black/African American phlebotomists in California are more highly educated than are white phlebotomists, whereas this is not true in the California workforce as a whole." (*Id*. ¶¶ 14–15.)  Neumark states he "was not provided with other data on Quest employees that could, in principle, be incorporated into this analysis or into an analysis of race differences in pay, including education, work experience prior to hire at Quest, or starting pay information." (*Id*. ¶ 16.)

Quest makes four arguments in support of its motion to strike the Neumark declaration.  First, Quest argues "[t]he Neumark Declaration is useless for establishing any discriminatory pattern or practice related to 'delayed' promotions" of Black PSRs compared to White PSRs because Neumark's declaration amounts to little more than "a headcount of each PSR level . . . over an unspecified period of time." (Mot. to Strike at 15–16.)  Second, Quest argues the Neumark declaration should be stricken because Quest's experts have been unable to replicate Neumark's analysis, and because Stewart and her counsel have refused "to provide the underlying program files and backup data Neumark used to calculate his findings." (*Id*. at 16.)  Third, Quest argues Neumark "ignores without comment the well-established legal and statistical principles that determine what constitutes a 'significant' finding" by "suggest[ing] without a shred of authority that performing a 'one-tailed test,' as opposed to the conventional 'two-tailed test,' allows a statistical significance at a lower threshold, i.e. at 1.65 standard deviations rather than 1.96 standard deviations." (*Id*. at 17–18.)  Finally, Quest argues "Neumark's analysis of

11

education levels for phlebotomists in California is completely useless to the Court." (*Id.* at 20.)   Stewart opposes Quest's motion by arguing that Quest's motion to strike is inappropriate at the class certification stage, and that Neumark's findings satisfy *Daubert*'s relevance and reliability standards.  (*See* Mot. to Strike Opp. at 3–6.)[1]

First, the Court rejects Stewart's argument that Quest's motion to strike is improper at the class certification stage pursuant to the Ninth Circuit's holding in *Sali v. Corona Regional Med. Ctr.*, 909 F.3d 996 (9th Cir. 2018).  (*Id.* at 3.)  In *Sali*, the Ninth Circuit held that the district court abused its discretion by declining to consider an expert declaration at the class certification stage solely on the basis of inadmissibility.  *Sali*, 909 F.3d at 1006–1007.  The Ninth Circuit made clear that, while the district court erred by excluding the expert evidence on the basis of admissibility alone, "[w]hen conducting its 'rigorous analysis' into whether the Rule 23(a) requirements are met, the district court need not dispense with the standards of admissibility entirely." *Id.* at 1006.  The Ninth Circuit confirmed that the *Daubert* standard of admissibility applies at the class certification stage, and that "an inquiry into the evidence's ultimate admissibility should go to the weight that evidence is given at the class certification stage."  In other words, the Court's instant task is to evaluate the admissibility of the Neumark and Krosnick declarations under *Daubert*, and examine whether the expert declarations "tend[] to support class certification." *Id.* Indeed, courts in this circuit have continued post-*Sali* to examine expert reports under

---

[1] Stewart also argues the motion to strike should be denied because Quest failed to meet and confer with Stewart prior to filing the motion, as required by Judge Todd W. Robinson's Standing Order for Civil Cases, Section III(A).  (Doc. 73, Mot. to Strike Opp. at 2–3.)  Stewart admits, however, that the parties communicated about Quest's concerns regarding the Neumark declaration before the motion was filed.  (*See id.*)  Quest submitted with its motion to strike correspondence between the parties before the motion to strike was filed about Stewart's expert's data, in which Quest communicated its intention to file a motion to strike.  (Doc. 66-2 at 2) ("Without limiting or waiving our objections to his report, if he refuses or we don't get that commitment by tomorrow, we will move to strike his report on the basis of this omission.").  Accordingly, the Court rejects this aspect of Stewart's opposition.

*Daubert*'s reliability standard at the class certification stage. *See*, *e.g.*, *Mier v. CVS Pharmacy, Inc.*, No. 820CV01979DOCADS, 2022 WL 1599633, at *2–4 (C.D. Cal. May 9, 2022) (granting in part and denying in part motion to strike expert report under *Daubert* standard at class certification stage); *Hamm v. Mercedes-Benz USA, LLC*, No. 5:16-CV-03370-EJD, 2021 WL 1238304, at *12 (N.D. Cal. Apr. 2, 2021), *reconsideration denied*, 2022 WL 913192 (N.D. Cal. Mar. 29, 2022) (denying motion to strike expert reports under *Daubert* standard at class certification stage).

The Court will next address each of Quest's objections to the Neumark declaration, starting with Quest's contention that the declaration is just a "headcount" of the number of PSRs in each level over an unspecified period of time. (Mot. to Strike at 15–16.) Quest argues that although Neumark's declaration "purports to analyze the length of time it takes for a PSR to achieve a [progression] from a Level 1 to a Level 2 and the impact that race has on that time," the declaration instead "only tracks the number of employees in a given PSR level, i.e. 1, 2, 3, or 4, over the course of an unspecified period of time." (*Id*. at 15.) The declaration, argues Quest, is not a true promotions analysis because it does not "look at a cohort of similarly situated employees and track their progression/promotion over the relevant time period," and therefore does not shed light on whether Black PSRs are progressed at a slower rate than White PSRs. (*Id*. at 16.) In a report submitted by Quest's expert, Dr. Amy Aukstikalnis, she similarly argues Neumark "does not, in fact, analyze the promotion rates of PSRs" and that Neumark ignores various "factors besides a company's promotion decisions that may explain the representation of African-American and White employees at different levels within a company." (Doc. 67 at 8–9.) Specifically, Dr. Aukstikalnis argues Neumark ignores factors such as the number of job openings, hiring rates, the availability of qualified applicants, and turnover rates. (*Id*. at 9.) In Stewart's opposition, she argues that both Neumark and Quest's expert, Dr. Aukstikalnis, "ultimately reached the same conclusion—that Black [PSRs] are promoted at a slower rate from the PSR1 to PSR2 role." (Mot. to Strike Opp. at 4.)

Quest's critiques of Neumark's promotions analysis go to the weight of the evidence,

not its admissibility.  *City of Pomona*, 750 F.3d at 1044.  Quest argues Neumark's declaration "is useless for establishing any discriminatory pattern or practice related to 'delayed' promotions" because Neumark fails to account for individuals with no interest in promotion, vacancies, or PSRs who move into other positions, among other factors. (Mot. to Strike at 15.)  Neumark admits in his declaration, however, that he "was not provided with other data on Quest employees that could, in principle, be incorporated into this analysis or into an analysis of race differences in pay, including education, work experience prior to hire at Quest, or starting pay information."  (Neumark Decl. ¶ 16.) Quest will be free to attack Neumark's analysis by cross examining him regarding these factors, along with the factors identified by Dr. Aukstikalnis.  "[O]bjections to a study's completeness generally go to the weight, not the admissibility of the statistical evidence and should be addressed by rebuttal, not exclusion."  *Obrey v. Johnson*, 400 F.3d 691, 695 (9th Cir. 2005) (internal quotation marks omitted) (quoting *Mangold v. Cal. Pub. Utils. Comm'n*, 67 F.3d 1470, 1476 (9th Cir. 1995) and citing *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 340 (1977)).  The Court declines to strike the Neumark report on this ground.

Next, the Court turns to Quest's argument that the Neumark declaration should be stricken because Stewart and her counsel have refused "to provide the underlying program files and backup data Neumark used to calculate his findings."  (Mot. to Strike at 16.) Quest appears to argue that counsel's failure to provide Neumark's backup files fails to comply with the disclosure requirements of Federal Rule of Civil Procedure 26.  (*See id*. at 16–17.)  Federal Rule of Civil Procedure 37(c)(1) forbids the use at trial or on a motion of any information not properly disclosed under Rule 26(a) unless the failure to disclose is substantially justified or harmless.  FED. R. CIV. PRO. 37(c)(1).  At the time Quest's motion to strike was filed, however, expert discovery was ongoing.  Stewart argues that, despite its motion to strike on Rule 26 grounds, "Defendant did not propound any discovery on this subject nor did Defendant seek to depose David Neumark."  (Mot. to Strike Opp. at 3.) The Court also notes that, despite the parties' various discovery disputes, Quest did not file

a motion to compel Neumark's backup files.  (*See generally* Docket.)  On this record, and because Quest's expert Dr. Aukstikalnis submitted a report rebutting Neumark's analysis (*see* Doc. 67), the Court declines to strike the Neumark report on this ground.

Third, Quest argues the Neumark declaration should be stricken due to the statistical principles Neumark relies upon in forming his opinions.  (Mot. to Strike at 17–18.)  Quest argues "the threshold for statistical significance, including in disparate impact cases, is a minimum of 1.96 standard deviations from the mean," but Neumark improperly "allows a statistical significance at a lower threshold, i.e. at 1.65 standard deviations rather than 1.96 standard deviations."  (Mot. to Strike at 17–18.)  Quest argues "[t]his is not only contrary to established legal and statistical principles, but it goes against each of the declarations Neumark had submitted in other cases for at least the last five years."  (*Id*. at 12.)  In her opposition, Stewart notes that Neumark and Quest's expert, Dr. Aukstikalnis, mostly reach the same conclusions, regardless of the standard deviation used.  (Mot. to Strike Opp. at 4–5.)

"Statistical significance is measured by standard deviations. The standard deviation is a number that quantifies the probability that chance is responsible for any difference between an expected outcome and the observed outcome in a sample containing two groups.  The greater the number of standard deviations, the less likely it is that chance is the cause of any difference between the expected and observed results." *Dukes v. Wal-Mart Stores, Inc.*, 222 F.R.D. 137, 156 (N.D. Cal. 2004) (subsequent history omitted).  As the Supreme Court has explained, "[a]s a general rule for such large samples, if the difference between the expected value and the observed number is greater than two or three standard deviations, then the hypothesis that the jury drawing was random would be suspect to a social scientist." *Castaneda v. Partida*, 430 U.S. 482, 496 (1977); *see also Hazelwood Sch. Dist. et al. v. United States*, 433 U.S. 299, 309 n.14 (1977).  The Ninth Circuit has similarly held that "the 1.96 threshold conforms with accepted conventions in the social science field and with the federal government's internal standards." *Paige v. California*, 233 F. App'x 646, 648 (9th Cir. 2007); *Heath v. Google LLC*, 345 F. Supp. 3d

1152, 1173 (N.D. Cal. 2018) ("[t]wo standard deviations is normally enough to show that it is extremely unlikely (that is, there is less than a 5% probability) that the disparity is due to chance, giving rise to a reasonable inference that the hiring was not [age]-neutral.") (quoting *Adams v. Ameritech Servs., Inc.*, 231 F.3d 414, 424 (7th Cir. 2000)).

The problem with Quest's objection to Neumark's use of 1.65 standard deviations, however, is that such a challenge again goes to the weight of Neumark's report, as opposed to its admissibility. *City of Pomona*, 750 F.3d at 1044. Quest fails "to concede that the dispute is a battle of the experts that the Court need not resolve at the certification stage." *Heath*, 345 F.Supp.3d at 1172 (citing *Perez v. State Farm Mut. Auto. Ins. Co.*, No. C 06-01962 JW, 2011 WL 8601203, at *5 (N.D. Cal. Dec. 7, 2011) (holding that at the certification stage "[t]he court cannot weigh in on the merits of plaintiffs' substantive arguments, and must avoid engaging in a battle of expert testimony"). As Quest points out, the use of 1.65 standard deviations in Neumark's declaration appears to depart from the approach Neumark has taken in other declarations filed in separate actions. (*See generally* Docs. 65-1–65-5.) Quest and its counsel will be free to cross examine Neumark about his statistical significance opinions in this case compared to those he has offered in other actions. Indeed, "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564 (citing *Daubert*, 509 U.S. at 596).

Finally, Quest objects to Neumark's use of data from the American Community Survey ("ACS"). (Mot. to Strike at 20–21.) Neumark states part of his assignment was to compare the education of Black phlebotomists in California to the education of White phlebotomists in California. (Neumark Decl. at 3.) Using data from the ACS, Neumark reports that Black phlebotomists in California are more highly educated compared to White phlebotomists. (*Id*. at 4, 8.) Even if the ACS data suggests Black PSRs at Quest are more highly educated than White PSRs—and Neumark himself admits he has not studied the educational background of Quest's actual employees—such a conclusion appears to cut against Stewart's college differential theory. The Court therefore finds this section of

16

Neumark's declaration irrelevant, but denies to strike the report on this ground.

For the reasons discussed above, the Court **DENIES** Quest's motion to strike the Neumark declaration.

### 2. Motion to Strike Declaration of Jon Krosnick

Stewart also submitted the declaration of Jon Krosnick in support of her motion for class certification.  (Doc. 56-8, Declaration of Jon Krosnick.)  Dr. Krosnick, a professor of communication and political science at Stanford University, was retained by Stewart "to provide [] opinions relating to whether a reliable survey can be conducted of some employees of Quest Diagnostics."  (*Id*. ¶¶ 1–2.)  Dr. Krosnick has yet to conduct a survey relevant to the issues in this action, but instead opines on "whether survey research methodology can be used to acquire reliable data on the experiences of employees who worked for Quest Diagnostics."  (*Id*. ¶ 10); *see also id*. ¶ 13 ("My assignment in this case has been to consider the possibility of designing a survey to administer to a specific list of employees of Quest Diagnostics.").  Dr. Krosnick concludes "that a survey can be feasibly administered using best practices for application in this case."  (*Id*. ¶ 11.)  Much of Dr. Krosnick's 81-page declaration discusses the usefulness of surveys generally, including "the logic and theory underlying survey research methods" and "the uses of surveys in court and the valuable roles they can play in general."  (*Id*. ¶ 12.)

Quest argues that the Dr. Krosnick declaration is useless to the trier of fact because Dr. Krosnick failed to actually conduct his proposed survey, making Dr. Krosnick's declaration speculative.  (Mot. to Strike at 21.)  Quest cites other courts which, Quest argues, have "expressed reservations or refrained from relying on Dr. Krosnick's submissions" under similar circumstances.  (*Id*. at 22–24.)  Quest also argues that Krosnick's declaration "is largely a boilerplate template that ignores the particular facts and circumstances relevant to this case."  (*Id*. at 24) ("Instead of focusing [on] the case at hand, the bulk of the Krosnick Declaration references other studies that Dr. Krosnick fails to relate back to Quest employees or the actual methodology of the survey that he purports to create.").  Finally, Quest argues the Krosnick declaration is based on improper

17

assumptions and speculation, including Krosnick's "personal assumptions," making the Krosnick declaration unreliable. (*Id*. at 25–28.)  Stewart argues "Krosnick's declaration describes in a very thorough fashion the methodology he would use to implement a survey," and that "Krosnick's methodology has been accepted in numerous cases." (*See* Mot. to Strike Opp. at 6–11.)

The Court agrees with Quest that the portions of Krosnick's report addressing the merits of surveys generally and the use of surveys in courts are irrelevant to any issue in this case. *See Allen v. Similasan Corp.*, 306 F.R.D. 635, 642 (S.D. Cal. 2015) (finding "irrelevant" portions of expert report authored by Krosnick which "discusses the usefulness of surveys generally").  However, the Court disagrees that Krosnick's declaration is useless solely because the survey Krosnick designed has not yet been completed.  Other courts in this district, examining a proposed survey designed by Krosnick at the class certification stage, have both declined to strike Krosnick's expert report and certified a class based in part on such a survey design. *See*, *e.g.*, *Allen*, 306 F.R.D. at 642 (denying motion to strike Krosnick report which "present[ed] a methodology for determining whether" Plaintiffs' claims were satisfied, but survey had not been completed).

Additionally, courts throughout this District have denied motions to strike at the class certification stage, even where the survey had not yet been completed, where the expert's testimony was otherwise reliable and relevant to a plaintiff's claims. *See*, *e.g.*, *Fodera v. Equinox Holdings, Inc.*, 341 F.R.D. 616, 625–26 (N.D. Cal. 2022) (denying motion to strike expert declaration and certifying class based on "proposed survey" which would "collect information about meal and rest periods").  Krosnick is clearly highly qualified in his field, and has ample experience designing surveys used in wage and hour class actions.  Quest's other arguments regarding Krosnick's survey design and reliability (*see* Mot. to Strike at 25–28) go to the weight of the evidence, not its admissibility. *Id*. at 626; *see also Jimenez v. Allstate Ins. Co.*, No. CV-10-08486, 2019 WL 13088814, at *15 (C.D. Cal. May 13, 2019) ("In general, issues of methodology, design, and reliability go to the weight of the survey evidence, rather than its admissibility.  Thus, these issues often

1   are addressed through cross examination.").

2     Accordingly, the Court **DENIES** Quest's motion to strike the Krosnick declaration.

3       **IV. MOTION FOR CLASS CERTIFICATION**

4    **A. Legal Standard**

5     The class action is "an exception to the usual rule that litigation is conducted by and

6   on behalf of the individual named parties only." *Dukes*, 564 U.S. at 348 (quoting *Califano*

7   *v. Yamasaki*, 442 U.S. 682, 700–701 (1979)).  To justify departing from that rule, "a class

8   representative must be part of the class and 'possess the same interest and suffer the same

9   injury' as the class members." *Id*. (citing *East Tex. Motor Freight Sys., Inc. v. Rodriguez*,

10  431 U.S. 395, 403 (1977)).

11    Class certification is governed by Federal Rule of Civil Procedure 23.  A district

12  court may certify a class only if: "(1) the class is so numerous that joinder of all members

13  is impracticable; (2) there are questions of law or fact common to the class; (3) the claims

14  or defenses of the representative parties are typical of the claims or defenses of the class;

15  and (4) the representative parties will fairly and adequately protect the interests of the

16  class."  FED. R. CIV. PRO. 23(a).  "Rule 23(a) ensures that the named plaintiffs are

17  appropriate representatives of the class whose claims they wish to litigate." *Dukes*, 564

18  U.S. at 349.

19    If the plaintiff satisfies the requirements of Rule 23(a), the district court must also

20  find that at least one of the several requirements set forth in Rule 23(b) is met.  Here,

21  Stewart seeks class certification pursuant to Rule 23(b)(3).  (*See* Mot. at 27.)  Rule 23(b)(3)

22  requires "that the questions of law or fact common to class members predominate over any

23  questions affecting only individual members, and that a class action is superior to other

24  available methods for fairly and efficiently adjudicating the controversy."  FED. R. CIV.

25  PRO. 23(b)(3).  "The matters pertinent to these findings include: (A) the class members'

26  interests in individually controlling the prosecution or defense of separate actions; (B) the

27  extent and nature of any litigation concerning the controversy already begun by or against

28  class members; (C) the desirability or undesirability of concentrating the litigation of the

claims in the particular forum; and (D) the likely difficulties in managing a class action."
*Id*.

"Rule 23 does not set forth a mere pleading standard." *Dukes*, 564 U.S. at 350. Rather, "[a] party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Id*. The court must engage in a "rigorous analysis" which often "will entail some overlap with the merits of the plaintiff's underlying claim" before finding that the requirements for class certification have been satisfied. *Dukes*, 564 U.S. at 351; *see also Ellis*, 657 F.3d at 983 n.8 ("The district court is required to examine the merits of the underlying claim . . . only inasmuch as it must determine whether common questions exist; not to determine whether class members could actually prevail on the merits of their claims."). District courts are given broad discretion to grant or deny a motion for class certification. *Bateman v. Am. Multi–Cinema, Inc.*, 623 F.3d 708, 712 (9th Cir. 2010).

## B. Discussion

Quest argues that neither the proposed Black PSR Class nor the proposed Rest Period Class are entitled to class treatment. Specifically, Quest argues: (1) Stewart has failed to demonstrate commonality; (2) Stewart has failed to demonstrate manageability requirements of Rule 23(b)(3), including predominance and superiority; and (3) Stewart's claims are atypical of the class. (Opp. at 17–30.)

### 1. Numerosity and Adequacy Requirements of Rule 23(a)

A plaintiff seeking class certification must satisfy Rule 23's requirements of numerosity and adequacy. Quest does not dispute that Stewart satisfies these requirements. *See generally* Opp.

Rule 23(a)(1) requires that the "the class is so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1). Courts in this circuit generally find that numerosity is satisfied where the proposed class includes forty or more members. *See In re Outlaw Lab'ys, LP Litig.*, No. 18-CV-840-GPC-BGS, 2021 WL 2916892, at *5 (S.D.

20

Cal. July 12, 2021) (citations omitted).   Stewart's motion states the Black PSR class consists of approximately 183 members, and the Rest Period Class consists of approximately 2,493 members.   Accordingly, numerosity is satisfied.

Rule 23(a)(4) requires that the class representative be able to "fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4).   "To determine adequacy, courts evaluate whether the named plaintiffs and their counsel "have any conflicts of interest with other class members" and whether they will "prosecute the action vigorously on behalf of the class." *Ellis*, 657 F.3d at 985.   The Court finds no apparent conflicts of interest between Stewart, her counsel, and the proposed class members.   Stewart and her counsel have demonstrated that they will prosecute this action vigorously on the class's behalf.   Plaintiff has continued to participate in this action since its inception in 2019, including by sitting for a deposition and by responding to Quest's discovery.   Similarly, Stewart's counsel has diligently litigated this case, including by filing this motion and timely responding to various motions filed by Quest.   Counsel has also taken depositions and conducted discovery.   Finally, counsel appears to have broad experience litigating wage and hour class actions.   (*See* Mot. at 27; *see also* Doc. 56-5 (Decl. of Graham S.P. Hollis ISO Mot.).) Accordingly, the Court finds that adequacy is satisfied here.

### 2. Commonality Requirement of Rule 23(a) and Predominance Requirement of Rule 23(b)(3)

For efficiency purposes, the Court will consider commonality under Rule 23(a) in connection with predominance under Rule 23(b)(3). *Collins v. ITT Educ. Servs., Inc.*, No. 12CV1395 DMS BGS, 2013 WL 6925827, at *3 (S.D. Cal. July 30, 2013) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 609 (1997) ("Rule 23(a) (2)'s 'commonality' requirement is subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class 'predominate over' other questions.")).

To satisfy the commonality requirement, a plaintiff must show "questions of law or fact common to the class." FED. R. CIV. P. 23(a)(2).   Plaintiffs must demonstrate that the class members suffered "the same injury," meaning their claims "depend upon a common

21

contention" that is of such a nature that "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. The moving party must demonstrate not only the existence of a common question, but also "the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." *Id*. (internal citation omitted). To satisfy Rule 23(a)(2), "even a single common question will do." *Id*. at 359.

Rule 23(b)(3) requires that "the questions of law or fact common to class members predominate over any questions affecting only individual members." FED. R. CIV. P. 23(b)(3). The predominance analysis "focuses on the relationship between the common and individual issues in the case and tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 545 (9th Cir. 2013) (citation and internal quotation marks omitted). Predominance is generally satisfied if a party can show that an employer used a standard policy that was uniformly implemented. *See Kamar v. Radio Shack Corp.*, 254 F.R.D. 387, 399 (C.D. Cal. 2008) ("When the claim is that an employer's policy and practices violated labor law, the key question for class certification is whether there is a consistent employer practice that could be a basis for consistent liability.").

### a. Black PSR Class

In her motion, Stewart seeks to certify claims under California's Fair Employment and Housing Act ("FEHA") that: (1) Quest "under-promotes" its Black PSRs from the Level 1 to Level 2 position; and (2) Quest's payment of a 50-cent additive to newly-hired PSR Level 1s with a college degree disparately impacts Black PSRs. (Mot. at 10, 25–26.) Stewart alleges her expert has determined Black PSRS "spend approximately 8 months to one year longer in the lowest level Patient Service Representative position," and that a college degree has no impact on a PSR's ability to do his or her job. (*Id*. at 9, 25.) Quest argues Stewart "is unable to make even a prima facie showing of disparate impact" and has failed to prove commonality on either her under-promotion theory or her college differential theory. (Opp. at 18–22.)

22

Stewart has not satisfied the commonality requirement on her delayed promotions theory. "[T]o satisfy the commonality requirement, the proposed class must pose a common question that will connect many individual promotional decisions to their claim for class relief and produce a common answer to the crucial question *why was I disfavored?*" *Moussouris v. Microsoft Corp.*, 799 Fed. App'x 459, 461 (9th Cir. 2019) (internal quotation marks omitted) (quoting *Ellis*, 657 F.3d at 981 and *Dukes*, 564 U.S. at 352). When a plaintiff challenges a discretionary system for pay raises or promotions, the plaintiff must "identif[y] a common mode of exercising discretion that pervades the entire company." *Dukes*, 564 U.S. at 356.

Here, the crux of Stewart's delayed promotions theory is that it takes a Black PSR Level 1 more time than a White PSR Level 1 to progress to PSR Level 2. However, as Stewart admits, Quest's supervisors are responsible for selecting which PSRs to progress from Level 1 to Level 2, and supervisors are vested with tremendous discretion in making such decisions. (*See* Mot. at 25.) Stewart's supervisor, Daniel Petersen, submitted a declaration in support of Quest's opposition brief, stating that part of his job as a supervisor was to evaluate PSR performance and make recommendations for progressions from Level 1 to Level 2. (Doc. 68-5 (hereinafter "Petersen Decl.") ¶ 11.)[2] Petersen states that he "consider[s] various factors" in making decisions about who to recommend for progressions, such as "whether the PSR was going above and beyond the regular call of duty, whether she or he was showing leadership skills, [and] whether she or he was willing to take on additional responsibilities." (*Id.* ¶ 12.) Petersen also considered factors such as

---

[2] In her reply, Stewart makes various evidentiary objections to Petersen's declaration on hearsay, speculation, foundation, and best evidence grounds. Reply at 11. However, the Court may "consider inadmissible evidence in deciding whether it is appropriate to certify a class." *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 965 n.147 (C.D. Cal. 2015) (internal quotations omitted) ("Since a motion for class certification is a preliminary procedure, courts do not require strict adherence to the Federal Rules of Civil Procedure or the Federal Rules of Evidence."). Accordingly, the Court overrules Stewart's objections for the purpose of ruling on the motion for class certification.

23

"she or he consistently showed interest in progressing, such as by being vocal about a desire to progress and taking actions to prove a commitment to that goal." (*Id*.)  In other words, Petersen appears makes progression decisions on a subjective, discretionary, and case-by-case basis.

*Dukes* is instructive here.  In *Dukes*, a group of current and former Wal-Mart employees filed a class action lawsuit, alleging Wal-Mart discriminated against them on the basis of their sex by denying them pay and promotions.  564 U.S. at 342.  Decisions regarding pay and promotions at Wal-Mart were committed to the broad discretion of local Wal-Mart managers, and such decisions were made "in a largely subjective manager." *Id*. at 343.  The Supreme Court found that plaintiffs failed to provide "significant proof" that Wal-Mart "operated under a general policy of discrimination." *Id*. at 354 (citations omitted).  Relying on Wal-Mart's practice of permitting local managers to make discretionary decisions about promotions and pay, the Court explained that "demonstrating the invalidity of one manager's use of discretion will do nothing to demonstrate the invalidity of another's." *Id*. at 355–56.  Because plaintiffs failed to identify "a common mode of exercising discretion that pervades the entire company," aside from an expert's theory which the court rejected, the Court held that plaintiffs failed to demonstrate commonality.  *Dukes*, 564 U.S. at at 356; *see also Moussouris*, 799 Fed. App'x at 462 (affirming denial of class certification as to disparate impact claims where "Appellants failed to identify a common mode of discretion throughout Microsoft because the individual managers had broad discretion over" decision-making).

The same is true here.  Petersen, Stewart's supervisor, "is only one of 70 supervisors who oversaw over 2,400 PSRs across 430 locations—a small fraction of the putative class." Opp. at 21.  Stewart has presented no evidence that there is "a common mode of exercising discretion that pervades" Quest as a whole.  *Dukes*, 564 U.S. at 356.  Unlike *promotions* at Quest (e.g., elevation from a PSR to a supervisor), which require a formal application and interview process, *progressions* (e.g., movement from PSR Level 1 to PSR Level 2) are discretionary decisions made by supervisors working across the Company.  Stewart has

24

presented no "common mode of discretion" that pervades the Company, *Moussouris*, 799 Fed. App'x at 462, and instead herself concedes that decisions about progressions are made by supervisors at their sole discretion.  (Mot. at 25) ("Defendant testified that its Supervisors are responsible for selecting which Patient Service Representatives to promote and the decisions as to whom the Supervisors do not select are not reviewed by management.").

The Court also finds that Stewart has failed to satisfy the commonality requirement on her college differential theory.  The crux of Stewart's college differential theory is that "Defendant maintains a policy and practice of compensating its Class Members at a higher hourly rate if they have college degrees" and that such practice disparately impacts Black PSRs.  (Mot. at 8–9.)  Stewart has not, however, adequately shown that this policy applies to all class members.  Stewart cites to the deposition of Quest's corporate representative, Eve Vandewiele, who testified regarding a "credit [given] to individuals that come to [Quest] with a bachelor's degree."  (Doc. 56-4 at 56.)  This record evidence, however, says nothing about whether the policy applies to all class members or whether the policy is uniformly applied.  Although Stewart alleges "Defendant utilizes the same pay and promotion practices in regard to all California Patient Service Representatives," the evidence Stewart cites for that proposition does not say that the college payment is uniformly applied across California.  Rather, Stewart cites portions of the deposition of Tiffani Walten, a patient services manager who works for Quest in Temecula, California.  (Doc. 56-3; *see also* Doc. 68-4.)  In the portions of Walten's deposition cited by Stewart, however, Walten is discussing only Quest's progression policies (i.e., how a PSR Level 1 progresses to PSR Level 2).  (*See* Doc. 56-3 at 299–301.)  Walten does not appear to have testified regarding Quest's pay practices for employees with a college degree.

Although Stewart seeks class certification on the issue of "[w]hether Defendant's policy of paying a college degree differential has a discriminatory impact on its Black Patient Service Representatives," the bulk of Stewart's analysis on the issue of commonality is devoted to her rest period claims, and, to a lesser extent, her delayed

promotions theory. (*See* Mot. at 10, 18–26.)   Indeed, the section of Plaintiff's brief discussing commonality does not mention the "college differential payment" at all, absent a note that her expert, Neumark, "provided information regarding education levels of Phlebotomists in California, which suggests that Black Patient Service Representatives should have more education than Defendant's white Patient Service Representatives." (Mot. at 25.)[3]   Under these facts, Stewart has not satisfied her burden of establishing commonality by a preponderance of the evidence. *Burgos v. Sunvalleytek Int'l, Inc.*, No. 18-CV-06910-HSG, 2020 WL 7319354, at *3 (N.D. Cal. Dec. 11, 2020) (citing *Dukes*, 564 U.S. at 350–51) ("The plaintiff bears the burden of showing by a preponderance of the evidence that class certification is appropriate under Federal Rule of Civil Procedure 23.").

Because Stewart has failed to satisfy her burden of establishing commonality on her Black PSR claims to satisfy Rule 23(a)(2), the Court denies certification of Stewart's proposed Black PSR class.[4]

### b. Rest Period Class

California Labor Code section 226.7 prohibits employers from requiring employees to work during rest periods mandated by an Industrial Welfare Commission order.   Cal. Lab. Code § 226.7(b).   Employers "shall authorize and permit all employees to take rest periods, which insofar as practicable shall be in the middle of each work period." *See* Cal. Code Regs. tit. 8, § 11020(12)(A).   "The authorized rest period time shall be based on the total hours worked daily at the rate of ten (10) minutes net rest time per four (4) hours or major fraction thereof. . . . Authorized rest period time shall be counted as hours worked for which there shall be no deduction from wages." *Id*.   The IWC Wage Order further provides that, "[i]f an employer fails to provide an employee a rest period in accordance

---

[3] As Quest argues in its opposition, Neumark's data speaks to the education level of phlebotomists in California generally, as opposed to phlebotomists employed by Quest. (Opp. at 22; *see also* Neumark Decl. ¶ 16.)

[4] Due to this determination, the Court will not reach the issue of whether Stewart has satisfied the other requirements of Rule 23 with respect to her pay and promotion claims.

with the applicable provisions of this order, the employer shall pay the employee one (1) hour of pay at the employee's regular rate of compensation for each workday that the rest period is not provided." *Id*. § 12(B).

Stewart lists three categories of common issues pertaining to her rest period claims. The Court will examine each in turn.

### (i)   Payment of Rest Period Penalties

The Court begins with Stewart's allegation that Quest has not paid any rest period penalty during the class period, despite class members having "routinely experienced missed, short, and/or late rest periods." (Mot. at 8.)  Stewart argues Quest "never informed [its employees] when they were entitled to a rest period premium or how to request one." (*Id*.)  With her motion, Stewart submitted declarations from Quest employees who state they missed rest breaks but were not told they could request a rest break premium, and never received such a rest break premium.  (*See*, *e.g.*, Doc. 56-4 at 601–603, Decl. of Marisol Balderas ¶¶ 9–14; Doc. 56-4 at 605–607, Decl. of Cinderella Brewer ¶¶ 9–14; Doc. 56-4 at 609–11, Decl. of Laquita Carraway ¶¶ 9–14; Doc. 56-4 at 613–15, Decl. of Courtney Castellanos ¶¶ 9–14; *see also* Doc. 56-4 at 616–86.)

Quest contends there is ample evidence from other Quest employees that they do take their full, uninterrupted rest breaks, that Quest provides extensive training regarding rest periods, and Quest has provided PSRs with rest break premiums.  (Opp. at 24–25; *see also id*. at 11 n.18 (quoting employee declarations regarding training on rest breaks and how to request rest period premiums).)[5]  Quest also submitted a declaration from Rosa

---

[5] Stewart objects to six of the employee declarations submitted with Quest's opposition brief on the grounds that "Defendant did not disclose 6 of these 7 witnesses until its Opposition, disregarding the class discovery cutoff of August 31, 2020," in violation of Federal Rule of Civil Procedure 26(a).  (Reply at 10–11.)  The Court construes Plaintiff's objection as a motion to strike.  Pursuant to Federal Rule of Civil Procedure 37(c), the court may exclude or refuse to rely on any witness who a party fails to disclose in accordance with Rule 26(a).  *See* FED. R. CIV. P. 37(c). Stewart notes, however, that the parties previously agreed that Quest would provide Stewart "with a 15% sample of putative class

Baeza, a supervisor who oversees various PSCs.  (Doc. 68-10.)  Attached to the Baeza Declaration is a Corrective Action write up given to an employee who was reprimanded for failing to take a rest break, to make sure the employee was given a premium.  (*Id*. ¶ 8 and Ex. A.)  With her reply brief, however, Stewart attaches the declaration of Brenda Godinez, who states she is the employee mentioned in the Baeza declaration.  (Doc. 74-1.)  Godinez states she missed rest breaks as detailed in the Corrective Action report, but that she has yet to receive any premium payment for the missed rest period.  (*Id*. ¶¶ 6–11.)

The Court concludes that Stewart has identified a common issue—namely, the non-payment of rest period penalty payments—that can be jointly tried.  Whether or not Stewart will prevail on her theory of liability, she alleges a uniform policy, or lack thereof, that is consistently applied across the Rest Period Class.  On the other hand, Quest might ultimately prevail on its theory that it does inform employees about how to request rest period premiums, and that it has paid rest period premiums in accordance with California law.  This is the type of question that is "routinely and properly" found suitable for class certification.  *Brinker Restaurant Corp. v. Superior Court*, 53 Cal. 4th 1004, 1033 (Cal. 2012); *see also Tapia v. Zale Delaware Inc.*, No. 13-CV-1565-BAS (PCL), 2016 WL 1385181, at *7 (S.D. Cal. Apr. 6, 2016) (whether defendant informed its employees of their right to a meal period penalty payment, and whether such penalty payments were made, raised common issue supporting class certification); *Villalpando v. Exel Direct Inc.*, No. 12-CV-04137-JCS, 2016 WL 1598663, at *14–15 (N.D. Cal. Apr. 21, 2016) (finding

---

member contact information, which equated to 658 Class Members."  (Doc. 74-1 ¶ 4.) Although six of the witnesses who submitted a declaration in connection with Quest's opposition were not part of the disclosed 658 Class Members, the Court notes that Stewart did not move to depose or cross-examine the additional witnesses.  Therefore, the Court finds that exclusion of this testimony is not necessary, because Stewart was not significantly harmed by the inclusion of these additional employee declarations (especially in light of the parties' discovery agreements).  *See Carrillo v. B & J Andrews Enters., LLC*, 2013 WL 394207, at *8 (D. Nev. Jan. 29, 2013) ("[T]he failure to disclose, under the circumstances is not so harmful that it necessitates total preclusion.").

3:19-cv-02043-RBM-KSC

common issues where plaintiffs alleged defendant did not pay employees for missed meal periods or rest breaks).

### (ii)   Rest Period Practices

Second, Stewart alleges she and other class members "have routinely been unable to take rest periods due to chronic understaffing and over-scheduling at the PSCs." (Mot. at 7.)  Stewart alleges Quest's "strict productivity and urgency goals" impede employees' ability to take rest breaks.  (*Id*. at 21.)  Of the five PSCs at which Stewart has worked, she alleges she received regular periods at only one of them.  (*Id*. at 11.)  Abdul claims that, because she was the only PSR working at her site, "it was impossible for her to take a rest period and still meet Defendant's patient service time requirements." (*Id*.)  Quest argues Stewart "rests exclusively on the anecdotal testimony of various declarants whose stories . . . are each subject to test by individual proof."  (Opp. at 24.)  The Company also argues class treatment is inappropriate where the plaintiff's theory is that employees are too busy to take a rest break.  (*Id*.)

Quest is correct that "[c]ourts have held that certification of a rest break class is not appropriate if the thrust of the liability argument is that the class members were 'too busy' to take breaks, because the argument is not subject to common proof and requires individualized inquiry into each employee's break decisions each shift." *Zayers v. Kiewit Infrastructure W. Co.*, No. 16CV06405PSGPJW, 2017 WL 4990460, at *4 (C.D. Cal. Oct. 26, 2017) (citing *Kenny v. Supercuts, Inc.*, 252 F.R.D. 641, 646 (N.D. Cal. 2008) (The "theory – that the stores were too busy to give employees a meaningful opportunity to take breaks – requires an individual inquiry into each store, each shift, each employee.")).  Here, however, Stewart alleges that it is Quest's productivity and urgency goals—that a walk-in patient waits 20 minutes or less to be seen, and that an appointment patient waits 10 minutes or less to be seen—which prevents class members from taking their rest periods.  (Mot. at 12.)  In other words, Stewart alleges that it is impossible both for PSRs to take their required rest periods while also meeting Quest's productivity and urgency goals surrounding patient wait times.

29

Other courts have certified classes where the plaintiff argued the employer had a policy or practice which made it difficult for employees to take their allotted rest periods. In *Villalpando v. Exel Direct Inc.*, 2016 WL 1598663, at \*13–15, for example, the Northern District of California certified a meal and rest period class where plaintiff alleged the employer's policies were not compliant with California law, because the company "requires drivers to remain on duty during breaks to protect the products in the delivery vehicle, that it does not pay drivers for missed meal periods or breaks, and that it does not keep records as to employee meal periods." The Court in *Villalpando* found that plaintiffs were entitled to proceed on their meal and rest period claims because "their theory of liability is based on common policies that make it *difficult or impossible* for class members to take breaks." *Id*. at 15 (emphasis added). Similarly, in *Ruiz v. XPO Last Mile, Inc.*, No. 5CV2125 JLS (KSC), 2016 WL 4515859, at \*7 (S.D. Cal. Feb. 1, 2016), a court in this District certified a meal and rest break class where plaintiff alleged defendant "created an atmosphere that discouraged [employees] from taking breaks or made it difficult to do so." *Id*. at \*6. The Court found "a question of whether Defendant structured its business in a way that gave rise to an unofficial policy of not providing breaks or created a work environment in which it was difficult for the [employees] to take breaks." *Id*. at \*7.

Here, Stewart alleges the productivity and urgency policies applied to the whole class, and that such policies made it "difficult or impossible" for class members to take breaks without missing their patient wait time goals. *Villalpando*, 2016 WL 1598663, at \*15. Accordingly, Stewart has established the existence of a common question regarding whether Quest's productivity and urgency goals impede employees' rights under California law to take rest breaks.

**(iii)   Rest Period Policy**

Finally, Stewart alleges Quest's written rest period policy is invalid because it "is silent as to what constitutes a bona fide rest break" and does not inform employees that rest periods should be uninterrupted and duty-free, in violation of the IWC Wage Order. (Mot. at 8–9, 13–14.) Quest argues its rest break policy mirrors the language of the applicable

30

IWC Wage Order, which itself does not use the words "duty-free" or "uninterrupted." (Opp. at 23); *compare* Cal. Code Regs. tit. 8, § 11020(12) *with* Mot. at 13.  Quest also argues that "an absence of a written policy, or simply not including a few words that are not statutorily required, does not make a policy illegal."  (Opp. at 23) (citing *Dailey v. Sears, Roebuck & Co.*, 214 Cal. App. 4th 974, 1002, 154 Cal. Rptr. 3d 480, 503 (2013), *as modified* (Mar. 27, 2013) (affirming denial of class treatment of rest period claims despite company having no written rest period policy, where court found "absence of substantial evidence of a uniform policy or widespread practice requiring 'on duty' rest breaks)).

The Court agrees with Quest that even the absence of a written rest period policy does not, by itself, violate California law and the IWC Wage Orders.  Here, however, Stewart alleges that Quest's employees are deprived of uninterrupted and duty-free rest periods, and that such rest periods (or lack thereof) violate California law.  Taken together, the Court finds this aspect of Stewart's rest period claim meets the commonality requirement.  "When deciding the procedural motion of whether to certify a class, the Court focuses on whether the lawfulness of an employer's policy can be determined on a classwide basis."  *Tapia*, 2016 WL 1385181, at *8.  The Court is not weighing fact evidence, nor is the Court making any finding that omitting the words "duty-free" or "uninterrupted" from Quest's written rest period policy violates the IWC Wage Order.  Rather, the Court has found that Quest has a uniform policy applied to all class members, and that the question of the legality of that rest period policy is suitable for class treatment.

The Court finds Stewart has met her burden regarding both commonality under Rule 23(a)(2) and predominance under Rule 23(b)(3) for the Rest Period Class.  Quest argues "Plaintiff's own declaration and deposition testimony illustrate the purely individualized nature of her rest break claims."  (Opp. at 27.)  The Company further argues "determining why an employee missed a rest break would require highly individualized inquiries."  (*Id.*)  The Court rejects this analysis.  "The reason an employee missed a break bears on the amount of damages he is entitled to recover" and "do[es] not preclude certification."  *Tapia*, 2016 WL 1385181, at *10 (citing *Brinker*, 53 Cal. 4th at 1040 (Cal. 2012) and *Leyva*

31

1   *v. Medline Inds. Inc.*, 716 F.3d 510, 513 (9th Cir. 2013)).

2   ### 3. Typicality Requirement of Rule 23(a)

3   Typicality requires that "the claims or defenses of representative parties are typical

4   of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3).  Claims and defenses are

5   "'typical' if they are reasonably coextensive with those of absent class members; they need

6   not be substantially identical." *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014).

7   "Measures of typicality include 'whether other members have the same or similar injury,

8   whether the action is based on conduct . . . not unique to the named plaintiffs, and whether

9   other class members have been injured by the same course of conduct.'" *Ruiz Torres v.*

10  *Mercer Canyons Inc.*, 835 F.3d 1125, 1141 (9th Cir. 2016) (quoting *Hanon v. Dataproducts*

11  *Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)).  Typicality focuses on "whether the named

12  plaintiffs' claim and the class claims are so interrelated that the interests of the class

13  members will be fairly and adequately protected in their absence." *Dukes*, 564 U.S. at 350,

14  n.5.

15  Quest argues Stewart's claims are atypical of the Rest Period Class for two reasons.

16  First, Quest argues "Plaintiff only worked as a part-time PSR, Level 1 during her tenure

17  with Quest" and therefore had different duties and worked under different conditions that

18  PSRs in Levels 2, 3, or 4.  (Opp. at 29.)  Relatedly, Quest argues "Plaintiff admits that her

19  ability to take rest breaks varied across the five different locations she worked" which

20  makes her claims atypical of other class members.  (*Id.* at 29–30.)  The Court disagrees.

21  Stewart submitted a declaration in support of her motion, stating that, among other things:

22  (1) she has only been able to take regular rest breaks at one of the locations she has worked

23  at; (2) she did not recall any training regarding rest periods when she was hired or

24  throughout her employment (other than signing an Annual Certification, which mentions

25  rest periods); (3) she was never told she was entitled to rest period premiums; (4) Quest's

26  productivity and urgency goals prevented her from being able to take rest periods; and (5)

27  she has never received a rest period premium, despite having missed the majority of her

28  rest periods during her employment with Quest.  (*See* Doc. 56-6 ¶¶ 6–21.)  Stewart's

32

allegations regarding missed rest periods and the lack of premium payments are undoubtedly "interrelated" with class members' interests. *Dukes*, 564 U.S. at 350, n.5. The Court also finds unpersuasive Quest's argument that Stewart's claims are atypical because she worked only as a part-time PSR Level 1. All of Quest's PSRs, regardless of level and regardless of scope of duty, are entitled to lawful rest periods under California law and the applicable IWC Wage Order.

Second, Quest argues Stewart's claims are atypical because "Plaintiff's declaration and deposition testimony have put her credibility at issue." (Opp. at 28.) Specifically, Quest points to handwritten notes Stewart produced in discovery which "included estimates of how long patient draws were taking." (*Id*.) Quest alleges Stewart "wrote an original estimate and then crossed it out with a higher estimate at a later time" and that Stewart denied at her deposition having written over her own notes. (*Id*.) The Court declines to find Stewart's claims atypical on this ground. Unlike the plaintiff in *Guido v. L'Oreal, USA, Inc.*, 2012 WL 2458118, at *4 (C.D. Cal. June 25, 2012), who produced new evidence one day before the hearing on her class certification motion which disproved her prior deposition testimony, here Quest was provided with Stewart's handwritten notes in the normal course of discovery, and had ample time to cross examine Stewart about the notes at her deposition. Quest will also be able to cross examine Stewart regarding her notes at trial. Other class members have the same injury as Stewart: missed rest periods and lack of payments for missed rest periods. The Court does not find that Quest's concerns with Stewart's credibility are fatal to her claims. Accordingly, Court finds Stewart has satisfied the typicality requirement.

### 4. Superiority Requirement of Rule 23(b)(3)

Certification of a class under Rule 23(b)(3) is proper when "the questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). As discussed above in connection with the commonality requirement of Rule 23(a), Stewart's rest period claims

33

meet the predominance requirement of Rule 23(b)(3).  The Court finds the superiority requirement of Rule 23(b)(3) is also satisfied.

Rule 23(b)(3) also requires the court find "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3).  This factor "encompasses the whole range of practical problems that may render the class format inappropriate for a particular suit." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974).

Stewart contends, and the Court agrees, that class treatment is superior to an individual treatment of Stewart's claims.  The Court also finds that class resolution of the rest period claims will be manageable.  Courts in this District have found that class treatment is superior where "[m]any employees may be reluctant to file an individual lawsuit for fear of retaliation." *Schulz v. QualxServ, LLC*, No. 09-CV-17-AJB MDD, 2012 WL 1439066, at *9 (S.D. Cal. Apr. 26, 2012).  The same is true here.  Additionally, the cost of litigating individual cases, compared with each class member's amount of damages, make one class action cost effective and will avoid burdening the court with duplicative cases.  *Schulz*, 2012 WL 1439066, at *9 ; *see also Moore v. Ulta Salon, Cosmetics & Fragrance, Inc.*, 311 F.R.D. 590, 622-23 (C.D. Cal. 2015) ("Where recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis, this factor weighs in favor of class certification.") (citation omitted); *Millan v. Cascade Water Servs., Inc.*, 310 F.R.D. 593, 606 (E.D. Cal. 2015) (superiority element met in overtime and meal break claims when employees would likely recover an average of $7,000, which would not motivate them to file separate action).

\* \* \*

As detailed above, Plaintiff's motion for class certification is granted in part and denied in part.

## V.    MOTION TO STRIKE PAGA ALLEGATIONS

On June 11, 2021, following the parties' completion of class certification briefing, Quest filed its PAGA Motion, asking the Court to strike Plaintiffs' representative PAGA

allegations pursuant to Federal Rule of Civil Procedure 12(f).  (Doc. 86.)  In its PAGA Motion, Quest argues the Court should strike Plaintiffs' PAGA claims because "the individualized inquiries and fact-intensive analysis required to assess Plaintiffs' claims will render any trial unmanageable as a PAGA representative trial."  (*Id*. at 3.)

Quest argues this Court has "power and discretion to strike PAGA claims as unmanageable where individualized, fact-specific inquiries are required to establish liability."  (Doc. 86-1 at 2; *see also id*. ("[T]he Court should exercise its power to strike Plaintiff's PAGA claims as unmanageable."); *see also id*. at 11 ("Within this [Court's] inherent power is the authority to strike PAGA representative claims under Rule 12(f) if those claims are unmanageable.").)  Quest relies on various federal district courts and California state courts which previously held it is permissible for a court to dismiss or strike a PAGA action on manageability grounds.  *See, e.g.*, *Salazar v. McDonald's Corp.*, Case No. 14-cv-02096-RS, 2017 WL 88999 (N.D. Cal. Jan. 5, 2017); *Ortiz v. CVS Caremark Corp.*, No. C–12–05859 EDL, 2014 WL 1117614 (N.D. Cal. Mar. 19, 2014); *Wesson v. Staples the Off. Superstore, LLC*, 68 Cal. App. 5th 746 (Cal. Ct. App. 2021).

Plaintiffs oppose Quest's PAGA Motion, arguing "manageability is not required under PAGA."  (Doc. 103 at 6) (emphasis omitted).  In support of their opposition, Plaintiffs cite other district courts which have declined to impose a manageability requirement when assessing PAGA claims.  *See, e.g.*, *Zackaria v. Wal-Mart Stores, Inc.*, 142 F. Supp. 3d 949, 956–58 (C.D. Cal. 2015); *Estrada v. Royalty Carpet Mills, Inc.*, 76 Cal. App. 5th 685 (Cal. Ct. App. 2022).  Plaintiffs further argue that, even if this Court did impose a manageability requirement, Plaintiffs' representative claims are manageable, and the PAGA Motion should be denied.  (*See* Doc. 103 at 14–20.)  Much of the parties' briefing recounts the arguments asserted in support of and against Stewart's motion for class certification.

The parties finished briefing Quest's PAGA Motion in January 2022.[6]  Five months later, on June 30, 2022, the Ninth Circuit issued its decision in *Hamilton v. Wal-Mart Stores, Inc.*, 39 F.4th 575, 580 (9th Cir. 2022).  In *Hamilton*, the Ninth Circuit considered the "split among both district courts and California courts regarding whether it is permissible for a court to dismiss a PAGA action on similar 'manageability' grounds" and held that "application of the Rule 23(b)(3) manageability requirement in PAGA cases would be 'inconsistent with PAGA's purpose and statutory scheme'."  *Id.* at 590 (quoting *Zackaria*, 142 F. Supp. 3d at 958).  The Ninth Circuit found "[t]he [manageability] requirement cannot be imposed in PAGA actions under the guise of a court's inherent powers" in part due to the "structural differences" between Rule 23(b)(3) class actions and PAGA actions.  *Id.* at 589–90.

*Hamilton* is directly on point and controls the Court's ruling here.  Quest's PAGA Motion is accordingly denied.

## VI.  CONCLUSION

For the reasons discussed above:

1.  Quest's request for judicial notice (Doc. 65) is **GRANTED**.

2.  Quest's motion to strike the expert declarations of David Neumark and Jon Krosnick (Doc. 66) is **DENIED**.

3.  Plaintiff's motion for class certification (Doc. 56) is **GRANTED IN PART AND DENIED IN PART**.  The Court hereby **CERTIFIES** the following class:

    All of Defendant's non-exempt California Patient Service Representatives who were not compensated with one hour of pay for all instances where they did not receive a duty-free and uninterrupted 10 minute rest period consistent with California law, any time between September 13, 2015, and the date of judgment.

---

[6] After Quest filed its amended reply in support of its PAGA Motion, Plaintiffs filed—and this Court granted—a motion for leave to file notice of supplemental authority.  (*See* Docs. 125, 129.)  Plaintiffs' supplemental authority concerned the California Court of Appeal's decision in *Estrada v. Royalty Carpet Mills, Inc.*, 76 Cal. App. 5th 685 (Cal. Ct. App. 2022).

The Court further **APPOINTS** Plaintiff Pamela Stewart as class representative and GrahamHollis APC as class counsel.

4. Quest's motion to strike Plaintiffs' PAGA allegations (Doc. 86) is **DENIED**.

   **IT IS SO ORDERED**.

DATE:  October 5, 2022

_____

HON. RUTH BERMUDEZ MONTENEGRO
UNITED STATES DISTRICT JUDGE

3:19-cv-02043-RBM-KSC